**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CR 181 |
| | ) | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS | ) | |
| AL-JAYAB, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT AWS MOHAMMED YOUNIS AL-JAYAB'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS
EVIDENCE OBTAINED OR DERIVED FROM WARRANTLESS
<u>SURVEILLANCE UNDER SECTION 702 OF THE FISA AMENDMENTS ACT</u>**

**THOMAS ANTHONY DURKIN
ROBIN V. WATERS
DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
Fax: 312-913-9235
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

**JOSHUA G. HERMAN
LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND ..........................................................................................................6

III.    THE HISTORY AND PROVISIONS OF SECTION 702 OF THE FAA .....................11

    A.    The Foreign Intelligence Surveillance Act.............................................................11

    B.    The Warrantless Wiretapping Program...................................................................12

    C.    Section 702 [The FISA Amendments Act (FAA)]...................................................12

    D.    Types of Section 702 Surveillance.........................................................................17

        1.   PRISM Collection.............................................................................................18

        2.   Upstream Collection .........................................................................................19

    E.    Acquisition of U.S. Persons' Communications Under Section 702 ........................20

    F.    "Backdoor Searches" ............................................................................................22

    G.    Courts Must Rely on Intelligence Agencies' Often  Inaccurate Representations............23

IV.     THE FOURTH AMENDMENT PROTECTIONS APPLY TO AL-JAYAB .................24

V.      SECTION 702 IS UNCONSTITUTIONAL AND REQUIRES SUPPRESSION
       OF ALL EVIDENCE THAT WAS DERIVED AS A RESULT ...................................27

    A.    Section 702 is Unconstitutional *Per Se* because it Violates the
        Fourth Amendment's Warrant Clause by Authorizing Surveillance
        and Interception of Communications without a Warrant ........................................31

    B.    Section 702 is Unconstitutional *Per Se* Because it Permits
        Surveillance and Interception without Probable Cause ..........................................35

    C.    Section 702 is Unconstitutional *Per Se* Because it Permits Generalized
        and Programmatic Acquisition, Retention and Accessing of Electronic
        Communications of U.S. Persons without Requiring Particularity and
        Specification Required by the Fourth Amendment's Warrant Requirement
        of the Places to be Searched and the Items to be Seized ........................................37

    D.    Section 702 is Unconstitutional *Per Se* Because it Violates
        the Fourth Amendment's Requirement of Reasonableness ....................................39

    E.    Section 702 is *Per Se* Unconstitutional because it Includes the Participation
        of the Foreign Intelligence Surveillance Court (FISC) in the Construction of its
        Surveillance Programs, thereby Blurring the Role of the Neutral and Detached
        Magistrate as Required by the Fourth Amendment ...............................................41

    F.    The Ninth Circuit's Opinion in *United States v. Mohamud*
        Did Not Persuasively Address the Constitutionality of Section 702, and
        Does Not Preclude Defendant's Arguments. .........................................................44

VI.     THE SECTION 702 SURVEILLANCE MAY HAVE VIOLATED
       THE STATUTE AND SHOULD BE SUPPRESSED ...............................................46

VII.    AT A MINIMUM, A WARRANT IS REQUIRED WHEN INTELLIGENCE AGENCIES
       SEEK TO ACCESS OR USE THE  PROTECTED COMMUNICATIONS OF AMERICANS .....................48

VIII.   CONCLUSION...........................................................................................................52

i

# TABLE OF AUTHORITIES

## Cases

*[Docket No. Redacted]*, (FISA Ct. Nov. 6, 2015).................................................................passim

*[Docket No. Redacted]*, 2011 WL 10945618 (FISA Ct. Oct. 3, 2011)................................passim

*ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006)....................................................12

*Arizona v. Hicks*, 480 U.S. 321 (1987)..............................................................................36

*Berger v. New York*, 388 U.S. 41 (1967)......................................................................passim

*Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006)..........................................................39

*Brinegar v. United States*, 338 U.S. 160 (1949).................................................................36

*Chafin v. Chafin*, 133 S.Ct. 1017 (2013)...........................................................................42

*City of Ontario v. Quon*, 560 U.S. 746 (2010)....................................................................30

*Continental Bank Corp.*, 449 U.S. 472 (1990)....................................................................42

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971)...............................................................29

*Gates v. Illinois*, 462 U.S. 213 (1983)...............................................................................35

*Georgia v. Randolph*, 547 U.S. 103 (2006).........................................................................29

*Groh v. Ramirez*, 540 U.S. 551 (2004)...............................................................................27

*Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983 (9th Cir. 2012)..............................25, 26

*In re Application of the FBI*, No. BR 14-01 (FISC Feb. 4, 2014)........................................52

*In re Directives Pursuant to Section 105B of Foreign Intelligence
   Surveillance Act ("In re Directives")*, 551 F.3d 1004 (Foreign Int. Surv. Ct. Rev. 2008)...........33, 34, 51

*In re Grand Jury Subpoena (Kitzhaber)*, 828 F.3d 1083 (9th Cir. 2016) ...........................46

*In Re Production of Tangible Things* No. BR 08-13 (FISA Ct. Mar. 2, 2009).......................23

*In re Sealed Case*, 310 F.3d 717, 737 (Foreign Int. Surv. Ct. Rev. 2002)......................39, 40

*ison v. Balinski*, 625 F.3d 953 (6th Cir. 2010)...................................................................31

*Johnson v. United States*, 333 U.S. 10 (1948).....................................................................42

*Katz v. United States*, 389 U.S. 347 (1967)........................................................................27

*Kyllo v. United States*, 533 U.S. 27 (2001).........................................................................36

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979) ...........................................................42

*Marron v. United States*, 275 U.S. 192 (1927)....................................................................37

*Maryland v. Garrison*, 480 U.S. 79 (1987).....................................................................37, 38

*McDonald v. United States*, 335 U.S. 451 (1948).................................................................42

*Nardone v. United States*, 308 U.S. 338 (1939).....................................................................6

*Rodriguez v. United States*, 135 S. Ct. 1609 (2015) ...........................................................50

*Samson v. California*, 547 U.S. 843 (2006).........................................................................39

*Segura v. United States*, 468 U.S. 796 (1984).......................................................................6

*Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989) ....................................30

*Steagald v United States*, 451 U.S. 204 (1981)................................................................42

*Steagald v. United States*, 451 U.S. 204 (1981)...............................................................31

*Tennessee v. Garner*, 471 U.S. 1 (1985).........................................................................50

*Terry v. Ohio*, 392 U.S. 1 (1968)....................................................................................48

*United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980)...................................................38

*United States v. Alderman*, 394 U.S. 165 (1969)............................................................30

*United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000)............................34, 45

*United States v. Bobo*, 477 F.2d 974 (4th Cir. 1973)......................................................50

*United States v. Cafero*, 473 F.2d 489 (3d Cir. 1973)....................................................40

*United States v. Calandra*, 414 U.S. 338 (1974)............................................................27

*United States v. Donovan*, 429 U.S. 413 (1977)..............................................................45

*United States v. Duka*, 671 F.3d 329 (3d Cir. 2011).......................................................40

*United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976).........................................34

*United States v. Hasbajrami*, No. 11-CR-623 (JG), 2016 WL 1029500 (E.D.N.Y. Mar. 8, 2016) ...........18

*United States v. Kahn*, 415 U.S. 143 (1974)..............................................................33, 45

*United States v. Katz*, 389 U.S. 347 (1967)....................................................................30

*United States v. Khan*, No. 12-cr-00659 (D. Or.) .............................................................6

*United States v. Leon*, 468 U.S. 897 (1984)...................................................................27

*United States v. Logan*, 250 F.3d 350 (6th Cir. 2001).....................................................37

*United States v. Martin*, 599 F.2d 880 (9th Cir. 1979)....................................................45

*United States v. McMillian*, 786 F.3d 630 (7th Cir. 2015)..............................................38

*United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982)......................................43

*United States v. Mihalik*, No. 11-cr-0833 (S.D. Cal.) .......................................................6

*United States v. Mohammad*, No 15-cr-00358 (N.D. Ohio) ..............................................6

*United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016) .........................................44, 46

*United States v. Mohamud*, No. 10-cr-00475 (D. Or.).......................................................6

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) ......................................39

*United States v. Muhtorov*, No. 12-cr-00033 (D. Colo.)...............................................6, 43

*United States v. Pelton*, 835 F.2d 1067 (4th Cir. 1987)..................................................50

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) ................................................30

*United States v. Ramsey*, 503 F.2d 524 (7th Cir. 1974)..................................................49

*United States v. Sklaroff*, 506 F.2d 837 (5th Cir. 1975).................................................49

*United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)..................................................38

*United States v. Tortorello*, 480 F.2d 764 (2d Cir. 1973)...............................................49

*United States v. Tortorello*, 480 F.2d 764 (2d Cir. 1973)...............................................40

*United States v. Truong*, 629 F.2d 908 (4th Cir. 1980)...................................................34

*United States v. Turner*, 528 F.2d 143 (9th Cir. 1975)...................................................50

*United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"), 407 U.S. 297 (1972)...........................passim

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).............................................................................24, 25, 27

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ............................................................................30, 32, 46

*United States v. Zazi*, No. 09-cr-00673 (E.D.N.Y.) ......................................................................................................6

## Statutes

18 U.S.C. § 2339A..................................................................................................................................................2

18 U.S.C. § 2518(1)(b) .....................................................................................................................................16, 17

18 U.S.C. § 2518(3)(a), (b) ...................................................................................................................................16

18 U.S.C. § 2518(7).................................................................................................................................................52

18 U.S.C. § 1001 ..........................................................................................................................................1, 2, 8

18 U.S.C. § 2331 .....................................................................................................................................................1

18 U.S.C. § 956 .......................................................................................................................................................2

50 U.S.C. § 1801 .................................................................................................................................................50

50 U.S.C. § 1801(e).............................................................................................................................................14

50 U.S.C. § 1801(h)..................................................................................................................................15, 41, 52

50 U.S.C. § 1801(i)..............................................................................................................................................24

50 U.S.C. § 1801(k)...............................................................................................................................................3

50 U.S.C. § 1804(a) ............................................................................................................................................11

50 U.S.C. § 1805(a)(2)(A) ..................................................................................................................................11

50 U.S.C. § 1805(c)(1)(A) ..................................................................................................................................16

50 U.S.C. § 1805(c)(1)(C) ..................................................................................................................................17

50 U.S.C. § 1805(d)(3) ........................................................................................................................................41

50 U.S.C. § 1806(e)(1) .............................................................................................................................3, 27, 52

50 U.S.C. § 1806(g)..............................................................................................................................................6

50 U.S.C. § 1821(4)(A) .......................................................................................................................................15

50 U.S.C. § 1881a [Section 702] .................................................................................................................*passim*

50 U.S.C. § 1881a(a) ...........................................................................................................................13, 36, 43, 48

50 U.S.C. § 1881a(b).....................................................................................................................................25, 47

50 U.S.C. § 1881a(g).............................................................................................................................14, 35, 38, 47

50 U.S.C. § 1881a(h)...........................................................................................................................................17

50 U.S.C. § 1881a(e)...........................................................................................................................................16

50 U.S.C. § 1881e(a)...........................................................................................................................................2, 3

50 U.S.C. §§ 1821-29 ...........................................................................................................................................3

50 U.S.C. § 1825(d)..............................................................................................................................................2

FAA Sunsets Extension Act of 2012, S. 3276, 112th Cong. (2012)...............................................................17

Foreign Intelligence Surveillance Act of 1978 (FISA) .................................................................................3, 11

H.R. 4870, 113th Cong. § 8127 (2014) ...........................................................................53

Protect America Act, Pub. L. No. 110-55, 121 Stat. 552 (2007) ....................................12

S.A. 3979, 110th Cong. (2008), 154 Cong. Rec. S607–08 (daily ed. Feb. 4, 2008)........53

## Other Authorities

"Wyden, Udall on Revelations that Intelligence Agencies Have Exploited
    Foreign Intelligence Surveillance Act 'Loophole,'" *Ron Wyden, Senator for Oregon*..........23

2015 NSA Minimization Procedures § 3(b)(5)..................................................................51

Adam Liptak, *A Secret Surveillance Program Proves Challengeable in
    Theory Only*, N.Y. TIMES, Jul. 15, 2013 ......................................................................6

Ashley Gorski and Patrick Toomey, *Unprecedented and Unlawful:
    The NSA's "Upstream" Surveillance*, ACLU, Sept. 23, 2016......................................5

Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. TIMES, Oct. 16, 2013 ............6

Charlie Savage, *NSA Said to Search Content of Messages to and From U.S.*,
    N.Y. TIMES, Aug. 8, 2013............................................................................................19

Charlie Savage, *Warrantless Surveillance in Terror Case Raises Constitutional
    Challenge*, N.Y.TIMES, April 26, 2016 ........................................................................6

*Code Word: Baking Bread*, Der Bund, Dec. 30, 2014 .....................................................10

David Kris, *Trends and Predictions in Foreign Intelligence Surveillance*,
    8 J. Nat'l Security L. & Pol'y 18 n.64 (2016)..............................................................48

Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*,
    THE WASH. POST, (Sept. 7, 2013)..............................................................................51

FBI 2015 Minimization Procedures............................................................................22, 41

James Ball & Spencer Ackerman, *NSA Loophole Allows Warrantless Search for
    US Citizens' Emails and Phone Calls*, THE GUARDIAN, Aug. 9, 2013.........................22

John Revill, *Swiss Court Jails Three Iraqis Over Terror Attacks Plot*,
    Wall Street Journal, Mar. 18, 2016............................................................................10

Laura K. Donahue, *NSA's Surveillance May Be Legal – But It's Unconstitutional*,
    THE WASH. POST, June 21, 2013 ...............................................................................5

Laura K. Donohue, *Section 702 and the Collection of International
    Telephone and Internet Content*, 38 HARV. J.L. & PUB. POL'Y 117, 123 (2015) ........4

Norman Abrams, *Anti-Terrorism and Criminal Enforcement*, 160-199 (4th ed. 2012) .........12

Patrick C. Toomey, *Why Aren't Defendant's Getting Notice of Section
    702 Surveillance – Again?*, JUST SECURITY, September 11, 2015.................................6

President's Review Group on Intelligence and Communications Technologies,
    *Liberty and Security in a Changing World* 28–29, 145–50 (2013)...............................52

Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated
    Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, July 2, 2014.................passim

Public Declaration of James R. Clapper, Director of National Intelligence
    ("DNI")........................................................................................................................12

Rainey Reitman, *In Hearing on Internet Surveillance, Nobody Knows How
    Many Americans Impacted in Data Collection*, May 10, 2016......................................17

Stephen Vladeck, *Forget the Patriot Act – Here are the Privacy Violations You Should be Worried About*, FOREIGN POLICY, June 1, 2015 ........................................................ 5

*Strengthening FISA: Does the Protect America Act Protect Americans' Civil Liberties and Enhance Security?: Hearing Before the H. Comm. on the Judiciary*, 110th Cong. (2007) ............................ 12

Testimony of Jameel Jaffer, former ACLU Deputy Legal Director, PCLOB Public Hearing on Section 702 at 21–24 (Mar. 19, 2014) ........................................................ 48

Walter F. Mondale, Robert A. Stein, and Caitlinrose Fisher, *No Longer a Neutral Magistrate: The Foreign Intelligence Surveillance Court in the Wake of the War on Terror*, 100 MINN. L. REV. 2251, 2267 (June 2016) ........................................................ 15

William C. Banks, *Programmatic Surveillance and Fisa: Of Needles in Haystacks*, 88 Tex. L. Rev. 1633 (2010) (same) ........................................................ 5

## Rules

F.R.C.P. Rule 12(b)(3)(c) ........................................................ 3

## Treatises

David Kris & J. Douglas Wilson, *National Security Investigations and Prosecutions* ........................................................ 47

## I.       INTRODUCTION

Defendant Aws Mohammed Younis Al-Jayab was born on November, 15, 1992 in Iraq and grew up in the Al-Baladiyat neighborhood of Baghdad.   Defendant was 10 years old when American forces invaded Iraq and toppled Saddam Hussein and his Ba'athist regime, leading to years of bloody sectarian violence at the hands of Shia Muslims, which took a horrific toll on Defendant's family who were Sunni Muslims.  Defendant's family began fleeing Iraq in 2010, and in March of 2012, Defendant emigrated from Iraq to Syria to escape the sectarian violence. Defendant's stay in Syria was brief, and by October of 2012, Defendant emigrated with his father and family from Syria to the United States as a refugee.

When Defendant arrived in the United States, he lived for a few weeks with an uncle in Tucson, Arizona, and then moved to Milwaukee, Wisconsin to live with another uncle.   Counsel believe that the government will argue that on or about November 9, 2013, Defendant returned to Syria, by way of Turkey, and then returned to the United States from Syria on January 23, 2014. Defendant has consistently resided in the United States since his return from that overseas travel. When he returned to the United States in 2014, he traveled to Sacramento, California to reside with his father.  While living in Sacramento, Defendant enrolled in American River College, a community college located in Sacramento.  In addition to studying at American River, Defendant worked a job as a security officer at a Ramada Hotel in Sacramento.

On January 6, 2016, a Criminal Complaint was filed in the Eastern District of California charging Defendant with violating 18 U.S.C. § 1001, for allegedly "[p]roviding materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of an agency of the United States, an offense involving international terrorism in 18 U.S.C. § 2331."

(E.D. Cal., 16-MJ-1).   On January 14, 2016, a one-count indictment was returned, specifically charging a violation of 18 U.S.C. § 1001(a)(2).  (E.D. Cal., 16-CR-0008).

On March 17, 2016, Defendant was charged in this district in a one-count indictment alleging an attempt to provide material support to terrorists in violation of 18 U.S.C. § 2339A.  The indictment alleges that, between no later than October 2012 until January 23, 2014, Defendant: "attempted to provide material support and resources, namely personnel (including himself), knowing and intending that they were to be used in the preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1)."  (Dkt. #1).   Section 956, in turn, is a conspiracy to "kill, kidnap, maim, or injure persons or damage property in a foreign country." That statute provides as follows:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

18 U.S.C. § 956(a)(1).

On April 8, 2016, the prosecution, pursuant to 50 U.S.C. §§ 1825(d)[1] and 1881e(a),[2] provided formal notice to Defendant and the Court that it "intends to offer into evidence, or

---

[1] Section 1825(d) provides as follows:

> (d) Notification by United States Whenever the United States intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from a physical search pursuant to the authority of this subchapter, the United States shall, prior to the trial, hearing, or the other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the United States intends to so disclose or so use such information.

[2] Section 1881e(a) provides as follows:

otherwise use or disclose in any proceedings in this matter, information obtained or derived from physical searches and acquisitions acquired pursuant to the Foreign Intelligence Surveillance Act of 1978 (FISA), as amended, 50 U.S.C. §§ 1821-29 and 1881a." (Dkt. #14). Section 1881e(a) is the notice provision for Section 702 of the FISA Amendments Act (FAA) (50 U.S.C. §1881a).

The prosecution's notice establishes that Defendant is an "aggrieved person" within the plain meaning of FISA and Section 702. *See* 50 U.S.C. § 1801(k) ("'Aggrieved person' means a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance."). As an "aggrieved person," Defendant "may move to suppress the evidence obtained or derived from such surveillance on the grounds that the information was unlawfully acquired." 50 U.S.C. § 1806(e)(1).

As this Court is well aware, in the typical federal criminal case, the prosecution is required to provide the bases for its surveillance and searches so that defense counsel can then file appropriate suppression motions pursuant to F.R.C.P. Rule 12(b)(3)(c) so as to obtain a judicial determination as to the admissibility of the evidence and fruits derived from the surveillance and searches. However, the specter of national security concerns triggered by FISA and the FAA has significantly changed the game and its rules.

Discovery tendered by the prosecution thus far has revealed voluminous emails, electronic communications and other online activity involving Defendant and numerous other individuals.[3]

---

(a)    Information acquired under section 1881a

Information acquired from an acquisition conducted under section 1881a of this title shall be deemed to be information acquired from an electronic surveillance pursuant to subchapter I for purposes of section 1806 of this title, except for the purposes of subsection (j) of such section.

[3] In terms of unclassified discovery, the prosecutors have produced mirror copies of multiple computers containing various file formats, hours of recorded conversations, and discs containing material that counsel conservatively estimate to total over a Terabyte of data.

These electronic communications include emails from several email accounts from U.S.-based services such as Facebook, Gmail, and Yahoo as well as other online services such as Google and Skype that are visited by millions of people on a daily basis. Yet, it is unclear when the government's use of Section 702 and FISA surveillance began as such details have not been disclosed to the defense. Discovery indicates that the earliest of such communications appears to have begun in 2012, suggesting an early implementation of that surveillance, but there is no indication how these communications were obtained. Nor is the defense aware of the "target(s)" of the Section 702 surveillance used in this case, which is a significant issue given Defendant's numerous electronic communications with individuals allegedly located overseas, specifically in Syria and Iraq, and also the fact that Defendant himself was allegedly overseas.

The extraordinarily voluminous emails, online activity and other electronic information that the intelligence agencies presumably collected in this case pursuant to Section 702 should be suppressed because the surveillance and collection of electronic information cannot withstand constitutional scrutiny. 50 U.S.C. § 1881a, which is also known as Section 702, was enacted in 2008 as part of the FAA. Section 702, and the notoriety surrounding it in light of the disclosures of Edward Snowden, has been viewed by many legal commentators, academics, and other scholars as an unprecedented violation of the privacy rights of Americans and others abroad who are affected by its ubiquitous surveillance but who receive none of the protections that the Fourth Amendment requires.[4]

---

[4] *See* Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 HARV. J.L. & PUB. POL'Y 117, 123 (2015) (providing an extensive overview of Section 702 and arguing for reforms in order to ensure that the law is consistent with the Fourth Amendment's protection of privacy of U.S. citizens); William C. Banks, *Programmatic Surveillance and Fisa: Of Needles in Haystacks*, 88 Tex. L. Rev. 1633 (2010) (same); Laura K. Donahue, *NSA's Surveillance May Be Legal – But It's Unconstitutional*, THE WASHINGTON POST, June 21, 2013, https://www.washingtonpost.com/opinions/nsa-surveillance-may-be-legal--but-its-unconstitutional/2013/06/21/; Stephen Vladeck, *Forget the Patriot Act – Here are the Privacy Violations*

Counsel would formally join in these opinions and respectfully submit, as set forth in the motion to suppress, that Section 702 violates the Fourth Amendment and is therefore unconstitutional because it:

- fails to require a warrant, of any kind, in order for electronic surveillance to commence;

- fails to require probable cause, or any level of suspicion, before the intelligence agencies can search, seize, retain, and later access those communications;

- fails to require particularity regarding the individual targeted by—or the facility to be accessed during—the electronic surveillance; and,

- fails to require individualized judicial review by a neutral and detached magistrate, instead limiting the FISA Court's role to reviewing only the government's general procedures once a year and limiting its power to supervise the surveillance and remedy non-compliance by the intelligence agencies.

Consequently, and for the reasons that follow, we respectfully submit that the fruits of all warrantless Section 702 surveillance must be suppressed in this case and thus precluded from being introduced against Defendant at trial. This request includes, *inter alia*, the following categories of evidence and information:

- all evidence and information derived as a result of warrantless Section 702 surveillance;

- all evidence and information obtained or derived from FISA collection that was itself also derived from other collection pursuant to FAA;

- Defendant's custodial statements; and,

---

*you Should be Worried About*, FOREIGN POLICY, June 1, 2015, http://foreignpolicy.com/2015/06/01/section-215-patriot-act-expires-surveillance-continues-fisa-court-metadata/; Ashley Gorski and Patrick Toomey, *Unprecedented and Unlawful: The NSA's "Upstream" Surveillance*, ACLU, Sept. 23, 2016, https://www.aclu.org/blog/speak-freely/unprecedented-and-unlawful-nsas-upstream-surveillance.

5

- any other evidence or information that the Government could not have obtained in this case through an independent source, *see Nardone v. United States*, 308 U.S. 338, 341 (1939).

As such, and for the reasons that follow, we respectfully submit that suppression is warranted under the Fourth Amendment as fruit of the poisonous tree. *See Segura v. United States*, 468 U.S. 796, 804 (1984); *see also* 50 U.S.C. § 1806(g) ("If the United States district court … determines that the surveillance was not lawfully authorized or conducted, it shall, in accordance with the requirements of law, suppress the evidence which was unlawfully obtained or derived from electronic surveillance . . .").

## II.     BACKGROUND

This is one of the rare cases in which the government has provided notice that it relied on Section 702 surveillance as part of its investigation.[5]  Counsel are aware of no other case in this district where such notice has been provided.  And the Seventh Circuit has not ruled on the constitutionality of the statute or considered—at least in any public opinion—the use of Section

---

[5] Counsel are aware of the following cases in which defendants have received formal notice from the government that evidence obtained through Section 702 will be used in their case: *United States v. Mohammad*, No 15-cr-00358 (N.D. Ohio); *United States v. Muhtorov*, No. 12-cr-00033 (D. Colo.); *United States v. Mohamud*, No. 10-cr-00475 (D. Or.); *United States v. Hasbajrami*, No. 11-cr-00623 (E.D.N.Y.); *United States v. Khan*, No. 12-cr-00659 (D. Or.); *United States v. Mihalik*, No. 11-cr-0833 (S.D. Cal.); *United States v. Zazi*, No. 09-cr-00673 (E.D.N.Y.).  *See* Charlie Savage, *Warrantless Surveillance in Terror Case Raises Constitutional Challenge*, N.Y.TIMES, April 26, 2016, https://www.nytimes.com/2016/04/27/us/warrantless-surveillance-in-terror-case-raises-constitutional-challenge.html.  Defendants did not receive notice of §702 surveillance until after it became evident that the Department of Justice had falsely advised the Supreme Court that it was providing such notice of §702, when in reality it was not doing so.  *See* Patrick C. Toomey, *Why Aren't Defendant's Getting Notice of Section 702 Surveillance – Again?*, JUST SECURITY, September 11, 2015, https://www.justsecurity.org/28256/arent-criminal-defendants-notice-section-702-surveillance-again; Adam Liptak, *A Secret Surveillance Program Proves Challengeable in Theory Only*, N.Y. TIMES, Jul. 15, 2013, http://www.nytimes.com/2013/07/16/us/double-secret-surveillance.html?pagewanted=all.  Charlie Savage, *Door May Open for Challenge to Secret Wiretaps*, N.Y. TIMES, Oct. 16, 2013, http://www.nytimes.com/2013/10/17/us/politics/us-legal-shift-may-open-door-for-challenge-to-secret-wiretaps.html ("But it turned out that Mr. Verrilli's assurances clashed with the practices of national security prosecutors, who had not been alerting such defendants that evidence in their cases had stemmed from wiretapping their conversations without a warrant.")

702 in any case.  The Court is thus presented with a unique opportunity to evaluate the statute in light of the constitutional concerns that are plainly at stake.

While the prosecution has provided notice that it intends to use information obtained or derived from Section 702-authorized searches and acquisitions, it has provided no other details regarding what that information actually is.  Unlike the other few cases in which Section 702 notice has been provided, we do not know *which* Section 702 program was used to acquire Defendant's communications (*i.e.*, Upstream surveillance or PRISM, which are discussed in more detail below).  Nor do we know what the "searches and acquisitions" consisted of, specifically when they occurred, how they were executed, or what exactly was searched.  The prosecutors do not specify what it means by "obtained or derived" as stated in the Section 702 notice.  Nor have the prosecutors disclosed who was the "target" of the Section 702 surveillance—including whether Defendant himself was targeted while overseas. And, of course, the government has not provided any applications or other submissions through which it obtained approval under Section 702. Thus, the defense stands at a significant disadvantage and is precluded from offering arguments tailored to particular evidence, as we would be able to do if this was a motion seeking suppression of evidence obtained from a search warrant issued by a federal magistrate judge or a TIII wiretap order.

At this stage, the defense offers publically available information regarding the intelligence agencies' investigation as context for the Court's consideration, and in advance of what counsel presume will be a largely *ex parte* and under seal prosecution response.  The indictment in this case is threadbare and does little more than track the language of the charged statute.  It offers no details regarding the government's factual allegations.  In contrast, an FBI special agent submitted a detailed Affidavit in support of a Criminal Complaint charging Defendant with violating of 18

7

U.S.C. § 1001 in Sacramento. (Case No. 16-CR-0008). This Criminal Complaint, attached hereto as Exhibit A, details numerous electronic communications allegedly between Defendant and sixteen other individuals from October 2012 through January 23, 2014—the precise dates charged in our indictment and well over one year before his departure for Turkey in late 2013.

Many of these communications are between Defendant, located in the United States, and other individuals who were allegedly located overseas—most notably in Syria, Iraq, and Turkey. Judging by the context of these excerpted electronic communications set forth in the Affidavit in support of the Criminal Complaint, some of these individuals appear to have experienced armed conflict in Syria. There are even references to combat injuries and fatalities. *See*, *e.g.*, Complaint Affidavit, ¶10(e) (describing January 20, 2013, communication with Individual D, who was purportedly located in Syria at the time and described how he had been shot twice in the hand and side); ¶10(o) (describing April 16, 2013 communication with Individual J, located in Syria, who described killing 10 members of Syrian militia with an IED). The Affidavit also describes electronic communications in February 2013 between Defendant and an individual in Syria who said he would wire funds from Damascus to Defendant, who at the time was located in Arizona, and confirmed that he received the Western Union funds transfer. (Complaint Aff., ¶10(g), (h)). A number of these communications also make specific reference to opposition groups such as Ansar al-Islam (Complaint Aff., ¶10(b)); the "Front," which the government says is reference to Al Nusrah Front (Complaint Aff., ¶10(r)); and Jabhat al-Nusrah (Complaint Aff., ¶10(j), (k), (p)).

The Affidavit also sets forth communications from between November 2013 and January 2014, when Defendant was allegedly in Turkey and then Syria. Indeed, the FBI agent states in her Affidavit that she has reviewed the "electronic communications records of Internet Protocol (IP) addresses that Defendant utilized to connect to the internet to access social media and email

accounts during his travel to Syria. Analysis of those IP addresses and other information establishes that Al-Jayab accessed the internet in the time period at issue through a satellite that covered both eastern Turkey and areas of northern Syria." (Complaint Aff., ¶11(e)). The Affidavit then describes a number of communications involving Defendant with others who were purportedly located in Cyprus, Iraq, Indonesia, and Syria.

According to the Affidavit, these electronic communications ostensibly indicated to the agent that the device or system that Defendant was using disclosed his location in Aleppo and later in Al-Hasakah. (Complaint Aff., ¶11(i), (j)). The communications also show Defendant openly discussing joining different militia groups such as Ansar al-Sham, and describing chaotic infighting amongst different militia groups, such between as the "State" (presumably, according to the affiant, ISIS) and Jabhat al-Nusrah. (Complaint Aff., ¶11(n)). Based on the review of discovery, a number of Defendant's electronic communications during this time period were also with individuals located in the United States. For example, Defendant was in Facebook and Skype communication with his family in both Sacramento and Milwaukee.

Not long after Defendant returned to the United States in January 23, 2014, discovery indicates that he was subjected to intense surveillance, both physical and electronic. Again, we do not know if this surveillance was done pursuant to Section 702. However, we presume that Defendant himself was not targeted by Section 702 surveillance while in the United States. Although, it is possible that Defendant's communications with individuals overseas could have been obtained pursuant to Section 702 surveillance. It is also noteworthy that the government waited close to two years to arrest Defendant on the false statement charge in California on January 6, 2016. By all appearances, this delay suggests that the government treated Defendant as an

intelligence asset and used him to try and acquire information regarding others, domestically and overseas.

We provide this background to contextualize the arguments against Section 702 set forth in greater detail below. Defendant's communications with individuals located overseas (and perhaps even communications "about" those individuals) that occurred while Defendant was on U.S. soil are the types of communications that could have been collected, retained, and used without a warrant under Section 702. Further, Defendant himself could have been targeted under Section 702 while he was overseas, depending on whether the intelligence agencies treated him as a U.S. person while he was abroad.

Additionally, we know that Defendant has been referenced in a Swiss terrorism case, including in the indictment brought against three individuals who were allegedly part of a Syrian insurgent group along with Defendant in 2012. A search warrant filed in the Eastern District of Virginia for one of the Swiss defendant's Facebook accounts states that the FBI worked with Swiss law enforcement as part of the investigation. (AL-JAYAB_422620).[6] Other media reports indicate that certain coded language introduced at the Swiss trial was "intercepted by a US intelligence service, presumably the National Security Agency (NSA)…alerted the Swiss security authorities. Because of such dialogues, Osama M. and two of his countrymen have been investigated in and around Bern since" March of 2014. (*Code Word: Baking Bread*, Der Bund, Dec. 30, 2014).[7]

---

[6] *See also* John Revill, *Swiss Court Jails Three Iraqis Over Terror Attacks Plot*, Wall Street Journal, Mar. 18, 2016, available at: https://www.wsj.com/articles/three-iraqis-convicted-of-plotting-terror-attacks-by-swiss-court-1458303447 (describing this case as "the first ever joint investigation by the Swiss federal police and the U.S. Federal Bureau of Investigation into terrorism.")
[7] *Available at*: http://www.tagesanzeiger.ch/schweiz/standard/Codewort-Brot-backen--wie-die-Schweizer-ISZelle-kommunizierte/story/21208465.

Again, undersigned counsel are at a severe disadvantage because there is simply no information how and when the surveillance under Section 702 was conducted. Nor does counsel know how the intelligence agencies are interpreting key terms like "obtain," "derive," and "acquire." What we do know for certain is that the multitude of communications that occurred before, during, and after Defendant's alleged trip to Syria, on top of the role played by United States intelligence agencies in the Swiss prosecution, present numerous opportunities for the prosecution to use—and as the public record amply demonstrates—abuse the expansive and, we submit, unconstitutional license provided by Section 702.

## III. THE HISTORY AND PROVISIONS OF SECTION 702 OF THE FAA

### A. The Foreign Intelligence Surveillance Act

Congress enacted FISA in 1978 in the wake of domestic surveillance abuses by federal law enforcement. Before passage of the FAA in 2008, FISA generally foreclosed intelligence agencies from engaging in "electronic surveillance" without first obtaining an individualized and particularized order from the FISC. To obtain a traditional FISA order, the intelligence agencies are required to submit an application that identifies or describes the target of the surveillance; explains the basis for believing that "the target of the electronic surveillance is a foreign power or an agent of a foreign power;" explains the basis for believing that "each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;" and describes the nature of the foreign intelligence information sought and the type of communications that will be subject to surveillance. *Id.* §1804(a).

The FISC may issue a traditional FISA order only if it finds that, among other things, there is "probable cause to believe that the target of the electronic surveillance [was] a foreign power or an agent of a foreign power," *id.* §1805(a)(2)(A), and "each of the facilities or places at which the

11

electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power," *id.* § 1805(a)(2)(B).[8]

### B.     The Warrantless Wiretapping Program

On October 4, 2001, President George W. Bush secretly authorized the Terrorist Surveillance Program (TSP), which allowed the NSA to engage in warrantless electronic surveillance inside the United States.[9]   After *The New York Times* exposed the program and a federal district court ruled that the program was unconstitutional, *ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006), the government stated that the program would not be reauthorized in its then-existing form.   The government ultimately sought legislative amendments to FISA that granted authorities beyond what FISA had allowed for three decades.[10]

### C.     Section 702 [The FISA Amendments Act (FAA)]

The legislative amendments sought by the Bush administration were embodied in Section 702, which was signed into law on July 10, 2008.[11]   Section 702 substantially revised the FISA regime and authorized the acquisition, without individualized suspicion, of a wide swath of communications, including U.S. persons' international communications, from internet and telecommunications providers inside the United States.[12]   The authority granted by Section 702,

---

[8] For further information on the history of FISA and the statute, *see* Norman Abrams, *Anti-Terrorism and Criminal Enforcement*, 160-199 (4th ed. 2012).

[9] See Public Declaration of James R. Clapper, Director of National Intelligence ("DNI") ¶ 6, *Jewel v. NSA*, No. 08-cv-04373 (N.D. Cal. July 23, 2013), Doc. 168 ("Clapper Jewel Decl.").   For further reading on the TSP and the controversy surrounding the program, *see* Abrams, pg. 200-215.

[10] *See id.*; *see also Strengthening FISA: Does the Protect America Act Protect Americans' Civil Liberties and Enhance Security?: Hearing Before the H. Comm. on the Judiciary*, 110th Cong. (2007) (statement of J. Michael McConnell, DNI), http://1.usa.gov/1kb6c26.

[11] On August 5, 2007, Congress passed a predecessor statute, the Protect America Act, Pub. L. No. 110-55, 121 Stat. 552 (2007), which expired in February 2008.

[12] For further reading on Section 702 and the statute, *see* Abrams, pg. 215-245.

however, is altogether different from, and far more sweeping than, the authority that the intelligence agencies have traditionally exercised under FISA. Section 702 surveillance is correspondingly far-reaching, despite the explicit limitation contained in the statute that surveillance acquisition "shall be conducted in a manner consistent with the fourth amendment to the Constitution of the United States." 50 U.S.C. § 1881a(b)(5).

Section 702 allows the intelligence agencies to conduct dragnet surveillance of international communications entering or leaving the United States, including communications sent or received by U.S. persons. As disclosed by the FISC in 2011, the NSA acquires "more than [250] million Internet communications each year pursuant to [Section 702], *[Docket No. Redacted]*, 2011 WL 10945618, at *9, (FISA Ct. Oct. 3, 2011) [hereinafter Bates October 2011 Opinion], and that number is, most certainly, "significantly higher" today. Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, July 2, 2014 [hereinafter "PCLOB Report"] at 116. This extraordinary reach is the result of the statute's granting of permission to intercept communications when at least one party to a phone call or email is a foreigner located abroad. In particular, Section 702 permits the Attorney General and DNI to "authorize jointly, for a period of up to 1 year . . . the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." 50 U.S.C. §1881a(a).

Significantly, no neutral judicial officer or court ever approves the target of this surveillance. Rather, the FISC approves only the general procedures the government proposes to use in carrying out its surveillance and, on the basis of those procedures alone, the FISC issues a so-called "mass-acquisition order." *See id.* § 1881a. Before obtaining such an order, the Attorney General and DNI must provide to the FISC a written certification attesting that the FISC has

approved, or that the government has submitted to the FISC for approval, both "targeting procedures" and "minimization procedures." *Id.* §1881a(d)–(g). The targeting procedures, according to the statute, must be "reasonably designed" to ensure the acquisition is "limited to targeting persons reasonably believed to be located outside the United States" and to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States." *Id.* §1881a(g)(2)(A)(I). The minimization procedures must also meet the requirements of section 1801(h), 1821(4). *Id.* §1881a(g)(2)(A)(ii).

Finally, the certification and supporting affidavit must attest that the Attorney General has adopted "guidelines" to prevent the targeting of U.S. persons in certain contexts, *id.* §1881a(b); that the targeting procedures, minimization procedures, and guidelines are consistent with the Fourth Amendment; and that "a significant purpose" of the acquisition is "to obtain foreign intelligence information." *Id.* §1881a(g)(2)(A)(iii)–(vii). The phrase "foreign intelligence information" is defined broadly to include, among other things, information concerning terrorism, national defense, and foreign affairs. *Id.* §1801(e).

Since all the FISC is reviewing are the "certifications" or procedures to be followed for the surveillance, a crucial difference between the Section 702 and traditional FISA emerges: Section 702 authorizes surveillance not predicated on probable cause or individualized suspicion. When an intelligence agency makes a Section 702 application to the FISC, it is simply asking the court to approve the overall targeting and minimization procedures, incredibly vague parameters, which will guide the agency's entire surveillance for the following year. The FISC does not consider individualized and particularized surveillance applications or make individualized probable cause determinations. Further, unlike in a FISA application, the intelligence agency need not

14

demonstrate to the FISC that its surveillance targets are agents of foreign powers, engaged in criminal activity, or connected even remotely with terrorism. Thus, the role that the FISC plays under the Section 702 bears no resemblance to the role that it traditionally played under FISA— let alone the role a typical Article III court plays when approving a search warrant.

Once a Section 702 certification has been approved, non-U.S. persons reasonably believed to be located outside the U.S. may become targets of surveillance. *See* Walter F. Mondale, Robert A. Stein, and Caitlinrose Fisher, *No Longer a Neutral Magistrate: The Foreign Intelligence Surveillance Court in the Wake of the War on Terror*, 100 MINN. L. REV. 2251, 2267 (June 2016) ("Unlike the original design of FISA, where FISC adjudicated individual warrant determinations before any targeting occurred, the FAA transformed FISC into a meta-arbiter, approving generally applicable targeting and minimization procedures that applied after a search occurred.").

Moreover, the FISC has no power to supervise the implementation of the Government's targeting or minimization procedures, meaning there is no way to ensure that the Government is in compliance with its own procedures. To the extent the statute attempts to provide safeguards for U.S. residents' constitutional rights, the safeguards take the form of "minimization procedures," which must be "reasonably designed . . . to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons." 50 U.S.C. §§ 1801(h)(1), 1821(4)(A). The statute's minimization requirement is supposed to protect against the collection, retention, and dissemination of communications that have been collected "incidentally" or "inadvertently."

However, the statute does not prescribe specific minimization procedures and it does not give the FISC the authority to monitor compliance with minimization procedures. Most significantly, the statute also includes an exception that specifically allows the intelligence agency

15

to retain and disseminate communications—including those of U.S. persons—if the government concludes that they contain "foreign intelligence information," a term as previously noted, is defined very broadly. *Id.* §1881a(e). In other words, the statute is designed to allow the intelligence agencies not just to collect, but to retain U.S. persons' international communications. We submit that these minimization procedures, which are administered by the executive branch, which cannot substitute for the Fourth Amendment's requirement of individualized judicial involvement.

The following chart[13] demonstrates how Section 702 differs from other electronic surveillance statutes—traditional FISA and Title III wiretaps—in terms of what information must be presented to a neutral and detached judicial officer in order to obtain authorization to execute specific search and seizures:

|  | Title III | Traditional FISA | Section 702 |
|---|---|---|---|
| Required level of suspicion | Probable cause the individual is committing, has committed, or is about to commit a criminal offense. *See* 18 U.S.C. § 2518(3)(a). | Probable cause the individual is a foreign power (including terrorist organizations) or an agent of a foreign power. *See* 50 U.S.C. § 1805(a)(2)(A). | None |
| Required level of suspicion regarding facility to be monitored | Probable cause communications concerning an offense will be obtained through interception. *See* 18 U.S.C. § 2518(3)(b). | Probable cause each targeted facility is being used, or is about to be used, by a foreign power or an agent of a foreign power. *See* 50 U.S.C. § 1805(a)(2)(B). | None |
| Particularity regarding individual to be monitored | Specify the identity, if known, of the person committing the offense or whose communications are to be intercepted. *See* 18 U.S.C. § 2518(1)(b). | Specify the identity, if known, or a description of the specific target of the surveillance. *See* 50 U.S.C. § 1805(c)(1)(A). | None |

---

[13] Lawyers for the Office of the Federal Public Defender for the District of Oregon created this chart for their post-trial motions in *United States v. Mohamud*, 10 Cr. 475 (KI) (D. Oregon), and it also appeared in pre-trial motions in *United States v. Hasbajrami*, 11 Cr. 623 (JG) (E.D.N.Y.).

| Particularity regarding location to be monitored | Specify the nature and location of the communications facilities as to which, or the places where, interception will occur. *See* 18 U.S.C. § 2518(1)(b). | Specify the nature and location of each facilities or places at which the surveillance will be directed. *See* 50 U.S.C. § 1805(c). | None |
| --- | --- | --- | --- |
| Particularity regarding types of communications to be intercepted | Particular description of the type of communication sought to be intercepted. *See* 18 U.S.C. § 2518(1)(b). | Designate the type of foreign intelligence information being sought and the type of communications or activities to be subjected to surveillance. *See* 50 U.S.C. § 1805(c)(1)(C). | None |

When Congress reauthorized Section 702 in 2012, it did so for only 5 years. Thus, the law is set to sunset at the end of 2017. *See* FAA Sunsets Extension Act of 2012, S. 3276, 112th Cong. (2012) (available at: https://www.congress.gov/112/crpt/srpt229/CRPT-112srpt229.pdf). Thus, the FAA is currently the subject of both closed and open congressional hearings and debate. Among other things, testimony during hearings indicated that the number of Americans impacted by the surveillance is unknown.[14]

### D. Types of Section 702 Surveillance

Once the FISC has approved the "certification" or general procedure, the NSA can target non-U.S. persons reasonably believed to be located outside of the U.S. in order to acquire foreign intelligence. The NSA accomplishes this by serving "directives" on U.S.-based electronic communication service providers compelling them to assist in the acquisition of communications. *See* 50 U.S.C. § 1881a(h); PCLOB Report p. 32. Once a non-U.S. person has been "targeted," Section 702 allows the NSA to use "selectors," such as a person's email address or telephone number, to acquire information. *Id.* A "selector" cannot be a general term, like "bomb," or name

---

[14] Rainey Reitman, *In Hearing on Internet Surveillance, Nobody Knows How Many Americans Impacted in Data Collection*, May 10, 2016, available at: https://www.eff.org/deeplinks/2016/05/hearing-internet-surveillance-nobody-knows-how-many-americans-impacted-data.

of an individual. *Id.* at 33. These "selectors" are then "tasked" and sent to an electronic service provider to begin the acquisition of information.

There are two different types of intelligence acquisition under Section 702 that are important to distinguish: the aforementioned "PRISM" collection, and the "Upstream" collection.[15]

### 1.    PRISM Collection

Usually, under the PRISM collection, the FBI on behalf of the NSA, sends the "selectors" to a U.S. based internet service provider, such as Google or Yahoo, which has been served a "directive" compelling them to provide information. (PCLOB Report, p. 33). Under that "directive," companies like Google must provide any communications that were sent "to" or "from" that "selector," or email address. *Id.* In 2011, the PRISM collection accounted for 91% of the internet communications collected by the NSA. (Bates October 2011 Opinion, p. *25). Importantly, under PRISM, the NSA cannot collect "about" communications from the "selector," meaning that it does not collect any other internet communication that refers to or is "about" the particular "selector" or email address. (PCLOB Report, p. 33) As a result, a U.S. person who is directly communicating with one of these "selectors" would have their communications swept up under this warrantless surveillance. It is even conceivable that, in theory, any communication that mentions ISIS or specific foreign leaders could be subject to collection.

---

[15] Unlike other cases (*i.e.*, *United States v. Hasbajrami*, No. 11-CR-623 (JG), 2016 WL 1029500, at *7 (E.D.N.Y. Mar. 8, 2016)), undersigned counsel do not know which specific method of collection was used in this case, or if both were used. Thus, we address both the PRISM and Upstream collection.

## 2. Upstream Collection

The use of so-called Upstream collection by the intelligence agencies is vastly more expansive, troublesome, and contains major defects. The process of targeting non-U.S. persons and tasking "selectors" is identical in Upstream collection. *Id.* at 35. However, instead of the directive instructing an internet service provider such as Google to provide information about that "selector" to the NSA, the directive is sent to "providers that control the telecommunications backbone over which communications transit." *Id.* at 35. Thus, companies that provide the internet communications, such as AT&T and Verizon, provide information that occurs "upstream" in the flow of communications. *Id.*

As a result, the NSA is able to collect information that is not simply "to" or "from" the "selector," but also information that is "about" the "selector."[16] As stated above, an "about" communication contains a reference to "selector," but that "selector" may not actually be a participant in the communication. *Id.* at 37. For example, if an email address "JohnTarget@example.com" was the "selector," the NSA would acquire not only emails sent to and from "JohnTarget@example.com," but also any email that contains a reference to that "selector." Thus, any communication that simply mentioned the "selector," or email address that has been targeted, would get swept up in the collection. While the NSA employs some filters to ensure that "about" communications of two people residing in the U.S. are not being collected, these filters do fail to filter all purely domestic communications that may be collected. *Id.* at 38.

---

[16] *See also*, Charlie Savage, *NSA Said to Search Content of Messages to and From U.S.*, N.Y. TIMES, Aug. 8, 2013, http://www.nytimes.com/2013/08/08/us/broader-sifting-of-data-abroad-is-seen-by-nsa.html?smid=tw-share ("While it has long been known that the agency conducts extensive computer searches of data it vacuums up overseas, that it is systematically searching—without warrants—through the contents of Americans' communications that cross the border reveals more about the scale of its secret operations.")

Accordingly, the FISC, in a 2011 opinion assessing the "certification" or general targeting and minimization procedures, found that the NSA was knowingly acquiring "tens of thousands of wholly domestic communications each year." (Bates October 2011 Opinion p. *15)

This high number of domestic communications being collected was mainly the result of what are called "multi-communication transactions," or "MCTs." An upstream collection may contain a "transaction" that consists of a single email being sent to and from one server to another. (PCLOB Report. p. 39) However, an upstream collection of a "selector" could also contain multiple discrete communications, and if just one transaction within the communication is to, from, or about the "selector," then the NSA will acquire the entire MCT. *Id.* In that same 2011 FISC opinion, the court estimated that the NSA was collecting between 300,000 and 400,000 MCTs where the user was a target and reasonably believed to be outside the U.S. (Bates October 2011 Opinion p. *12). Yet, the FISC also estimated, quite problematically, that the NSA had collected 7,000-8,000 MCTs of non-targets who *were* located in the U.S., and another 97,000-140,000 MCTs where the NSA could not determine the user's identity or location. *Id.* The FISC relented that even if just 1% of those 97,000-140,000 were to or from U.S. persons in the United States, the NSA would still be acquiring in excess of 10,000 discrete communications each year that they would otherwise be prohibited from acquiring. *Id.*

### E. Acquisition of U.S. Persons' Communications Under Section 702

The prosecutors have not disclosed how Defendant's communications were swept up without a warrant under Section 702—yet the relevant legal analysis depends on that fact. Several of the possible scenarios are outlined below, but without this basic information the defense cannot provide the Court with the informed arguments necessary to determine whether the surveillance was lawful.

First, the intelligence agencies may have targeted Defendant directly while he was overseas, based on the erroneous belief that he was a lawful target for surveillance under Section 702.

Second, the intelligence agencies may have obtained Defendant's communications through "incidental collection," which means that the U.S. person is in direct contact with the targeted foreigner outside of the U.S. (PCLOB Report, p. 114) Since no court approves these "targets," the range of foreigners who are targeted is extremely broad, and can include individuals who may only have an attenuated connection to terrorism or no involvement whatsoever.[17] This means U.S. persons communicating with individuals they do not believe to be engaging in terrorism could have their communications collected. *Id.* at 115.

Third, U.S. persons can have their communications collected "inadvertently," meaning the NSA mistakenly thought they were a non-U.S. person located outside the U.S. and targeted them. This appears to be a relatively uncommon error, however, with the government claiming that its error rate is 0.4 percent. *Id.* at 118.

The fourth way occurs through "about" communications, described above, which collects communications that simply reference the "selector." As a result, the target is not a participant in communication, and "there is no guarantee that any of the [actual] participants are located outside the United States." *Id.* at 120. More troubling, as the PCLOB Report makes clear, is the fact that "it permits the government to acquire communications exclusively between people about whom the government had no prior suspicion, or even knowledge of their existence, based entirely on what is contained within the contents of their communications." *Id.* at 121.

---

[17] And for 2015 the government reported that it monitored the communications of 94,368 targets under a single order issued by the FISC. ODNI, 2015 Statistical Transparency Report at 5, Apr. 30, 2016, http://bit.ly/1TmRuV0.

Finally, U.S. persons' communications can be obtained through the multi-communication transaction (MCT), described above. The MCT must only have one communication that meets the criteria for collection under Section 702, meaning it may "also contain other individual communications that do not meet these criteria and have no direct relationship to the tasked selector" meaning communications exclusively between U.S. persons could be collected. *Id.* at 125. In both "about" communications and MCTs, the NSA's technology is limited as to its ability to prevent the collection of wholly domestic communications. *Id.* at 123-26.

### F. "Backdoor Searches"

Once the NSA has collected this enormous trove of communications, which inevitably contain U.S. persons' communications, the communications are stored in databases at the NSA, FBI and CIA, where analysts and agents are allowed to "query" the repositories of collected data. (PCLOB Report, p. 127). All three agencies are permitted to sift through that Section 702 data looking for information about Americans—including the communications of specific individuals—but the FBI's ability to "query" from this collection is the most expansive. Under the FBI's minimization procedures, the FBI is permitted to "find and extract" *either* "foreign intelligence information" *or* "evidence of a crime." (FBI 2015 Minimization Procedures, pp. 11, 28-29) The FBI applies this standard "to all queries . . ., regardless of whether the querying term includes information concerning a United States person." *[Docket No. Redacted]*, (FISA Ct. Nov. 6, 2015) [hereinafter "Hogan November 2015 Opinion"] at 27.[18] These so-called "backdoor searches"[19] permit the FBI to do an end-around of the Fourth Amendment by using U.S.-person

---

[18] *Available at* https://www.dni.gov/files/documents/20151106-702 Mem_Opinion_Order_for_Public_Release.pdf.

[19] *See* James Ball & Spencer Ackerman, *NSA Loophole Allows Warrantless Search for US Citizens' Emails and Phone Calls*, THE GUARDIAN, Aug. 9, 2013, https://www.theguardian.com/world/2013/aug/09/nsa-loophole-warrantless-searches-email-calls ("Senator Ron Wyden told the Guardian that the law provides

identifiers to search through a trove of communications, thousands of which, as shown above, contain domestic communications between U.S. persons, in order to simply find "evidence of a crime." These warrantless "backdoor searches" of U.S. communication have been widely criticized, notably by members of the United States Senate,[20] as clearly violating the Fourth Amendment. Yet, it is wholly unknown how many of these "back-door" searches the FBI is performing. (PCLOB Report, p. 130).

### G. Courts Must Rely on Intelligence Agencies' Often Inaccurate Representations

Courts, particularly the FISC, are entirely reliant on the intelligence agencies' representations about the extent of the surveillance and are consequently limited in their ability to ensure compliance. As one district court stated, Section 702 is "riddled with loopholes," and due to the FISC's limited role in approving the general procedures, the government is the "sole arbiter" of this self-monitored program. *United States v. Muhtorov*, No.12-cr-00033-JLK, (D. Colo., Nov. 5, 2015) (Dkt. #885).

Moreover, the FISC has detailed numerous issues of non-compliance in an opinion approving Section 702 general procedures for the year 2015.[21] (Hogan 2015 Opinion, p. 45).

---

the NSA with a loophole potentially allowing 'warrantless searches for the phone calls or emails of law-abiding Americans'")

[20] *See* "Wyden, Udall on Revelations that Intelligence Agencies Have Exploited Foreign Intelligence Surveillance Act 'Loophole,'" *Ron Wyden, Senator for Oregon*, https://www.wyden.senate.gov/news/press-releases/wyden-udall-on-revelations-that-intelligence-agencies-have-exploited-foreign-intelligence-surveillance-act-loophole.

[21] This is not the first time the FISC has had to scold the Intelligence Agencies for non-compliance with their own procedures and lack of transparency with the court over the extent of the surveillance. *See* Bates October 2011 Opinion at *9-11 (discussing the FISC previous and erroneous understanding of the Upstream Collection based on representations made by the Government). For further instances of non-compliance and the FISC's inability to stop it until the Government reveals it, *see* Judge Reggie Walton's March 2, 2009 FISC Order *In Re Production of Tangible Things* No. BR 08-13 (FISA Ct. Mar. 2, 2009). In that opinion, Judge Walton famously depicted how the NSA had been searching non-authorized telephone metadata since 2006 due to "a flawed depiction of how the NSA uses [business record] metadata," and "buttressed by repeated inaccurate statements made in the government's submissions." *See*

These issues of non-compliance included the failure to set up review teams to examine the communications of foreign targets who had been indicted to ensure that any privileged communication was not being collected. *Id.* at 47-52. In addition, the FISC criticized the NSA's failure to purge cellphone records through Section 702 surveillance of what appeared to be foreign targets who had roamed onto U.S. soil, despite a FISC order in 2011, four years prior, requiring destruction of this illegal surveillance. (Hogan November 2015 Opinion, pp. 55-58) The FISC accurately and alarmingly summarized the difficult position they are in when attempting to ensure compliance:

> Perhaps more disturbing and disappointing than the NSA's failure to purge this information for more than four years, was the government's failure to convey to the Court explicitly during that time that the NSA was continuing to retain this information in [redacted].

(Hogan November 2015 Opinion).

## IV. THE FOURTH AMENDMENT PROTECTIONS APPLY TO AL-JAYAB

Despite the fact that Defendant is defined as a non-U.S. person under 50 U.S.C. § 1801(i) of the FISA statute, he is still entitled to the protections of the Fourth Amendment on two independent bases: (1) the search and seizure occurred on U.S. soil; and, (2) Defendant has "substantial connections" to the U.S. sufficient to trigger Fourth Amendment protections.[22]

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court held that the Fourth Amendment did not apply to a search and seizure of property owned by a non-resident alien located in a foreign country. *Id.* at 261. The Court's opinion in *Verdugo-Urquidez* focused on the fact that the search of the non-resident alien's property occurred outside of the United States

---

https://www.dni.gov/files/documents/section/pub_March%202%202009%20Order%20from%20FISC.pdf at pp. 10-11.

[22] Counsel submit that either of these bases would be sufficient to trigger Fourth Amendment protections.

in Mexico. *Id.* at 274-75 ("At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico."). However—and entirely distinguishable from *Verdugo-Urquidez*—even though Defendant was a non-U.S. person who may have been located within the United States and at times overseas when his communications were collected, the "search" of his communications occurred on United States soil.

As discussed above, once the FISC approves a "certification" for surveillance pursuant to Section 702, it may issue a "directive" to a U.S.-based electronic communications company, like Facebook, Google or Yahoo, compelling them to produce information. The NSA then collects these communications, which are stored into databases in the U.S., and the intelligence agencies, including the NSA, FBI and CIA, can then query or "search" through the collection. (PCLOB Report, p. 127) Since the search of Defendant's electronic communications most likely occurred in the U.S., and he is being prosecuted in a case charged in the United States, the full protections of the Fourth Amendment apply and he should not be barred from asserting Fourth Amendment rights simply because of his status as a non-U.S. person. Further, from a statutory perspective, Section 702 prohibits targeting of anyone (regardless of citizenship) located inside the United States, or outside of the United States if the purpose is to target a person believed to be inside the United States. *See* 50 U.S.C. §1881a(b)(1) and (2).

Moreover, even the plurality opinion in *Verdugo-Urquidez* recognized that a person abroad with 'substantial connections' to the United States would be entitled to Fourth Amendment protections. There is no doubt that Defendant meets that threshold. *See Verdugo-Urquidez*, 494 U.S. at 270-71.

Importantly, the Ninth Circuit has held that a non-U.S. person who studied in the U.S. has sufficient enough connections to pursue First and Fifth Amendment claims despite being located outside the United States. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994-97 (9th Cir. 2012). In *Ibrahim*, a student who had been living in the United States and enrolled at a university here challenged her alleged placement on a no-fly list and her resulting inability to return to the United States from a trip overseas. *Id.* at 986. The Ninth Circuit noted that under "*Verdugo-Urquidez*, the inquiry is whether the alien has voluntarily established a connection with the United States, not whether the alien has voluntarily left the United States." *Id.* at 996. Although a departure from the U.S. may cast light on whether an alien has established and wishes to maintain their voluntary connections, the Ninth Circuit found that the defendant had not severed her connections to the U.S. when she made a trip overseas. *Id.* at 996-97.

As stated above, Defendant and much of his family emigrated to the U.S. in October 2012 from Syria as a refugee. He moved between his uncles' homes in Arizona and Wisconsin until November 2013, when returned to Syria by way of Turkey. When he returned to the US in January of 2014, Defendant resided with his father in Sacramento, California under refugee status until his arrest two years later. While in Sacramento, Defendant attended a community college and was employed as in security at a hotel. Most of Defendant's closest relatives remain in the United States, and he has developed close connections with the Sacramento community through his education and employment. In addition, Defendant's communications that were collected on U.S. soil pursuant to 702 were likely communications with United States residents.

These "substantial connections," coupled with the fact that the intelligence agencies were collecting and storing his communications on United States soil, entitle him to the protections of the Fourth Amendment. Moreover, Defendant's brief trip overseas in from November 2013

26

through January 2014 did not "sever" his substantial connections to the U.S. or the constitutional protections he gained while residing as a refugee in the United States.

Regardless of Defendant's status as a non-U.S. person, counsel submit that the FISA statute alone entitles Defendant to challenge whether the surveillance complied with the Fourth Amendment. As an aggrieved person who has received Section 702 notice, Defendant may move to suppress evidence that was unlawfully obtained. 50 U.S.C. § 1806(e). Section 702 requires that the surveillance comply with the Fourth Amendment. 50 U.S.C. § 1881a(b)(5). Thus, if the surveillance, as a whole, is inconsistent with the Fourth Amendment, then the express terms of the statute allow Defendant to suppress the evidence.

## V. SECTION 702 IS UNCONSTITUTIONAL AND REQUIRES SUPPRESSION OF ALL THE EVIDENCE THAT WAS DERIVED AS A RESULT

The Fourth Amendment to the United States Constitution is worth citing in its entirety:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

This fundamental Constitutional requirement imbues U.S. persons with the freedom, security, and protection from warrantless surveillance and the collection of evidence resulting from such surveillance absent: (1) a neutral judicial determination of probable cause; (2) based on a sworn affidavit; (3) particularizing the place to be searched; and, (4) particularizing the person or things to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 554 (2004).

Searches undertaken without a warrant, as was done in this case pursuant to Section 702, "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967), none of which apply to this case. *See also Verdugo-Urquidez*, 494 U.S. at 264 ("The Fourth Amendment

27

… prohibits 'unreasonable searches and seizures' whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is 'fully accomplished' at the time of an unreasonable governmental intrusion.") (citing, *United States v. Calandra*, 414 U.S. 338, 354 (1974), *United States v. Leon*, 468 U.S. 897, 906 (1984)).

Notwithstanding the enactment of Section 702, the warrantless mass collection, retention, accessing, dissemination, and use of the contents of the electronic communications of U.S. persons has long been held to violate the Fourth Amendment. *See United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"), 407 U.S. 297, 313 (1972) (holding that warrantless domestic surveillance for national security purposes violates the Fourth Amendment); *Berger v. New York*, 388 U.S. 41, 64 (1967) (finding statute that authorized electronic surveillance under judicial supervision violated the Fourth Amendment because it "permits a trespassory invasion of the home or office, by general warrant, contrary to the command of the Fourth Amendment").

To be clear, Section 702 permits the widespread capture, retention, and later querying, dissemination and use of the communications of U.S. persons under the guise of targeting foreign actors, but without any of the protections required by the Fourth Amendment for those that reside in the United States and at all relevant times possess the rights bestowed upon them by the United States Constitution. The Privacy and Civil Liberties Oversight Board (PCLOB), in its report examining Section 702, made this poignant observation when discussing the extent of Section 702 surveillance:

> Nothing comparable is permitted as a legal matter or possible as a practical matter with respect to analogous but more traditional forms of communication. From a legal standpoint, under the Fourth Amendment the government may not, without a warrant, open and read letters sent through the mail in order to acquire those that contain particular information. Likewise, the government cannot listen to telephone conversations, without probable cause about one of the callers or about the telephone, in order to keep recordings of those conversations that contain particular content.

(PCLOB Report, p. 122).

Indeed, the intrusions in this case also implicate the separation of powers doctrine, which inheres in the structure of checks and balances created by the first three Articles of the Constitution:

> The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government.  The independent check upon executive discretion is not satisfied, as the Government argues, by 'extremely limited' post-surveillance judicial review. Indeed, post-surveillance review would never reach the surveillances which failed to result in prosecutions. Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights

*Keith*, 407 U.S. at 317-18 (footnotes and citations omitted). *See also Berger*, 388 U.S. at 63 ("Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices.").

Another way to view this issue is that under well-established Fourth Amendment law, Section 702 fails to meet Constitutional requirements for two primary reasons.  First, since Section 702 surveillance has not been confined to the collection of foreign communications by foreign actors abroad, as both the FISC and the PCLOB have detailed with the Upstream collection, Section 702 is subject to the Warrants Clause of the Fourth Amendment, which, as will be discussed, contains fundamental requirements that Section 702 surveillance fails to meet.  *See, e.g. Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) ("[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment…' ") (quoting *Katz*, 389 U.S. at 357).

And second, the warrantless searches and seizures in this case cannot pass constitutional muster because the prosecution will be unable to establish one of the "jealously and carefully

drawn" exceptions to the warrant requirement. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (*quoting Jones v. United States*, 357 U.S. 493, 499 (1958)).

Notably, the contents of telephone calls and emails of United States persons are within the core zone of privacy protected from government intrusion in the absence of a warrant. *See United States v. Alderman*, 394 U.S. 165, 177 (1969); *United States v. Katz*, 389 U.S. 347, 353 (1967); *see also United States v. Warshak*, 631 F.3d 266, 285-86 (6th Cir. 2010) (concluding that email "is the technological scion of tangible mail" and that it would "defy common sense to afford emails lesser Fourth Amendment protection."). Moreover, as has long been held, "the broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the application of Fourth Amendment safeguards." *Keith*, 407 U.S. at 313.

Importantly, the Fourth Amendment has been applied in international as well as domestic communications. *See United States v. Peterson*, 812 F.2d 486, 490-92 (9th Cir. 1987). The Fourth Amendment also applies beyond criminal investigations because it "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government," *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613-14 (1989), "without regard to whether the government actor is investigating crime or performing another function," *City of Ontario v. Quon*, 560 U.S. 746, 756 (2010), including protecting national security, *see Keith*, 407 U.S. at 313-14.

The Fourth Amendment presupposes a number of measures that are conspicuously missing from the search and seizure of electronic communications under Section 702: (1) a warrant authorizing the search and seizure; (2) based upon probable cause; (3) particularly describing the place to be searched and the items to be seized; (4) based at all times on an affidavit under oath or affirmation; (5) issued by a neutral and detached magistrate operating in a judicial capacity; and,

(6) with a return or other procedure assuring compliance with the terms of the warrant in its execution.

The absence of even one of these six critical features from Section 702 surveillance would be fatal to the statute, because only these features can adequately protect against the search and seizure of the private communications of persons who reasonably should be known to be U.S. persons. *See, e.g.,* Bates October 2011 Opinion at *16 (finding that the "NSA knows with certainty that the upstream collection, viewed as a whole, results in the acquisition of wholly domestic communications"). That none of them are present in Section 702 compounds the statute's unconstitutionality immeasurably. The absence of these factors, either individually or collectively, violates the Fourth Amendment, and as such this Court should hold that the Government's warrantless collection, retention, and accesses of communications under Section 702 presumptively unreasonable.

### A. Section 702 is Unconstitutional *Per Se* because it Violates the Fourth Amendment's Warrant Clause by Authorizing Surveillance and Interception of Communications without a Warrant

The issuance of a search warrant pursuant to the Warrant Clause requires a specific, individualized determination regarding the constitutionality of the invasion of privacy. This requirement was inserted into the Fourth Amendment "to curb the abuses of general warrants, devices which provided British officers with broad discretion to search the homes of citizens of the Colonies for evidence of vaguely specified crimes." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010) (citing *Steagald v. United States*, 451 U.S. 204, 220 (1981)).

The warrant requirement to any search under the Fourth Amendment stands in direct contrast to the "certification" that the Attorney General and the Director of National Intelligence

submit to the FISC, pursuant to Section 702, in order to conduct the electronic surveillance of persons reasonably believed to be located outside of the U.S. *See* 50 U.S.C. § 1881a(a, d-g).

As outlined above, the intelligence agencies simply provide the FISC with general procedures, namely the targeting and minimization procedures, and then receive a so-called "mass acquisition order" that allows then to collect this enormous amount of electronic communications. The "certification" upon which all elements of Section 702 surveillance are predicated merely requires: (1) that the target of the surveillance "be located outside of the United States" and prevent the intentional acquisition of communications within the U.S.; (2) that minimization procedures will be utilized; (3) that "a significant purpose of the acquisition is to obtain foreign intelligence information"; and (4) that other elements of the statute are followed. Nowhere does Section 702 require that such "certification" establish the existence of "probable cause" or any other threshold level of proof.

Analogous to the interception of email communications that occurred in this case, the Sixth Circuit has held that an email "subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial ISP [internet service provider]." *Warshak*, 631 F.3d at 288. There, the Government compelled a commercial ISP to turn over 27,000 emails of the defendant without a warrant. *Id.* at 282. After rejecting the Government's position that there was a diminished expectation of privacy in emails passing through the channels of third parties, the Court stated that the "government may not compel a commercial ISP to turn over the contents of a subscriber's emails without first obtaining a warrant." *Id.* at 288.

The Fourth Amendment protections apply to Section 702 surveillance that occurs on U.S. soil, and most certainly apply to all international and domestic communications of U.S. persons

that are collected pursuant to Section 702. A 2011 FISC opinion disclosed that the NSA is collecting tens of thousands of domestic communications through Section 702, many of which are the "about" communications and MCTs collected through Section 702's Upstream collection, and the opinion stated clearly that these communications are "Fourth Amendment-protected communications." (Bates October 2011 Opinion p. *28). Moreover, a 2015 FISC opinion disclosed that the NSA had failed to comply with a 2011 order instructing them to purge a trove of Fourth Amendment-protected cellphone communications of targets who had roamed over U.S. soil. (Hogan November 2015 Opinion, p. 55-58). This goes without mentioning the fact that intelligence agencies are permitted to query through PRISM collections through what are known as "backdoor searches."

These publicly disclosed[23] instances of "incidental," "inadvertent," "about" or "MCT" collections cannot be supported by the Foreign Intelligence Surveillance Court of Review's 2008 opinion *In re Directives Pursuant to Section 105B of Foreign Intelligence Surveillance Act* ("*In re Directives*"), 551 F.3d 1004 (Foreign Int. Surv. Ct. Rev. 2008). There, the FISCR found that the petitioner Yahoo's concern with these collections, pursuant to the Protect America Act of 2007 (PAA) (the precursor to Section 702 in 2008), was "overblown." *Id.* at 1015. The FISCR stated that it was settled that any of these collections, occurring as a result of "constitutionally permissible acquisition," did not render it unlawful. *Id.* But the case the FISCR cited to support that proposition, *United States v. Kahn*, 415 U.S. 143, made that holding based on a "constitutionally permissible acquisition" pursuant to an actual warrant, the complete opposite of the illegal, warrantless surveillance under Section 702. *Id.* at 144-46. Moreover, the FISCR took comfort in

---

[23] It goes without saying that undersigned counsel believe that there are likely numerous other instances of incidental surveillance or non-compliance that have either: (1) been disclosed to the FISC and are not publicly available; or, (2) have not even been disclosed to the FISC. This suggestion is certainly not without merit given the government's record of misrepresentations to the FISC.

the fact that the "government assures us that it does not maintain a database of incidentally collected information from non-targeted United States persons." *In re Directives*, 551 F.3d at 1015. However, that notion has been undermined by the 2015 FISC opinion detailing an "inadvertent" NSA collection of domestic communications that it had maintained for four years despite a court order to purge it. (Hogan November 2015 Opinion pp. 55-58).

Further, the Government cannot crutch its massive, warrantless collection of U.S. persons' communications on the "foreign intelligence exemption." For even if such an exemption could be said to exist, the courts that have recognized a foreign intelligence exception to the warrant requirement have defined that exception very narrowly. These courts excused the government from compliance with the warrant requirement only where the surveillance in question was directed at a specific foreign agent or foreign power. *See, e.g., United States v. Truong*, 629 F.2d 908, 915-16 (4th Cir. 1980); *United States v. Ehrlichman*, 546 F.2d 910, 925 (D.C. Cir. 1976); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 277 (S.D.N.Y. 2000). And, the courts required that the government's "primary purpose" be to gather foreign intelligence information. *See, e.g., Truong*, 629 F.2d at 916. Finally, they required that the surveillance be personally approved by the President or Attorney General. *See, e.g., Ehrlichman*, 546 F.2d at 926 ("Unless carefully circumscribed, such a power is easily subject to abuse."); *Bin Laden*, 126 F. Supp. 2d at 277.

Section 702 contains none of these limitations—it permits warrantless surveillance in circumstances far removed from those that have previously been held to fall within the foreign intelligence exception. Surveillance under Section 702 is not directed only at foreign powers and their agents. Rather, Section 702 surveillance operates at a wholesale level, allowing the government to collect and search the international communications of U.S. persons in bulk. Nor does Section 702 require that warrantless surveillance be personally approved by the President or

34

the Attorney General. The Attorney General has a role in authorizing Section 702 surveillance, but this role involves approval of the overall procedures, not individual targets. *See* 50 U.S.C. §1881a.

Nor does Section 702 require that the government's "primary purpose" be to collect foreign intelligence information. To the contrary, it allows the government to engage in warrantless surveillance even when its primary purpose is to gather evidence of criminal activity rather than to collect foreign intelligence information. *See* 50 U.S.C. §1881a(g)(2)(A)(v) (permitting warrantless surveillance where gathering foreign intelligence information is simply a "significant purpose" of the interception); *see also* FBI 2015 Minimization Procedures at 11, 28-29 (allowing the FBI to conduct "backdoor-searches" by querying through the NSA's massive Section 702 collection to "find and extract *either* "foreign intelligence information" *or* "evidence of a crime.")

As such, it is submitted that the massive collection and access to electronic communications, without an individual, neutral determination that the communications of U.S. persons can be searched or seized, is utterly inconsistent with the Fourth Amendment's warrant requirement.

**B.     Section 702 is Unconstitutional *Per Se* Because it Permits Surveillance and Interception without Probable Cause**

The Fourth Amendment's requirement of "probable cause" assures that "baseless searches shall not proceed." *Keith*, 407 U.S. at 316. This fundamental norm for searches and seizures requires sworn facts sufficient for a judge to decide whether individualized suspicion justifies the Government's intrusion on privacy. *See Gates v. Illinois*, 462 U.S. 213, 239 (1983) ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, which is not met by wholly conclusory statements.").

For centuries leading up to and following the ratification of the Bill of Rights, the probable cause standard has been the fundamental bulwark protecting people from Governmental over-reaching into their private lives. *Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("long-prevailing standards [of probable cause] seek to safeguard citizens from rash and unreasonable interferences with privacy."); *Kyllo v. United States*, 533 U.S. 27, 34 (2001) (requiring a warrant for use of a thermal imaging device outside the home because "[t]o withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment"). The Supreme Court has carefully guarded the probable cause standard against encroachment within core areas of privacy; even a minor intrusion beyond the boundary of the lawful Government action, where core rights are concerned, requires probable cause. *See Arizona v. Hicks*, 480 U.S. 321, 329 (1987) ("there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all" by requiring a warrant to search predicated on probable cause.)

In contrast, Section 702 fails to require individualized suspicion or probable cause before engaging in electronic surveillance. Instead, the statute allows intelligence agencies to target any "persons reasonably believed to be located outside the United States to acquire foreign intelligence information," 50 U.S.C. § 1881a(a), with the definition of "person" defined so broadly to include "any group, entity, association, corporation, or foreign power," 50 U.S.C. § 1801(m). While the FISC approves general programs and procedures under Section 702, it does not, contrary to the requirements of the Fourth Amendment or FISA, review or approve the Government's specific targeting decisions, nor its access and querying of any seized communications after the mass collection. Given the fact that, as described above, tens of thousands of domestic communications are illegally collected pursuant to Section 702, and then queried through for "evidence of a crime"

by the FBI, the lack of any probable cause determination violates the Fourth Amendment rights of those U.S. persons.

Accordingly, it is also submitted that the intelligence agencies' surveillance and interception of electronic communications of U.S. persons is constitutional only if based on a judicial finding of probable cause. Under Section 702, no finding of probable cause—or any other modicum level of suspicion is required in order to collect the massive amounts of surveillance, thus unquestionably violating the Fourth Amendment.

> **C.** **Section 702 is Unconstitutional *Per Se* Because it Permits Generalized and Programmatic Acquisition, Retention and Accessing of Electronic Communications of U.S. Persons without Requiring Particularity and Specification Required by the Fourth Amendment's Warrant Requirement of the Places to be Searched and the Items to be Seized**

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.' " *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging rummaging searches." *United States v. Logan*, 250 F.3d 350, 364 (6th Cir. 2001). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement endures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Garrison*, 480 U.S. at 84 (citing *Marron v. United States*, 275 U.S. 192, 196 (1927)).

Moreover, as the Seventh Circuit has recognized, the "Fourth Amendment's particularity requirement limits 'the authorization to search to the specific areas and things for which there is probable cause to search,' and in doing so 'ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the

Framers intended to prohibit.'" *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). Other courts have also stated that the wholesale seizure of documents, not unlike the mass collection of communications under Section 702, "for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as the kind of investigatory dragnet that the fourth amendment was designed to prevent." *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) (emphasis in original); *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980).

Notwithstanding the clear mandates of the Fourth Amendment, Section 702 "lays down no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor 'the place to be searched,' or 'the persons or things to be seized.'" *Berger*, 388 U.S. at 56 (finding the New York electronic surveillance statute unconstitutional). To the contrary, Section 702 specifically removed from FISA the previous specific requirement of particularity as to the facilities to be targeted. *See* 50 U.S.C. § 1881a(g)(4) ("A certification made under this subsection is not required to identify the specific facilities, places, premises, or property at which an acquisition authorized under subsection (a) will be directed or conducted."). By doing so, Section 702 created an exception to FISA that is incompatible with the Fourth Amendment.

Section 702 creates a mechanism that lacks any particularity of the places to be searched or the items to be seized; and contains no check on the intelligence agencies' capacity to execute, in effect, a general warrant on all of a person's communications; no check, of course. Again, it is submitted that this lack of particularity, too, cannot survive the scrutiny that the Fourth Amendment requires.

**D.      Section 702 is Unconstitutional *Per Se* Because it Violates
          the Fourth Amendment's Requirement of Reasonableness**

Section 702 would be unconstitutional even if the warrant clause were inapplicable because "the ultimate touchstone of the Fourth Amendment is reasonableness"—a test Section 702 fails. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks omitted). The reasonableness requirement applies even where the warrant requirement does not. *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985).  Reasonableness is determined by examining the "totality of circumstances" to assess "on the one hand, the degree to which [government conduct] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006).  Section 702 is unreasonable under the Fourth Amendment because the privacy interests of U.S. persons in their communications, both domestic and international, far outweighs the intelligence agencies' interest in collecting foreign intelligence.

In the context of electronic surveillance, reasonableness requires that government eavesdropping be "precise and discriminate" and "carefully circumscribed so as to prevent unauthorized invasions of privacy." *Berger*, 388 U.S. at 58.  While the constitutional limitations on foreign intelligence surveillance may differ in some respects from those applicable to law enforcement surveillance, *see Keith*, 407 U.S. at 323–24, "the closer [the challenged] procedures are to Title III procedures, the lesser are [the] constitutional concerns," *In re Sealed Case*, 310 F.3d 717, 737 (Foreign Int. Surv. Ct. Rev. 2002).

Section 702 exposes every U.S. person's international communications to the possibility of warrantless surveillance.  By abandoning the core requirements of the warrant clause—individualized suspicion, prior judicial review, and particularity—Section 702 eliminates the primary protections against general surveillance.  Whereas both FISA and Title III require the

intelligence agencies to identify to a court its targets and the facilities they intend to monitor, Section 702 does not. Whereas both FISA and Title III require the agencies to demonstrate individualized suspicion to a court, Section 702 does not. Indeed, Section 702 does not require even an administrative finding of individualized suspicion. And, whereas both FISA and Title III impose strict limitations on the nature of the communications that the intelligence agencies may monitor and the duration of its surveillance, Section 702 does not.

Section 702's failure to include these basic safeguards is fatal, because these are the very safeguards that the courts have cited in upholding the constitutionality of both FISA and Title III. *See, e.g., United States v. Duka*, 671 F.3d 329, 345 (3d Cir. 2011) (FISA); *United States v. Cavanagh*, 807 F.2d 787, 790 (9th Cir. 1987) (FISA); *In re Sealed Case*, 310 F.3d at 739-40 (FISA); *United States v. Tortorello*, 480 F.2d 764, 773-74 (2d Cir. 1973) (Title III); *United States v. Bobo*, 477 F.2d 974, 982 (Title III); *United States v. Cafero*, 473 F.2d 489, 498 (3d Cir. 1973) (Title III). The consequence of Section 702's failure to include any of these limitations is that the government may target any foreigner for surveillance—even where another party to the communication is a U.S. person.

The targeting and minimization procedures are defective in ensuring that domestic communications are not kept, shared or used. As demonstrated above, Section 702's sweeping authorization has led to the communications of countless U.S. persons being monitored without a warrant. The targeting procedures cannot meaningfully constrain the NSA's selection of foreign targets and the minimization procedures impose no affirmative obligation on the NSA to promptly identify and purge U.S. persons' communications once they have been obtained. In fact, both the targeting and minimization procedures expressly contemplate the collection of "about" communications or MCTs, both of which can contain communications between two U.S. persons

40

who are not targets.  (PCLOB Report, pp. 123-26)  Moreover, the NSA is then allowed to share this collection of surveillance with the FBI and CIA who in turn are allowed to retain these purely domestic communications in order to query through them for foreign intelligence information, or evidence of a crime.  *See* 2015 FBI Minimization Procedures 11, 28-29.

The targeting and minimization procedures are completely ineffective at preventing illegal surveillance of domestic communications because they only pertain to the actual surveillance program, not an individualized or specific target.  Unlike FISA or Title III searches, there is no individualized judicial authorization of the procedures pertaining to a particular target, nor are they subject to ongoing judicial supervision.  Moreover, the FISC is granted no authority to supervise the intelligence agencies' compliance with the minimization procedures during the course of an acquisition or even to inquire about the treatment of U.S. persons' communications. *Compare with* 50 U.S.C. § 1805(d)(3).  Nor is there any requirement that an agency seek judicial approval before it analyzes, retains, or disseminates U.S. communications.  *Compare with* 50 U.S.C. § 1801(h)(4) (requiring court order in order to "disclose[], disseminate[], use[] . . . or retain[] for longer than 72 hours" U.S. communications obtained in the course of warrantless surveillance of facilities used exclusively by foreign powers).

Since the privacy interest of U.S. persons in their communications outweighs the interest in collecting foreign intelligence, it is submitted that Section 702 violates the Fourth Amendment's requirement of reasonableness.

    **E.**    **Section 702 is *Per Se* Unconstitutional because it Includes the Participation of the Foreign Intelligence Surveillance Court (FISC) in the Construction of its Surveillance Programs, thereby Blurring the Role of the Neutral and <u>Detached Magistrate as Required by the Fourth Amendment</u>**

The Fourth Amendment requires the participation of a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out

crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948); *see also McDonald v. United States*, 335 U.S. 451, 455-56 (1948) (discussing the need for "an objective mind [to] weigh the need to invade" privacy to enforce the law); *Steagald v United States*, 451 U.S. 204, 212 (1981) (explaining that judicial approval of warrants ensures a "checkpoint between the Government and the citizen.").

When the role of the judge is reduced merely to ratifying Executive Branch decisions, and even participating in them as consultants for all intents and purposes—with no case or controversy involving an adversary—the court's input regarding the program morphs into an impermissible advisory opinion. *See Chafin v. Chafin*, 133 S.Ct. 1017, 1023 (2013) ("Federal courts may not … give 'opinion[s] advising what the law would be upon a hypothetical state of facts' ") (brackets in original) (*quoting Lewis v. Continental Bank Corp.*, 449 U.S. 472, 477 (1990)); *see also Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979) (noting that when the magistrate participated in search, "the objective facts of record manifest an erosion of whatever neutral and detached posture existed at the outset"); *Coolidge*, 403 U.S. at 449 (finding State Attorney General who was actively in charge of criminal investigation and later was to be chief prosecutor at trial was *per se* disqualified from determining whether there was probable cause to issue search warrants).

Given the programmatic "approval" process of general procedures performed by the FISC under Section 702, the FISC no longer functions as neutral and detached judicial officers. Rather, the statutory function of the court under Section 702 is not to issue a warrant based on probable cause but to authorize and certify a program. *See* 50 U.S.C. §1881a(a). Thus, the statute assigns an Article III court a role that is fundamentally incompatible with the case-or-controversy requirement.

42

It is instructive in this regard to consider the Article III challenges that have been made to the traditional FISA process. In the traditional FISA context, courts have pointed out that the FISC's job in evaluating a FISA warrant is a particularized one, specifically, that under 50 U.S.C. §1805(a) and (b), the FISC considers concrete facts about a specific persons to be monitored and the facilities to be targeted. In rejecting an Article III challenge to the traditional FISA process, the district court in *United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982), stated:

> Applications for electronic surveillance submitted to FISC pursuant to FISA involve concrete questions respecting the application of the Act and are in a form such that a judge is capable of acting on them, much as he might otherwise act on an *ex parte* application for a warrant. In the case of each application, the FISC judge is statutorily obliged to ensure that each statutory prerequisite is met by the application before he may enter a surveillance order. The FISC judge who is faced with a surveillance application is not faced with an abstract issue of law or called upon to issue an advisory opinion, but is, instead, *called upon to ensure that the individuals who are targeted do not have their privacy interests invaded*, except in compliance with the detailed requirements of the statute.

*Id.* at 1197. *See also Muhtorov*, No.12-cr-00033-JLK, (D. Colo., Nov. 5, 2015) (Dkt. #885) (discussing the difference between the FISC's role in the FISA and Section 702 context in analyzing whether the Section 702 violates Article III). Thus, in the FISA context, there is an actual, concrete application relating to an individual target. In Section 702 context, there is no specific, individualized application and thus, no case or controversy.

Finally, the FISC meets *ex parte* with the Government and assists in formulating the program. *See* Bates October 2011 Opinion at *1-3; *see also id.* at *28-*30 (holding that one aspect of the Section 702 collection proposed therein, the " 'upstream collection' of Internet transcriptions containing multiple communications[,] is, in some respects deficient on statutory and constitutional grounds," and then identifying the deficiencies and ordering their correction or cessation if the corrections do not occur). As such, rather than approve or disapprove of proposals, the FISC has a role in designing and modifying them and advising how the programs may be

43

fashioned in order to comply with the requirements of the Fourth Amendment when applied—exactly what the Supreme Court has clearly prohibited.

Given the blurred lines involved in Section 702 surveillance, we respectfully submit that the Foreign Intelligence Surveillance Court does not operate, at least in the context of Section 702, as the neutral and detached magistrate required by the Warrant Clause of the Fourth Amendment.

**F.   The Ninth Circuit's Opinion in *United States v. Mohamud* Did Not Persuasively Address the Constitutionality of Section 702, and Does Not Preclude Defendant's Arguments.**

To date, only one federal appellate court has weighed the constitutionality of Section 702. In *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016), the Ninth Circuit recently found the Section 702 to be constitutional. That opinion, not binding on this Court, is flawed in several meaningful respects.

The Ninth Circuit found no Fourth Amendment violation because the "target" of the warrantless surveillance—a non-U.S. person outside the United States—had no Fourth Amendment rights. According to the Ninth Circuit, because there was no initial violation of the "target's" rights, there was no subsequent violation when a U.S. person's communications were "incidentally" collected during the surveillance of the target. As an initial matter, the concept of "targeting" as applied by the Ninth Circuit is contrary to Fourth Amendment law because it focuses on the intelligence agency's subjective state of mind. There are no special Fourth Amendment rules for "targets." It was this "targeting" principled that led the Ninth Circuit to conclude that incidental collection of the defendant's communications—a U.S. person who was in the United States—did not run afoul of the Fourth Amendment.

Moreover, the Ninth Circuit misapplied the law when it found that the defendant's communications were only "incidentally" collected ruing otherwise lawful acquisition. The cases

relied upon by the Ninth Circuit for its "incidental overhear" rationale all involved court-issued warrants. *See United States v. Kahn*, 415 U.S. 143, 154-55 (1973) (Title III order permitted government to listen o conversations of a named individual's wife who spoke on wiretapped phone); *United States v. Donovan*, 429 U.S. 413 (1977) (warrant); *United States v. Martin*, 599 F.2d 880 (9th Cir. 1979) (warrant).  In contrast to Section 702 surveillance involves no warrant issued based on a showing of probable cause.  Nor is Section 702 surveillance particularized given that the government collects all of a targets' communications and retains them for at least five years.

The Ninth Circuit's "targeting" and "incidental overhear" rationale permit the government to exploit a gap in the law, which has previously been rejected. *See United States v. Bin Laden*, 126 F. Supp. 2d 264, 281 (S.D.N.Y. 2000) (rejecting government's reliance on incidental overhearing doctrine and instead applying Fourth Amendment standard where U.S. person was a "contemplated interceptee of electronic surveillance … even he was not officially deemed a target."). Notwithstanding the Ninth Circuit's conceptual errors regarding targeting and incidental searches—which result in a new a gaping loophole to Fourth Amendment jurisprudence—the government in our case has not yet argued that Defendant's communications were incidentally collected, *i.e.*, that he was communicating with a foreign "target" located outside of the United States.  Therefore, *Mohamud* is of limited relevance.  Should the government advance that argument, then the defense will reply in greater detail.

Additionally, the Ninth Circuit erred when it found that the defendant had a diminished expectation of privacy in his emails under the "third-party doctrine."  *Mohamud*, 843 F.3d at 442 (concluding that "the communications at issue here had been sent to a third party, which reduces Mohamud's privacy interest at least somewhat.").  That conclusion was contrary to the Ninth

Circuit's own precedent, which holds that individuals have a reasonable expectation of privacy in the contents of their own personal online communications. *See In re Grand Jury Subpoena* (*Kitzhaber*), 828 F.3d 1083, 1090-91 (9th Cir. 2016) (finding a reasonable expectation of privacy in personal emails); *United States v. Forrester*, 512 F.3d 500, 509, 511 (9th Cir. 2007); *United States v. Warshak*, 631 F.3d 266, 286-88 (6th Cir. 2010) ("[A] subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial [internet service provider ('ISP')]").

Lastly, the Ninth Circuit declined to address the legality one of the more troubling uses of Section 702 surveillance—the use of "backdoor" or secondary searches through which intelligence agencies can sift through databases containing millions, if not billions, of communications that were collected through Section 702. These searches essentially allow the government, under the premise of targeting foreigners, to investigate U.S. persons. While the defendant expressly addressed this issue before the Ninth Circuit, the court concluded that the issue was not before the Court. *Mohamud*, 843 F.3d at 438.

## VI. THE SECTION 702 SURVEILLANCE MAY HAVE VIOLATED THE STATUTE AND SHOULD BE SUPPRESSED

In addition to the constitutional defects identified above, the surveillance used in this case may also have violated the statute itself, which would similarly require suppression. Undersigned counsel have received the bare-bones Section 702 notice. Nevertheless, based on the statute, counsel would identify the following independent and alternative bases for suppression:

> (1) the acquisition intentionally targeted any person known at the time of acquisition to be located in the U.S.;[24]

---

[24] *See* 50 U.S.C. § 1881a(b)(1).

(2)     the acquisition intentionally targeted a person reasonably believed to be located outside the U.S., but the purpose of the acquisition was to target a known person reasonably believed to be in the U.S.;[25]

(3)     the acquisition intentionally targeted a U.S. person reasonably believed to be outside the U.S.;[26]

(4)     the acquisition intentionally targeted communication in which the sender and all intended recipients were known to be located in the U.S.;[27]

(5)     the acquisition was not made pursuant to the necessary certification, approved by the Attorney General and the Director of National Intelligence;[28] or,

(6)     the acquisition was made pursuant to a certification that lacked the necessary targeting and minimization procedures, or contained targeting and minimization procedures that were not in accordance with *see* 50 U.S.C. § 1881a(d) and (e).[29]

In addition, if the government relied on Upstream surveillance in this case, that surveillance violated the authority that Congress provided in Section 702. Indeed, the government has interpreted Section 702 to allow it to seize and search the internet communications of millions of innocent people in order to search for identifiers associated with its targets. *See* David Kris & J. Douglas Wilson, *National Security Investigations and Prosecutions* § 17.5 ("NSA's machines scan the contents of all of the communications passing through the collection point, and the presence of the selector or other signature that justifies the collection is not known until after the scanning is complete.") (emphasis in original). This intrusive and far-reaching practice has no basis in the statute. The statute authorizes surveillance only of *targets'* communications; it does not authorize surveillance of everyone. *See* 50 U.S.C. § 1881a(a); David Kris, *Trends and Predictions in Foreign Intelligence Surveillance*, 8 J. Nat'l Security L. & Pol'y 18 n.64 (2016), http://bit.ly/1WLjG8C

---

[25] S*ee* 50 U.S.C. § 1881a(b)(2).

[26] *See* 50 U.S.C. § 1881a(b)(3).

[27] *See* 50 U.S.C. § 1881a(b)(4).

[28] *See* 50 U.S.C. § 1881a(g)(1)(A).

[29] *See* 50 U.S.C. § 1881a(g)(2)(B).

(discussing Upstream surveillance and observing that it is unresolved whether the government should be permitted to "review the contents of an unlimited number of e-mails from unrelated parties in its effort to find information 'about' the target").[30]

Since undersigned counsel have not been provided with any of the underlying certification, applications, orders and directives related to the Section 702 surveillance, undersigned counsel can only outline and hypothesize these possible bases for suppression for the Court to examine and consider.  In light of this, undersigned counsel therefore respectfully request that the Court require the prosecutors to disclose to the Court all relevant certifications, applications, orders and directives related to the Section 702 surveillance in this case in order to conduct a review of the materials for any potential statutory violations.

## VII.   AT A MINIMUM, A WARRANT IS REQUIRED WHEN THE INTELLIGENCE AGENCIES SEEK TO ACCESS OR USE THE PROTECTED COMMUNICATIONS OF AMERICANS

Even if intelligence agencies are permitted to conduct surveillance of foreigners without first obtaining a warrant, it is not entitled to completely bypass the Fourth Amendment rights of Americans when it seeks to access and use their communications. Rather, the government's reasoning would justify, at most, the warrantless acquisition of foreign-to-foreign communications, in which it says no Fourth Amendment interests are implicated.  But instead the prosecution seeks a windfall: the ability to retain, use, and deliberately query the communications of known Americans without ever satisfying the Fourth Amendment.  *See Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible."). After-the-fact minimization procedures can and must

---

[30] *See also* Testimony of Jameel Jaffer, former ACLU Deputy Legal Director, PCLOB Public Hearing on Section 702 at 21–24 (Mar. 19, 2014) (explaining that "about" surveillance not authorized by the text of Section 702 and is incompatible with FISA's definitions and legislative history).   (available at: https://www.pclob.gov/library/20140319-Testimony-Jaffer.pdf)

provide Americans with the protection that is absent on the front-end. Indeed, courts have long held that back-end "minimization" protections are essential to the lawfulness of electronic surveillance. Here, where the intelligence agencies seek to query, access, and use the communications of Americans that it acquired without a warrant, those procedures must at the very least interpose individualized judicial review after the fact.

The Supreme Court and other courts have routinely judged the reasonableness of electronic surveillance by assessing the strength of the back-end protections. For example, the Supreme Court invalidated a New York eavesdropping statute because it failed to meaningfully restrict the state's conduct of surreptitious surveillance. *See Berger*, 388 U.S. at 58–60. The statute at issue in *Berger* did not limit the surveillance to particular conversations, but instead permitted the retention and use of "any and all conversations" of the state's targets; it did not meaningfully constrain the duration of surveillance; and it did not provide for after-the-fact notice to those monitored. *Id.*

Lower courts have similarly evaluated the reasonableness of electronic-surveillance regimes by analyzing back-end protections. In *United States v. Ramsey*, 503 F.2d 524, 531 (7th Cir. 1974), the Seventh Circuit rejected a facial challenge to the constitutionality of Title III, and also noted that there were "additional protections" that safeguarded against unconstitutional application of the statute. Similarly, the Fifth Circuit likewise observed that "a statute permitting wire interceptions under narrow restrictions and carefully circumscribed conditions may be constitutional." *United States v. Sklaroff*, 506 F.2d 837, 840 (5th Cir. 1975). And the Second Circuit concurred after concluding that Title III "provide[s] for particularity in the application and order, judicial supervision, and other protective procedures whose absence caused the Court to condemn the electronic surveillance in *Berger* and *Katz*." *United States v. Tortorello*, 480 F.2d

764, 773 (2d Cir. 1973); *accord United States v. Bobo*, 477 F.2d 974, 979 (4th Cir. 1973); *United States v. Turner*, 528 F.2d 143, 159 (9th Cir. 1975).

The lesson of these cases is simple: the constitutionality of wiretapping depends upon strict protections designed to minimize the inherent risks that secret surveillance poses to privacy. As the Supreme Court said in *Berger*, surveillance carries with it "inherent dangers," *Berger*, 388 U.S. at 60, and it must therefore be limited by "precise and discriminate" safeguards. *Id*. at 58.

Courts have applied this same lesson in the context of foreign-intelligence surveillance. Indeed, the importance of strict safeguards is perhaps even greater in the context of intelligence surveillance because of "the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent." *Keith*, 407 U.S. at 320. In *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987), for example, the Fourth Circuit concluded as follows: "FISA's numerous safeguards provide sufficient protection for the rights guaranteed by the Fourth Amendment within the context of foreign intelligence activities." It based that holding, in part, on FISA's requirement of "minimization procedures" designed to minimize the invasion of the privacy of U.S. persons. *See id.* (citing 50 U.S.C. § 1801).

Again, these cases reject the notion that wiretapping that is "lawful" at its inception is somehow immune from the Fourth Amendment's continuing requirement of reasonableness. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (rejecting argument "that if [the probable-cause] requirement is satisfied the Fourth Amendment has nothing to say about how that seizure is made" (emphasis in original)); *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015).

In this case, the surveillance of Defendant was unreasonable because it lacked sufficiently protective back-end restrictions. The prosecution may very well premise its collection on the theory that its targets lack Fourth Amendment rights, but when it collects the communications of

someone who *has* those rights, the protections remain paltry.  The procedures under Section 702 provide no meaningful protection to the many Americans swept up in the intelligence agencies' warrantless surveillance.  Perhaps most troublingly, a central feature of the procedures is that they permit FBI agents to search Section 702 databases specifically for the protected communications of U.S. persons. It was the *absence* of the ability to conduct such "backdoor" searches on which the FISCR rested its approval of warrantless surveillance under Section 702's predecessor statute. *See In re Directives*, 551 F.3d 1004, 1015 (FISCR 2008) ("The government assures us that it does not maintain a database of incidentally collected information from non-targeted United States persons, and there is no evidence to the contrary."). Yet even that protection has since been stripped away.

A rule restricting the government's ability to query, access, or use Americans' communications would not be anomalous.  For one thing, such a restriction already exists in the context of Section 702 itself: the government is already prohibited from conducting backdoor searches targeting Americans within its Upstream databases. *See* 2015 NSA Minimization Procedures § 3(b)(5), available at: https://perma.cc/4PRP-MGS3. In fact, up until 2011, secondary searches targeting Americans within the NSA's PRISM databases were also prohibited.  *See [Redacted]*, 2011 WL 10945618, at *7 ("The procedures previously approved by the Court effectively impose a wholesale bar on queries using United States-Person identifiers.").[31]

And as noted above, when the FISCR ruled on Section 702's predecessor statute, such searches were categorically barred.  *See In re Directives*, 551 F.3d at 1015. Indeed, rules that restrict the government's later use of information—especially electronic information—or require the government to seek court approval after the fact are especially common when the government

---

[31] Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*, Wash. Post, (Sept. 7, 2013), available at: https://perma.cc/5E85-T7EU.

has engaged in broad collection or relied on an exception to the warrant requirement. *See, e.g.*, 50 U.S.C. 1801(h)(4) (requiring individualized FISC authorization to retain and use Americans' communications); *In re Application of the FBI*, No. BR 14-01, slip op. at 6–9 (FISC Feb. 4, 2014), https://perma.cc/2MVK-LER7 (requiring individualized FISC authorization to query bulk call-records database); 50 U.S.C. § 1806(e)(1) (requiring after-the-fact FISC authorization in emergencies); 18 U.S.C. § 2518(7) (similar for Title III).

A rule requiring intelligence agencies to obtain individualized court approval in order to query, access, or use the communications of a known U.S. person would simply require the type of protection the agencies have bypassed on the front-end. The President's Review Group, the House of Representatives, and then-Senator Obama have all called for similar protection. President's Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World* 28–29, 145–50 (2013), http://bit.ly/2mENMiU; H.R. 4870, 113th Cong. § 8127 (2014).[32] Given the breadth and intrusiveness of this surveillance, such a requirement is a practical, necessary, and reasonable safeguard.

## VIII.   CONCLUSION

For all of the above reasons, Defendant, through counsel, respectfully requests that the Court order suppression of all the fruits and derivatives of evidence obtained pursuant to Section 702 due to the statute's unconstitutionality.

---

[32] For example, during the debate that preceded the passage of the FAA, then-Senator Barack Obama co-sponsored an amendment that would have codified these limitations by prohibiting the government from (1) acquiring a communication without a warrant if it knew "before or at the time of acquisition that the communication [was] to or from a person reasonably believed to be located in the United States," and (2) accessing Americans' communications collected under the FAA without a warrant. *See* S.A. 3979, 110th Cong. (2008), 154 Cong. Rec. S607–08 (daily ed. Feb. 4, 2008).

Respectfully submitted,


/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Robin V. Waters
**ROBIN V. WATERS,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**,
Attorneys for Defendant
Aws Mohammed Younis Al-Jayab.


**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
Fax: 312-913-9235
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

  Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing Defendant Aws Mohammed Younis Al-Jayab's Memorandum of Law in Support of Motion to Suppress Evidence Obtained or Derived through the Warrantless Surveillance of Section 702 of the FISA Amendments Act, was served on March 14, 2017, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.1, and LCrR 49.2, pursuant to the district court's system as to ECF filers.

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN**
2446 N. Clark Street
Chicago, Illinois 60614
(312) 981-0123
tdurkin@durkinroberts.com

54