# EXHIBIT A

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

# CHAPTER SEVEN
## DISCOVERY ISSUES RELATED TO STELLAR WIND INFORMATION (TS//SI//NF)

In this chapter we discuss the government's statutory and judicial discovery obligations in international terrorism cases relating to Stellar Wind-derived information. Under the Stellar Wind program, the federal government collected vast amounts of information, including the content of communications and meta data about telephone and e-mail communications involving U.S. citizens and non-U.S. citizens. ██████ (b)(1), (b)(3) ██████████ potentially triggering an obligation under the Federal Rules of Criminal Procedure and applicable case law for the government to disclose certain information to the defendant. This obligation created a tension between the need to protect the secrecy of the Stellar Wind program and the need to comply with legal disclosure requirements. (TS//STLW//SI//OC/NF)

In this chapter, we examine the process by which the Department of Justice attempted to resolve this tension and meet its discovery obligations to criminal defendants.[403] (U)

## I. Relevant Law (U)

The government's obligation to disclose certain statements made by a defendant and to disclose other information concerning a defendant in a criminal proceeding comes primarily from two sources: Federal Rule of Criminal Procedure 16 and the U.S. Supreme Court case of *Brady v. Maryland*, 373 U.S. 83 (1963). (U)

Federal Rule of Criminal Procedure 16(a)(1)(B)(i) requires the government to make various disclosures at the request of a criminal defendant. Among other things, the government must disclose "any relevant written or recorded statement by the defendant if the statement is within the government's possession, custody, or control; and the attorney for the government knows – or through due diligence could know – that the statement exists[.]" Rule 16(a)(1)(E) provides that, upon a defendant's request, the government must allow a defendant to inspect and copy papers,

---

[403] In our review, we did not seek to determine what the government disclosed in specific cases. Rather, we focused on the adequacy of the process that the Justice Department implemented to comply with its discovery obligations in cases that involved Stellar Wind-derived information. (TS//STLW//SI//OC/NF)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

documents, data, and other materials "if the item is within the government's possession, custody, or control" and the item is material to preparing the defense; the government intends to use the item in its case-in-chief at trial; or the item was obtained from or belongs to the defendant. (U)

Under Rule 16, a defendant's statements carry a "near presumption of relevance," and "the production of a defendant's statements has become 'practically a matter of right even without a showing of materiality.'" *United States v. Yunis*, 867 F.2d 617, 621-22, 625 & n.10 (D.C. Circuit 1989).[404] (U)

Disclosure of a defendant's statements is usually made by the government after receiving a request pursuant to Rule 16. However, even without making a Rule 16 request, a defendant has an independent right to discovery of his statements and certain other relevant information under *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the government to disclose evidence in its possession favorable to the defendant and material to either guilt or punishment. Material evidence must be disclosed if it is exculpatory or if it could be used to impeach a government witness. (U)

According to an Office of Intelligence Policy and Review (OIPR) memorandum on the government's Rule 16 and *Brady* obligations,

NSD b(5) - AWP

[405] (U)

However, according to the memorandum, when production of the defendant's statements or other information would reveal classified information, the government may assert a national security privilege, sometimes known as the state secrets privilege.[406] If the government asserts a colorable claim in a legal proceeding that classified information is privileged, the defendant must show that the information is not only

---

[404] See also *United States v. Scarpa*, 913 F.2d 993, 1011 (2nd Cir. 1990), citing *United States v. McElroy*, 697 F.2d 459, 464 (2nd Cir. 1982)("Rule 16 does not cover oral statements unrelated to the crime charged or completely separate from the government's trial evidence."). (U)

[405] Counsel for Intelligence Policy James Baker told us the memorandum was drafted at his request by an Assistant U.S. Attorney who had been detailed to OIPR. Baker said he requested the memorandum to refresh his understanding of the government's discovery obligations in criminal prosecutions. (U//FOUO)

[406] The state secrets privilege is a common law doctrine asserted by the United States government to protect classified information. See generally, *United States v. Reynolds*, 345 U.S. 1 (1952). (U)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

relevant but material. If the defendant can show materiality, some courts balance the defendant's need for disclosure against the government's substantial interest in protecting sources and methods associated with the sensitive information. See *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988); *United States v. Smith*, 781 F.2d 1102, 1180 (4th Cir. 1985) (en banc). (U)

The government can also invoke the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, to protect classified information in federal prosecutions. CIPA does not expand or limit a defendant's right to discovery under Rule 16; rather, CIPA allows a court, "upon a sufficient showing" to authorize the government to delete specified items of classified information from otherwise discoverable documents, substitute a summary of the information, or stipulate to relevant facts that the classified information would tend to prove. (U)

As detailed below, after aspects of the Stellar Wind program were disclosed in The New York Times and confirmed by the President in December 2005, the Justice Department invoked CIPA to prevent disclosure of the program and any program-derived information in (b)(1), (b)(3) criminal cases. (b)(1), (b)(3) (TS//STLW//SI//OC/NF)

## II. Cases Raise Questions about Government's Compliance with Discovery Obligations (U)

The tension between the highly classified nature of the Stellar Wind program and the government's discovery obligations in criminal cases initially arose in (b)(1), (b)(3)          b1, b3, b7E
(TS//STLW//SI//OC/NF)

**A.**  (TS//STLW//SI//OC/NF)          b1, b3, b6, b7C, b7E

The Department's awareness that Stellar Wind would have implications in criminal discovery arose in a case involving



b1,
b3,
b6,
b7C,
b7E

(Cont'd.)
b1, b3, b6, b7C, b7E

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

information collected under Stellar Wind would be discoverable and, more generally, how the Stellar Wind collections might be treated in view of the government's discovery obligations in criminal prosecutions. (TS//STLW//SI//OC/NF)

Baker said he raised these issues with Attorney General Ashcroft, FBI Director Mueller, and other Justice Department, FBI, and NSA officials. Baker stated that they concluded that a determination should first be made whether the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ obtained through Stellar Wind also were captured through FISA and therefore could be produced. Baker said it turned out ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had been intercepted under FISA and could be produced under that authority rather than as a result of Stellar Wind collections. Baker told the OIG that he was relieved by this outcome, but continued to be concerned about future cases. (TS//STLW//SI//OC/NF)

b1,
b3,
b6,
b7C,
b7E

**B.** ▮▮▮▮▮▮▮▮ (TS//STLW//SI//OC/NF)



b1,
b3,
b6,
b7C
b7E

b1,
b3,
b6,
b7C,
b7E

(TS//STLW//SI//OC/NF)

336

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

b1, b3, b6, b7C, b7E

(b)(1), (b)(3), (b)(5)

On [redacted] Yoo orally recommended to Ashcroft that the Justice Department not disclose the Stellar Wind program intercepts to the [redacted] Yoo subsequently memorialized his advice in a memorandum. (TS//STLW//SI//OC/NF)

b1, b3, b6, b7C, b7E



(b)(1), (b)(3), (b)(5)

b1, b3, b6, b7C, b7E

337

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

b6, b7C, b7E



Yoo finished his written memorandum regarding

410

b(1),b(3), b(5) - NSD AWP and A/C

b1,
b3,
b6,
b7C,
b7E

(TS//STLW//SI//OC/NF)

(b)(1), (b)(3), (b) (5)

b1,
b3,
b6,
b7C,
b7E

(b) (5), (b)(1), (b)(3)

b1, b3,
b6, b7C,
b7E

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN



(b) (5)                                                                411

(TS//STLW//SI//OC/NF)

(b)(1), (b)(3), (b) (5)

b1, b3, b6, b7C, b7E

(TS//STLW//SI//OC/NF)

As a final point, Yoo wrote,

(b) (5)

(TS//STLW//SI//OC/NF)

b1, b3, b6, b7C, b7E

(b)(1), (b)(3), (b) (5)

411

(b)(1), (b)(3), (b) (5)

b1, b3, b6, b7C, b7E

412  At the time Yoo wrote the (b)(1), (b)(3) memorandum, he, Baker, and Ashcroft were the only non-FBI Justice Department officials read into the Stellar Wind program. (TS//STLW//SI//OC/NF)

b1, b3, b7E

413
(b)(1), (b)(3), (b) (5)

b1, b3, b7E

414
(b) (5), (b)(1), (b)(3)

[Cont'd.]

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

b1, b3, b7E

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN



b1, b3,
b6,
b7C,
b7E

In another internal Justice Department review of his actions, Yoo has acknowledged that he is not well versed in criminal law. During an interview with the Department's Office of Professional Responsibility (OPR) in connection with its investigation concerning his legal opinions in support of a detainee interrogation program, Yoo stated that "criminal prosecution process in the Department was not my specialty," and "criminal law was not my area."[415] (TS//SI//OC/NF)

## III.  Criminal Division Examines Discovery Issues  (U)

Following **(b)(1), (b)(3)** the Justice Department's Criminal Division was tasked with developing procedures for handling Rule 16 disclosure issues because the issues fell within its area of expertise. As a result, in **(b)(1), (b)(3)** Patrick Rowan, a senior counsel in the Criminal Division, was read into the program to deal with Stellar Wind-related discovery issues. Rowan's supervisor, Criminal Division Assistant Attorney General Christopher Wray, was also read into the program at the same time.

b1, b3, b6,
b7C, b7E



b1, b3,
b6, b7C,
b7E

[415] The OPR investigation concerned a Top Secret compartmented program relating to detainee interrogations. Yoo drafted legal opinions for this program while in the Office of Legal Counsel. However, as discussed in Chapter Four, in contrast with the Stellar Wind program at least four other OLC attorneys assisted Yoo with drafting the legal memoranda. Yoo was also able to consult with Criminal Division attorneys and the client agency on this matter. (TS//STLW//SI//OC/NF)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

Wray and Rowan were the first Department attorneys with Criminal Division-level responsibility for terrorism prosecutions to be read into the program. (TS//STLW//SI//OC/NF)

Wray told the OIG that after his and Rowan's read-in, they "were kind of left on our own." He said that no one directed him or Rowan to continue studying the Rule 16 issues or the government's *Brady* obligations in connection with international terrorism prosecutions, nor did anyone tell them to develop any judgments or opinions on the subject. (U)

Wray told us that at some point after his read-in he may have read Yoo's ██(b)(1), (b)(3)██████ memorandum on the Department's discovery obligations in ████████████ and he instructed Rowan to review the memorandum. Rowan told us that he was familiar with Yoo's memorandum, but stated that he could not recall whether the purpose of Yoo's memorandum was to lay out in general the pertinent legal issues or to document how ████████████ in particular was to be handled. Rowan told us that he did not recall having any problems with the conclusions Yoo reached. (TS//STLW//SI//OC/NF)

b1, b3, b6, b7C, b7E

## A. The "Informal Process" for Treating Discovery Issues in International Terrorism Cases (U)

During his OIG interview, Rowan described the processes at the Department prior to the December 2005 disclosure of aspects of the Stellar Wind program in The New York Times to address discovery obligations with respect to Stellar Wind-derived information. He said that the NSA was generally aware of the Justice Department's international terrorism criminal cases, at least in part due to NSA's ongoing contacts with Patrick Philbin and others in the Department. According to Rowan, the NSA's general awareness of the Department's international terrorism docket amounted to an "informal process" for spotting cases that may present discovery issues. Rowan stated that prosecutors in U.S. Attorney's Offices typically would request the NSA to perform "prudential searches" of its databases for any relevant information concerning their prosecutions, including for discovery purposes, although this did not happen in every international terrorism case. Rowan stated that if the NSA located any responsive but classified information, it would be expected to notify senior Justice Department officials with the requisite clearances about the information. Rowan said he was confident that if *Brady* information were known to the NSA, it would be brought to the attention of the Department and steps would have been taken to dismiss the case or otherwise ensure the program was not disclosed. (TS//STLW//SI//OC/NF)

In addition to these routine communications between Department prosecutors and the NSA in criminal prosecutions, Rowan described other

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

measures that were in place to keep Stellar Wind-derived information out of the criminal prosecution process. He stated that the FBI had "walled off" any evidence it collected from inclusion in criminal cases by tipping out Stellar Wind-derived information under ▆▆▆▆▆ with a caveat that the information in the tipper was "for lead purposes only." Rowan noted that OIPR also had in place a scrubbing process to delete program-derived information from FISA applications. Rowan expressed confidence that these mechanisms ensured that no program information was used in international terrorism prosecutions.[416] Finally, Rowan stated that the FBI is "very quick to get FISAs up," thereby minimizing the likelihood that the NSA's Stellar Wind database would be the sole repository of *Brady* material. (TS//STLW//SI//OC/NF)

b1, b3, b7E

**B.** ▆(b)(5)▆ **Memorandum Analyzing Discovery Issues Raised by the Stellar Wind Program** (TS//STLW//SI//OC/NF)

At the direction of Assistant Attorney General Wray, Rowan memorialized his research regarding these discovery issues in a memorandum entitled ▆▆▆▆▆▆▆▆▆▆



Rowan said he worked on the memorandum largely alone, consulting occasionally with Wray. Rowan said it was very difficult to work on the matter because of the secrecy surrounding the program and the other demands of his job.[417] (TS//STLW//SI//OC/NF)

In his ▆(b)(5)▆ memorandum, ▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ (b)(5) ▆▆▆▆▆▆▆▆▆▆

---

[416] As discussed in Chapter Six, the caveats were intended to exclude at the outset any Stellar Wind-derived information from FISA applications and other criminal pleadings. The scrubbing process acts as a second check against including this information in FISA applications. However, neither the caveats nor the scrubbing process relieved the government of its obligations under *Brady* to disclose evidence in the government's possession favorable to the defendant and material to either guilt or punishment. (TS//STLW//SI//OC/NF)

[417] The memorandum noted, "Because there were no additional attorneys within the Criminal Division who were read into the program (and very few in the Department generally), we have been unable to assign work to others or to fully consult with others within the Division." (TS//SI//NF)



b1, b3, b6, b7C, b7E

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

(b)(5)

b1,
b3,
b7E

(b)(5)

b1,
b3,
b7E

    Rowan's memorandum also referred to guidance in the United States Attorney's Manual (USAM). For cases in which the Intelligence Community had no active involvement in the criminal investigation, the USAM stated that there are two circumstances in which the prosecutor must conduct a "suitable search" of Intelligence Community files: (1) where the prosecutor has "direct or reliable knowledge" that the Intelligence Community

b1, b3, b6,
b7C, b7E



TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

possesses potential *Brady* or other discovery material; or, (2) in the absence of such knowledge, where "there nonetheless exists any reliable indication suggesting" that the Intelligence Community possesses such material. USAM, Criminal Resources Manual § 2052 (2002). The USAM stated that, as a general rule, a prosecutor should not seek access to Intelligence Community files unless there is an affirmative obligation to do so. However, it noted that certain types of cases, including terrorism prosecutions, fall outside this general rule. In such cases, the USAM advised that the prosecutor should conduct a "prudential search." Id. (TS//STLW//SI//OC/NF)

Rowan wrote that the practice in several sections within the Criminal Division was to "generally go beyond both the legal obligations outlined [in his memorandum] and the general rule outlined in the USAM, initiating searches out of prudence, rather than a legal obligation." For instance, Rowan reported that the practice of the Criminal Division's Counterespionage Section (CES) was to search Intelligence Community files in almost every case, even in instances in which the Intelligence Community had no involvement in the investigation or prosecution ▮▮▮▮▮▮

(b) (5) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [420]

(TS//STLW//SI//OC/NF)

(b) (5) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ [421] In cases involving the NSA, the typical practice

---

[420] The OIG interviewed John Dion, the Chief of CES, which became part of the National Security Division in 2006. (b) (5) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dion stated that such searches are conducted in cases in which there is likely to be intelligence collection concerning the defendant as "suggested by the facts of the matter." He added that the searches were requested for a variety of reasons, including for purposes of meeting discovery obligations. Dion said that searches also were requested to determine whether the defendant has a "relationship" with an intelligence agency. He noted that CES does not request prudential searches as a matter of course to avoid making spurious requests. (S//NF)

[421] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) (5) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dion said CES was a proponent of the position that line prosecutors with whom CES co-prosecutes cases should have the same knowledge as CES concerning the "national security equities" involved in each case. Dion said this arrangement also allows for the AUSA, who is often the prosecutor most familiar with the case and the jurisdictional practices, to review any Intelligence Community material for Rule 16 and *Brady* purposes. Dion acknowledged the limitations to this arrangement concerning strictly compartmented programs such as Stellar Wind, where the NSA understandably would be reluctant to read in line prosecutors for the limited purpose of screening defense discovery requests. (TS//STLW//SI//OC/NF)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

was for the CES attorney to use the provisions of CIPA to prevent disclosure of sensitive material. Rowan noted that other sections within the Criminal Division also relied on CIPA to protect Intelligence Community files found during searches. (TS//SI//OC/NF)



Thus, although Rowan's memorandum did not contain a proposal for handling discovery requests in cases involving Stellar Wind, it identified key legal issues that would have to be addressed as a part of any such proposal.



(TS//STLW//SI//OC/NF)

---

422 When Rowan became principally responsible for coordinating the Department's responses to defense discovery requests as a Deputy Assistant Attorney General in the

(Cont'd.)

345

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

## C. Office of Legal Counsel and Discovery Issue (U)

Shortly before Rowan finished his memorandum in ▮(b)(5)▮ OLC Principal Deputy Assistant Attorney General Steve Bradbury became the acting head of OLC. Bradbury told us that he recalled having some discussion with Rowan about how discovery matters should be handled in connection with the Stellar Wind program. Bradbury said that John Eisenberg, later a Deputy in OLC, also may have discussed the matter with Rowan. Bradbury stated that he did not believe that OLC followed up on Rowan's request that it continue researching these issues. (TS//STLW//SI//OC/NF)

Eisenberg told us that he discussed the Rule 16 issue with Rowan at some point, but did not recall whether they discussed the *Brady* issue. He recalled discussing Yoo's ▮(b)(1), (b)(3)▮ memorandum with Rowan and said he believes the Justice Department took the position that the Yoo memorandum was correct, at least with respect to Yoo's legal analysis in ▮ ▮(b)(1), (b)(3)▮ (TS//STLW//SI//OC/NF)

b1, b3, b6, b7C, b7E

When we showed Eisenberg a copy of Rowan's ▮(b)(5)▮ memorandum, Eisenberg stated that he had not previously seen it. Eisenberg told us that OLC would not typically be responsible for addressing the discovery issues presented in Rowan's memorandum and that he was not aware of any OLC opinion on the subject other than Yoo's memorandum. Eisenberg also said he was not aware of any formal procedures for handling Rule 16 disclosure requests or the government's affirmative *Brady* obligations other than the *ex parte* in camera motions practice pursued by the National Security Division, discussed below. (TS//STLW//SI//OC/NF)

CES Chief Dion agreed that OLC would not be the appropriate entity to review discovery procedures in the context of Stellar Wind, in part because OLC attorneys generally do not have criminal litigation expertise. Dion suggested that if the Department were to develop procedures for handling discovery of Intelligence Community files, it should be done by the Department's National Security Division in coordination with United States Attorneys' Offices, and it should be binding only on those two entities. Rowan, while generally agreeing with Dion, told the OIG that he believed the OLC appropriately could have analyzed the legal issue of what impact a

National Security Division in 2006. ▮(b)(5)▮ The results of these searches were produced to the courts *ex parte*, in camera, pursuant to CIPA. (TS//STLW//SI//OC/NF)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

~~TOP SECRET//STLW//HCS/SI//ORCON/NOFORN~~

guilty plea would have on the government's *Brady* obligations. ~~(TS//STLW//SI//OC/NF)~~

Wray also told us that there was no organized Departmental effort to establish formal procedures for reviewing international terrorism prosecutions to comply with Rule 16 disclosure requests and *Brady* obligations. He said "the thinking was" that the Rowan memorandum was the "first step" toward devising "some kind of systematized process" for such reviews. However, we found no indication that OLC followed up on Rowan's request to further study these discovery issues with any kind of written product. ~~(TS//STLW//SI//OC/NF)~~

## IV. Use of the Classified Information Procedures Act (CIPA) to Respond to Discovery Requests (U)

After publication of The New York Times articles in December 2005, the Justice Department received numerous discovery requests in connection with international terrorism prosecutions throughout the country. After these articles, additional officials in the Criminal Division were read into the Stellar Wind program, including the new Assistant Attorney General Alice Fisher and other senior officials, both to assist with the Criminal Division's investigation into the leak of information to The New York Times and to handle the discovery requests following the public confirmation of the program by the President and other Administration officials in December 2005.[423] After the National Security Division was created in September 2006, it assumed much of the responsibility for handling the responses to discovery requests. ~~(TS//STLW//SI//OC/NF)~~

Typically, the defense motions sought to compel the government to produce information concerning a defendant that had been derived from the "Terrorist Surveillance Program," the term sometimes used by the government to refer to what the President confirmed after publication of The New York Times articles. The government responded to the discovery requests by filing *ex parte* in camera responses requesting to "delete items" from material to be produced in discovery pursuant to CIPA. ~~(S//NF)~~

In the following sections we provide a brief overview of CIPA and its use in international terrorism cases potentially involving Stellar Wind-derived intelligence. ~~(TS//STLW//SI//OC/NF)~~



[423]

(b)(3)

~~TOP SECRET//STLW//HCS/SI//ORCON/NOFORN~~

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

## A. Overview of CIPA (U)

The Classified Information Procedures Act, 18 U.S.C. App. 3, was enacted in 1980 to provide procedures for protecting classified information in federal criminal prosecutions. When a party to a criminal proceeding notifies the court that classified information will be used in the course of the proceeding, CIPA requires the court to initiate procedures to "determine the use, relevance, or admissibility of the classified information that would otherwise be made during the trial or pretrial proceeding." 18 U.S.C. App. 3 § 6(a). Where the government holds the classified information, it may bring the matter before the court *ex parte*, but it also must provide notice to the defense that classified information is at issue. Id. at § 6(b)(1). (U)

Protective procedures generally are established through a CIPA hearing with both parties present. The hearing may be conducted in camera if the government certifies that an in camera hearing is necessary to protect the classified information. Id. at § 6(a). Typically, the government seeks an order to protect against the disclosure of any classified information to the defense. The government may also seek to withhold production of the classified information in one of three ways: (1) deletion of the classified items from the material disclosed to the defendant, (2) summarization of the classified information, or (3) admission of certain facts that the classified information would tend to prove. Id. at § 4. Based on the OIG's review of CIPA filings related to the Stellar Wind program, the government has only used option 1 (deleting classified items from material to be disclosed to the defendant) in response to defense motions for Stellar Wind information. (TS//STLW//SI//OC/NF)

To prevent the disclosure of classified information, the government may make an *ex parte* showing to the court. To do so the government must submit "an affidavit of the Attorney General certifying that disclosure of classified information would cause identifiable damage to the national security of the United States and explaining the basis for the classification of such information." Id. at § 6(c)(2). If the court decides that the defendant's right to access to the evidence outweighs the government's national security interests, the government can choose to dismiss the indictment rather than make a disclosure. *United States v. Moussaoui*, 382 F.3d 453, 466 n. 18, 474-76 (4th Cir. 2004). (U)

## B. Use of CIPA in International Terrorism Prosecutions Alleged to Involve Stellar Wind-Derived Information (TS//STLW//SI//OC/NF)

We reviewed the CIPA pleadings files maintained in the National Security Division relating to the Stellar Wind program. In almost every instance, the CIPA litigation was handled by the National Security Division

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

without the involvement of the line prosecutors in the U.S. Attorney's Offices who handled the underlying prosecutions but who were not read into the Stellar Wind program. (TS//STLW//SI//OC/NF)

(b)(1), (b)(3)

Rowan, who became the National Security Division Acting Assistant Attorney General in April 2008 and was confirmed as the Assistant Attorney General in September 2008, told us that ▮▮▮▮▮▮
(b)(1), (b)(3)
(TS//STLW//SI//OC/NF)

The scope and nature of the defense motions initiating the CIPA litigation varied, depending on the procedural posture of the case. For instance, some defense motions sought to compel discovery of NSA surveillance information, while others sought to suppress all government evidence and, in the alternative, have the government's case dismissed on the theory that illegal electronic surveillance caused the government to initiate its criminal investigation in the first instance. ▮▮▮▮
(b)(1), (b)(3)

(TS//STLW//SI//OC/NF)

Regardless of the varying procedural posture of the cases and the scope and nature of the defense motions, the government responses we examined were fairly uniform, consisting of a motion to delete items from discovery, a legal memorandum in support of the motion, declarations from senior FBI and NSA officials, and a proposed order. (TS//STLW//SI//OC/NF)

(b)(3)

(TS//STLW//SI//OC/NF)

The government's CIPA submissions asserted that the information at issue in the discovery litigation was classified and subject to the national security privilege as codified in CIPA. They generally described the types of information its searches of intelligence databases (including Stellar Wind) might reveal. (b)(3)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN



TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

(b)(1), (b)(3)                                                                425

The government's responses we reviewed uniformly stated that information in the NSA's intelligence reports had not been or would not be used as evidence, and that there was no causal connection between the information in the reports and any evidence used or to be used at trial, or was too attenuated from the evidence to be discoverable. The government argued that because the facts concerning the NSA's reporting would not aid the defense, the court need not explore the sources and methods used to acquire the information. The submissions also argued that the information collected by the NSA was not included in the government's FISA application, and therefore was too attenuated from the trial evidence to merit a review of the means by which the intelligence information was gathered. The government asserted that the "causal connection" between discovery of the derivative evidence and the alleged illegal search "may have become so attenuated as to dissipate the taint."[426] It is important to note that the government did not argue in the CIPA responses we reviewed that

(b)(5), (b)(1), (b)(3)

(TS//STLW//SI//OC/NF)

b1,
b3,
b6,
b7C,
b7E

### C.    Government Arguments in Specific Cases  (U)

In this section we describe ▮▮▮ cases that illustrate the arguments made by the government in CIPA litigation with respect to defendant's requests for discovery of Stellar Wind-derived information. (TS//STLW//SI//OC/NF)

b1, b3, b6,
b7C, b7E



---

[425] In several instances, the Stellar Wind information was disseminated within the FBI after the FBI already had obtained a FISA order to conduct electronic surveillance of the defendant, thus allowing the government to argue that the NSA reporting played no role in its acquisition of the evidence used or planned to be used against the defendant. (TS//STLW//SI//OC/NF)

[426] *Nardone v. United States*, 308 U.S. 338, 341 (1939). The government also argued in its submissions that suppressing its evidence would not serve any deterrence purpose. The government argued that the NSA acquires, processes, and disseminates intelligence not to produce criminal prosecutions, but to protect the national security. It asserted that any suppression of evidence would therefore frustrate a criminal prosecution and create an incentive for the intelligence community not to share information with law enforcement, thereby harming national security. (TS//SI//OC/NF)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN     b1, b3, b6, b7C, b7E



352

b1, b3, b6, b7C, b7E

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN



353

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

b1, b3, b6, b7C, b7E



354

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN b1, b3, b6, b7C, b7E



355

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

b1, b3, b6, b7C, b7E



356

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN        b1, b3, b7E



## V.    OIG ANALYSIS (U)

We found that the Department made little effort to understand and comply with its discovery obligations in connection with Stellar Wind-derived information for the first several years of the program. The Department's limited initial effort was also hampered by the limited number of attorneys who were read into the program. As a result, OLC attorney John Yoo alone initially analyzed the government's discovery obligations in one early case, and he produced a legal analysis that was based on an incorrect understanding of the facts of the case to which it applied. When other attorneys from the Department's Criminal Division eventually were read into the program, (b)(5) At that point, the Department eventually took steps to address its discovery obligations. However, in our view, those steps are not complete and do not fully ensure that the government has met its discovery obligations regarding information obtained through the Stellar Wind program. (TS//STLW//SI//OC/NF)

As described in this chapter, in 2002 the Department first recognized that the Stellar Wind program could have implications for discovery obligations in terrorism cases. OIPR Counsel Baker raised with Department



357

b1, b3, b6, b7C, b7E

and FBI officials the question of how the government would meet its discovery obligations regarding Stellar Wind information. Despite awareness of this issue, the Department took no action at this time to ensure that it was in compliance with Rule 16 or *Brady* with respect to Stellar Wind-derived information. We believe that at this point senior Department officials were on notice that, at a minimum, the discovery issue merited attention. However, no concrete action was taken until early ▮▮▮ in the context of ▮▮▮▮▮▮ when the Department had to address how to handle Stellar Wind information that was not also obtained under FISA and that could be material to the defense under Rule 16. This issue was assigned to Yoo, who concluded ▮▮▮▮▮▮

b1, b3, b6, b7C, b7E



(TS//STLW//SI//OC/NF)

(b)(5), (b)(1), (b)(3)

b1, b3, b6, b7C, b7E

As with other aspects of the Stellar Wind program, we believe the error in Yoo's legal analysis may have resulted in part from the failure to subject his memorandum to typical OLC and Department review and scrutiny. Because other Department attorneys were not read into the Stellar Wind program, the risk that the Department would produce a factually flawed and inadequate legal analysis of these important discovery issues was escalated. As we concluded in Chapters Three and Four, we believe the lack of sufficient legal resources at the Department during this early phase of the Stellar Wind program hampered its legal analysis of important issues related to the program. We believe that Yoo's (b)(1), (b)(3) memorandum is one more manifestation of this problem. (TS//STLW//SI//OC/NF)

b1, b3, b6, b7C, b7E

In July 2004, Patrick Rowan, a senior counsel in the Criminal Division, was read into the program and conducted a more systemic analysis of the Department's discovery obligations with regard to Stellar Wind information. ▮▮▮▮▮

(b)(5)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN

(b) (5)

. (TS//STLW//SI//OC/NF)

(b) (5)

With his memorandum, Rowan initiated a request that the issue be further examined by OLC. (TS//SI//NF)

However, other than in informal discussions with Rowan concerning Yoo's [redacted] memorandum, OLC did not further examine these issues or follow up on Rowan's recommendation. While we recognize that OLC was not responsible for developing litigative strategy on this issue, we believe that OLC or another appropriate Department component should have provided guidance on this important legal issue. (TS//STLW//SI//OC/NF)

b1,
b3,
b6,
b7C,
b7E

We recommend that the Department conduct a comprehensive legal assessment of the important issues (b) (5) that still remain unresolved (b) (5) the legal ramifications of a guilty plea on the government's disclosure obligations under Rule 16 and in particular *Brady*. We believe the Department should carefully consider whether it must re-examine past cases to see whether potentially discoverable but undisclosed Rule 16 or *Brady* material was collected by the NSA, and take appropriate steps to ensure that it has complied with its discovery obligations in such cases. (TS//SI//NF)

The Department took steps to respond, on a case-by-case basis, to discovery motions (b)(1), (b)(3)

However, the Department's handling of these motions did not require the Department to identify the potentially discoverable information derived under the Stellar Wind program that may exist in other cases. We recommend that the Department, in coordination with the NSA, develop and implement a procedure for identifying Stellar Wind-derived information that may be associated with international terrorism cases, currently pending or likely to be brought in the future, and to evaluate such information in light of the government's discovery obligations under Rule 16 and Brady. (TS//STLW//SI//OC/NF)

TOP SECRET//STLW//HCS/SI//ORCON/NOFORN