**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CR 181 |
| | ) | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS | ) | |
| AL-JAYAB, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT AWS MOHAMMED YOUNIS AL-JAYAB'S CONSOLIDATED REPLY
IN SUPPORT OF HIS FAA, FISA, AND SURVEILLANCE-RELATED PLEADINGS
AND RESPONSE TO THE GOVERNMENT'S UNCLASSIFIED MEMORANDUM**

Defendant, **AWS MOHAMMED YOUNIS AL-JAYAB**, by and through his attorneys,

**THOMAS ANTHONY DURKIN, ROBIN V. WATERS,** and **JOSHUA G. HERMAN**,

respectfully replies to the Government's Unclassified Memorandum in Support of its Motion for

an *Ex Parte*, *In Camera* Review to Determine the Legality of Collection Pursuant to the Foreign

Intelligence Surveillance Act ("FISA") and in Opposition to Defendant's Motions for Notice of

Surveillance Techniques, for Discovery, and to Suppress Evidence Obtained or Derived from

Section 702 of FISA (Dkt. #63, hereinafter, "Unclassified Memo") and in consolidated support

of the following pleadings:

- Defendant Aws Mohammed Younis Al-Jayab's Motion to Suppress Evidence Obtained or Derived from Warrantless Surveillance Under Section 702 of the FISA Amendments Act and Memorandum in Support (Dkt. #47, 48) (hereinafter, "FAA Motion");

- Defendant's Objection to Secret, *Ex Parte* CIPA Litigation of Fourth Amendment Suppression Issues and Motion for Disclosure to Cleared Counsel (Dkt. #50) (hereinafter, "CIPA Objection");

- Defendant's Motion for Discovery Regarding the Intelligence Agencies' Surveillance Pursuant to Executive Order 12333 (Dkt. #51) (hereinafter, "EO 12333 Motion"); and,

- Defendant's Motion for Notice of Surveillance Techniques Used During the Course of the Investigation (Dkt. #52) (hereinafter, "Surveillance Notice Motion").

## I. BACKGROUND.

The prosecution begins its "factual background" section by boldly asserting as follows: "[f]rom the moment he arrived in the United States, the defendant began to plot his return to Syria to fight on behalf of terrorist groups there." (Unclassified Memo, p. 7). Then, in what appears to resemble a preview of its trial brief, the prosecution lays out its evidence over the course of ten pages, highlighting numerous communications allegedly between Defendant and other individuals, mainly concerning travel to Syria. While the prosecution's motives for the tone of its introduction are apparent, and, indeed, entirely consistent with the fear-driven rhetoric surrounding Section 702, counsel question its necessity in what is a defense of the FAA and FISA surveillance conducted in this case—especially when, as the prosecution contends, Defendant was not "targeted," but was instead subject only to "incidental" collection of his communications. Needless to say, counsel strongly disagree with many of the prosecution's conclusions, particularly its opening salvo.[1] Counsel save that discussion for a more appropriate pleading or juncture.[2] However, the prosecution's factual background is not without some

---

[1] It cannot go without mentioning that, notwithstanding its assertion that Defendant fought "on behalf of terrorist groups," the prosecutors charged this single-count indictment under 18 U.S.C. § 2339A, rather than the more commonly charged 18 U.S.C. § 2339B, which prohibits providing material support to terrorist groups. Indeed, the indictment filed in this case is silent as to terrorism, much less any specific terrorist group.

[2] Discussion of the extraordinarily complex geopolitical and human rights disaster that is Syria will certainly be a topic for another time. That analysis should no doubt include the long-running covert, and now overt, participation of the United States in the conflict, and particularly its suspected association with "terrorist groups" against the common enemy of the Syrian regime and its leader, Bashar al-Assad.

relevance for the legal issues. As discussed below, for the issues before the Court, the prosecution's focus on Defendant's communications does nothing more than underscore the necessity of defense counsel participation in any review of the FISA and FAA materials pursuant to 50 U.S.C. §§ 1806(f) and 1825(g). Indeed, the number and nature of the communications calls into question whether the collection of Defendant's communications was "incidental" in the first place. We will save a debate as to the facts of the case for another day.

## II. DEFENSE COUNSEL REQUESTS DISCLOSURE OF FAA AND FISA MATERIALS, AND PARTICIPATION IN ANY HEARING, WHICH IS NECESSARY TO DETERMINE THE LEGALITY OF THE SURVEILLANCE AT ISSUE PURSUANT TO 50 U.S.C. §§ 1806(f) AND 1825(g), AND FURTHER OBJECT TO ANY *EX PARTE* REVIEW SOUGHT BY THE PROSECUTION.

In light of the prosecution's invocation of *ex parte* and *in camera* proceedings, as an initial matter, defense counsel object to any *ex parte* and *in camera* proceedings under 50 U.S.C. §§1806(f) and 1825(g) to determine whether any electronic or physical search was lawfully authorized and conducted. Counsel also request disclosure of FAA and FISA materials. Disclosure to defense counsel, all of whom have security clearances, is necessary for a fair and accurate resolution of those issues, and as a matter of Due Process.

The prosecutors correctly note that the Section 702 motion has triggered the court's review pursuant to 50 U.S.C. §§1806(f) and 1881e(a). (Unclassified Memo, p. 2). The prosecutors have submitted an affidavit signed by Attorney General Sessions, in which he represents that disclosure or an adversary hearing would harm national security. (Unclassified Memo, Exhibit 1). That affidavit in turn triggers the "*in camera* and *ex parte*" review provisions in §§1806(f) and 1825(g). Secret review that excludes defense counsel is not absolutely mandated. To the contrary, the statutes specifically require the Court to consider disclosure to defense counsel when it examines whether the (electronic or physical) surveillance

of the aggrieved person[3] was "lawfully authorized and conducted."   Specifically, the statutes

provide as follows:

> In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

50 U.S.C. § 1806(f); and,

> In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the physical search, or may require the Attorney General to provide to the aggrieved person a summary of such materials, only where such disclosure is necessary to make an accurate determination of the legality of the physical search.

50 U.S.C. § 1825(g).   The same procedure applies to motions to disclose Section 702-related

materials, or to suppress information obtained or derived from Section 702 surveillance.   50

U.S.C. § 1881e(a).   (Unclassified Memo, p. 40).   Thus, after the Court's own initial *ex parte* and

*in camera* review, disclosure to defense counsel should be made when it is "necessary to make

an accurate determination of the legality" of the surveillance or of the physical search.

No defendant, to our knowledge, has actually received such disclosure.   Undersigned

counsel represented Adel Daoud, the first defendant to be authorized to receive such disclosure

in a FISA case.   (Case No. 12 CR 723, Dkt. #92).   However, the government appealed Judge

Sharon Johnson Coleman's order authorizing disclosure to cleared counsel, and the Seventh

Circuit reversed that order after conducting its own *ex parte* and *in camera* review of the

material.   *United States v. Daoud*, 755 F.3d 479, *supplemented*, 761 F.3d 679 (7th Cir. 2014),

*cert. denied*, 135 S. Ct. 1456 (2015).   The Seventh Circuit's *Daoud* decision does not, of course,

---

[3] The government does not argue that Defendant is not an aggrieved person with standing to challenge the electronic and physical surveillance under §§1806(e), 1825(f), and 1881e(a).

foreclose disclosure to defense counsel under the appropriate circumstances. Rather, the decision lays out an analytical framework for identifying those circumstances (or more precisely put, the order of that analysis).[4] In doing so, the Seventh Circuit specified that a district court must first conduct an *ex parte* and *in camera* review of the FISA materials, and then determine whether disclosure to defense counsel is necessary.

In Daoud's case, the district court merely failed to find that disclosure was necessary, and instead stated that it "may be necessary." *Daoud*, 755 F.3d at 482 ("The statute requires the judge to review the FISA materials *ex parte in camera* in every case, and on the basis of that review decide whether any of those materials must be disclosed to defense counsel. The judge did not do that. She did not find that disclosure was necessary, only that it "may be necessary."). Nothing in the Seventh Circuit's opinion precludes disclosure to defense counsel after the district court makes an appropriate finding after review of the FISA materials. Thus, this Court has an independent duty to determine whether disclosure to defense counsel is "necessary" when deciding whether the surveillance was lawfully authorized and conducted.

In carrying out that duty, counsel respectfully submit that the Court should be sensitive to the legislative intent behind the use of "necessary" in the FISA disclosure provisions, 50 U.S.C. §§ 1806(f) and 1825(g).[5] "Necessary" does not mean, as the government often argues, that disclosure is not allowed unless it is essential or indispensable to the district court's ruling on a

---

[4] As noted above, rather than remand the case to Judge Coleman to determine whether disclosure was "necessary," the Seventh Circuit usurped that decision, notwithstanding the fact that Judge Coleman was much closer to the facts and circumstances of the case.

[5] The Seventh Circuit did not resolve the disputed interpretation of "necessary" in *Daoud*. Rather, it noted that the term had a "legendary" vagueness in legal contexts (*Daoud*, 755 F. 3d at 484 (*citing Cellular Telecommunications & Internet Ass'n v. FCC*, 330 F.3d 502, 509-512 (D.C. Cir. 2003)). It then observed that because the district court's disclosure order indicated it was "capable" of making of determining the legality of the FISA surveillance, "disclosure was not 'necessary' under any definition of the word." *Id*. at 485.

suppression motion.  To the contrary, the legislative history shows that disclosure is "necessary" under §§ 1806(f) and 1825(g) when it would substantially promote an accurate determination of legality.

The word "necessary" does not have a plain meaning.  Indeed, the D.C. Circuit observed as follows:  "[t]he term 'necessary' is a chameleon-like word whose meaning . . . may be influenced by its context . . . .[It] is not language of plain meaning." *Cellco Partnership v. FCC*, 357 F.3d 88, 96-97 (D.C. Cir. 2004).  Courts have frequently interpreted "necessary" to mean "less than absolutely essential, and have explicitly found that a measure may be 'necessary' even though acceptable alternatives have not been exhausted." *CT&IA v. FCC*, 330 F.3d 502, 510 (D.C. Cir. 2003) (quotation omitted).   In *Commissioner v. Tellier*, 383 U.S. 687 (1966), for example, the Supreme Court found that the word "necessary" in the phrase "ordinary and necessary [business] expenses" imposes "only the minimal requirement that the expense be appropriate and helpful for the development of the taxpayer's business." *Id*. at 689 (quotations and brackets omitted); *see*, *e.g.*, *Snider v. United* States, 468 F.3d 500, 513 (8th Cir. 2006) (interpreting "necessary" in 26 U.S.C. § 6103; court rejects 'strictly essential' and holds that the "'appropriate or helpful' meaning of 'necessary' is the only practical interpretation in this context").[6]

These cases confirm that the word "necessary" in §§ 1806(f) and 1825(g) does not plainly mean essential or indispensable.  Instead, the term must be read in light of the legislative history of FISA and the statutory purposes.  Indeed, cases interpreting "necessary" have emphasized that

---

[6] *See also Prometheus Radio Project v. FCC*, 373 F.3d 372, 393-94 (3d Cir. 2004) (interpreting "necessary" in § 202(h) of the Telecommunications Act of 1996 to mean "'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable'"); *FTC v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979) (interpreting "necessary" in 15 U.S.C. § 46; court holds that FTC's authority to conduct an ancillary investigation of a bank when "necessary" did not require investigation to be "absolutely needed" or "inescapable," but instead that it "arise reasonably and logically out of the main investigation").

its meaning must be "harmonized with its context." *Armour & Co. v. Wantock*, 323 U.S. 126, 130 (1944). The "context" of § 1806(f) (and by extension, § 1825(g)), including the legislative history and the purposes of FISA, demonstrates that Congress intended the term to mean that disclosure would substantially promote the accuracy of the district court's determination of legality—not that disclosure had to be essential or indispensable to an accurate determination. The legislative history of FISA cuts squarely against the government's insistence that the word "necessary" in § 1806(f) requires a showing that disclosure is essential or indispensable to an accurate determination of legality.

Two authoritative Senate Reports—one from the Senate Judiciary Committee and the other from the Senate Intelligence Committee—discuss in detail the provision that became § 1806. The Reports observe:

> The extent to which the government should be required to surrender to the parties in a criminal trial the underlying documentation used to justify electronic surveillance raises delicate problems and competing interests. On the one hand, broad rights of access to the documentation and subsequent intelligence information can threaten the secrecy necessary to effective intelligence practices. However, the defendant's constitutional guarantee of a fair trial could seriously be undercut if he is denied the materials needed to present a proper defense. The Committee believes that a just, effective balance has been struck in this section.

S. Rep. 604(I), 95th Cong., 1st Sess. 53, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3954; *see* S. Rep. 701, 95th Cong., 1st Sess. 59 (similar passage in Senate Intelligence Committee Report), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4028. Turning to § 1806(f), the Committees summed up the disclosure provision as follows:

> The committee views the procedures set forth in this subsection as striking a reasonable balance between an entirely *in camera* proceeding which might adversely affect the defendant's ability to defend himself, and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information.

7

The decision whether it is necessary to order disclosure to a person is for the Court to make after reviewing the underlying documentation and determining its volume, scope and complexity. The committee has noted the reasoned discussion of these matters in the opinion of the Court in *United States v. Butenko*, [494 F.2d 593 (3d Cir. 1974) (en banc)]. There, the Court, faced with the difficult problem of determining what standard to follow in balancing national security interests with the right to a fair trial stated:

"The distinguished district court judge reviewed *in camera* the records of the wiretaps at issue here before holding the surveillances to be legal . . . Since the question confronting the district court as to the second set of interceptions was the legality of the taps, not the existence of tainted evidence, it was within his discretion to grant or deny Ivanov's request for disclosure and a hearing. The exercise of this discretion is to be guided by an evaluation of the complexity of the factors to be considered by the court and by the likelihood that adversary presentation would substantially promote a more accurate decision." (494 F.2d at 607.)

Thus, in some cases, the Court will likely be able to determine the legality of the surveillance without any disclosure to the defendant. In other cases, however, the question may be more complex because of, for example, indications of possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which includes [sic] a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order. In such cases, the committee contemplates that the court will likely decide to order disclosure to the defendant, in whole or in part since such disclosure "is necessary to make an accurate determination of the legality of the surveillance." [Footnote omitted.]

Cases may arise, of course, where the Court believes that disclosure is necessary to make an accurate determination of legality, but the Government argues that to do so, even given the Court's broad discretionary power to excise certain sensitive portions, would damage national security. In such situations the Government must choose—either disclose the material or forego the use of the surveillance-based evidence. Indeed, if the Government objects to the disclosure, thus preventing a proper adjudication of legality, the prosecution would probably have to be dismissed . . . .

S. Rep. 604(I), 95th Cong., 1st Sess. 58-59 (footnote omitted; ellipsis in original), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3959-60; *see* S. Rep. 701, 95th Cong., 1st Sess. 64-65 (identical language in Senate Intelligence Committee Report), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4033-44.

Several points are evident from this passage. First, the Senate Judiciary and Intelligence Committees plainly did intend to create an absolute barrier to disclosure. To the contrary, in choosing a balanced approach, the Committees specifically eschewed "an entirely *in camera* proceeding"—only to have the courts overturn that Congressional intent through an overly strict interpretation of "necessary."

Second, the Committees, through their citation to *Butenko*, placed broad discretion in district judges in determining when disclosure is "necessary to make an accurate determination of the legality of the surveillance." They intended that discretion to be exercised "after reviewing the underlying documentation and determining its volume, scope and complexity."

Third, the Committees noted the district court's "broad discretionary power to excise certain sensitive portions" from the FISA materials before disclosure. This recognition of the district court's inherent power to take necessary protective measures finds a statutory basis both in § 1806(f), § 1825(g), and in CIPA. That power substantially ameliorates any national security concerns.

Finally, the Senate Judiciary and Intelligence Committees contemplated—and did not shy away from—an outcome unpalatable to the government: that the district court would order disclosure, the government would refuse to comply, and the court would suppress the surveillance or dismiss the prosecution. Just as Congress did in CIPA, 18 U.S.C. App. 3 § 6(e), the Committees left the choice with the government: either comply with the disclosure order or refuse and suffer appropriate sanctions.

A court must construe a statutory term "in a manner consistent with the [statute's] purpose." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001); *see*, *e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1081-82 (2015) (plurality opinion) (looking to "broader context of the

statute as a whole" to determine meaning of statutory phrase) (quotation omitted). FISA "was enacted to create a framework whereby the Executive could conduct electronic surveillance for foreign intelligence purposes without violating the rights of citizens." *United States v. Hammoud*, 381 F.3d 316, 332 (4th Cir. 2004) (*en banc*), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated in relevant part*, 405 F.3d 1034 (4th Cir. 2005) (*en banc*). The Act "was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties."[7] Interpreting "necessary" in § 1806(f) and § 1825(g) to mean "substantially promote" is fully consistent with FISA's effort to balance civil liberties and the need for surveillance.

Mindful of the legislative underpinnings of the term "necessary" in the FISA disclosure provisions—and how its meaning is somewhat higher than "useful or convenient," but far lower than the "essential" or "indispensable"—counsel submit that defense counsel participation is particularly "necessary" in a case like this where there is an extraordinary complicated factual background presented in Defendant's personal history. As we highlighted in prior filings, that history includes growing up in war-torn Iraq; fleeing to Syria under even worse conditions; coming to the United States as a refugee; and allegedly returning to Syria for a short time period prior to returning back to the Untied States for nearly two years prior to his arrest. Among other reasons, disclosure to defense counsel is necessary to determine whether communications claimed to be from Defendant are properly attributed to him and accurately translated. In

---

[7] *In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (quotation omitted); *see, e.g.,* S. Rep. 604(I), 95th Cong., 1st Sess. 4 (Senate Judiciary Committee Report notes Attorney General Griffin Bell's view that "this bill strikes the balance, sacrifices neither our security nor our civil liberties, and assures that the abuses of the past will remain in the past . . . ."), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3905-06; *id.* at 7 (bill "goes a long way in striking a fair and just balance between protection of national security and protection of personal liberties"), *reprinted in* 1978 U.S.C.C.A.N. at 3908; *id.* at 9 ("Striking a sound balance between the need for such surveillance and the protection of civil liberties lies at the heart of S. 1566."), *reprinted in* 1978 U.S.C.C.A.N. at 3910; S. Rep. 701, 95th Cong., 1st Sess. 7, 16 (Senate Intelligence Committee Report with similar remarks), *reprinted in* 1978 U.S.C.C.A.N. 3973, 3975, 3985.

addition, at least for any FISA application, defense counsel participation is necessary to test any assertion that Defendant was an "agent of a foreign power." 50 U.S.C. §§ 1801(b), 1805(a)(2). Further, defense counsel participation is necessary to determine whether Defendant was considered an agent of a foreign power "solely on the basis of activities protected by the first amendment," which is prohibited by statute. 50 U.S.C. § 1805(a)(2)(A).

Most importantly, defense counsel's participation is necessary to ensure that the prosecution's representations in an *ex parte in camera* proceeding are not wildly inaccurate. For instance, if the prosecutors are willing to assert in their unclassified pleading that, "[f]rom the moment he arrived in the United States, the defendant began to plot his return to Syria to fight on behalf of terrorist groups there," (Unclassified Memo, p. 7)—a conclusion counsel take great issue with—counsel are deeply concerned how the evidence and Defendant's communications may be characterized in an *ex parte* and *in camera* setting.[8]

Disclosure is also necessary to highlight any intentional or reckless material falsehoods that may very well form the basis for a suppression motion pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Without access to the underlying applications, orders, and related materials (*e.g.*, affidavits accompanying the applications), the defense can only speculate; it cannot identify specific falsehoods or omissions to make the "substantial preliminary showing" that *Franks* requires for an evidentiary hearing. 438 U.S. at 155-56. As Judge Rovner acknowledged in *Daoud*: "Thirty-six years after the enactment of FISA, it is well past time to recognize that it is

---

[8] Further, the timing of the "incidental" collection is clearly material, particularly if it occurred *prior to* Defendant allegedly travelling to Syria in November 2013. This information is particularly relevant in light of the fact that the intelligence agencies appear to have monitored Defendant for close to two years after his return to the United States, clearly viewing him as an intelligence asset. Indeed, the vast number of communications allegedly between Defendant and others even prior to his departure in November 2013 raise doubt as to whether Defendant was truly "unknown" and that his collection was therefore "incidental," especially if that collection occurred sometime upon his return to the United States in early 2014.

virtually impossible for a FISA defendant to make the showing that *Franks* requires in order to convene an evidentiary hearing." *Daoud*, 755 F.3d at 496 (Rovner, J., concurring).  Judge Rovner further observed that the district court is also largely unable to identify such statements, and must depend entirely on the prosecutors to affirmatively disclose the wrongdoing or negligence of the intelligence agency representatives.  *See id*. at 486 ("[T]he court, which does have access to the application, cannot, for the most part, independently evaluate the accuracy of that application on its own without the defendant's knowledge of the underlying facts.").

The Court should be particularly hesitant to decide contested issues in an *ex parte* setting because the FAA was used in this case.  Counsel are particularly concerned, and respectfully submit that the Court should be as well, that surveillance conducted under the relaxed and unconstitutional FAA standards was used as the basis for subsequent FISA applications.  This raises another dimension to the *Franks* analysis, which Judge Rovner emphasized in her *Daoud* concurrence is not dispensed with regardless of the unique FISA disclosure rules.   *Daoud*, 755 F.3d at 496.

Finally, the Court should order the disclosure of the FAA and FISA materials as a matter of due process pursuant to 50 U.S.C. §§ 1806(g), 1825(h)[9] and the Fifth Amendment Due Process Clause.  To determine whether due process requires disclosure, the Court must consider the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used" and "the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and

---

[9] Section 1825(h) provides in relevant part that "[i]f the court determines that the physical search was lawfully authorized or conducted, it shall deny the motion of the aggrieved person *except to the extent that due process requires discovery or disclosure*." 50 U.S.C. § 1825(h) (emphasis added). Section 1806(g) contains a similar provision.

the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.* at 335; *see*, *e.g.*, *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1068-71 (9th Cir. 1995) (applying *Mathews* test to determine whether use of secret evidence violates due process); *Rafeedie v. INS*, 880 F.2d 506, 524-25 (D.C. Cir. 1989) (*Mathews* balancing test governs process due alien in exclusion proceeding, including use of secret evidence), on remand, 795 F. Supp. 13, 18-20 (D.D.C. 1992) (same); *Kindhearts for Charitable Humanitarian Development, Inc. v. Geithner*, 710 F. Supp. 2d 637, 659 (N.D. Ohio 2010) ("Courts have found that their duty to protect individual rights extends to requiring disclosure of classified information to give a party an ability to respond to allegations made against it."). Application of the *Mathews* test confirms that Defendant must be granted access to the FAA and FISA materials as a matter of due process.

First, Defendant's "private interests" here are extremely severe. He seeks an accurate determination of his claim that the government's secret electronic and physical searches violated his rights, including under the Fourth Amendment. He seeks to vindicate his constitutionally protected privacy rights and has endured and faces the prospect of further loss of liberty. If mere property interests "weigh heavily in the Mathews balance," as the Supreme Court has held, *United States v. James Daniel Good Real Property*, 510 U.S. 43, 54-55 (1993), Defendant's privacy and liberty interests have even greater significance.

Under the second *Mathews* factor, the adjudication of Defendant's rights under the FAA, FISA, and the Fourth Amendment through *ex parte* review of materials that his counsel has no opportunity to examine or challenge carries a notoriously significant "risk of an erroneous deprivation" of the liberty interests at issue. Further, "additional . . . procedural safeguards," namely access to the FISA materials and an opportunity to address them, carry substantial

13

"probable value." *Mathews*, 424 U.S. at 335.  The Supreme Court has declared that "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" *James Daniel Good*, 510 U.S. at 55 (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)); *See also American-Arab Anti-Discrimination Committee*, 70 F.3d at 1069, 1070 (observing an "enormous risk of error" in the use of secret evidence); *Alderman v. United States*, 394 U.S. 165 (1969) (rejecting use of *ex parte* proceedings in Fourth Amendment context).

The need for an adversarial setting is even more pronounced here, where the proceedings before the FISC that resulted in approval of FAA certifications and any FISA orders were the results of *ex parte* proceedings.  As discussed in the FAA motion (Dkt. #47, 48) and below, the intelligence agencies and executive branch officials have, time and again, made "erroneous statements" and "omissions of material facts" that went undetected for years (and perhaps still do) until the DOJ chooses to disclose the falsehoods.  *See In re All Matters*, 218 F. Supp. 2d 611, 620-21 (FISC), *rev'd*, 310 F.3d 717 (FISCR 2002); *In re FBI*, 2009 U.S. Dist. LEXIS 132935, at *4 (FISC Sept. 25, 2009); [Redacted], 2011 U.S. Dist. LEXIS 157706, at *20 n.14 (FISC Oct. 3, 2011). *Ex parte* review does not adequately protect the surveillance target's constitutional and statutory rights.  The "additional . . . procedural safeguards" that Defendant requests—access to the FISA materials and an opportunity to address them—thus carry substantial "probable value." *Mathews*, 424 U.S. at 335.

Lastly, the Court must consider the government's purported interest in maintaining the secrecy of the FISA materials.  The government typically asserts (and will undoubtedly do so

here) its generalized interest in avoiding damage to "national security," without any explaining how that disclosure of the FISA materials to defense counsel under the circumstances of this case would cause such damage. The prosecutors' asserted national security interest in withholding the FISA materials from the defense is undermined in light of the protections available under CIPA. Most critically, CIPA provides for entry of a protective order. The CIPA protective order—the standard terms of which are largely settled after decades of experience—sets the conditions under which defense counsel may review classified discovery, requires defense counsel and staff to have security clearances, establishes procedures for filing classified pleadings, and prohibits anyone associated with the defense from revealing publicly the classified information to which access is granted.

As a final matter, *Brady* requires production of material evidence that would be favorable Defendant on a motion to suppress. *See United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.").[10] For the reasons we have outlined, the government's application to the FISC and the FISC order authorizing the electronic and physical searches in this case are helpful to the defense in preparing the motion to suppress the FAA and FISA-derived evidence. *Brady* thus requires their disclosure.

---

[10] The Seventh Circuit has assumed that *Brady* applies in a suppression-hearing context (*see United States v. Veras*, 51 F.3d 1365, 1374 (7th Cir. 1995)) but has subsequently noted that it has not had an opportunity to hold conclusively that to be the case. *See United States v. Stott*, 245 F.3d 890, 901-02 (7th Cir.), *amended on reh'g in part*, 15 F. App'x 355 (7th Cir. 2001) and *United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016).

### III. SECTION 702 IS UNCONSTITUTIONAL AND SUPPRESSION IS REQUIRED FOR ALL EVIDENCE OBTAINED OR DERIVED UNDER ITS AUTHORITY.

The prosecution does not argue that the Fourth Amendment is inapplicable to Defendant with respect to the Section 702 collection in this case. (Unclassified Memo, p. 48, footnote 60). Rather, the prosecution argues that the Section 702 acquisitions were reasonable and lawful under the Fourth Amendment. (*Id.*). That argument is based on the following: (1) the Fourth Amendment does not apply to a non-U.S. person located abroad; (2) the collection targeting the non-U.S. person located abroad which "incidentally" collects communications of U.S. persons or persons in the United States does not require a warrant, nor does it render the latter collection unreasonable under the Fourth Amendment; (3) and, even if "incidental" collection triggers Fourth Amendment scrutiny, no warrant is required due to the "foreign intelligence exception." Thus, according to the prosecutors, because no warrant was required, the collection here only had to be reasonable under the Fourth Amendment. (Unclassified Memo, p. 44).

First, counsel do not attempt to extend the Fourth Amendment to non-U.S. persons located abroad, particularly because the prosecution's redacted memorandum prevents us from making any fact-specific arguments. However, "incidental" collection in this case is not excused from the Fourth Amendment, including its warrant requirement. Moreover, the "foreign intelligence exception," whatever such limited exception that may exist, does not apply to the collection at issue in this case.[11]

---

[11] The only appellate court to have considered "incidental" collection under Section 702 is the Ninth Circuit in *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016). Defense counsel distinguished *Mohamud* in their FAA Motion (see pp. 44-46), including its analysis of the "incidental" collection issue. Now that it has disclosed that "incidental" collection was at issue, the prosecution unsurprisingly relies on *Mohamud*. Rather than restate all of our arguments, we incorporate them herein.

A. **The Incidental Collection of Defendant's Communications Pursuant to a Section 702 Acquisition Does Not Negate the Need for a Warrant and Reasonableness Under the Fourth Amendment.**

Through their Unclassified Memorandum, the prosecutors notify Defendant that he "was not targeted under Section 702." (Unclassified Memo, p. 5). Further, the prosecution discloses that the case involved only "incidental," and not "upstream" collection.[12] (Unclassified Memo, p. 31). Because he was not himself targeted, and instead subject to "incidental" collection, the prosecution argues that the Section 702 collection was reasonable under the Fourth Amendment: "the collection lawfully targeted one or more non-U.S. persons located outside the United States, who generally are not protected by the Fourth Amendment, for foreign intelligence purposes. That the communications of U.S. persons or persons located inside the United States might be acquired incidentally during such collection does not trigger a warrant requirement." (Unclassified Memo, p. 5). *See also id.* at 48 ("The defendant was not targeted under Section 702. Rather, his communications were incidentally collected through Section 702 acquisitions targeting one or more non-U.S. persons located outside the United States."); and *id.* at 48-54.

Thus, the primary issue before the Court is the legality of this "incidental" collection, which requires some background explanation beyond what is set forth in Defendant's FAA

---

[12] As such, we must then assume that the surveillance authority was PRISM. And because the prosecution also claims that Defendant was subject to "incidental" collection, we can only assume that Defendant's communications were found during a PRISM search, which may have involved an intelligence agency searching stored communications from an internet provider. This is, of course, only a guess as the prosecution has provided only these few clues.

Motion and the prosecution's Unclassified Memo.[13]  As discussed in greater detail below, even if a foreign person located outside the United States may not have strong Fourth Amendment rights, it does not necessarily follow that a U.S. person, or person on U.S. soil, loses all Fourth Amendment rights to communications that may be swept up in the intelligence agencies' far-reaching surveillance tools.

### 1.  "Incidental" Collection is Anything but Incidental.

As the term is understood, a collection of communications of a U.S. person (or other person in the United States) under Section 702 is "incidental" only because the communications actually targeted involve non-U.S. persons who are located outside the United States.  Accepting this argument requires the Court to condone the surveillance, collection, and searching of countless volumes of these otherwise protected communications merely because the prosecution claims it to be "incidental," which it is not.  Indeed, there is nothing about the mass acquisition of American's communications that is "incidental," as that term is defined as (1) "being likely to ensue as a chance or minor consequence" or (2) "occurring merely by chance or without intention or calculation."  Merriam Webster, *available at*: https://www.merriam-webster.com/dictionary/incidental.  Incidental collection was one of the Privacy and Civil Liberties Oversight Board's (PCLOB) stated concerns, noting in their report that there was an "unknown and potentially large scope of incidental collection of U.S. person's communications."

---

[13] Had the prosecutors notified undersigned counsel that Defendant was subject to incidental collection in its FAA/FISA notice or other pleading, counsel would have focused on that subject, which would have perhaps avoided the need to discuss other surveillance techniques (such as "upstream").  Counsel do not, of course, concede that Defendant's communications were only "incidentally" collected pursuant to the Section 702 acquisition of another target.  Of course, we do not suggest that the prosecutors on this case have deliberately misrepresented the nature of the surveillance.  Rather, the prosecutors must, like the Court, ultimately rely on the representations of the intelligence agencies, whom have repeatedly demonstrated a lack of candor before the FISC.  The fact that only now, in the response to a suppression motion, the prosecutors have provided notice of the type of surveillance involved only highlights the need for disclosure of the FAA/FISA materials to cleared defense counsel.

(Privacy and Civil Liberties Oversight Bd., *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, July 2, 2014, "PCLOB Report", p. 8-9).

First, the intelligence agencies and executive branch are acutely aware that vast quantities of Americans' communications are collected as a consequence of Section 702 surveillance. The government's use of the term "incidental" conveys the impression that its collection of Americans' communications under the FAA is a *de minimis* byproduct common to all forms of surveillance. That impression is false. Where surveillance under Title III or the original FISA might lead to the incidental collection of a handful of people's communications, surveillance under the FAA invades the privacy of thousands or even millions of people. *See* [Redacted], 2011 WL 10945618, at *27 (FISC Oct. 3, 2011) (observing that "the quantity of incidentally-acquired, non-target, protected communications being acquired by NSA through its upstream collection is, in absolute terms, very large, and the resulting intrusion is, in each instance, likewise very substantial"); *id.* at *26 ("[T]he Court must also take into account the absolute number of non-target, protected communications that are acquired. In absolute terms, tens of thousands of non-target, protected communications annually is a *very* large number."); *see id.* at *27 (noting that the government collects over 250 million communications each year under the FAA); President's Review Group on Intelligence & Communications Technologies, Liberty and Security in a Changing World 149 (Dec. 12, 2013), http://1.usa.gov/1be3wsO ("PRG Report") ("incidental interception is significantly more likely to occur when the interception takes place under Section 702 than in other circumstances"); *see also Riley v. California*, 134 S.Ct. 2473, 2489-91 (2014) (recognizing that the broad collection of data raises different constitutional

questions); *United States v. Jones*, 565 U.C. 400, 428-29 (2013) (Alito, J., concurring) (similar); *Id.* at 413-18 (Sotomayor, J., concurring).

The mere fact that the intelligence agencies themselves cannot (or refuse to) inform the legislature how the precise volume of "incidentally" collected communications of U.S. persons and others located in the U.S. should give the Court great pause, as that fact alone calls out for greater oversight, rather than less as the prosecution advocates.[14]

Second, this massive collection cannot be said to be by "chance or without intention or calculation." The intelligence agencies and executive were not only aware of "incidental" collection prior to the enactment of the FAA, but expressly threatened to veto any legislation that would limit their ability to "incidentally" collect American's communications. In a letter dated February 5, 2008 sent to majority leader Sen. Harry Reid, Attorney General Michael B. Mukasey and DNI J.M. McConell stated that if "court approval" were required for the incidental collection of U.S. person communications, they would recommend that President Bush veto the bill.[15]

---

[14] *See* Barton Gellman, Julie Tate, and Ashkan Soltani, *In NSA-intercepted data, those not targeted far outnumber foreigners who are*, WASH. POST, July 5, 2014, *available at* https://www.washingtonpost.com/world/national-security/in-nsa-intercepted-data-those-not-targeted-far-outnumber-the-foreigners-who-are/2014/07/05/8139adf8-045a-11e4-8572-4b1b969b6322_story.html?utm_term=.37f0c5c78c2f. The article states:

> No government oversight body, including the Justice Department, the Foreign Intelligence Surveillance Court, intelligence committees in Congress or the president's Privacy and Civil Liberties Oversight Board, has delved into a comparably large sample of what the NSA actually collects — not only from its targets but also from people who may cross a target's path.

> Among the latter are medical records sent from one family member to another, résumés from job hunters and academic transcripts of schoolchildren. In one photo, a young girl in religious dress beams at a camera outside a mosque.

[15] *See* Letter from Att'y Gen. Michael Mukasey & DNI John M. McConnell to Sen. Harry Reid, at pp. 3-4 (Feb. 5, 2008), http://1.usa.gov/1ihhf9A.

Indeed, the collection of U.S. persons' international communications was one of the underlying purposes of the FAA.[16]

It is thus impossible to maintain that the collection of Americans' communications are merely "incidental" and should therefore be excused from the Fourth Amendment. True, the FAA prohibits "reverse targeting"; but that prohibition is narrow and applies only if the government's surveillance targets a "particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(b)(2). "Outside that narrow prohibition, the statute allows the government to conduct surveillance to collect Americans' international communications. This is precisely how the government uses the statute, and the government has acknowledged not only that it collects Americans' communications under the statute, but that it uses selectors associated with U.S. persons to search through the communications it collects." *See* Letter from Deirdre M. Walsh, Dir. of Legislative Affairs, Office of the Dir. of National Intelligence, to Sen. Ron Wyden (June 27, 2014), http://1.usa.gov/V8lYTo ("ODNI–Wyden Letter") (acknowledging that various agencies, including the Federal Bureau of Investigation, conducted thousands of "backdoor searches" using U.S. identifiers in 2013 alone); Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*, WASH. POST, Sept. 7, 2013, http://wapo.st/1hP9FWm.

---

[16] *See, e.g., FISA for the 21st Century: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. at 9 (2006), http://1.usa.gov/1kbgHm3 (statement of NSA Director Michael Hayden) (stating, with respect to the FAA's predecessor statute, that certain communications "with one end . . . in the United States" are the ones "that are most important to us"); Privacy and Civil Liberties Oversight Board ("PCLOB"), *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 114–15 (July 2, 2014), http://www.pclob.gov/All%20Documents/Report%20on%20the%20Section%20702%20Progra m/PCLOB-Section-702-Report.pdf ("PCLOB 702 Report") ("Executive and legislative branch officials have repeatedly emphasized to us that, with respect to terrorism, communications involving someone in the United States are some of the 'most important' communications acquired under the program.")

Incidental collection is also highly problematic because it provides the vast fodder for intelligence agency queries, often called "backdoor searches." In other words, otherwise protected troves of U.S. persons' communications can be "incidentally" collected, stored in vast repositories, and then searched at some future date by intelligence agencies. The FBI can make those queries to conduct assessments and investigations, even for domestic criminal investigations unrelated to national security, and divorced from the foreign intelligence purposes of the FAA.[17] This inevitable result of permitting the collection of U.S. persons' communications that the FBI and other agencies can query is contrary to the principle announced by the FISCR that "the FISA process cannot be used as a device to investigate wholly unrelated crimes." *In re Sealed Case*, 310 F.3d 717, 736 (FISA Ct. Rev. Nov. 18, 2002).

These queries, like the incidental collection, were another concern to the PCLOB. *See* PCLOB Report, p. 8-9, ("the use of queries to search for the communications of specific U.S. persons within the information that has been collected."). Permitting the government to maintain a database of incidentally collected information, which can then be queried through for law enforcement purposes using U.S. person identifiers at a future date without a warrant is constitutionally unreasonable.

To the extent the government argues that querying of Section 702-acquired information is not a "search" and thus falls outside the Fourth Amendment because the actual "search" is the Section 702 collection itself, the argument should be rejected. Searches related to electronic

---

[17] *See* "Statistical Transparency Report Regarding Use of National Security Authorities for Calendar Year 2016," April 2017, p. 7-9 *available at*: https://www.dni.gov/files/icotr/ic_transparecy_report_cy2016_5_2_17.pdf. The report states that the "government" used 5,288 "search terms," such as an email address or telephone number, of a known U.S. person to "backdoor" search these unminimized 702 repositories in 2016. The report also states that the government conducts 30,355 individual "queries" using those U.S. person identifiers. Importantly, the report notes that these statistics do *not* include the amount of search terms and queries conducted by the FBI.

evidence raise new concerns, as recent Supreme Court decisions make clear. For instance, in *Riley v. California*, the Supreme Court required a warrant for the search of a smartphone's digital contents, even though the seizure of the phone itself was lawful.

> **2. "Incidental" Collection Must Meet Fourth Amendment Standards, Including a Warrant, with Respect to Communications by U.S. Persons and Persons on U.S. Soil.**

The prosecution relies on "incidental overhear" cases to defend "incidental" collection. (Unclassified Memo, p. 49). But the analogy is inapt, and the prosecution's attempt to extend the incidental overhear doctrine to cover its massive collection of U.S. person communications collected under Section 702 misapplies constitutional exceptions that developed for cases of individualized surveillance. *See, e.g.*, *United States* v. *Kahn*, 415 U.S. 143 (1974); *United States v. Figueroa*, 757 F.2d 466 (2d Cir. 1985).[18] The prosecution cannot apply those limited exceptions to a case involving programmatic surveillance, such as Section 702. Those cases show how the "incidental overhear" exception is invoked only after a court has carefully circumscribed the government's surveillance and limited the government's intrusion into the privacy of third parties. *See also United States v. Donovan*, 429 U.S. 413, 436 n.15 (1977) (holding that while a warrant is not made unconstitutional by "failure to identify every individual who could be expected to be overheard," the "complete absence of prior judicial authorization would make an intercept unlawful"); *see also* PCLOB Report, p. 95 ("Where a wiretap is conducted in a criminal investigation pursuant to a warrant, satisfaction of the three requirements of the warrant clause . . . renders the wiretap constitutionally reasonable—both as to the intended subjects of the surveillance and as to any persons who end up being incidentally overheard, the full range of whom the government can never predict.").

---

[18] *United States v. White*, 401 U.S. 745, 751-53 (1971), cited at p. 49 of the Unclassified Memo, is particularly inapt because it involved a conversation recorded with the consent of one participant.

In contrast, surveillance conducted under Section 702 is not similarly constrained. Section 702 does not require the Department of Justice to establish probable cause or individualized suspicion of any kind; it does not require any identification of the facilities it intends to monitor; and it does not place meaningful limits on communications acquired— provided that the programmatic purpose of the surveillance is to obtain foreign-intelligence information. The prosecution's argument that the "incidental collection principle" applies "precisely the same way" for Section 702 as it does for traditional FISA orders or Title III wiretaps (Unclassified Memo, p. 51) is therefore somewhat misleading, and ignores the fundamental differences in how the surveillance authority is initially authorized. In short, the "incidental overhear" cases cannot be extended to the Section 702 context.[19]

Additionally, and as noted above, the sheer volume of communications intercepted "incidentally" in surveillance under Section 702 differs significantly from the volume of communications intercepted incidentally in surveillance conducted under original FISA or Title III. Unlike traditional FISA and Title III, Section 702 allows the government to monitor individuals without regard to whether those individuals are suspected criminals or foreign agents. PCLOB Report, p. 116 ("[T]he expansiveness of the governing rules, combined with the technological capacity to acquire and store great quantities of data, permit the government to target large numbers of people around the world and acquire a vast number of communications."). Further, the prosecution's continued reliance on traditional FISA to defend the FAA overlooks the substantial differences between the two regimes. (*See, e.g.*, Unclassified

---

[19] The prosecution also cites *In re Directives*, 551 F.3d 1004 (FISCR 2008) (Unclassified Memo, p. 49), but in that case the FISC found it significant that the government was not amassing the database it is concededly amassing here—let alone querying that database for information about Americans and others located in the United States. *Id.* at 1015 ("The government assures us that it does not maintain a database of incidentally collected information from non-targeted United States persons, and there is no evidence to the contrary.").

Memo, p. 53 ("Incidentally collecting non-targeted third party communications under Section 702 is reasonable, just as it is under traditional FISA, because the surveillance is lawful as to the target, and no separate warrant is required as to those third parties."). In stark contrast to traditional FISA, Section 702 obviates the need for the FISC to consider the validity of the specific target, because it considers general procedures, specifically minimization and targeting.[20] Additionally, while Section 702 is subject to minimization procedures, those procedures do not account for the lack of individualized judicial review at the acquisition stage. Under FISA and Title III, minimization operates as a second-level protection against the acquisition, retention, and dissemination of information relating to U.S. persons. Prior to that minimization, there is individualized judicial authorization for each surveillance target.

The prosecution contends that requiring a warrant for incidental collection of U.S. person communications would be impossible, as it would effectively require a warrant for all foreign intelligence collection. (Unclassified Memo, pp. 54, 63-64). This is argument is a straw man. The Fourth Amendment does not require, and defense counsel do not request, that the Department of Justice obtain prior judicial authorization for surveillance of foreign targets merely because those foreign targets might, at some unknown point, communicate with U.S. persons. However, the warrant clause of the Fourth Amendment does require that the Department of Justice at least avoid warrantless acquisition of communications of U.S. persons (and persons in the U.S.) where it is reasonably possible to do so. It further requires that the Department of Justice avoid warrantless review of such communications when it incidentally (or intentionally) collects those communications. And, at the very minimum, FAA's relaxed

---

[20] Moreover, unlike the surveillance at issue in *In re Directives*, Section 702 surveillance permits the government to "maintain a database of incidentally collected information from non-targeted United States persons," *In re Directives*, 551 F.3d at 1015, and to later search that database using the names, email addresses, or other identifiers of U.S. persons.

25

procedures cannot be used to end-run the Fourth Amendment. Moreover, Defendant does not argue that any search conducted overseas, of a foreign person, violates the Fourth Amendment, and the prosecution's cases regarding foreign are inapposite. (*Id.*, citing *In re Terrorist Bombings of U.S. Embassies*, 552 F.3d 157, 169 (2d Cir. 2008) (search of residence in Kenya); *United States v. Stokes*, 726 F.3d 880, 893 (7th Cir. 2013) (search of defendant's home in Thailand).

The prosecution also argues that the location of the search does not trigger a warrant requirement. (Unclassified Memo, pp. 55-56). The prosecution's argument misstates Defendant's position. The key issue is that *Defendant's* communications occurred while he was in the United States and, as the prosecution concedes, the Fourth Amendment applies. (Unclassified Memo, p. 48, note 60). Requiring a warrant for *Defendant's* communications would not result in any kind of windfall for a foreign person abroad "seeking to evade U.S. government surveillance." (Unclassified Memo, p. 55). It bears repeating that Defendant seeks to only vindicate his own Fourth Amendment rights, and does not argue for an extension to any individual located overseas.

Thus, the "incidental" collection of communications of U.S. persons and others in the United States is anything but. It is intentional, targeted, and devised to create a database of information that can be queried for assessments and investigations, even of purely domestic concerns. It simply cannot be the case that a program that essentially allows the warrantless and suspicionless collection of virtually all electronic communications that originate or terminate

outside the United States without any particularized showing can be consistent with the Fourth Amendment.[21]

B.     The "Foreign Intelligence Exception" Does Not Apply,
       Nor Does it Excuse the Warrant Requirement.

The prosecutors next argue that even if "incidental collection" of "communications of persons located in the United States under Section 702 is subject to the same constitutional scrutiny as foreign intelligence collection targeting such persons," no warrant is required because of the "foreign intelligence exception." (Unclassified Memo, p. 56). As an initial point, counsel do not argue that Defendant should be treated as a "target" of foreign intelligence. Indeed, intelligence agencies, namely the FBI, can and do query collected Section 702 material for law enforcement purposes, not just for foreign intelligence. Those queries can be for assessments and investigations of domestic crimes. Thus, simply because a foreign target has purported foreign intelligence value (again, this case-specific information is not presented to the FISC, which reviews "certifications"), does not necessarily mean that a domestic party will only have foreign intelligence value.

---

[21] The prosecution claims that FISA "does not confer on an aggrieved person Fourth Amendment protection to which that person was not otherwise entitled." (Unclassified Memo, p. 40, footnote 53). However, the FAA specifically requires that an acquisition is authorized only if it is "conducted in a manner consistent with the fourth amendment of the Constitution of the United States." 50 U.S.C. § 1881a(b)(5).

Indeed, in his November 6, 2015, FISC order, Judge Hogan specifically held that "[t]here is no statutory requirement that all activities involving Section 702 data serve solely a foreign intelligence national security purpose." *[Redacted]*, p. 31, (FISC Nov. 6, 2015, Hogan), *available at:* www.dni.gov/files/documents/20151106-702Mem_Opinion_Order_for_Public_Release.pdf. Judge Hogan observed that "even at the time of acquisition, the statute does not require the government to have as its sole purpose obtaining foreign intelligence information." (*Id.*). He further found that the FBI could search information regardless of a connection to foreign intelligence, and stated as follows:

> Nothing in the statute precludes the examination of information that has otherwise been properly acquired through application of the targeting procedures and retained under the minimization procedures for the purpose of finding evidence of crimes, *whether or not those crimes relate to foreign intelligence.*

*Id*. at 33 (emphasis added). Thus, and notwithstanding the prosecution's citation to the "special needs" doctrine (Unclassified Memo, pp. 57-58), the incidental collection of a U.S. person's (or person in the United States) communications should not be exempted from the warrant requirement given how the FBI is authorized to search and collect that information for domestic law enforcement purposes.

In this case, the fact that Defendant was subject to surveillance, primarily in California and elsewhere in the United States for nearly *two years* prior to his arrest, suggests an undeniable interest in domestic law enforcement. Indeed, the FBI's ability to query raw, unminimized Section 702 information that was incidentally collected from U.S. persons and others on U.S. soil severely minimizes the justification for the "foreign intelligence exception," at least as it was discussed in *In re Directives*, 551 F.3d 1004. In that case the Department of Justice assured the FISC that it did not "maintain a database of incidentally collected information from non-targeted United States persons" and the court found "no evidence to the contrary." *In re Directives*, 551

F.3d at 1015. At best, we know that representation regarding the lack of a database to no longer be true. For this point, the prosecution's reliance on *In re Directives* and the "programmatic purpose" discussion (Unclassified Memo, p. 67) should be given little weight.

Indeed, in *Truong Dinh Hung*, the district court applied a "foreign intelligence exception" to the warrant requirement, but only for evidence secured while the investigation was "primarily a foreign intelligence investigation. It also excluded all evidence of warrantless surveillance after the FBI investigation "had become primarily a criminal investigation." *United States v. Truong Dinh Hung*, 629 F.2d 908, 912-13 (4th Cir. 1980). The Fourth Circuit approved of this approach. *Id.* at 917. As noted above, in his November 6, 2015 FISC order, Judge Hogan approved the FBI's standing practice of querying Section 702 information (which no doubt included "incidentally" collected communications of U.S. persons and persons in the United States), whether or not the crimes related to foreign intelligence.[22] There are thus limits to the "foreign intelligence exception," that go not to simply the "reasonableness" of the search, but whether a warrant is required in the first instance. At least in the Unclassified Memo, the prosecution does not discuss how the exception would apply in this particularly case. Accordingly, the prosecution should not be able to rely on the "foreign intelligence exception" to avoid a warrant based on generalized policy concerns alone.

---

[22] Additionally, the "foreign intelligence exception" articulated in *Truong Dinh Hung* required foreign intelligence to be a "primary purpose," whereas Section 702 requires only a "significant purpose," a lower standard. While the Patriot Act eschews the "primary purpose" standard, it is still important to note that the Fourth Circuit relied on it when discussing the "foreign intelligence exception." Further, and as the Fourth Circuit observed, the "foreign intelligence exception" was developed prior to the enactment of FISA at a time when the "practical difficulties of obtaining a warrant for foreign intelligence were particularly acute." *Truong Dinh Hung*, 629 F.2d at 913 n.2.

**C.** **Section 702 Collection is Not Reasonable Even if No Warrant Applies, Particularly for "Incidental" Collection.**

Concluding that no warrant applies, the prosecution contends that foreign intelligence collected under Section 702 is reasonable under the Fourth Amendment. (Unclassified Memo, pp. 68-92). To the contrary, Section 702 is unreasonable under the Fourth Amendment because it exposes virtually every American's international communication to warrantless surveillance. Section 702 abandons the limits that courts have identified as key to the constitutionality of electronic surveillance statutes, including FISA—individualized suspicion, prior judicial review, and particularity. Rather than dealing directly with these defining features of the FAA, the prosecution mainly argues that the statute is similar to the surveillance program held reasonable in *In re Directives* (pp. 70-73); that it is justified because of the government's overriding interest in countering terrorism (pp. 73-75); that Americans have little to no expectation of privacy in their international communications (pp. 75-78).

The prosecution's reliance upon *In re Directives*, is misplaced. There, FISCR based its ruling upon several factors that are absent here, including that, under the scheme considered, the government could acquire the communications only of "overseas foreign agents," (551 F.3d at 1011); and, the determination that each target was a foreign agent was made by the Attorney General himself, *id.* at 1014. In addition, as noted above, the FISCR found the fact that the government did not "maintain a database of incidentally collected information from non-targeted United States persons" was significant to the reasonableness of the scheme. *Id.* at 1015. None of these factors are present here for the issue of "incidental" collection of communications where the Fourth Amendment inarguably applies.

Because it permits the government to monitor any foreigner overseas, and not just foreign agents, Section 702 eliminates the primary criterion relied upon by every appellate court to find a

30

scheme of foreign-intelligence surveillance reasonable: individualized suspicion. And by transferring targeting authority away from the Attorney General of the United States, Section 702 permits low-level NSA analysts to decide whom to target.[23] Finally, Section 702 permits the government to assemble—and the government *has* assembled—"a database of incidentally collected information from non-targeted United States persons." And by implying that PRISM was involved here (by disclaiming "upstream"), it was precisely that database of incidentally collected information that is at issue in this case.

Second, the prosecution's assertion that Section 702 "crucial to the government's efforts against terrorism and other threats both to the United States and its interests abroad," Unclassified Memo, p. 74), is a non-sequitur with regard to the issues before the Court.[24] Defendant does not challenge the government's warrantless acquisition of foreign-to-foreign communications. Rather, he challenges the collections of his own communications, which were foreign-to-U.S. The real question, which the prosecution's analysis does not squarely address, is how the government's interest would be impacted by requiring a warrant prior to acquiring or reviewing a U.S. person's, or person within the U.S., incidentally collected communications. On

---

[23] *See also* Glenn Greenwald, *XKeyscore: NSA Tool Collects 'Nearly Everything a User Does on the Internet'*, GUARDIAN, July 31, 2013, http://gu.com/p/3hy4h (describing interface through which NSA analysts can initiate FAA surveillance "by clicking a few simple pull-down menus designed to provide both legal and targeting justifications"

[24] The prosecution's reliance on *Maryland v. King*, 133 S. Ct. 1958 (2013), which permitted the warrantless search of DNA in a database, does not support its "reasonableness" argument. (Unclassified Memo, pp. 69-70). One cannot simply analogize the querying of vast databases of U.S. person communications to the accessing of records and profiles in a DNA database. *See Boroian v. Mueller*, 616 F.3d 60, 67-68 (1st Cir. 2010) (running search of an individual's DNA profile against other profiles in a DNA database "does not violate an expectation of privacy that society is prepared to recognize as reasonable, and thus does not constitute a separate search under the Fourth Amendment"); *Johnson v. Quander*, 440 F.3d 489, 498-99 (D.C. Cir. 2006) (accessing records stored in a DNA database is not a "search" for Fourth Amendment purposes). Section 702 collection cannot be compared to the manner of collection of DNA, which is generally collected within the traditional structures of the criminal justice system in compliance with constitutional guarantees. It is collected from persons who are subject to arrest based on probable cause. The government does not incidentally collecting large quantities of DNA using methods unrelated to specific law enforcement objectives and depositing it in its databases.

this critical issue, the prosecution's brief is silent.  Moreover, while there is no doubt that the Department of Justice and intelligence agencies appreciate the incredibly expansive surveillance authorities, and the ability to operate those authorities with minimal oversight, there are lingering questions as to the degree which the FAA has contributed to the success of counterterrorism investigations.[25]

The prosecution also argues that U.S. persons (and persons on U.S. soil) have no privacy interest in their international communications.  (Unclassified Memo, pp. 76-78) ("U.S. persons and Persons in the United States Have, at Most, Limited Expectations of Privacy in Electronic Communications with Non-U.S. Persons Outside the United States").  However, if the prosecution's position were true, then the Department of Justice and intelligence agencies could target U.S. persons' communications for surveillance directly—a position it does not advance.  If Americans truly did not have an expectation of privacy in their international communications, then the Department of Justice and intelligence agencies would not have to defend "incidental" collection, and they could just collect and store every international call and email directly without the subterfuge.  Accepting the prosecution's position would essentially mean the intelligence agencies have free license, and can collect each and every communication that crosses the border.   That simply cannot be the law.

The prosecution also claims the FAA is reasonable because "multiple safeguards" are in place to protect Americans' privacy.  (Unclassified Memo, pp. 78-92).  However, those supposed

---

[25] In Senate testimony, the government has admitted that only thirteen "had some nexus to the United States." *Continued Oversight of the Foreign Intelligence Surveillance Act: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. at 52:33 (2013), http://1.usa.gov/TPpSQb (Sen. Leahy: "Would you agree that the fifty-four cases that keep getting cited by the administration were not all plots, and of the fifty four only thirteen had some nexus to the United States?  Would you agree with that, yes or no?"; Keith Alexander, Director, NSA: "Yes."). The prosecution does not explain why requiring that it demonstrate individualized suspicion or acquire a warrant for U.S. persons or persons on U.S. soil would frustrate its surveillance efforts of foreign actors, especially given that the government may conduct such surveillance without a warrant in exigent circumstances.

safeguards are riddled with exceptions, and FISC oversight has time and again proven to condone prior misdeeds.

As an initial matter, the "multiple safeguards" have proven inadequate on multiple occasions. For example, highly critical FISC opinions, such as Judge Bates' 2011 FISC opinion, [*Redacted*], 2011 WL 10945618, which found the NSA's minimization procedures deficient with regard to upstream acquisitions, are not "irrelevant" as the prosecution contends. (Unclassified Memo, p. 31, footnote 34).[26]  Arguments concerning acquisition of "about" communications (rather than just communications to and from a target) are not irrelevant simply because the prosecution says that this case only involved "incidental" collection and that "about" collections have since stopped. (*Id.*).  Rather, the opinions and orders (at least the limited, declassified glimpse that we have), have elucidated an FISC chiding the Department of Justice and intelligence agencies for lacking candor and misrepresenting the nature of the acquisitions; for failing to disclose and timely report non-compliance problems, even recurring issues; for hiding or omitting facts; and finally, for failing to correct problems when directed (and allowing them to

---

[26] In an April 7, 2009 FISC opinion by Judge Mary McLaughlin that was only disclosed on June 13, 2017 pursuant to a FOIA request, the court disagreed with the government's contention that the "unintentional collection of communications unrelated to such an email account and its user is irrelevant to whether NSA's targeting procedures comply" or that compliance with the FAA statute is "purely a matter of intent."   *[Redacted]*,   p.   23,   (FISC   April   7,   2009,   McLaughlin), https://www.dni.gov/files/documents/icotr/702/Bates%20549-579.pdf.   Speaking to the relationship between compliance problems and minimization standards, Judge McLaughlin stated, "substantial implementation problems can, notwithstanding the government's intent, speak to whether the applicable targeting procedures are 'reasonably designed' to acquire only the communications of non-US person outside the United States. If, for example, NSA unintentionally obtained 100 domestic communications for every properly targeted and acquired communication, one might reasonably question whether its targeting procedures were 'reasonably designed' to target only non-domestic communications." (*Id.*). Also of note, Judge McLaughlin noted early in her opinion how the "government suggested that the overcollection incidents reported to the Court on [redacted] 2008, which were still under investigation, might affect the accuracy of prior government representations 'concerning the efficacy of the [redacted] used to conduct acquisitions authorized under [the 2008 FAA] certifications.'" (*Id.*, p. 5, quoting government brief). Still, Judge McLaughlin approved the targeting and minimization procedures.

go uncorrected, even for years).[27]

These ongoing non-compliance issues show that the targeting and minimization procedures are not absolute safeguards. For instance, while procedures may require that "[a]ny data acquired from a selector while it was being used by a U.S. person or a person in the United States is subject to purge" (Unclassified Memo, pp. 35-36), the fact of the matter is that the NSA retained data for up to four years after it should have purged. *[Redacted]*, p. 56-58, (FISC Nov. 6, 2015, Hogan). Additionally, the minimization procedures discussed in the Unclassified Memo (pp. 36-38), did not prevent the FBI from improperly disclosing raw and unminimized Section 702 material to a contractor in a way that violated minimization procedures. *[Redacted]*, p. 83 (FISC April 27, 2017, Collyer) *available at*: https://www.dni.gov/files/documents/icotr/51117/2016_Cert_FISC_Memo_Opin_Order_Apr_20 17.pdf . The contractors' access to raw data "went well beyond what was necessary to respond to the FBI's requests.") (*Id.*).

The realities of these problems simply do not mesh with the prosecution's charitable description of the minimization "safeguards." *Compare* Unclassified Memo, p. 37 ("For

---

[27] And even when the NSA appears to correct course, it appears to have taken measures to allow the questionable surveillance practices to continue. For example, the NSA recently announced that it would cease "about" collection (which allowed for the broad acquisition of communications "about" a target, not just to or from a target). But before doing so, it secured authorization from the Obama administration to share raw, unminimized data collected under EO12333 with other agencies. As one commentator has observed, as a result of this shift:

> the government can still obtain the very things they've told the FISC they won't collect [under 702], and they can share them more easily with the FBI and CIA (which can do back door searches on them). In other words, even as the FISC was saying that the backdoor searches of upstream collection violated the Fourth Amendment, the government was self-authorizing a way to do the very same searches via means that don't have any FISC oversight (and for which the existing oversight regime is flimsy).

Marcy Wheeler, *It is False that Downstream 702 Collection Consists Only of To and From Communications*, June 3, 2017, *available at*: https://www.emptywheel.net/2017/06/03/it-is-false-that-downstream-702-collection-consists-only-of-to-and-from-communications/ (last visited July 7, 2017).

example, each agency limits access to unminimized Section 702-acquired data to personnel who have been trained to apply the applicable minimization procedures."). The FBI also repeatedly failed to comply with minimization procedures for attorney-client materials, causing Judge Hogan to remark that he was "extremely concerned about these additional instances of non-compliance." *[Redacted]*, p. 47-52, (FISC Nov. 6, 2015, Hogan). In light of these concerns, counsel submit that the prosecution's claim of "multiple safeguards," including self-reporting and FISC oversight, should give the Court little comfort.[28]

At a minimum, it is essential that the Court review the FAA and FISA surveillance in the context of its particular time, which could very well have been during a period of non-compliance described in now-declassified FISC opinions, such as that of Judge Hogan and Judge Collyer.[29] Indeed, the entire history of the FAA is marked by the NSA's "act first, disclose later" mentality.

### D.    The Good Faith Exception Does Not Apply.

The prosecution also argues that the good faith exception to the exclusionary rule provides an "independent basis for denying defendant's suppression motion." (Unclassified Memo, pp. 102-104). That argument should be rejected. That exception does not apply to FISA's statutory suppression remedy, which provides that if the Court "determines that the

---

[28] Indeed, during congressional oversight hearings regarding these surveillance authorities, the executive's representatives in multiple administrations have time and again confounded our legislators with carefully parsed double-talk. *See, e.g.*, Ruth Marcus, *James Clapper's 'least untruthful' answer*, Wash. Post, June 13, 2013 (available at http://articles.washingtonpost.com/2013-06-13/opinions/39950057_1_oversight-national-intelligence-national-security-agency) (last visited July 3, 2017) (describing how James Clapper, Director of National Intelligence, stated how he answered questions posed by Senator Ron Wyden in the "least untruthful manner"); Steve Nelson, Wyden Asks Spy Chief to Give Third Answer to Question About Domestic Surveillance, June 15, 2017 (available at https://www.usnews.com/news/articles/2017-06-15/ron-wyden-asks-dan-coats-to-give-third-answer-to-question-about-domestic-surveillance)
(describing how Senator Ron Wyden has repeatedly asked DNI Dan Coates to answer whether the government can use Section 702 "to collect communications it knows are entirely domestic.").

[29] Counsel submit that this is an additional reason for defense counsel participation in the review of FAA and FISA materials.

surveillance was not lawfully authorized or conducted, it *shall . . .* suppress the evidence which was unlawfully obtained or derived" from such surveillance." 50 U.S.C. § 1806(g) (emphasis added); *see also* 50 U.S.C. § 1825(h) (analogous provision for physical searches).

Accordingly, if the Court finds that the surveillance at issue in this case (either under the FAA or FISA) was not lawfully authorized or conducted, then it must order suppression under § 1806(g) or § 1825(h). As suppression is statutorily mandated, it "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." *United States v. Giordano*, 416 U.S. 505, 524 (1974). Thus, as with Title III, the good-faith exception to the Fourth Amendment's exclusionary rule does not apply. *United States v. Glover*, 736 F.3d 509, 515–16 (D.C. Cir. 2013); *United States v. Rice*, 478 F.3d 704, 711–14 (6th Cir. 2007) ("The language and legislative history of Title III strongly militate against engrafting the good-faith exception into Title III warrants.").

Further, even if the good-faith exception applied to § 1806(g), it would not be properly invoked here. The good-faith exception announced in *United States v. Leon*, 468 U.S. 897 (1984) does not apply because this case does not involve reliance on an individualized warrant authorizing the search of particularly described communications or locations. *See Leon*, 468 U.S. at 920–21; *United States v. Ning Wen*, 477 F.3d 896, 897–98 (7th Cir. 2006) (discussing reliance on individualized FISA warrants). For FAA surveillance, the FISC approves only general procedures proposed by the government, and, on the basis of those procedures alone, the government determines whom to monitor, when, and for how long. *See* 50 U.S.C. § 1881a.

## IV.    SECTION 702 IS INCONSISTENT WITH ARTICLE III.

The prosecution contends that the "FISC's role under Section 702 is similar to that of other federal courts which review *ex parte* applications for warrants and Title III wiretap orders."

36

As such, according to the prosecutors, Section 702 is entirely consistent with governing Article III Principles." (Unclassified Memo, pp. 5-6; *see also id* at 97-102). The prosecution is mistaken.

Section 702 violates Article III's "case or controversy" requirement because it requires FISC judges to issue advisory opinions addressing the constitutionality of abstract procedures absent concrete facts. Indeed, even in the traditional FISA setting, the FISC's job is particularized. Under 50 U.S.C. § 1805(a) and (b), the FISC considers concrete facts about a particular person to be monitored and the facilities to be targeted. In contrast, Section 702 imposes no similar requirements.

The Supreme Court has clearly explained, "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006); *see Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496, 498-499 (7th Cir. 2014) ("It would be very nice to be able to ask federal judges for legal advice … But that would be advisory jurisdiction, which … is both inconsistent with Article III's limitation of federal jurisdiction to actual disputes, thus excluding jurisdiction over merely potential ones …").

The prosecution's cited cases rejected very different Article III challenges. (Unclassified Memo, pp. 98-99). Defendant's "case or controversy" argument has little in common with the failed Article III challenges in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Mistretta v. United States*, 488 U.S. 361 (1989), which concerned congressional statutes granting executive and administrative functions to federal judges.

Moreover, Defendant does not, like other criminal defendants challenging traditional

FISA, base his Article III complaint solely on the fact that the FISC acts in secret and *ex parte*. *See In re Sealed Case*, 310 F.3d 717, 732 n.19 (FISCR 2002); *In re Kevork*, 634 F. Supp. 1002, 1013 (C.D. Cal. 1985), *aff'd*, 788 F.2d 566 (9th Cir. 1986); *United States v. Megahey*, 553 F. Supp. 1180, 1196 (E.D.N.Y. 1982), *aff'd sub nom.*, *United States v. Duggan*, 743 F.2d 59, 73–74 (2d Cir. 1984). Instead, Defendant's Article III argument is that the FAA asks judges to rule without a constitutionally required "case or controversy" in which to do so. The analysis in *Megahey* is illustrative, particularly the language cited in the FAA Motion at page 43, which we incorporate here. The prosecution's response does not persuasively address that language nor the principle behind it. Put simply, Section 702 permits the FISC to abandon its traditional judicial function in a manner not authorized by Article III.

Any attempt to justify the FISC's review pursuant to Section 702 by analogy to traditional FISA undermines rather than supports the prosecution's argument. For the many reasons discussed above, comparison to more commonplace Fourth Amendment proceedings casts even further doubt on Section 702 proceedings. Indeed, the prosecution acknowledges that traditional warrant assessments "typically involve a more fact-specific form of review" than that required by Section 702. (Unclassified Memo, p. 102). That fact exposes the critical difference between the two assessments: warrant and wiretap applications almost always involve specific targets or premises, and unique, articulable facts, based on information available to the public; the FISC's Section 702 review involves *none* of those particularities.

In short, Section 702 assigns to the FISC a role that is "fundamentally incompatible with the case-or-controversy requirement" because it compels the FISC to "evaluate in a vacuum whether proposed targeting and minimization procedures comply with the statute and the Constitution" without any particularized facts or context.

## V. THE COURT SHOULD GRANT DEFENDANT'S MOTIONS FOR ADDITIONAL SURVEILLANCE CONCERNING EXECUTIVE ORDER 12333 AND OTHER SURVEILLANCE AUTHORITIES.

Counsel moved for discovery regarding the use of EO 12333 in connection with Defendant and his communications and activities. (EO 12333 Motion, Dkt. #51). Counsel also moved for notice of other specific surveillance techniques used during the investigation, and particularly Sections 703 (50 U.S.C. §1881b), 704 (50 U.S.C. §1881c), and 705 (50 U.S.C. §1881d). (Surveillance Notice Motion, Dkt. #52).[30] These discovery requests are limited to the specific surveillance authorities cited and only as they relate to Defendant and this case. There is nothing in the motions to suggest that counsel asked for a "clear, concise narrative" as the prosecution represents. (Unclassified Memo, p. 113).

In response to these motions, the prosecution relies on its "*in camera, ex parte*" presentation of the FISA material, which it assures will show that it "has complied with its notice and discovery obligations." (Unclassified Memo, p. 113). The prosecution relies on *in camera, ex parte* proceedings, despite the numerous factual issues and concerns that counsel highlighted in Defendant's motions. (*See*, *e.g.*, Surveillance Notice Motion, pp. 3-5, 10-11; EO 12333 Motion, pp. 9, 15). Because the government relies on secret arguments, this reply is necessarily limited. However, the prosecution's response is still revealing in its silence. Most tellingly, the prosecution cannot even say that EO 12333, Sections 703-705, or any of the other specified

---

[30] With respect to Sections 704 and 705, which could be germane given Defendant's time overseas during which satellite surveillance was apparently used, a recently disclosed January 7, 2016 report from the NSA Inspector General reveals that the NSA did not establish a means to identify all of the queries conducted under those sections, and therefore it could not even determine if analysts were following compliance protocol. *See* NSA Inspector General Report, Report on the Special Study of NSA Controls to Comply with the FISA Amendments Act §§ 704 and 705(b) and Minimization Procedures, ST-15-0002, January 7, 2016, p. ii, *available at*: https://www.dni.gov/files/documents/icotr/51117/NSA_IG_Report_1_7_16_ST-15-0002.pdf.

surveillance authorities were *not* used in this case.  One would at least expect that it could indicate as much, if that was the case, particularly since the prosecutors were able to disclose that Section 702 "upstream" collection was not used.  The failure to even deny the use of those authorities returns us to the larger problem that pervades this case, and other national security cases like it:  either the prosecution knows the answers but has interpreted its notice obligations so narrowly that there will never be notice; or, the intelligence agencies are withholding this critical information from the prosecution to prevent any scrutiny or challenge to the surveillance methods.  In either case, we have deep concerns that the *in camera*, *ex parte* presentation will not permit the Court to make an accurate decision.

The prosecution goes on to describe the normal disclosure practices in a "criminal case," and cites Fed. R. Crim. P. 12(b)(4)(B).  (Unclassified Memo, p. 114).  But this is not a normal criminal case.  The prosecution's reliance on the onerous FISA disclosure provisions prove as much.  (Unclassified Memo, p. 115).  The prosecution uses its interpretation of the notice provisions to circumscribe what is "necessary" for the defense.  Relying on the FISA notice provisions, the prosecution only justifies counsel's previously stated concern that the prosecution "holds unjustifiably narrow view[s] of its notice obligations, even when it relies on novel and legally untested surveillance methods in its investigations."  (Surveillance Notice Motion, p. 7; *see also* EO 12333 Motion, p. 11 ("Courts and defendants must have the ability to ensure that the prosecutors, at the behest of the intelligence agencies, are not interpreting away their notice obligations through secret or self-serving legal and factual determinations, such as a unilateral assessment of whether evidence is "derived from" EO 12333 surveillance.").  In any event, the prosecution does not claim how the FISA notice provisions (or any other authority) precludes

disclosure related to EO 12333, which is the "primary source" of the NSA's foreign intelligence gathering. (EO 12333 Motion, p. 2).[31]

The prosecution also notes that Congress provided greater protection of information for FISA information "because of the need to protect sensitive national security information." (Unclassified Memo, p. 116). However, Congress also provided procedures for regulating the disclosure of classified information with CIPA. The implication of the prosecution's argument is precisely why counsel objected to the litigation of suppression issues in the *ex parte* setting and requested disclosure, pursuant to the well-established CIPA practices. (Dkt. #50). The prosecution did not respond to that motion.

Lastly, the prosecution's interpretation of its notice and disclosure obligations cannot trump Defendant's Due Process rights, which were discussed in detail in the motions. (Surveillance Notice Motion, pp. 2, 19-22; EO 12333 Motion, p. 11).[32] The prosecution's response conspicuously fails to even mention Due Process.

---

[31] The prosecution states that Defendant only makes "bare assertions" accompanied by newspaper articles in seeking additional disclosure regarding EO 12333. (Unclassified Memo, p. 118, footnote 92). Any fair reading of the EO 12333 motion discredits the prosecution's characterization. First, the motion relied on the language of the executive order itself, which was attached to the motion. Second, the articles the motion cited were hardly speculative, but rather included information from individuals with first-hand knowledge of EO 12333 and were authored by experienced and respected journalists. Third, the information in the motion was based on disclosures and records produced by the NSA in FOIA litigation, which the prosecution does not disclaim as inaccurate. And finally, we find it curious, to say the least, the prosecution would criticize Defendant for not marshaling more evidence regarding EO 12333, when the prosecution has never, in this case or any other, provided notice or disclosure regarding its use, despite the fact that it is described to be the NSA's "primary source" for gathering foreign intelligence.

[32] *See* Patrick Toomey, *Executive Order 12333, Notice, and the Due Process Rights of Criminal Defendants*, Aug. 14, 2014, *available at* http://justsecurity.org/14040/executive-order-12333-notice-due-process-rights-criminal-defendants/ ("Yet, as we know, E.O. 12333 surveillance is not overseen by *any* court, and today it involves some of the most novel, intrusive, and massive surveillance techniques ever used by the government. If the government is not providing notice in certain circumstances, it is depriving criminal defendants of a due process right the Supreme Court has long found fundamental.")

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Robin V. Waters
**ROBIN V. WATERS,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**,
Attorneys for Defendant
Aws Mohammed Younis Al-Jayab.

**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
Fax: 312-913-9235
tdurkin@durkinroberts.com

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

## CERTIFICATE OF SERVICE

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant Aws Mohammed Younis Al-Jayab's Consolidated Reply in Support of his FAA, FISA, and Surveillance-Related Pleadings, and Response to the Government's Unclassified Memorandum, was served on October 4, 2017, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.1, and LCrR 49.2, pursuant to the district court's system as to ECF filers.


/s/ Joshua G. Herman
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com