1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3

UNITED STATES OF AMERICA,        )
4                                )
               Plaintiff,        )
5                                )    Case No. 16 CR 181
     -vs-                        )
6                                )    Chicago, Illinois
                                 )    October 11, 2017
7    AWS MOHAMMED YOUNIS AL-JAYAB,   )   12:44 p.m.
                                 )
8              Defendant.        )

9

                 TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE SARA L. ELLIS

11   APPEARANCES:

12   For the Government:    MR. BARRY JONAS
                           Assistant U.S. Attorney
13                         219 S. Dearborn Street
                           Chicago, IL  60604
14                         (312) 353-5300
                           E-mail:  Barry.jonas@usdoj.gov
15
                           MR. ANDREW SIGLER
16                         Counterterrorism Section
                           National Security Division
17                         Department of Justice

18   For the Defendant:    MR. THOMAS A. DURKIN
                           Durkin & Roberts
19                         2446 North Clark Street
                           Chicago, IL  60614
20                         (312) 981-0123
                           E-mail:  Tdurkin@durkinroberts.com
21   Court Reporter:

22        KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                 Official Court Reporter
23            United States District Court
         219 South Dearborn Street, Suite 2524-A
24              Chicago, Illinois  60604
              Telephone:  (312) 435-5569
25                www.KathyFennell.com

1   APPEARANCES:   (Continued)

2   For the Defendant:      MR. JOSHUA G. HERMAN
                            Law Office of Joshua G. Herman
3                           53 W. Jackson Boulevard
                            Suite 1650
4                           Chicago, IL  60604
                            (312) 909-0434
5                           E-mail:  Jherman2joshhermanlaw.com

6   ALSO PRESENT:           Mr. Daniel O. Hartenstine
                            CISO
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings heard in open court:)

2            THE CLERK:  2016 CR 181, U.S.A. versus Aws Mohammed

3    Younis Al-Jayab.

4            MR. JONAS:  Good afternoon, your Honor.  Barry Jonas

12:44:34   5    and Andrew Sigler for the United States.

6            MR. DURKIN:  Good afternoon, Judge.  Tom Durkin and

7    Joshua Herman for the defendant who is present.

8            MR. JONAS:  Judge, thank you for accommodating me and

9    moving the status up.

12:44:44   10           THE COURT:  You're welcome.

11           (Defendant present.)

12           THE COURT:  I will tell you, Mr. Jonas, I had to

13   think twice once you gave me the reason.  We're Sox fans over

14   here.

12:45:00   15           MR. JONAS:  Well, if it helps any, I'm actually

16   rooting for the Nationals.

17           THE COURT:  All right.  Good afternoon.

18           MR. DURKIN:  Sox fan, you win both ways.

19           THE COURT:  This is true.  This is true.

12:45:14   20           Good afternoon, Mr. Al-Jayab.

21           THE DEFENDANT:  Good afternoon.

22           THE COURT:  And we'll put the interpreter's name on

23   the record.

24           THE INTERPRETER:  My name is Mamdouh Allam

12:45:27   25   M-A-M-D-O-U-H, A-L-L-A-M.

1        THE COURT:  Okay.  Thank you.

2        All right.  So I have brought you all here.  So I

3   have some questions before I'm ready to issue the opinion, so

4   I wanted to have a hearing and go through some of the

12:45:53    5   questions that I have.

6        And I wanted to note before we get started, so it

7   came to my attention that one of the defense documents that

8   was filed back in July contained an item that had classified

9   markings on it, and I am sure that it was an oversight, Mr.

12:46:30   10   Durkin.  However, I don't want any more classified materials

11   showing up on the docket.

12        MR. DURKIN:  I am tremendously embarrassed.  I don't

13   know what else to say other than it was an oversight.  The

14   document itself was in a book, it was like twice removed, and

12:46:54   15   I didn't -- there's no excuse other than I just didn't -- you

16   know, we just made a mistake, although to be honest, it was --

17   the way it came out, it never crossed my mind, just, you

18   know -- I'd like to tell you that it was --

19        MR. HERMAN:  Judge, I'll accept more responsibility

12:47:23   20   for this and apologize.  It was complete oversight, and it's

21   more fault on my shoulders than his.  I won't let somebody

22   wear my jacket.

23        THE COURT:  And I figured that's what it was, was

24   just a simple oversight.  However, it caused a lot of

12:47:41   25   consternation, and so I want to make sure that it doesn't

1    happen again.

2            So we do have the very able Mr. Hartenstine, who is

3    our CISO, so if there's any question whatsoever about things

4    in the future --

12:47:59    5            MR. DURKIN:  No, I understand.

6            THE COURT:  -- use him as a resource.

7            MR. DURKIN:  We can do that.  I've been doing this

8    now for 15 years now, and I have never missed one before.  I

9    guess the law of averages caught up to me.

12:48:14    10            THE COURT:  Yeah, you were due.  So -- but now you've

11    got your one, you've had your pass.

12            MR. DURKIN:  Thanks.

13            THE COURT:  Your free dog bite, so we'll make sure

14    that it doesn't happen again, and so we just want to make sure

12:48:30    15    that we all check with Dan who knows what we can do and what

16    we can't.

17            All right.  So with regard to the non-classified

18    information and material, the first question that I have,

19    which I think would take care of a lot of this is does

12:48:57    20    everybody agree that Mr. Al-Jayab is not a U.S. person under

21    FISA?

22            MR. JONAS:  Your Honor, I think he is a U.S. person.

23            THE COURT:  Why -- why would he --

24            MR. JONAS:  Because he was in the United States

12:49:15    25    legally.  You do not have to be a citizen to be considered a

1  U.S. person is my understanding.

2        THE COURT:  Well, it's not that you have to be a

3  citizen, but that -- and I could be wrong --

4        MR. JONAS:  Your Honor, I'm trying to -- there's a

5  line here I can't cross in going too far in the answer, so --

6        THE COURT:  No, so here's -- here's the thing.  So

7  my -- and I have to find where I put it.

8        Oh, thanks.  Okay.

9        Ah, yeah, okay.  So my reading of the statute is that

10  United States persons includes a citizen of the United States,

11  which Mr. Al-Jayab is not, and then an alien lawfully admitted

12  for permanent residence.  But my understanding, and I could be

13  wrong, but my understanding was at the time that Mr. Al-Jayab

14  was admitted as a refugee but had not yet acquired his green

15  card which would enable him to be here as a permanent

16  resident.

17        MR. DURKIN:  Judge, can I ask if the interpreter and

18  the defendant could move farther away because it's --

19        THE COURT:  That's fine.

20        MR. DURKIN:  -- too distracting.

21        MR. JONAS:  Your Honor, my understanding of the

22  status that you described is factually correct.  I'm not an

23  immigration expert, so whether or not the status he had, it

24  was my understanding that that qualified him as a U.S. person,

25  but I don't want to -- I'd rather confer with people who are

12:50:06

12:51:00

12:51:31

12:51:46

12:52:03

1    more experienced in this area than giving you an answer of
2    what my suspicion is.
3          THE COURT:  Okay.  So -- and the reason that I'm
4    asking this question is that FISA applies to the United -- to
5    a United States person, right, if Mr. Al-Jayab is not a United
6    States person, then some of these hoops that we are jumping
7    through, we don't necessarily need to jump through because the
8    requirements are not going to apply to him.
9          I've already jumped through the hoops in many pages.
10   However, I want to just be sure legally what his status is and
11   whether the requirements apply or don't apply.
12         MR. JONAS:  Understood, your Honor, and I'd rather
13   defer our response.  I do -- I'd rather defer the response.  I
14   will say that I think whether they apply or not, I think the
15   government has --
16         THE COURT:  I understood.
17         MR. JONAS:  -- I think we've met our standard.
18         THE COURT:  Understood.  Yes.
19         MR. JONAS:  I would request time to confer back with
20   Washington to make sure we give you the correct answer.
21         THE COURT:  And then Mr. Durkin, what's your
22   position?  Because --
23         MR. DURKIN:  Are we saying this for the purpose of
24   Fourth Amendment protections, is that what we're saying?
25         THE COURT:  Yes.  Under FISA, under FISA, not the

1  Fourth Amendment protections generally but whether the

2  requirements under FISA applied.

3         MR. DURKIN:  The position we took is on Page 24 of

4  our pleading that he is entitled to protection on two bases,

5  the search and seizure occurred on U.S. soil and that he had

6  substantial connections, as that's defined just to trigger

7  Fourth Amendment.

8         THE COURT:  Okay.

9         MR. DURKIN:  And I think that may relate to your

10 first comment or question that, you know, does it exactly fit

11 under the statute?  Maybe not.

12        THE COURT:  Okay.

13        MR. DURKIN:  But --

14        THE COURT:  Because my understanding was that you had

15 acknowledged that he doesn't fall within the definition of --

16        MR. DURKIN:  I'm sorry?

17        THE COURT:  My understanding was that you had

18 acknowledged that he did not fall under the definition of a

19 United States person under the statute, under the FISA

20 statute.

21        MR. DURKIN:  I think that's -- I don't think we have

22 any other choice but to take that position.

23        THE COURT:  Okay.

24        MR. DURKIN:  I think you're correct.

25        MR. HERMAN:  Technically correct, but the government

12:54:16
12:54:33
12:54:46
12:55:02
12:55:11

1    may have an alternative understanding of the statute.  This

2    was our reading of the -- as set forth on Page 24, and perhaps

3    the Fourth Amendment would -- confers the standing to raise a

4    challenge.  Again, it's the government that takes the position

12:55:31    5    that Mr. Al-Jayab requires notice under FISA and the FAA

6    regardless of debate over citizenship --

7              THE COURT:  Okay.

8              MR. HERMAN:  -- status.

9              MR. JONAS:  And we have taken that position, but,

12:55:46    10    again, I'd like to confer back with Washington to give you a

11    more definitive answer.

12              THE COURT:  That's fine.

13              MR. DURKIN:  I also think there's some interesting

14    issues with respect to what his true status in the country

12:55:59    15    was --

16              THE COURT:  Okay.

17              MR. DURKIN:  -- based on what I know now.

18              THE COURT:  Okay.

19              MR. DURKIN:  If that makes any sense, I mean,

12:56:10    20    without --

21              MR. JONAS:  I'm not sure I follow him.

22              THE COURT:  I don't follow it either, but that's

23    okay.

24              MR. DURKIN:  Well --

12:56:15    25              THE COURT:  Maybe it will become clear later.

1      MR. DURKIN:  Put it this -- well, maybe I should just

2  keep my mouth shut for the time being, but just -- I think an

3  issue will come up in this case as to how it is that he was

4  permitted back into the country.

12:56:34   5      THE COURT:  Okay.

6      MR. DURKIN:  One of two things is true.  Either the

7  government -- well, I'll just leave it at that.

8      I think there's issues surrounding why Mr. Al-Jayab

9  was permitted back in the country if the government believed

12:56:53  10  its intelligence beforehand.

11      THE COURT:  Okay.

12      MR. DURKIN:  And it could be that they didn't believe

13  it, which is what we might argue, too, but --

14      THE COURT:  Okay.

12:57:02  15      MR. JONAS:  Your Honor, I can't get into specifics

16  other than I think you have the information --

17      THE COURT:  I do.

18      MR. JONAS:  -- in your filings to that.

19      THE COURT:  I do.

12:57:12  20      All right.  So the other questions relating to the

21  non-classified material is both parties discuss a showing

22  necessary under Section 3504 to obtain a response from the

23  government about whether surveillance took place, but neither

24  side cites 7th Circuit case law.

12:57:48  25      It appears to me that In Re Grand Jury Proceeding of

1    August 1984, which is at 757 F.2d 108 at 115, 7th Circuit 1984,

2    is relevant and in that, following that case, then I would

3    need to require the government to provide an affidavit either

4    affirming or denying the surveillance even where

12:58:28    5    Mr. Al-Jayab's allegation of unlawful surveillance are general

6    and unsupported.

7            So I'm not sure if both sides weren't aware of that

8    case or you just believe it doesn't apply in this situation;

9    but in reading that case, it would seem to me that where

12:58:49    10    Mr. Al-Jayab has raised the question of whether there was any

11    illegal surveillance that the government could provide an

12    affidavit saying there wasn't any illegal surveillance, and

13    that would take care of a lot of this.

14            So is there any reason, first of all, why nobody

12:59:19    15    thought that this case applied?

16            And, secondly, is there a reason why the government

17    wouldn't want to, through an affidavit even of yourself,

18    Mr. Jonas, say there was no illegal surveillance that was done

19    in this case?

12:59:42    20            MR. JONAS:  First of all, off the top of my head, I'm

21    not familiar with the case, your Honor.  I'd have to look at

22    it, so I can't answer as to whether we think it applies or

23    not.

24            Second, I think thematically if we thought there

12:59:56    25    was -- I think just the filings alone should generally state

1    we didn't think there was any illegal surveillance.  If we

2    did --

3            THE INTERPRETER:  Interpreter cannot hear.  If you

4    can get close to the microphone.

01:00:09    5            MR. JONAS:  I thought I was.

6            If we thought there was illegal surveillance, in all

7    likelihood, we would not be using any of the FISA materials in

8    the first place and there wouldn't be a need for this

9    proceeding.  The undercurrent to everything we've done, it's

01:00:21   10    our position the surveillance was legal.  But clearly we have

11    to come back to answer the first question, so if I can have an

12    opportunity to review the case law and then we can provide you

13    with an answer.

14            THE COURT:  Okay.  All right.  Because I do think

01:00:33   15    that a simple affidavit -- I think that Mr. Al-Jayab's filings

16    have triggered the need for the affidavit and that a simple

17    affidavit would take care --

18            MR. JONAS:  True.

19            THE COURT:  -- of a lot of this.

01:00:50   20            All right.  Does -- does the government intend to use

21    any evidence that was derived from the classified surveillance

22    techniques that are at issue during the trial?

23            MR. JONAS:  Yeah, I'm trying to make sure I

24    understand your question the way you're phrasing it, your

01:01:16   25    Honor.

1        The answer is yes, if I understand your question, and

2    that's why we gave the FISA notice in the first place.  If we

3    were not, again, there would be no suppression issue here.  So

4    the answer is yes.

01:01:29    5        THE COURT:  Okay.  All right.  Does Mr. Al-Jayab have

6    any specific objections or issues with the traditional FISA

7    physical search?

8        MR. HERMAN:  I can speak to that.

9        Your Honor, in our reply, which is now docket 78, we

01:01:49   10    did discuss more of the physical search aspects and weren't

11    doing that in just a reply to, you know, sandbag in any way.

12    It was more that we were focused on the FAA issues.

13        The physical search aspect, like the FAA searches, we

14    aren't sure what was actually searched.  We don't know what

01:02:14   15    was subject to the physical searches.

16        We can surmise as much.  There are a couple of

17    things, based on the discovery.  So without -- I mean, that's

18    the whole --

19        THE COURT:  I know.

01:02:27   20        MR. HERMAN:  -- tail-chasing aspect, so we would just

21    lodge an objection not only to -- for what it's worth,

22    whatever was searched, but also anything that was derived from

23    the physical FISA searches.

24        So I see Mr. Jonas wanting to jump in.

01:02:43   25        MR. JONAS:  I was going to say, your Honor, there

1    were probably I think between five to seven products that we

2    are anticipating seeking to admit at trial that's derived

3    from.

4            What we can do is we can have a meeting with

5    Mr. Durkin and Mr. Herman in their SCIF and explain to them

6    what those products are.  Although they have been declassified

7    and they have those items, I recognize that we've produced a

8    lot of discovery, and it may be difficult for them to point

9    out exactly which ones they are.

10           I thought we would have notated them in a way that

11   would signal to them what they were through the sensitive

12   markings, but I'm happy to specifically point to them exactly

13   what those products are.

14           THE COURT:  Okay.

15           MR. DURKIN:  We'll accept that.

16           THE COURT:  Okay.  In reading the government's

17   filings, and I could have just missed this in reading the

18   filings, but it didn't seem to me that the government

19   addressed Mr. Al-Jayab's arguments regarding Section 702's

20   failure to have a probable cause requirement or to require

21   specificity and particularity.

22           So what's the government's position on why the lack

23   of these requirements doesn't present a constitutional issue?

24           MR. JONAS:  Again, your Honor, we'll get back to you

25   on that.  We're notating all your questions and Mr. Sigler's

1   writing them down, and we'll come back with answers to all of
2   them.

3           THE COURT:  Okay.  All right.

4           MR. DURKIN:  Just as an aside, Judge, I don't know if
5   you ever read my Law Review article, but it's proving my
6   point.

7           MR. JONAS:  I think I've just been insulted.

8           MR. DURKIN:  No, it's not an insult.  It's a
9   structural issue.  It's nothing personal.

10          THE COURT:  All right.  Has everything that formed
11  the basis of the criminal complaint in California been turned
12  over to defense counsel?

13          MR. JONAS:  Yes.

14          THE COURT:  Okay.  The -- what's the status of the
15  document production in the Swiss terrorism case?

16          MR. JONAS:  We've produced to them I believe
17  everything that we have in the United States, and I think
18  we've gone way beyond what we would normally have to produce
19  in a criminal case.

20          The Swiss case, which we've explained in one of our
21  filings, really is -- there's a relationship, but it also
22  doesn't impact the crime at issue here.  So is it possible
23  that the Swiss may have something?  We've checked with them.
24  We've been told that we have everything they have on the
25  defendant, which is not a lot.

1    So I'm not sure there's anything for us to produce at
2  this point, anything more for us to produce.
3         THE COURT:  Okay.  All right.  And what's the status
4  of that case?
01:06:17  5         MR. JONAS:  That case has been adjudicated.  The
6  defendants were found guilty I think well over a year ago and
7  have been sentenced.
8         THE COURT:  Okay.
9         MR. JONAS:  I don't recall their sentences though.
01:06:27  10         THE COURT:  Okay.  All right.
11         MR. HERMAN:  It was terrorism.
12         MR. JONAS:  As Mr. Herman points out, it was a
13  terrorism case.
14         MR. HERMAN:  They were acquitted of the terrorism and
01:06:42  15  convicted of lesser charges.
16         MR. JONAS:  Are you sure?
17         MR. HERMAN:  I'm not sure.
18         MR. JONAS:  They've been convicted.  We'll leave it
19  at that.  There's a dispute among us about what charges they
01:06:53  20  are, but I'm not sure that's correct.
21         THE COURT:  Okay.  What would be, and this may go to
22  Mr. Durkin's somewhat cryptic comment at the beginning of the
23  hearing about when the government became aware of
24  Mr. Al-Jayab, would the -- would that information be relevant,
01:07:29  25  and is it the government's position that Mr. Al-Jayab would be

1  entitled to that information in a statement as to when they

2  became aware of him?

3      MR. JONAS:  I do not think it is relevant to start.

4  I'm hesitant, again, because of some of the concern about

01:07:51  5  going down a road that's going to get into some of the

6  information we've provided *ex parte* to your Honor.

7      You know, once we start providing this information,

8  it's going to lead to additional questions, and then we're

9  going down a dangerous path.  I do not think it is relevant.

01:08:07  10      THE COURT:  Okay.  All right.  And --

11      MR. DURKIN:  Could I speak to that?

12      THE COURT:  Mr. Durkin, go head.

13      MR. DURKIN:  It's -- I don't see how it could not

14  possibly be relevant, if nothing else, to sentencing under

01:08:21  15  *Brady*.  If, in fact, they were aware of all this and still

16  permitted him in the country, I mean, I don't want to go too

17  far either as to what I can say and not say, but I think it's,

18  one, in -- in any criminal case, I would suggest it is

19  absolutely material to the preparation of the defense that you

01:08:57  20  know how the investigation began.  That's -- that may seem

21  irrelevant to a prosecutor; but it is, I think, one of the

22  most fundamental facts in the case that, in order to prepare a

23  defense.

24      And in this case in particular, there is so many what

01:09:22  25  I would call timing issues about who was doing what at a

1  certain time, who knew what at a certain time.  It's also

2  terribly relevant to what was going on in Syria, which has

3  always been a fluid, changing-by-the-week kind of issue.

4            I just can't understand how it couldn't be relevant.

01:09:53  5  I mean, it's -- is it necessarily something that we could

6  admit into evidence?  Maybe not.  I don't know.  But I don't

7  think that's the test.  I think the test is would it be

8  material to the preparation of the defense.  I can't imagine

9  also that it wouldn't be -- always get confused with *Giglio*

01:10:18  10  and *Agurs*, but is it impeaching?  Is it conceptually -- will

11  it contradict other things?  You know, for example, and I'm

12  not suggesting that this is what it is, but there's -- in

13  these cases a big issue to determine is whether the government

14  is engaged in parallel construction.

01:10:46  15            Without knowing that, I don't know how you would ever

16  ascertain something like parallel construction.  So, I mean, I

17  can't give you any more specifics than that, but I certainly

18  think -- I mean, I could explain that more in an *ex parte*

19  proceeding if you wanted to hear it, because I just think --

01:11:11  20  you've been around enough and you've been on this side of the

21  aisle, and I just think it's an absolutely critical fact, but

22  I think it's -- not to keep harping on my Law Review article

23  but it's another thing I mention -- well, this is something

24  you don't get in these cases, which is, again, why I keep

01:11:36  25  suggesting we're going to end up with a two-tiered system

1    because you get it in everything else, almost any other case

2    you're ever involved in, they turn that over without

3    hesitating.  And in this, they don't want to because I guess

4    it would somehow reveal their sources, as if that's a secret.

5    I mean, like, here we are, but that's, I guess, the best I can

6    argue.

7                MR. JONAS:  Your Honor, what I'm going to do, since

8    it's clear we have to return to address some other issues, is

9    I'm going to go back to talk to other individuals who are the

10   parts of the government that own some of this information to

11   find out if we can provide that very limited answer to your

12   question and just to inform defense counsel in a classified

13   letter, classified document, when the government learned of

14   the defendant with the understanding that -- I can anticipate

15   what's going to be asked of me, and it would have to be a

16   representation that we don't provide any more than that.

17               And I think, again, we've explained in all our

18   filings why, your Honor, and I'd like to think -- I mean,

19   again, I'm not a defense counsel, so I don't want to speak for

20   defense, but I think that answer, if we could provide that

21   information, may address a lot of Mr. Durkin's concerns.

22               So if I can have the opportunity to go back to talk

23   to the people who own the information essentially to say, you

24   know, can we provide that one limited piece of information in

25   a classified letter, maybe we can address all that.

1    THE COURT:  And I think -- I think -- so, Mr. Durkin,

2    you know, and I understand that, and having stood in your

3    shoes as well, that I do understand that it is difficult to be

4    the only one in the room not -- without access to all the

01:13:39    5    information.

6        But having reviewed everything and all the classified

7    information, I do think that what Mr. Jonas suggests, if he's

8    able to do that, will take care of a number of concerns and

9    issues that you have, I think.

01:14:04    10    MR. DURKIN:  Well --

11    THE COURT:  I'm not you.

12    MR. DURKIN:  As my mother used to say, beggars can't

13    be choosers, so I'm not going to refuse it.  I'm not going to

14    promise that I won't get greedy and ask for more, but they

01:14:18    15    know what the answer to that will be and --

16    THE COURT:  Yeah.

17    MR. DURKIN:  -- they're very capable of telling me

18    no, so --

19    THE COURT:  Yeah.

01:14:26    20    MR. DURKIN:  -- I'm used to it.

21    THE COURT:  You can always ask, and they are free to

22    tell you no.

23    MR. DURKIN:  But I -- I'm just -- I always feel

24    compelled to have to say that it still amazes me that we could

01:14:41    25    be talking about evidence that is owned by someone else.  I --

1    we're entering stages of the world of Never, Neverland.  It's

2    just an amazing phenomenon, and I just don't want to go in

3    silence and say, oh, it's okay, that's just the way it is, we

4    want to use your criminal courts, but we're only going to --

01:15:11    5    we don't own this stuff, I've got to go speak to the owners.

6    Maybe the owners ought to prosecute this case.

7             THE COURT:  Well --

8             MR. DURKIN:  But that might happen, too.

9             THE COURT:  I think Mr. Jonas would be quite happy.

01:15:23    10             MR. JONAS:  I think so.

11             MR. DURKIN:  When they get their national security

12    court, that's what's going to happen, so --

13             THE COURT:  All right.  So that, I think, covers all

14    the questions I had on the non-classified material.

01:15:38    15             So at this point then, I'm going to speak to defense

16    counsel first to bring up any issues that you have regarding

17    any classified material, and then I'll speak to the government

18    and go over the questions that I have regarding the classified

19    material.

01:16:02    20             And what time do you need to go, Mr. Jonas?

21             MR. JONAS:  I was hoping to be out of here by about

22    1:30, but I don't see that happening now.

23             THE COURT:  1:45?

24             MR. JONAS:  1:45.

01:16:16    25             THE COURT:  Yes.

```
 1              MR. JONAS:  Before we break, two quick requests.
 2              THE COURT:  Sure.
 3              MR. JONAS:  One is clearly we need to reconvene to
 4    answer your non-classified questions.  Can we schedule that
 5    right now while we're all together?
 6              THE COURT:  Yes, and when do you want to -- how long
 7    do you think it will take you to get the answers to my
 8    questions?
 9              MR. JONAS:  Probably less than a week.  We can meet
10    Tuesday, the 17th, your Honor, if you're available then.
11              THE COURT:  Dan?
12              MR. HARTENSTINE:  I can be available, your Honor.
13              MR. DURKIN:  What day are we talking about?
14              MR. JONAS:  Tuesday, October 17.
15              MR. DURKIN:  I was supposed to be in New York that
16    day, and I -- the specific meeting that I was going to was
17    canceled, but I was told that I might come to some other
18    meeting in the same group, but if we could do -- would
19    Thursday be okay?
20              MR. JONAS:  Thursday is fine with the government, as
21    long as it's in the afternoon, your Honor.
22              THE COURT:  Dan?
23              MR. HARTENSTINE:  Yes, that's fine with me as well,
24    your Honor.
25              THE COURT:  All right.  I have two change of plea at
```

01:16:25
01:16:38
01:16:53
01:17:10
01:17:18

1    2:00, so could we do it at 3:00?

2         MR. JONAS:  That works for the government, your

3    Honor.

4         MR. DURKIN:  At what time?

01:17:36   5    THE COURT:  At 3:00.

6         MR. DURKIN:  Yes, that would be great.

7         THE COURT:  Dan, does that work for you?

8         MR. HARTENSTINE:  Yes, your Honor.

9         THE COURT:  Okay.  Because I suspect, Mr. Jonas, when

01:17:47   10   I meet with you in a couple minutes, that I'll have

11   questions -- I do have questions about some of the classified

12   information, so I suspect you're going to need to get answers,

13   and we'll need Dan, so --

14        MR. JONAS:  Yes, your Honor.

01:18:03   15        The second thing unrelated to everything we've been

16   discussing today, can we -- and I'm sorry I forgot to bring

17   this up with defense counsel -- just get authorization to

18   issue early return of trial subpoenas?

19        THE COURT:  Yes, that's fine.

01:18:16   20   MR. JONAS:  For both sides.

21        MR. DURKIN:  That's fine.

22        MR. JONAS:  Thank you, your Honor.

23        THE COURT:  That's fine.

24        MR. DURKIN:  Judge --

01:18:20   25   THE COURT:  And before we break, Mr. Durkin, are

1 there any ongoing issues with Mr. Al-Jayab's detention?  I

2 know you had brought up some issues earlier.

3   MR. DURKIN:  No, other than he'd like to be released,

4 I think he's -- I don't think any of those --

01:18:40 5   MR. HERMAN:  Judge, as you know, he's -- your Honor,

6 I believe, gave authorization for a doctor to see

7 Mr. Al-Jayab.  That meeting happened.  There may be follow-up,

8 and if I brought this up before and didn't follow through on

9 it, I apologize, but I may be preparing a budget because of

01:19:00 10 the $2,400 cap.

11   THE COURT:  Okay.

12   MR. HERMAN:  So just in case you see that, and it --

13 we usually do those under seal.

14   THE COURT:  Yes.  Okay.

01:19:10 15   MR. JONAS:  I do have one other matter, your Honor.

16 I've discussed with defense counsel beforehand is the trial

17 date.

18   THE COURT:  Yes.

19   MR. JONAS:  I just want to find out if we are still

01:19:19 20 going forward in February.

21   THE COURT:  I certainly hope so because I have put

22 this aside, so February 12th.

23   MR. DURKIN:  I --

24   THE COURT:  Three weeks.

01:19:27 25   MR. DURKIN:  We told Mr. Jonas at present time, we

1  don't have an intention of seeking a continuance.  We did come

2  across something recently that could require a Rule 15

3  deposition, but I don't know whether we're going to be able

4  to -- whether anybody will be able to get to that person, and

01:19:46  5  even if we did, I think it should be do-able.  I mean, so --

6      THE COURT:  You have plenty of time between now and

7  then.

8      MR. DURKIN:  Right.  We also have a couple of other

9  motions that we intend to file along the lines of -- what is

01:20:08  10  it, would you say?

11     (Counsel conferring.)

12     MR. DURKIN:  Combatant immunity and

13  extraterritoriality.

14     THE COURT:  Okay.

01:20:16  15     MR. DURKIN:  But they're not, I don't think they're

16  going to require evidence or anything, so they should be --

17     MR. HERMAN:  They may.

18     MR. DURKIN:  He says they may, so -- I'll listen to

19  him.  He's smarter than I am.

01:20:32  20     Would it be better if we did the *ex parte* stuff on

21  the 19th, or do you need that for your rulings?

22     THE COURT:  Well, I'll need -- yes, I do need it for

23  my ruling.

24     MR. DURKIN:  I'm sorry?

01:20:49  25     THE COURT:  I do need it for my ruling, so -- and I

1   know I'm going to be sending Mr. Jonas away more likely than

2   not with a list of questions for which I need some answers, so

3   if we can do that.

4          MR. DURKIN:  No, that's fine.  I just have to be down

01:21:08   5   to the Daley Center by 2:00.

6          THE COURT:  Oh, and I don't anticipate that --

7   basically, for the defense, it's if you -- I know that you had

8   requested to meet in a classified setting to bring up some

9   concerns that you had.

01:21:28   10          MR. DURKIN:  That's fine.

11          THE COURT:  So that was what this was.

12          MR. DURKIN:  We can do that.

13          THE COURT:  Okay.  All right.

14      (Which were all the proceedings heard.)

15                         CERTIFICATE

16      I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.

18   */s/Kathleen M. Fennell*              *October 17, 2017*

19   _____      _____

20   Kathleen M. Fennell                      Date
     Official Court Reporter

21

22

23

24

25