**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CR 181 |
| | ) | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS | ) | |
| AL-JAYAB, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT AWS MOHAMMED YOUNIS AL-JAYAB'S
MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS
THE INDICTMENT BASED ON COMBATANT IMMUNITY**

**THOMAS ANTHONY DURKIN**
**ROBIN V. WATERS**
**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
Fax: 312-913-9235
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

## **TABLE OF CONTENTS**

I.   Introduction ............................................................................................................... 1

II.  Factual Background .................................................................................................. 6

   A.   The Syrian War. ................................................................................................. 6

   B.   The Involvement of the United States and Other Nations in the Syrian War. .................... 8

   C.   The Relevant Syrian Rebel and Opposition Groups .......................................... 14

   D.   The United States Supports Syrian Rebel Opposition Groups .......................... 17

   E.   Mr. Al-Jayab's Association with the Islamic Front Through
His Involvement in Ansar al-Sham in Late 2013 and Early 2014 ..................... 20

III. The Combatant Immunity Doctrine ....................................................................... 22

   A.   The Combatant Immunity Doctrine Under Common Law. ............................... 23

   B.   The Combatant Immunity Doctrine Under International Law. .......................... 27

IV.  Argument ............................................................................................................... 35

   A.   Introduction. ..................................................................................................... 35

   B.   Legal Standards. ............................................................................................... 36

   C.   Mr. Al-Jayab is Entitled to Combatant Immunity under the Common Law. ..................... 37

   D.   Mr. Al-Jayab is Entitled to Combatant Immunity Under International Law. .................... 39

      1.   Combatant Immunity Applies Under GPW III. ............................................ 40

         a.   The Syrian War Is an International as Well as an
Internationalized Armed Conflict ............................................ 40

         b.   The Islamic Front and Sub-Groups Qualify Under GPW III, Art. 4. ......................... 44

      2.   Mr. Al-Jayab is Entitled to Combatant Immunity
Even if the  Syrian War is Deemed to be a Non-International
Armed Conflict. ........................................................................................... 49

V.   Conclusion ............................................................................................................. 53

## TABLE OF AUTHORITIES

**Cases**

*Bennett v. Davis*, 267 F.2d 15 (10th Cir. 1959) ............................................. 24

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) .................................... 36

*Brig Army Warwick (The Prize Cases)*, 67 U.S. (2 Black) 635 (1863) ........................ 23

*Coleman v. Tenn.*, 97 U.S. 509 (1879).......................................................... 24

*Dostal v. Haig*, 652 F.2d 173 (D.C. Cir. 1981)................................................... 24

*Dow v. Johnson*, 100 U.S. 158 (1879) ........................................................ 23

*Ex Parte Quirin*, 317 U.S. 1 (1942) .......................................................... 22

*Ford v. Surget*, 97 U.S. 594 (1878)........................................................... 23

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749  (2006) ............................................ 27, 34

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)................................................ 24

*Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988)............................................. 36

*New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100 (2d Cir. 2014)................. 26

*Orleans v. S.S. Co.*, 87 U.S. (20 Wall.) 387 (1874)........................................ 24

*Prosecutor v. Blaskic*, Case No. IT-95-14 (Int'l Crim. Trib. For the
    Former Yugoslavia  March 3, 2000) .................................................. 41

*Prosecutor v. Tadic*, Case No. IT-94-1-A, Decision on Defence Motion for
    Interlocutory Appeal on Jurisdiction PP 94-137 (Int'l Crim. Trib. For
    the Former Yugoslavia Oct. 2, 1995) ............................................... 49

*Respublica v. Sparhawk*, 1 U.S. (1 Dall.) 357 (Pa. Sup. Ct. 1788)......................... 23

*Tennessee v. Hibdom*, 23 F. 795 (C.C.M.D. Tenn. 1885).................................... 24

*Underhill v. Hernandez*, 168 U.S. 250 (1897).............................................. 23

*United States v. Achter*, 52 F.3d 753 (8th Cir.1995)....................................... 39

*United States v. Arnaout*, 236 F. Supp. 2d 916 (N.D. Ill. 2003)........................... 32

*United States v. Brimberry*, 744 F.2d 580 (7th Cir. 1984)................................. 36

*United States v. DeLaurentis*, 230 F.3d 659 (3d Cir. 2000) ............................... 36

*United States v. Hamidullin*, 114 F. Supp. 3d 365 (E.D. Va. July 13, 2015) ............. 32

*United States v. Khadr*, 717 F. Supp. 2d 1215 (C.M.C.R. 2007) ......................... 22

*United States v. Labs of Virginia, Inc.*, 272 F. Supp. 2d 764 (N.D. Ill. 2003)............ 36

*United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002).................... 22, 27, 33, 48

*United States v. Naj Ahmed, et al.*, Case No. 15 CR 49
    (D. Minn, Feb. 11, 2016), Dkt. #371 .............................................. 48

*United States v. Noriega*, 808 F. Supp. 791 (S.D. Fla. 1992) ................................................ 22, 27

*United States v. Segal*, 299 F. Supp. 2d 840 (N.D. Ill. 2004) ...................................................... 36

*United States v. Yashar,* 166 F.3d 873 (7th Cir. 1999) ................................................................ 36

**Statutes**

18 U.S.C. § 114 .......................................................................................................................... 35

18 U.S.C. § 956(a)(1) .................................................................................................. 3, 26, 35, 38

18 U.S.C. § 1111 ........................................................................................................................ 35

18 U.S.C. § 1119 ........................................................................................................................ 26

18 U.S.C. § 1201 ........................................................................................................................ 35

18 U.S.C. 2339A ................................................................................................................ 3, 4, 35

**Other Authorities**

1 Hale, Pleas of the Crown § 433 (1847) ................................................................................... 23

1 Joel P. Bishop, Commentaries on the Criminal Law § 131 (7th ed. 1882) ............................. 23

1 Wharton's Criminal Law § 41 at 272 (15th ed. 1993) ............................................................ 25

2 Paul Robinson, Criminal Law Defenses § 148(a) (1984) ....................................................... 25

4 Blackstone, Commentaries on the Laws of England 198 (1769)............................................. 23

Department of Defense Law of War Manual, June 2015 ............................................................ 34

Geneva Convention Relative to the Treatment of Prisons of War,
  Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ............................................................. *passim*

Hague Convention Respecting the Laws and Customs of War on Land,
  Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 ..................................................................... 47

Instructions for the Government of the Armies of the United States in the
  Field, General Orders No. 100 (Prepared by Francis Lieber, 1863) ........................................ 24

Model Penal Code § 3.03 ........................................................................................................... 25

Office of Legal Counsel's July 16, 2010 Memorandum For the
  Attorney General Re: Applicability of Federal Criminal Laws
  and the Constitution to Contemplated Lethal Operations
  Against Shaykh Anwar al-Aulaqi .................................................................... 26, 37, 38, 39

Protocol Additional to the Geneva Conventions of 12 August 1949, and
  Relating to the Protection of Victims of International Armed Conflicts,
  (Protocol I), June 8, 1977 ...................................................................................... *passim*

Protocol Additional to the Geneva Conventions of 12 August 1949, and
  relating to the Protection of Victims of Non-International Armed Conflicts
  (Protocol II), June 8, 1977 .......................................................................................... 51

**Rules**

Fed. R. Crim. P. 12(b)(1) ........................................................................................................... 36

**Articles and Other Sources**

Aaron Y. Zelin & Charles Lister, *The Crowning of the Syrian Islamic Front*,
FOREIGN POLICY, June 24, 2013 ................................................................. 15

Adam Entous & Julian E. Barnes, *U.S. to Arm Syrian Rebels*,
WALL ST. J., June 14, 2013 ........................................................................ 2

Adam Entous, Julian E. Barnes, and Siobhan Gorman, *U.S. Begins Shipping
Arms for Syrian Rebels; CIA Aims to Vet and Train Fighters With New
Weapons for Deployment by August; Saudi Antiaircraft Missiles Expected*,
WALL ST. J., June 26, 2013 ........................................................................ 11

Anne Barnard & Hwaida Saad, Rebels Gain Control of
Government Air Base in Syria, N.Y. TIMES, Aug. 5, 2013 ......................... 15

Aron Lund, *Islamist Mergers in Syria:  Ahrar al-Sham Swallows
Suqour al-Sham*, Carnegie Middle East Center, Mar. 23, 2015 ................ 17

Aron Lund, *Pushing Back Against the Islamic State of Iraq and the Levant:
The Islamic Front*, Carnegie Middle East Center, Jan. 8, 2014 ................ 17

Aron Lund, *The Politics of the Islamic Front, Part 1:
Structure and Support*, Carnegie Middle East Center, Jan. 14, 2014 ....... 16

Associated Press, *Syria needs time to win 'regional, global' battle, Assad says:
Turkey wants UN to set up safe havens in Syria for refugees*, CBC News, Aug. 29, 2012 ....... 8

BBC News, Guide to the Syrian Rebels, Dec. 13, 2013 ................................ 15, 44

BBC News, *Leading Syrian rebel groups form new Islamic Front*, Nov. 22, 2013 .............. 15, 45

BBC news, *Syria in state of war, says Bashar al-Assad*, June 27, 2012 ....... 8

C.J. Chivers & Eric Schmitt, *Arms Airlift to Syria Rebels Expands,
With Aid from C.I.A.*, N.Y. TIMES, Mar. 24, 2013 ................................. 2, 17

Christopher Woolf, *A veteran from Wisconsin explains why
he joined the fight against ISIS*, PRI, Oct. 21, 2014 ................................ 6

Dave Burke, *The boy whose graffiti changed the world*, DAILY MAIL, Mar. 14, 2017 ............ 6

David Kenner, *Why Is Saudi Arabia Buying 15,000 U.S. Anti-Tank
Missiles for a War It Will Never Fight?  Hint: Syria*. Foreign Policy ...................... 20

David S. Cloud and Raja Abdulrahim, *U.S. has secretly provided
arms training to Syria rebels since 2012: CIA agents and special
operations troops have trained the rebels in anti-tank and antiaircraft
weaponry in Jordan and Turkey*, L.A. TIMES, June 21, 2013 ................... 18

Deepak Tripathi, *Barack Obama's 'Intelligence Finding' and the
Syrian Civil War*, INT'L POL DIGEST, August 12, 2012 ......................... 10

Defense Security Cooperation Agency News Release, Dec. 5, 2013 ........... 19

Eli Lake, *Iran Spent Billions to Prop Up Assad*, BLOOMBERG, June 9, 2015 ............... 14

Ernesto Londoño and Greg Miller, *CIA begins weapon delivery to Syrian rebels*, WASH. POST., Sept. 11, 2013 ........................................................ 11

Faysal Itani*, The End of American Support for Syrian Rebels Was Inevitable*, THE ATLANTIC, July 21, 2017 ......................................... 3

Greg Jaffe and Adam Entous, *Trump ends covert CIA program to arm anti-Assad rebels in Syria, a move sought by Moscow*, WASH. POST, July 19, 2017 ................. 3

Greg Myre, *In One Map, The Dramatic Rise of the Islamic State Militants*, NPR, June 13, 2014 ........................................................ 51

*Iran's Secret Army* (BBC News night television broadcast, Oct. 28, 2013) ................................ 14

James Ball, *Obama issues a 'red line' warning on chemical weapons*, WASH. POST, Aug. 2012 ........................................... 9

Jason Fritz and Joseph Young, *Transnational "Volunteers": America's Anti-ISIL Fighters,* War on the Rocks, Sept. 13, 2016 .............................. 6

Jeffrey Goldberg *The Obama Doctrine: The U.S. president talks through his hardest decisions about America's role in the world*, THE ATLANTIC, April 2016 ............ 13

Joby Warrick, *More than 1,400 killed in Syrian chemical weapons attack, U.S. says*, WASH. POST, Aug. 30, 2013 ........................................ 11

Kareem Fahim and Hwaida Saad, *A Faceless Teenage Refugee Who Helped Ignite Syria's War*, N.Y. TIMES, Feb. 8, 2013 ........................................ 6

Karen DeYoung, Syrian opposition fighters obtain U.S.-made TOW antitank missile, WASH. POST, Apr. 16, 2014 ................................................ 20

Liz, Sly, *Syrian rebels who received first U.S. missiles of war see shipment as 'an important first step'*, WASH. POST, Apr. 27, 2014 ........................... 20

Loveday Morris, *Seven Syrian Islamist rebel groups form new Islamic Front*, Wash. Post., Nov. 22, 2013 .......................................... 16

Mariam Karouny, *Saudi Arabia Edges Qatar to Control Syria Rebel Support*, REUTERS, May 31, 2013 ........................................ 14

Mark Hosenball, *Obama authorizes secret support for Syrian rebels*, REUTERS, Aug. 1, 2012 ................................................ 2, 18

Mark Mazzetti and Matt Apuzzo, *U.S. Relies Heavily on Saudi Money to Support Syrian Rebels*, N.Y. TIMES, Jan. 23, 2016 .......................... 11, 18

Mark Mazzetti, Adam Goldman, Michael S. Schmidt, *Behind the Sudden Death of a $1 Billion Secret C.I.A. War in Syria*, N.Y. TIMES, Aug. 2, 2017 ............... 3

Neil MacFarquhar and Michael R. Gordon, *As Fighting Rages, Clinton Seeks New Syrian Opposition*, N.Y. TIMES, Oct. 31, 2017 ............................ 9

Official Website of Matthew VanDyke, *Home Page* ................................................ 6

Reuters Staff, Factbox: Syria's rebel groups, Jan. 9, 2014 ........................................ 16

RULAC, Geneva Academy, *Non-international armed conflicts in Syria* ..................................... 8

Ruth Sherlock, *Iran Boosts Support to Syria*, TELEGRAPH, Feb. 21, 2014 ................................... 14

Seth Harp, *The Anarchists vs. the Islamic State:  On the front lines of Syria with the young American radicals fighting ISIS*, ROLLING STONE, Feb. 14, 2017 ........... 6

Shahir Shahidsaless, *It is Russia, not IS or al-Qaeda, that poses primary threat to US*, Middle East Eye, Aug. 16, 2016 ......................................................... 40

Statement by President Obama on the Situation in Syria, The White House, Office of Press Secretary, Aug. 11, 2011 ...................................... 9

Tam Hussein, *The Ansar al-Sham Battalions*, Carnegie Middle East Center, Mar. 24, 2014 ...................................................... 17

The International Committee of the Red Cross, *Syria: ICRC and Syrian Arab Red Crescent maintain aid effort amid increased fighting, Operational Update* ............................................... 8

UCLA math major Chris Jeon talks about joining rebel fighters in Libya, YouTube ................... 6

White House, Office of Press Secretary, *Government Assessment of the Syrian Government's Use of Chemical Weapons on August 21, 2013*, Aug. 30, 2013 ............. 12

**Law Review Articles**

Aleksandar Marsavelski, *The Crime of Terrorism and the Right of Revolution in International Law*, 28 CONN. J. INT'L L. 243 (2013) ..................................... 31, 44

Geoffrey S. Corn, *Thinking the Unthinkable: Has the Time Come to Offer Combatant Immunity to Non-State Actors?*, 22 Stan. L. & Pol'y Rev 253 (2011) ..................................................................... 33, 34, 53

James G. Stewart, *Towards a Single Definition of Armed Conflict in International Humanitarian Law:  A Critique of Internationalized Armed Conflict*, International Review of the Red Cross, Vol. 850 (2013) ........................ 28, 30, 31, 43

Jed Odermatt, *Between Law and Reality: 'New Wars' and Internationalised Armed Conflict*, Amsterdam Law Form, p. 31, Vol. 5:4 (2013) ........................ 29, 52

Jens David Ohlin, *The Combatant's Privilege in Asymmetric and Covert Conflicts*, 40 Yale J. Int'l L. 337 (2015) .................................................................. 50

Jordan J. Paust, *NIAC Nonsense, The Afghan War, and Combatant Immunity*, 44 Ga. J. Int'l & Comp. L. 555 (2016) ............................................................... *passim*

Katie Johnston, *Transformations of Conflict Status in Libya*, 17 J Conflict Security Law 81 (2012) ................................................................. 41

Louise Arimatsu & Mohbuba Choudhury, *The Legal Classification of the Armed Conflicts in Syria, Yemen and Libya* (Chatham House: Royal Inst. Int'l Aff. 2014) ......................................... 7, 30, 42, 51

Major Jim Sleesman, Conducting Unconventional Warfare in Compliance with the Law of Armed Conflict, 224 Mil. L. Rev. 1101 (2016) ............................... 43

Melysa H. Sperber, *John Walker Lindh and Yaser Esam Hamdi: Closing the Loophole in International Humanitarian Law for American Nationals Captured Abroad While Fighting with Enemy Forces*, 40 AM. CRIM. L. REV. 159 (2003) ........................... 33

Michael N. Schmitt and Christopher M. Ford, *Assessing U.S. Justifications for Using Force in Response to Syria's Chemical Attacks: An International Law Perspective*, 9 J. NAT'L SECURITY L. & POL'Y 1 (2017) ......................................................................... 13, 41

Mohamad Ghazi Janaby, *The Legal Status of Hezbollah in the Syrian Conflict, An International Humanitarian Law Perspective*, 33 Ariz. J. Int'l Comp. Law 383 (2016) ...................................................................... 28, 30, 43

Peter Gasser, *Internationalized Non-International Armed Conflicts: Case Studies of Afghanistan, Kampuchea, and Lebanon*, 33 Am. Univ. L. Rev. 145 (1983) ........................... 28

Sandra Fabijanić Gagro, *Defining and recognizing prisoners of war in contemporary armed conflicts*, Int'l J. of Soc. Sciences, Vol. 3, No. 5 (2014) ......................................... 28, 52

Terry D. Gill, *Classifying the Conflict in Syria*, 92 Int'l L. Stud. 353 (2016) ...................... *passim*

Tom Ruys, *The Syrian Civil War and the Achilles' Heel of the Law of Non-International Armed Conflict*, 50 Stan. J. Int'l L. 247 (2014) .................................... 22, 52

Waldemar A. Solf & Edward R. Cummings, *A Survey of Penal Sanctions Under Protocol I to the Geneva Conventions of August 12, 1949*, 9 Case W. Res. J. Int'l L. 205 (1977) ................................................................................. 22

Yahli Shereshevsky, *Politics by Other Means: The Battle over the Classification of Asymmetrical Conflicts*, 49 Vand. J. Transnat'l L. 455 (2016) ................................................. 51

## I.     INTRODUCTION

Words fail to describe the tragedy and horrors that have gripped Syria since early 2011. The same could be said for the life of Mr. Al-Jayab.  When the Syrian government, led by Bashar al-Assad, responded to the country's peaceful pro-democracy protests with brutal military force, unmitigated violence ensued and has continued to this day, creating an international nightmare that has now wound its way absurdly into a U.S. criminal court as part of our endless War on Terror.  The Syrian War has destroyed cities, killed hundreds of thousands of people, and displaced millions of others, creating a humanitarian crisis of global proportions that hardly needs further documentation.  Mr. Al-Jayab personally bore witness to this war and as both a participant and victim.  How Mr. Al-Jayab finds himself in this courtroom in Chicago borders on the level of a Greek tragedy.

In early 2012 Mr. Al-Jayab and his family lived in a refugee camp in Yarmouk near Damascus, an indirect victim of our country's misguided invasion of Iraq.  The family, Sunni Muslims of Palestinian background, had been forced to flee to Syria from Baghdad, where they also faced conflict and violence.  Part of the reason the family left Baghdad was because Mr. Al-Jayab had been falsely imprisoned and tortured for weeks.  Syria, of course, offered no refuge from that violence.  In Syria Mr. Al-Jayab personally experienced the deaths of friends and family, who were killed by the Syrian Army.  Mr. Al-Jayab and his family then fled Syria for the United States as refugees in October 2012.  When he left Syria, Mr. Al-Jayab also left behind friends and family.

The war in Syria is not simply limited to an internal conflict between the Syrian Army and local groups who opposed it.  Instead, the war quickly took on an unmistakable international dimension due to the direct and indirect proxy intervention of foreign governments.  It is beyond

dispute that countries such as Iran, Russia, Turkey, Saudi Arabia, and Qatar had and continue to have various forms of military involvement, including but not limited to providing their own military personnel and equipment and supplying arms and training to other forces within Syria. Far from an internal conflict, the Syrian War is in many ways a proxy war for traditionally opposed national foreign policy interests, such as Iran and Saudi Arabia, and Russia and the United States. Indeed, as has become clear and beyond dispute, the United States has long supported Syrian rebels—the same side of the war Mr. Al-Jayab was driven to support.

In 2012 President Barack Obama made a formal presidential finding that authorized the C.I.A. to arm and train rebel groups in Jordan with the intent that they fight the Syrian government.[1] It is reported that this authorization led to a C.I.A. program known as "Timber Sycamore." This extensive program ran until around July 24, 2017, when President Donald Trump publicly confirmed its termination in a tweet that abruptly stated: "The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad...."[2] Numerous news sources corroborated the termination of the

---

[1] *See* Mark Hosenball, *Obama authorizes secret support for Syrian rebels*, REUTERS, Aug. 1, 2012 (available at: http://reut.rs/2FGqy3o) ("Obama's order, approved earlier this year and known as an intelligence "finding," broadly permits the CIA and other U.S. agencies to provide support that could help the rebels oust Assad."). Indeed, news articles from the spring and summer of 2013 reported how the C.I.A. was arming Syrian rebels. *See* Adam Entous & Julian E. Barnes, *U.S. to Arm Syrian Rebels*, WALL ST. J., June 14, 2013 (available at: http://on.wsj.com/2raA3o8); C.J. Chivers & Eric Schmitt, *Arms Airlift to Syria Rebels Expands, With Aid from C.I.A.*, N.Y. TIMES, Mar. 24, 2013, (available at: http://nyti.ms/1H3LeOd).
[2] https://twitter.com/realdonaldtrump/status/889672374458646528?lang=en:



program.[3]  This brief background of Mr. Al-Jayab's tragic personal history in Syria, which involved the incipient stages of the war, as well as the international involvement in that war, particularly the United States' own support for rebels in opposition to the Assad regime, is critical to understanding the misguided charge against Mr. Al-Jayab.[4]

The indictment charges Mr. Al-Jayab with having "attempted to provide material support and resources, namely, personnel (including himself), knowing and intending that they were to be used in the preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons outside of the United States) in violation of 18 U.S.C. § 2339A.   (Dkt. #1).   The indictment alleges that the charged offense occurred from October 2012 to January 23, 2014.  While not immediately evident from the threadbare indictment, it is the government's theory that during that time period Mr. Al-Jayab prepared to and actually returned to Syria.

On that simple point, the government is correct.  However, the crux of the charge is not merely that Mr. Al-Jayab returned to Syria, where he had lived and watched relatives be killed by Assad.  Rather, the core issue, which is far from simple, is whether Mr. Al-Jayab attempted to provide resources, namely himself, knowing that they would be used for a conspiracy to kill, maim, or kidnap others.  On that point the government's theory completely fails because of the doctrine of combatant immunity, which shields conduct, including hostile acts, that occurs

---

[3] *See* Faysal Itani, *The End of American Support for Syrian Rebels Was Inevitable*, THE ATLANTIC, July 21, 2017 (available at: http://theatln.tc/2mG88Hc) (describing fighters being on the "U.S. payroll" and stating "Without U.S. support, the rebels cannot survive continued war against the Assad regime and its allies."); Greg Jaffe and Adam Entous, *Trump ends covert CIA program to arm anti-Assad rebels in Syria, a move sought by Moscow*, WASH. POST, July 19, 2017 (available at: http://wapo.st/2mM9Is0). *See, e.g.*, Mark Mazzetti, Adam Goldman, Michael S. Schmidt, *Behind the Sudden Death of a $1 Billion Secret C.I.A. War in Syria*, N.Y. TIMES, Aug. 2, 2017 *available at* http://nyti.ms/2ENzfrh) (describing C.I.A. program in Syria as a "four-year-old effort to arm and train Syrian rebels" as "one of the costliest covert action programs in the history of the C.I.A.").

[4] The same might be said for our entire foreign policy in the Middle East, not to mention the extension of that policy into our now never-ending War on Terror, in the name of which this prosecution is brought.

during legitimate warfare. As discussed in more detail below, for the brief period that Mr. Al-Jayab was in Syria in late 2013 and early 2014, he associated with a group called Ansar al-Sham, which in turn was part of an umbrella organization called the Islamic Front. The Islamic Front was a recognized and organized group that was established to defend the civilian Syrian population from the Syrian army and to remove Assad from power. Additionally, the Islamic Front was one of the rebel forces that fought against ISIS in Syria.

Due to the combatant immunity privilege, any acts attempted or committed by Mr. Al-Jayab that were directed against the Syrian Army and Assad regime are legally immune from prosecution under 18 U.S.C. § 2339A. Significantly, application of the combatant immunity doctrine to this case presents numerous novel issues due to the fluid nature of the Syrian War, and the fact that the true extent of other countries' participation in the war, including that of the United States, still remains shrouded in the everlasting secrecy of international foreign policy.

This memorandum begins by providing further factual background concerning the Syrian War, including what has been publicly disclosed about how the United States armed and supported rebel groups. On that front, counsel believe that information that is material to these complex issues may be solely in the hands of the prosecutors—or more accurately put, its intelligence agencies, specifically the C.I.A., which likely requires additional discovery and evidentiary proceedings. Next, the relevant rebel groups that were opposed to the Syrian Army are discussed, including the groups that Mr. Al-Jayab was associated with in late 2013 and early 2014. An overview of the legal principles of the combatant immunity doctrine is then provided. Finally, the various means of applying combatant immunity to Mr. Al-Jayab are analyzed.

While this memorandum provides an extensive factual background and also discusses at length the often confusing and complex theories of international law that rightfully preclude this

prosecution, counsel would be remiss in not questioning the very spirit of this case against Mr. Al-Jayab.  The government has taken an extreme step in prosecuting an individual who, as the government surely knows the evidence will show, was opposed to the same brutal Assad regime that the United States has condemned and conducted military operations against.

Further, unlike almost all cases of this nature, Mr. Al-Jayab had a direct connection to Syria, having lived there as a refugee, and having had friends and family who were killed by the Syrian government.[5]  His brief return to Syria was not some frolic, but a legitimate internal response that was similar to the very foreign policy responses made by numerous world leaders—including the President of the United States and the C.I.A.  Moreover, and incredulously, the government brought this prosecution after waiting nearly *two years* while it watched Mr. Al-Jayab under different forms of surveillance, foreign and domestic, after he returned to the United States on January 23, 2014, when he then began working and going to school.  Perhaps this prosecution is just another expansion of the War on Terror, so that now even individuals who oppose our own declared enemies are subject to prosecution.  Or perhaps Mr. Al-Jayab was simply caught in the ever-shifting political and foreign policy winds.  Indeed, the government's decision to prosecute Mr. Al-Jayab makes even less sense in light of its repeated failure not to charge numerous Americans who recently went overseas to fight oppressive regimes, including to Syria to join Kurdish groups such as the PKK and YPG to fight against Assad.  Rather than face federal prosecution, those individuals are often celebrated upon their return to this country, and interviewed by media outlets that delight in retelling their stories

---

[5] Counsel have previously advanced the well-founded proposition that Mr. Al-Jayab "has a dog in this fight."

of combat and battle.[6]  Regardless of the purported reasoning behind this prosecution, in the end

Mr. Al-Jayab was justified in his conduct, and he is immune from this prosecution.

## II.    FACTUAL BACKGROUND

### A.  The Syrian War.

In February 2011, a fourteen-year old student named Naief Abazid painted the words,

"It's your turn, Doctor Bashar al-Assad," on the side of his school in Daraa, a town in Southern

Syria.[7]   In a disproportionately violent response, Syrian government forces arrested Abazid and

then tortured him by whipping him 40 times with cables and folding him into a tire that was

rolled into a wall.[8]   Twenty-two of Abazid's classmates were also arrested and tortured.

---

[6] The (invariably) non-Muslim men who have returned from combat are often described as heroes for having taken the initiative to travel overseas and fight injustice.  Those stories often include images of the young Americans holding automatic rifles and dressed in combat fatigues as badges of honor and celebrity status.  While here, those same photos will be used by the government to prosecute Mr. Al-Jayab.  This disparity raises serious concerns of selective prosecution, which counsel may address in a separate pleading, should it be necessary.  *See, e.g.*, UCLA math major Chris Jeon talks about joining rebel fighters in Libya, YouTube, available at:  https://www.youtube.com/watch?v=irZOhJq5Dvo (clips of news stories describing American Chris Jeon's trip to Libya to fight with rebels as a "vacation of a lifetime");  Official Website of Matthew VanDyke, *Home Page*, available at http://www.matthewvandyke.com/ (describing VanDyke as "Veteran of the Libyan Revolution"); Jason Fritz and Joseph Young, *Transnational "Volunteers": America's Anti-ISIL Fighters,* War on the Rocks, Sept. 13, 2016, available at: https://warontherocks.com/2016/09/transnational-volunteers-americas-anti-isil-fighters/ ("On August 3, 2016, Jordan MacTaggart, a self-described radical leftist and atheist, was killed in action while fighting with a Kurdish militia against the Islamic State. It was his second tour of duty in Syria. MacTaggart was seriously wounded during his first. Born and raised in suburban Colorado, he was a high school dropout, a reformed drug user, and a fan of punk rock. MacTaggart followed the conflict in Syria, discovered the Kurdish People's Protection Unit, or YPG, and decided that fighting with them was worthwhile and a welcome break from his mundane life.") (last visited January 9, 2017); Seth Harp, *The Anarchists vs. the Islamic State:  On the front lines of Syria with the young American radicals fighting ISIS*, ROLLING STONE, Feb. 14, 2017, available at: http://rol.st/2re1vlf (last visited Jan. 14, 2018); Christopher Woolf, *A veteran from Wisconsin explains why he joined the fight against ISIS*, PRI, Oct. 21, 2014 (available at http://bit.ly/2EPGL4T) (last visited Jan. 14, 2018).

[7] Kareem Fahim and Hwaida Saad, *A Faceless Teenage Refugee Who Helped Ignite Syria's War*, N.Y. TIMES, Feb. 8, 2013, available at: http://nyti.ms/2B9m3e8. ("The government, nervous as leaders were being toppled around the Arab world, reacted furiously to the slight, arresting the teenager and more than a dozen other boys and then torturing them for weeks.").  Dave Burke, *The boy whose graffiti changed the world*, DAILY MAIL, Mar. 14, 2017, available at: http://dailym.ai/2sqogO9 (last visited Jan. 14, 2018).

[8] Burke, *supra* note 7.

After learning of the Syrian government's misconduct, non-violent protests led by pro-democracy groups spread across Syria. These protests were part of the widely acclaimed Arab Spring, a wave of pro-democracy movements that occurred in many other countries in the Middle East and North Africa, particularly Egypt, Tunisia, Libya, Yemen, and Bahrain. While Arab Spring movements led to regime change or other systemic reform in some countries, in Syria it resulted in lethal military force by the government against civilians, as protestors were met with live ammunition. In April 2011, the Syrian government launched a military operation that besieged Daraa for two weeks and led to the shooting of deaths of dozens of protestors on April 29, 2011.[9] The Syrian government's violent response was quickly met with international condemnation. Additionally, a number of armed groups were soon formed to defend against the brutal conduct of the Syrian government. This opposition included defectors from the Syrian military and security forces that formed the Free Syrian Army (FSA) in around July 2011.[10] Further, "ad hoc localized armed groups were formed and civilians joined their ranks to take up arms against the government forces."[11] Early evidence indicated that foreign countries, including Saudi Arabia, Qatar, and Turkey—all strong U.S. allies—supported and armed opposition groups, including paying the salaries of FSA fighters.[12]

---

[9] One of the first civilian casualties was reported to be a 13-year-old boy named Hamza al-Khateeb, who was killed while protesting with his family in 2011 in Daraa. As reported, he "suffered gunshot wounds, his jaw and kneecaps had been smashed, his genitals cut off and he had been whipped with a cable." Burke, *supra* note 7. *See also* Louise Arimatsu & Mohbuba Choudhury, *The Legal Classification of the Armed Conflicts in Syria, Yemen and Libya*, pp. 7-9 (Chatham House: Royal Inst. Int'l Aff. 2014) (detailing history of protests, the military response of Syrian government, and the reaction of the international community).

[10] Arimatsu & Choudhury, *supra* note 9, p. 9.

[11] *Id*.

[12] *Id*. *See also id.* at pp. 9-11 for a description of the development of the FSA and other armed opposition groups in 2011 and 2012.

Faced with an armed opposition and increasingly vocal and widespread calls to resign, in June 2012, Assad told his cabinet that Syria was in a "state of war."[13] Shortly after that speech, Assad stated in a televised interview that the "state of Turkey bears direct responsibility for the blood being shed in Syria."[14] Assad further described the war as extending beyond the borders of Syria: "*We are fighting a regional and global war*, so time is needed to win it."[15]

In July 2012, the International Committee of the Red Cross concluded that there was a non-international armed conflict within Syrian between government forces and "a number of organized, armed opposition groups operating in several parts of the country."[16] A month later, in August 2012, the Independent International Commission of Inquiry on the Syrian Arab Republic similarly concluded that a non-international armed conflict existed due to the "intensity and duration of the conflict, combined with the increased organizational capabilities of anti-Government armed groups."[17] The destruction, violence, and displacement increased at an alarming rate, especially after foreign States both directly and indirectly intervened in the conflict.

**B. The Involvement of the United States and Other Nations in the Syrian War.**

Soon after the conflict began, the United States called on Assad to resign, and by doing so it aligned itself with the prerogatives and views of the pro-democracy and anti-government

---

[13] BBC news, *Syria in state of war, says Bashar al-Assad*, June 27, 2012, available at: http://bbc.in/2mysQsp (last visited Jan. 8, 2018).

[14] Associated Press, *Syria needs time to win 'regional, global' battle, Assad says: Turkey wants UN to set up safe havens in Syria for refugees*, CBC News, Aug. 29, 2012, available at: http://bit.ly/2ENHIuM (last visited January 8, 2018).

[15] *Id.* (emphasis added).

[16] The International Committee of the Red Cross, *Syria: ICRC and Syrian Arab Red Crescent maintain aid effort amid increased fighting, Operational Update*, Jul. 17, 2012, available at: http://bit.ly/1S0OAXy (last visited Jan. 8, 2018).

[17] RULAC, Geneva Academy, *Non-international armed conflicts in Syria*, available at: http://bit.ly/2wNUIwn (last visited Jan. 8, 2018).

groups in Syria. For instance, on August 18, 2011, President Obama wrote, "For the sake of the Syrian people, the time has come for President Assad to step aside."[18] The United States also authorized individuals to provide financial support to the FSA. On July 23, 2012, United States Office of Foreign Assets Control (OFAC), granted the Syrian Support Group, Inc. (SSG), a U.S. nonprofit organization, a license to support the FSA.[19] The license specifically permitted the SSG to "export, reexport, sell, or supply to the Free Syrian Army ("FSA") financial, communications, logistical, and other services otherwise prohibited by Executive Order 13582 in order to support the FSA."[20]

Assad's brazen use of chemical weapons, especially against civilians, drew the most severe rebuke from the United States. On August 20, 2012, President Obama declared that Assad's use of chemical weapons constituted a "redline."[21] On October 31, 2012, Secretary of State Clinton called for a coalition that was broader than the Syrian National Council[22] and fully represented "those who are in the frontlines, fighting and dying to obtain their freedom."[23] The New York Times did not mince words when it characterized Secretary Clinton's message in these terms: "The United States indicated on Wednesday that it was undertaking its most aggressive attempt yet to reshape the Syrian opposition, with Secretary of State Hillary Rodham Clinton dismissing the current leadership as a bunch of out-of-touch exiles, who should be replaced with a group more representative of the fighters on the ground."[24]

---

[18] Statement by President Obama on the Situation in Syria, The White House, Office of Press Secretary, Aug. 11, 2011, available at: http://bit.ly/2mJN6Zm (last visited Jan. 14, 2018).

[19] The license, No. SY-2012-294747-1, is available at: http://www.telegram.com/assets/pdf/WT17763819.PDF (last visited January 9, 2018).

[20] Id.

[21] James Ball, *Obama issues a 'red line' warning on chemical weapons*, WASH. POST, Aug. 2012, available at http://wapo.st/2ENST6w (last visited Jan. 14, 2018).

[22] The Syrian National Council was a coalition opposed to Assad that operated out of Turkey.

[23] Neil MacFarquhar and Michael R. Gordon, *As Fighting Rages, Clinton Seeks New Syrian Opposition*, N.Y. TIMES, Oct. 31, 2017, available at: http://nyti.ms/2mCzLkH (last visited Jan. 8, 2018).

[24] Id.

Continuing its support of opposition forces, on December 11, 2012, President Obama stated that the United States would recognize the National Coalition of Syrian Revolutionary and Opposition Forces as the legitimate representative of the Syrian people.[25]  These comments thus marked the United States' official recognition of the Syrian opposition and the legitimacy of its fight against Assad and the Syrian government.  At the time, it was noted that despite his recognition of the coalition, President Obama did not publicly commit to providing arms or other military support to the rebels.[26]  However, despite the lack of a public pledge of military support for Syrian rebels, by the time President Obama made that public announcement, he had already secretly authorized the C.I.A. to arm Syrian rebels.

Indeed, by August 2012, it was reported that President Obama had decided to help arm Syrian rebels.[27]  Perhaps not coincidentally, this authorization coincided with the public "redline" warning regarding chemical weapons.  This "game changer" decision was a "presidential order, known as an 'intelligence finding' in the world of espionage," and it was portrayed in the press as "authorizing the C.I.A. to support armed groups fighting to overthrow Bashar al-Assad's government."[28]  Sometime in late 2012, the C.I.A. began a training program known as "Timber Sycamore."  The program appears to have involved the training and arming of Syrian rebels.  Significantly, this covert program was funded in part by Saudi Arabia:  "in the deal, current and former administration officials said, the Saudis contribute both weapons and

---

[25] Mark Lander, Michael R. Gordon, Anne Barnard, *U.S. Will Grant Recognition to Syrian Rebels, Obama Says*, N.Y. Times, Dec. 11, 2012, available at http://nyti.ms/2mOHJYL (last visited Jan. 8, 2018).
[26] *Id*.
[27] *See also supra* note 1.
[28] Deepak Tripathi, *Barack Obama's 'Intelligence Finding' and the Syrian Civil War*, INT'L POL DIGEST, August 12, 2012, available at: http://bit.ly/2DIuKzf (last visited Jan. 12, 2018).

large sums of money, and the C.I.A takes the lead in training the rebels on AK-47 assault rifles and tank-destroying missiles."[29]

The United States' direct support for rebels soon became undeniable.  In June 2013, it was reported that the C.I.A. moved weapons from "a network of secret warehouses" and "plans to start arming small groups of vetted Syrian rebels within a month."[30]  This C.I.A. support was described as "lethal aid that had been promised by the Obama administration."[31]  The arming of rebels by the United States is discussed in more detail below, including how it is likely that it actually predated the reported "lethal aid" in 2013.

The chemical weapons "redline" that President Obama drew in August 2012, when he also authorized the C.I.A. to arm rebels, was crossed a year later in August 2013.  Specifically, on August 21, 2013, President Obama publicly criticized Assad's use of chemical weapons in an attack outside of Damascus that killed over 1,400 civilians, including 426 children.[32]  A White House Intelligence Assessment dated August 30, 2013 began:  "The United States Government assesses with high confidence that the Syrian government carried out a chemical weapons attack

---

[29] Mark Mazzetti and Matt Apuzzo, *U.S. Relies Heavily on Saudi Money to Support Syrian Rebels*, N.Y. TIMES, Jan. 23, 2016 available at: http://nyti.ms/2uYOlp5 (last visited Jan. 12, 2018).

[30] Adam Entous, Julian E. Barnes, and Siobhan Gorman, *U.S. Begins Shipping Arms for Syrian Rebels; CIA Aims to Vet and Train Fighters With New Weapons for Deployment by August; Saudi Antiaircraft Missiles Expected*, WALL ST. J., June 26, 2013, available at: http://on.wsj.com/2D9eUfL (last visited Jan. 8, 2018).

[31] Ernesto Londoño and Greg Miller, *CIA begins weapon delivery to Syrian rebels*, WASH. POST., Sept. 11, 2013, available at: http://wapo.st/2mOIfpF (last visited Jan. 14, 2018) ("The CIA shipments are to flow through a network of clandestine bases in Turkey and Jordan that were expanded over the past year as the agency sought to help Middle Eastern allies, including Saudi Arabia and Qatar, direct weapons to moderate Syrian rebel forces.").

[32] Joby Warrick, *More than 1,400 killed in Syrian chemical weapons attack, U.S. says*, WASH. POST, Aug. 30, 2013, available at http://wapo.st/2DiHTSs (last visited Jam. 8, 2018).

in the Damascus suburbs on August 21, 2013. We further assess that the regime used a nerve agent in the attack."[33]

This deadly chemical attack prompted President Obama to make a major public speech that ostensibly marked a shift in United States policy towards expressly authorizing direct action against the Assad regime. President Obama began that speech with the following words:

> Over the past two years, what began as a series of peaceful protests against the repressive regime of Bashar al-Assad has turned into a brutal civil war. Over 100,000 people have been killed. Millions have fled the country. In that time, America has worked with allies to provide humanitarian support, to help the moderate opposition, and to shape a political settlement. But I have resisted calls for military action, because we cannot resolve someone else's civil war through force, particularly after a decade of war in Iraq and Afghanistan.

> The situation profoundly changed, though, on August 21st, when Assad's government gassed to death over a thousand people, including hundreds of children. The images from this massacre are sickening: Men, women, children lying in rows, killed by poison gas. Others foaming at the mouth, gasping for breath. A father clutching his dead children, imploring them to get up and walk. On that terrible night, the world saw in gruesome detail the terrible nature of chemical weapons, and why the overwhelming majority of humanity has declared them off-limits—a crime against humanity, and a violation of the laws of war.[34]

President Obama was determined to respond to the chemical attack with a targeted military strike against the Syrian government. But rather than order this strike, the President sought authorization from Congress, as he stated in his speech:

> This is not a world we should accept. This is what's at stake. And that is why, after careful deliberation, I determined that it is in the national security interests of the United States to respond to the Assad regime's use of chemical weapons through a targeted military strike. The purpose of this strike would be to deter Assad from using chemical weapons, to degrade his regime's ability to use them, and to make clear to the world that we will not tolerate their use.

---

[33] White House, Office of Press Secretary, *Government Assessment of the Syrian Government's Use of Chemical Weapons on August 21, 2013*, Aug. 30, 2013, available at: http://bit.ly/2EPJVWt (last visited Jan. 8, 2018).

[34] The full transcript of this September 10, 2013 speech is available at: http://wapo.st/2mNlsui (last visited Jan. 8, 2018).

12

> That's my judgment as Commander-in-Chief. But I'm also the President of the world's oldest constitutional democracy. So even though I possess the authority to order military strikes, I believed it was right, in the absence of a direct or imminent threat to our security, to take this debate to Congress. I believe our democracy is stronger when the President acts with the support of Congress. And I believe that America acts more effectively abroad when we stand together.[35]

Congress, however, declined to authorize a targeted strike, despite President Obama's plea.[36]  It must be noted again that while the President publicly deferred to Congress for this targeted military strike, he had already authorized the C.I.A. to arm rebels and provide them with essential training, which surely some high-ranking Congress members must have been aware.

The targeted airstrike that President Obama requested was eventually delivered by President Trump, albeit without Congressional authorization.  On August 7, 2017 the United States conducted the military strike against Assad after it "launched an attack employing fifty-nine U.S. Navy Tomahawk Land Attack Missiles against the Al Shayrat airfield in response to Syria's use of chemical weapons against civilians two days earlier."[37]

The United States is of course not the only foreign country involved in Syria.  In support of the Syrian government, Russia and Iran have contributed substantial sums of money and direct military support in the form of military equipment and even troops that have conducted military operations against opposition rebel groups in Syria.  Iran is reported to have invested anywhere

---

[35] *Id*.

[36] The events surrounding President Obama's response to the August 21, 2013 Syrian chemical attack are extensively addressed in Jeffrey Goldberg's article, *The Obama Doctrine:  The U.S. president talks through his hardest decisions about America's role in the world*, THE ATLANTIC, April 2016, available at: http://theatln.tc/1rxfg9B.  Notably, the article recognizes that while Congress did not approve President Obama's call for direct military intervention in September 2013, President Obama had already "authorized the CIA to train and fund Syrian rebels."

[37] Michael N. Schmitt and Christopher M. Ford, *Assessing U.S. Justifications for Using Force in Response to Syria's Chemical Attacks:  An International Law Perspective*, 9 J. NAT'L SECURITY L. & POL'Y 1, p. 1 (2017).

from $6 and $15 billion in 2012 and 2013 to support Assad's regime.[38]  In 2013 and 2014 Iran

sent thousands of operatives, including Islamic Revolutionary Guard Corps, to Syria to provide

direct support for Syrian military operations.[39]  Russia reportedly deployed at least 4,000

personnel in Syria as of November 2015, as well as combat aircraft and helicopters that have

been used in airstrikes.[40]  Russia and Iran have "the shared objective of shoring up their common

ally, the Syrian government, aiding it in regaining some of the strategic areas it has lost, and

ensuring the inclusion of the government and its supporters in any overall peace agreement that

may emerge."[41]  Foreign militias, such as Hezbollah from Lebanon and Iraqi Shi'a fighters, also

support the Syrian government.

On the other side, our ally, Saudi Arabia has supported rebel groups primarily by

supplying weapons and ammunition.  In mid-2013, rebel officials stated:  "Saudi Arabia is now

formally in charge of the Syria issue."[42]  In doing so, Saudi Arabia surpassed Qatar as the

primary third-party supporter of the Syrian rebels in the region.[43]  Turkey has also supported

rebel groups, in addition to engaging directly in cross-border hostilities with Syrian forces.

### C.  The Relevant Syrian Rebel and Opposition Groups.

A wide range of rebel and opposition groups formed during the ongoing struggle against

the Syrian government.  At one point, it was reported that over 1,000 different armed and

---

[38]  *Iran's Secret Army* (BBC News night television broadcast, Oct. 28, 2013), available at: http://bbc.in/2DFCvpC (last visited Jan. 16, 2018). . Eli Lake, *Iran Spent Billions to Prop Up Assad*, BLOOMBERG, June 9, 2015, available at: https://bloom.bg/2ENdEzi (last visited Jan. 16, 2018)
[39]  Ruth Sherlock, *Iran Boosts Support to Syria*, TELEGRAPH, Feb. 21, 2014, available at: http://bit.ly/Tph2rN (last visited Jan. 16, 2018); *See* Terry D. Gill, *Classifying the Conflict in Syria*, 92 Int'l L. Stud. 353, 356 (2016).
[40]  *See* Gill, *supra* note 39, p. 356.
[41]  *Id.*
[42]  Mariam Karouny, *Saudi Arabia Edges Qatar to Control Syria Rebel Support*, REUTERS, May 31, 2013 available at: http://reut.rs/2DpBiES.
[43]  *Id.*

opposition groups existed.[44]   To complicate matters further, there was often considerable fluidity between the groups, as they shared resources, including personnel and arms, and also conducted joint operations.[45]   However, the groups generally shared the common objective of defeating Assad and the Syrian government.   Over time, many of the groups began fighting ISIS as it became more prevalent in parts of Syria.

Particularly around the relevant time period of this prosecution—late 2013 to early 2014—the mainstream opposition groups consisted of the Free Syrian Army (FSA) and the Islamic Front.[46]   The FSA was an insurgent group that was formed in 2011.   Many of its defected from the regular Syrian armed forces. The FSA was relatively well organized, trained, and armed.

The Islamic Front was an umbrella organization, consisting of different groups that agreed to merge together as, according to the group's statement, an "'independent political, military and social formation' to topple the Assad regime and build an Islamic state."[47]   The Islamic Front is the most relevant group for the purposes of this motion because it was the group with which Mr. Al-Jayab associated while in Syria, specifically through his involvement with a sub-group called Ansar al-Sham.   Ansar al-Sham was one of several groups that joined together in late November 2013 to form the Islamic Front.   The other groups were:  Ahrar al-Sham, Jaysh al-Islam, Suqour al-Sham, Liwa al-Tawhid, Liwa al-Haqq, and the Kurdish Islamic Front.   At the

---

[44]  BBC News, Guide to the Syrian Rebels, Dec. 13, 2013, available at:  http://bbc.in/2D8rZWz (last visited January 10, 2018).

[45]  Anne Barnard & Hwaida Saad, Rebels Gain Control of Government Air Base in Syria, N.Y. TIMES, Aug. 5, 2013, https://goo.gl/pZGgG3.  ("The dividing lines between the groups and the alliances between them are blurred and shifting, and while it is too early to say who played the decisive role at Minakh, Islamist battalions and Free Syrian Army fighters seem to have worked together there.").

[46]  *See* Gill, *supra* note 39, pp. 353, 354-62.  *See also* Aaron Y. Zelin & Charles Lister*, The Crowning of the Syrian Islamic Front*, FOREIGN POLICY, June 24, 2013.

[47]  BBC News, *Leading Syrian rebel groups form new Islamic Front*, Nov. 22, 2013, available at: http://bbc.in/2FMR6QH (last visited January 8, 2018).

time of the Islamic Front's formation, Ahmed Issa al-Sheikh of Suqour al-Sham was identified as the leader. The Islamic Front did not include the more extreme Jabhat al-Nusra.[48]

Ahmed Issa al-Sheikh was previously the head of the "Syrian Islamic Liberation Front (SILF), a coalition of Islamist factions aligned to the Supreme Military Council of the Free Syrian Army."[49] Together, the groups formed what was the largest rebel alliance at the time, with somewhere between 40,000 and 50,000 members, although some estimates included substantially more members.[50] Its numbers could not be confirmed with precision, but after its formation the Islamic Front was still recognized as "Syria's most powerful insurgent bloc."[51] While each group had its own name and operated independently, the Islamic Front was still hierarchical and structured. The Islamic Front had designated military, media, humanitarian and administrative offices. It also operated under a distinct banner:



[52]

---

[48] Loveday Morris, *Seven Syrian Islamist rebel groups form new Islamic Front*, Wash. Post., Nov. 22, 2013, available at: http://wapo.st/2DlJTJu (last visited Jan. 8, 2018).
[49] *Id*.
[50] Reuters Staff, Factbox: Syria's rebel groups, Jan. 9, 2014, available at: http://reut.rs/2mD67vu (last visited Jan. 8, 2018).
[51] Aron Lund, *The Politics of the Islamic Front, Part 1: Structure and Support*, Carnegie Middle East Center, Jan. 14, 2014, available at: http://ceip.org/2mDQ4gQ (last visited Jan. 7, 2018).
[52] *See* https://en.wikipedia.org/wiki/Islamic_Front_(Syria).

The FSA and Islamic Front often cooperated with each other. Additionally, in November 2013, the Islamic Front was "embroiled in heavy fighting against" ISIS.[53] The umbrella organization reportedly dissolved in early 2015 after several member groups were absorbed into Ahrar al-Sham.[54]

As noted above, Mr. Al-Jayab was associated with the Islamic Front through his involvement with Ansar al-Sham, which translates to the "Helpers of the Levant."[55] Ansar al-Sham was primarily active in northwest Syria and allied itself under the Islamic Front umbrella. In late 2013 and early 2014, the group was estimated to have approximately 2,500 members.[56] An author who interviewed members of the group in Syria observed that Ansar al-Sham played a "crucial role in aid delivery in the areas where it dominates," and that it "has been catering to internally displaced persons, and it seems to have supplanted the international aid organizations in delivering humanitarian relief to some of these areas."[57] When the Islamic Front dissolved after many groups became part of Ahrar al-Sham, Ansar al-Sham still remained an independent group. Ansar al-Sham, like the Islamic Front, was never a designated terrorist organization.

### D. The United States Supports Syrian Rebel and Opposition Groups.

While Congress did not authorize President Obama's requested military strike in September 2013, the C.I.A. was nevertheless providing direct military support, training and funding to Syrian rebels on the ground, possibly as early as June 2012.[58] The exact timing is unclear, but what is known is that in August 2012 President Obama issued this then secret "order

---

[53] Aron Lund, *Pushing Back Against the Islamic State of Iraq and the Levant: The Islamic Front*, Carnegie Middle East Center, Jan. 8, 2014, available at http://ceip.org/2mDGESO (last visited Jan. 7, 2018) ("Several of the Islamic Front's member factions appear to be at daggers drawn with the ISIL.").

[54] Aron Lund, *Islamist Mergers in Syria: Ahrar al-Sham Swallows Suqour al-Sham*, Carnegie Middle East Center, Mar. 23, 2015, available at http://ceip.org/2B7L09G (last visited Jan. 7, 2018).

[55] Tam Hussein, *The Ansar al-Sham Battalions*, Carnegie Middle East Center, Mar. 24, 2014, *available at*: http://ceip.org/2kJXz7k (last visited Jan. 7, 2018).

[56] *Id*.

[57] *Id*.

[58] Chivers & Schmitt, *supra* note 1.

authorizing U.S. support for rebels seeking to depose Syrian President Bashar al-Assad and his Government."[59]  This order was said to "broadly permit[] the CIA and other U.S. agencies to provide support that could help the rebels oust Assad."[60]  This support included "training Syrian rebels with anti-tank and antiaircraft weapons" since late 2012.[61]  The New York Times reported that even prior to the United States' support, Saudi Arabia and Qatar had been providing arms to rebels for more than a year, and that the C.I.A. arranged some of the arms purchases:

> When Mr. Obama signed off on arming the rebels in the spring of 2013, it was partly to try to gain control of the apparent free-for-all in the region. The Qataris and the Saudis had been funneling weapons into Syria for more than a year. The Qataris had even smuggled in shipments of Chinese-made FN-6 shoulder-fired missiles over the border from Turkey. The Saudi efforts were led by the flamboyant Prince Bandar bin Sultan, at the time the intelligence chief, who directed Saudi spies to buy thousands of AK-47s and millions of rounds of ammunition in Eastern Europe for the Syrian rebels. The C.I.A. helped arrange some of the arms purchases for the Saudis, including a large deal in Croatia in 2012.[62]

While much remains unknown—particularly concerning exactly whom the C.I.A. was training and equipping—more information regarding the C.I.A.'s activities in Syria has come to light since President Trump cancelled the C.I.A. program in 2017.  The Washington Post reported that the C.I.A. ran its program from "secret operations centers in Turkey and Jordan" and "pumped many hundreds of millions of dollars to many dozens of militia groups."[63]

Other information supports the conclusion that the C.I.A. was arming Syrian rebels even before its training program launched.  A declassified October 2012 Defense Intelligence Agency

---

[59] Hosenball, *supra* note 1.

[60] *Id.*

[61] David S. Cloud and Raja Abdulrahim, *U.S. has secretly provided arms training to Syria rebels since 2012: CIA agents and special operations troops have trained the rebels in anti-tank and antiaircraft weaponry in Jordan and Turkey*, L.A. TIMES, June 21, 2013, available at:  http://lat.ms/1oSrEcf.

[62] Mazzetti & Apuzzo, *supra* note 29. *See also* Greg Miller, *CIA ramping up covert training program for moderate Syrian rebels*, WASH. POST, Oct. 2, 2013, available at: http://wapo.st/2B7nOIO.

[63] David Ignatius, *What the demise of the CIA's anti-Assad program means*, Wash. Post, July 20, 2017 ("Syria adds another chapter to the star-crossed history of CIA paramilitary action"), available at: http://wapo.st/2rguuVh.

report that was produced in response to a FOIA request made by Judicial Watch, Inc. reveals that in late August 2012 the United States shipped massive quantities of weapons from Libya to Syria. Specifically, the report states that "[t]he weapons shipped from Libya to Syria during late-August 2012 were Sniper rifles, RPG's, and 125mm and 155mm howitzers missiles. The numbers for each weapon were estimated to be: 500 Sniper rifles, 100 RPG launchers with 300 total rounds, and approximately 400 howitzers missiles [200 ea – 125mm and 200ea – 155mm].[64] The report indicates that these arms which were from former military stockpiles in Benghazi, were shipped from the port of Benghazi, Libya to the ports of Banias and the Port of Borj Islam, Syria "[d]uring the immediate aftermath of, and following the uncertainty caused by, the downfall of the ((Qaddafi)) regime in October 2011 and up until early September 2012."[65]

The United States also provided arms indirectly through its allies, including Saudi Arabia, which funded the C.I.A.-led Timber Sycamore rebel-training program. As noted above, it has been reported that the C.I.A. indirectly provided arms to Saudi Arabia through sources in Croatia. The United States also provided arms directly to Saudi Arabia. In December 2013, Saudi Arabia requested to buy from the United States "9,650 BGM-71 2A Tube-Launched, Optically-Tracked Wire-Guided (TOW) Radio-Frequency (RF) missiles, 4,145 BGM-71 2B Tube-Launched, Optically-Tracked Wire-Guided Aero RF missiles, 91 TOW-2A Fly-to-Buy missiles, 49 TOW-2B Fly-to-Buy missiles" for an estimated cost of $900 million.[66] These TOW missiles were used by Syrian rebels through Saudi Arabia with the express endorsement of United States officials. As reported by the Washington Post:

> The weapons were not directly provided by the United States. "Friends of Syria" delivered them, he said, referring to the U.S.-backed alliance of Western powers

---

[64] A copy of this declassified report is available at: http://bit.ly/1WRcmXK. The quoted material appears at p. 4 of 100 of the .pdf.

[65] *Id.*

[66] Defense Security Cooperation Agency News Release, Dec. 5, 2013, available at: http://bit.ly/1jTuphj.

and Persian Gulf Arab states established to support the opposition Free Syrian Army. The rebels had to promise to return the canister of each missile fired, to not resell the weapons and to protect them from theft.

But he said the donors made clear to him that the delivery had U.S. approval, and U.S. officials have confirmed that they endorsed the supply. "The most important thing is not the TOW missile itself, it's the change in the policy," he said. "It suggests a change in the U.S. attitude toward allowing Syria's friends to support the Syrian people. It's psychological more than physical."[67]

It is fairly clear that by no later than December 2013, the United States agreed to fund Syrian rebels, at first through its ally Saudi Arabia.[68]  While many facts have come to light regarding the United States' role in funding, training, and arming Syrian rebels, the extent of our government's involvement, not surprisingly, remains shrouded in secrecy.  That includes, in large part, the United States' role—either directly or operating through Saudi Arabia or other allies—in supporting the Islamic Front and its associated groups.

### E.  Mr. Al-Jayab's Association with the Islamic Front Through His Involvement in Ansar al-Sham in Late 2013 and Early 2014.

Mr. Al-Jayab arrived in Syria in November 2013, a critical moment in the history of the Syria War.  His arrival coincided with the formation of the Islamic Front.  He left Syria in 2014 after the Islamic Front had coalesced.   Mr. Al-Jayab was most closely associated with a group called Ansar al-Sham, which was part of the Islamic Front.  On December 28, 2013, while Mr. Al-Jayab was in Syria, communicated with Facebook with another individual.  Mr. Al-Jayab sent an image to this individual that he described as the "banner" that had not yet been publicized. This was the image that Mr. Al-Jayab sent:

---

[67] Liz, Sly, *Syrian rebels who received first U.S. missiles of war see shipment as 'an important first step'*, WASH. POST, Apr. 27, 2014 (available at http://wapo.st/2DgYoyq) (last visited Jan. 8, 2018); *see also* Karen DeYoung, Syrian opposition fighters obtain U.S.-made TOW antitank missile, WASH. POST, Apr. 16, 2014, available at: http://wapo.st/2Dcd4uL (last visited Jan. 8, 2018).

[68] David Kenner, *Why Is Saudi Arabia Buying 15,000 U.S. Anti-Tank Missiles for a War It Will Never Fight?  Hint: Syria*. Foreign Policy, Dec. 12, 2013, available at: http://bit.ly/250kuKC.



AL-JAYAB_330560. During this same online conversation, Mr. Al-Jayab, as translated by the government, told the individual, "Why I joined the al-Ansar even though there's little action." AL-JAYAB_283073. Additionally, and as set forth in the Criminal Complaint filed in the Eastern District of California, also on December 28, 2013 Mr. Al-Jayab informed another individual the he was in Aleppo and had joined Ansar al-Sham. (Case No. 16 CR 00008, Dkt. #1, p. 13, ¶ 11(n) (E.D. Cal.). Mr. Al-Jayab informed this same individual that Ansar al-Sham was merged with the Islamic Front. (*Id.*; *see also id*. p. 14, footnote 13 (describing Islamic Front)). Mr. Al-Jayab's arrival in Syria occurred only months after President Obama stated that the "situation profoundly changed" and called for military action and targeted strikes against Assad for gassing and killing over 400 children and 1,000 other civilians. He was also in Syria after the C.I.A. had provided arms directly and indirectly to Syrian rebels opposed to Assad.[69]

---

[69] As with counsel's ongoing investigation into the extent of the C.I.A. and United States government's role in funding Syria rebels, counsel's investigation into potential witnesses in Syria to provide further background information regarding the Islamic Front is also ongoing.

### III.    THE COMBATANT IMMUNITY DOCTRINE

Combatant immunity is a common law doctrine that derives from international law. The doctrine of combatant immunity protects lawful combatants from criminal prosecution for "those warlike acts which do not violate the laws and customs of war but which might otherwise be common crimes under municipal law."[70]   Lawful combatants "have a recognized right to take direct part in hostilities and cannot be punished for merely doing so."[71]   It "forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets." *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002); *see also Ex Parte Quirin*, 317 U.S. 1, 30-31 (1942) ("Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.").  *See also, United States v. Khadr*, 717 F. Supp. 2d 1215, 1220 (C.M.C.R. 2007) ("The determination of whether an individual captured on the battlefield is a 'lawful' or 'unlawful' enemy combatant carries with it significant legal consequences (both international and domestic) relating to the treatment owed that individual upon capture and ultimate criminal liability for participating in war-related activities associated with the armed conflict").  Combatant immunity may be raised as an absolute defense in domestic courts.  *United States v. Noriega*, 808 F. Supp. 791, 799 (S.D. Fla. 1992) ("[I]t is inconsistent with both the language and spirit of [the GPW] and with our professed support of its purpose to find that the rights established therein cannot be enforced by individual POWs in a court of law").

---

[70] Waldemar A. Solf & Edward R. Cummings, *A Survey of Penal Sanctions Under Protocol I to the Geneva Conventions of August 12, 1949*, 9 Case W. Res. J. Int'l L. 205, 212 (1977).

[71] Tom Ruys, *The Syrian Civil War and the Achilles' Heel of the Law of Non-International Armed Conflict*, 50 Stan. J. Int'l L. 247, 250 (2014).

With those overarching principles in mind, this section provides an overview of the sources and scope of combatant immunity.

## A. The Combatant Immunity Doctrine Under Common Law.

Combatant immunity is a common law doctrine with deep historical roots. *See Respublica v. Sparhawk*, 1 U.S. (1 Dall.) 357, 362 (Pa. Sup. Ct. 1788) (noting that in war "many things are lawful in that season, which would not be permitted in a time of peace"). Belligerents engaged in legitimate armed conflict have long been granted immunity from prosecution. *See* 4 Blackstone, Commentaries on the Laws of England 198 (1769) (killing an enemy "in time of war" is not murder); 1 Hale, Pleas of the Crown § 433 (1847) ("If a man kill an alien enemy within this kingdom, yet it is felony, unless it be in the heat of war, and in the actual exercise thereof."); 1 Joel P. Bishop, Commentaries on the Criminal Law § 131 p.78 (7th ed. 1882) (noting that "the men who compose the respective armies are not deemed criminal for what they do in the heat and conflict of battle; or, in general, for belligerent acts.")

At common law, combatant immunity has been applied in both civil wars and international armed conflicts. *See Underhill v. Hernandez*, 168 U.S. 250, 253 (1897) ("If the political revolt fails of success, still, if actual war has been waged, acts of legitimate warfare cannot be made the basis of individual liability."). A number of cases arising in the context of the United States Civil War provide immunity for acts, even when hostile and warlike, taken by belligerent parties during "legitimate warfare." *See Brig Army Warwick (The Prize Cases)*, 67 U.S. (2 Black) 635, 666-67 (1863); *Ford v. Surget*, 97 U.S. 594, 605 (1878) (finding members of the Confederate army accused of destroying property to be exempt "from liability for acts of legitimate warfare"); *Dow v. Johnson*, 100 U.S. 158, 169 (1879) (observing that "doctrine of non-liability to the tribunals of the invaded country for acts of warfare" is applicable to

23

Confederate army members for civil and criminal acts, "whether those acts resulted in the destruction of property or the destruction of life."); *Tennessee v. Hibdom*, 23 F. 795, 797 (C.C.M.D. Tenn. 1885) (holding that a Union soldier participating in occupation of Confederate Tennessee was not subject to Tennessee's criminal laws); *Coleman v. Tenn.*, 97 U.S. 509, 516 (1879) ("Officers and soldiers of the armies of the Union were not subject during the war to the laws of the enemy, or amenable to his tribunals for offences committed by them."); *Orleans v. S.S. Co.*, 87 U.S. (20 Wall.) 387, 394 (1874) ("In such cases the laws of war take the place of the Constitution and laws of the United States as applied in time of peace.").

These principles have been relied upon to protect the conduct of American soldiers overseas. *Bennett v. Davis*, 267 F.2d 15, 18 (10th Cir. 1959) (noting that an American soldier participating in the post-World War II occupation of Austria was not subject to Austrian law) (*citing Coleman* and *Dow*); *Dostal v. Haig*, 652 F.2d 173, 176 (D.C. Cir. 1981) ("The U.S. military, entering Berlin as conquerors, were immune from the jurisdiction of the courts of the conquered country, or would have been if any such courts had remained.") (*citing Coleman*).

Privileged combatants cannot be prosecuted under domestic laws for crimes conducted during warfare, including murder. *Johnson v. Eisentrager*, 339 U.S. 763, 793 (1950) (Black, J., dissenting) ("[L]egitimate 'acts of warfare,' however murderous, do not justify criminal conviction .... [I]t is no 'crime' to be a soldier."); Instructions for the Government of the Armies of the United States in the Field, General Orders No. 100, Art. 41 (Prepared by Francis Lieber, 1863 and known as the Lieber Code) ("All municipal law of the ground on which the armies stand, or of the countries to which they belong, is silent and of no effect between armies in the field."); *Id.*, Art. 57 ("So soon as a man is armed by a sovereign government and takes the soldier's oath of fidelity, he is a belligerent; his killing, wounding, or other warlike acts are not

24

individual crimes or offenses."). Articles "49 and 57 of the Lieber Code affirmed the existence of combatant immunity under the customary laws of war for all soldiers whatever species of arms for lawful acts of war."[72] Therefore, "acts of warfare engaged in by privileged belligerents … cannot properly be characterized as criminal under domestic law, elements of domestic crimes, or acts of an alleged conspiracy under domestic law."[73] Thus, the common law principles that protect the conduct of individuals engaged in legitimate conflict are deeply rooted and long precede the GPW that provides for combatant immunity in international armed conflicts.

Combatant immunity at common law is a subset of the public authority defense, which applies in the context to combatants who fight for an insurgent force, even in an internal conflict. *See*, *e.g.*, 1 Wharton's Criminal Law § 41 at 272 (15th ed. 1993) ("In time of war, acts done under the authority of the enemy or insurgent government do not support criminal liability, except that the actor may be captured and treated as a prisoner of war, and may also in an appropriate case be convicted of espionage or treason."). Another authority observes as follows: "[w]here the exercise of military authority relies upon the law governing the armed forces or upon the conduct of war, . . . military authority is not significantly different from the exercise of most other forms of public authority." 2 Paul Robinson, Criminal Law Defenses § 148(a) at 208 (1984). Thus, from a common law perspective, combatant immunity applies to legitimate acts of war during an armed conflict, and does not necessarily depend on the status of the individual actor or the nature of the conflict (*i.e.*, as an international or non-international armed conflict). *See also* Model Penal Code § 3.03 ("conduct is justifiable when it is required or authorized by . . . (d) the law governing the armed services or the lawful conduct of war").

---

[72] Jordan J. Paust, *NIAC Nonsense, The Afghan War, and Combatant Immunity*, 44 Ga. J. Int'l & Comp. L. 555, 572 (2016).
[73] *Id.*

The United States Department of Justice's Office of Legal Counsel (OLC) adopted this rationale when it defended the conduct of C.I.A. personnel and others who conducted drone strikes in foreign countries. *See* Office of Legal Counsel's July 16, 2010 Memorandum For the Attorney General Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi, at p.33 n.44, attached as an appendix to *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 144 (2d Cir. 2014) (hereinafter, "OLC Drone Memo") ("lethal activities conducted in accord with the laws of war, and undertaken in the course of lawfully authorized hostilities, do not violate the laws of war by virtue of the fact that they are carried out in part by government actors who are not entitled to the combatant's privilege.").[74] The OLC asserted that civilian employees who were not eligible for prisoner of war status under international law would be immune from prosecution for killings overseas because those killings would not be "unlawful." The killings would not be unlawful because the potentially applicable statutes, including 18 U.S.C. § 956(a) and § 1119 ("Foreign murder of United States nationals") "must be construed to incorporate the public authority justification." OLC Drone Memo, p. 12. The OLC's Drone Memo thus demonstrates how the common law understanding of combatant immunity is broader than the immunity set forth in the international law: specifically that immunity can be granted to individuals who would not otherwise qualify under international law because there is not an international armed conflict and because the individuals were not part of a qualifying organization, points which are discussed in more detail below.

---

[74] A copy of the OLC's memorandum is available, among other places, at: http://bit.ly/2rd1U7n (last visited Jan. 10, 2018).

B.     **The Combatant Immunity Doctrine Under International Law.**

The combatant immunity doctrine is also based in international law.  It is included in the Geneva Convention Relative to the Treatment of Prisons of War, also known as Third Geneva Convention ("GPW III"), to which both the United States and Syria are signatories.[75]  It is also available through customary international law, specifically Additional Protocol I of 1977 to the 1949 Geneva Convention ("Additional Protocol I").[76]

Turning first to GPW III, because the United States is a signatory, under the Supremacy Clause of the United States Constitution, the provisions of GPW III are part of United States law and binding on federal courts.  *See* U.S. CONST. ART. VI, § 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land. . . .").  *See also Lindh*, 212 F. Supp. 2d at 553-554 ("[T]he GPW provisions in issue here are a part of U.S. law and thus binding in federal courts under the Supremacy Clause.") (footnotes omitted).  The Supreme Court has recognized that  "the 1949 Geneva Conventions were written 'first and foremost to protect individuals, and not to serve State interests.'"  *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2794 n.57 (2006).  Lawful combatant status under GPW III is a bar to criminal prosecution, not simply a defense.  *Noriega*, 746 F. Supp. at 1529 ("[T]he essential purpose of the Geneva Convention Relative to the Treatment of Prisoners of War is to protect prisoners of war from prosecution for conduct which is customary in armed conflict.").

Determining whether combatant immunity applies under GPW III requires analysis of the type of conflict at issue, as well as the nature of the group to which the individual belongs.

---

[75] Geneva Convention Relative to the Treatment of Prisons of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 [hereinafter GPW].

[76] Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3.

Traditionally speaking, combatant immunity applies to international armed conflicts when the group at issue meets specific criteria, and not to purely internal and domestic conflicts. However, courts and international law experts have also recognized another category called an "internationalized armed conflict," which is "defined as 'a civil war characterized by the intervention of the armed forces of a foreign power.'"[77]

Additionally, it must be noted that the distinction between "international" and "internal" conflicts has been criticized as being "'arbitrary,' 'undesirable,' 'difficult to justify,' and that it 'frustrates the humanitarian purpose of the law of war in most of the instances in which war now occurs.'"[78] Many international law experts have called for a universal view of human rights law, which includes the application of combatant immunity even in traditionally defined non-international armed conflicts.[79] In considering the Syrian War to be a "crisis of compliance" one author observed as follows: "'new wars present a shift in the very nature of war itself. War is no longer a duel between competing states, but comprises a complex mix of internal and international elements, taking place in a globalised context involving an ever-greater number of

---

[77] Mohamad Ghazi Janaby, *The Legal Status of Hezbollah in the Syrian Conflict, An International Humanitarian Law Perspective*, 33 Ariz. J. Int'l Comp. Law 383, 397 (2016) (quoting Peter Gasser, *Internationalized Non-International Armed Conflicts: Case Studies of Afghanistan, Kampuchea, and Lebanon*, 33 Am. Univ. L. Rev. 145 (1983)).

[78] James G. Stewart, *Towards a Single Definition of Armed Conflict in International Humanitarian Law: A Critique of Internationalized Armed Conflict*, International Review of the Red Cross, Vol. 850, p. 313 (2013) available at: http://bit.ly/2DHtxYA (calling for "single law of armed conflict by illustrating the failure of the current regime to deal with conflicts that contain both international and non-international elements, namely internationalized armed conflicts").

[79] Sandra Fabijanić Gagro, *Defining and recognizing prisoners of war in contemporary armed conflicts*, Int'l J. of Soc. Sciences, Vol. 3, No. 5, pp. 76-77 (2014) (while concluding that unification is "still far away," also observing that "[o]ne could say it will not be easy to maintain the differences between international and non-international aspects of armed conflicts, especially in situations where the elements of both conflicts are mingled. Considering that the human rights law is primarily concerned with behaviour within a state, it is possible that further resistance to unification tendency will be eroded by human rights pressure.").

state and non-state actors. In such conflicts, the traditional dichotomies upon which the law of armed conflict is based are simply outdated."[80]

GPW III applies to "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them." GPW III, Art. 2. International Armed Conflicts are defined in Article 2 of the Geneva Conventions Article 2 provides as follows: "In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties [Note: A "High Contracting Party" is a nation-state that has signed the Geneva Conventions], even if the state of war is not recognized by one of them." In such conflicts, prisoners of war are considered to be lawful combatants.

Non-international armed conflicts encompass armed conflicts between a nation-state and an insurgent group or between two rebel groups that occur within the borders of a single nation-state. They are subject to Common Article 3 of the Geneva Conventions, which applies to "armed conflicts not of an international character occurring in the territory of one of the High Contracting Parties." Common Article 3 provides that in "the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum," various protections insuring the humane treatment of civilians and non-combatants and various prohibitions on violence, hostage-taking, "outrages upon personal dignity," and capital punishment without due process. Common Article 3 also requires the care for the wounded and sick. Traditionally, Common Article 3 does

---

[80] Jed Odermatt, *Between Law and Reality: 'New Wars' and Internationalised Armed Conflict*, Amsterdam Law Form, p. 31, Vol. 5:4 (2013); *See also id.* at 23 (noting that the legal difference between international and non-international armed conflicts is "being blurred by the development of customary international law."). *See also id.*, pp. 24-25 (discussing the criticism regarding the dichotomy between international and non-international armed conflicts).

not extend combatant immunity to non-international armed conflicts because such conflicts, in the classic sense, are deemed to be internal affairs governed by domestic law. Syria is a contracting party and is subject to Common Article 3.[81] To qualify as a non-international armed conflict, authorities focus on the existence of the following two key criteria: "i) intensity of the hostilities; and ii) the involvement of an organized armed group (OAG)."[82]

As noted above, in addition to international and non-international armed conflicts, another category called "internationalized armed conflicts" describes "internal hostilities that are rendered international."[83] This type of conflict has aspects of both international and non-international armed conflicts, as the "fighting can be between armed forces of the territorial state and intervening state(s), between intervening state(s) and parties to an internal armed conflict, or between armed forces of both intervening and territorial states against armed groups."[84] The Appeals Chamber for the International Criminal Tribunal for the former Yugoslavia described an internationalized armed conflict in these terms:

> It is indisputable that an armed conflict is international if it takes place between two or more States. In addition, in case of an internal armed conflict breaking out on the territory of a State, it may become international (or, depending upon the circumstances, be international in character alongside an internal armed conflict) if (i) another State intervenes in that conflict through its troops, or alternatively if (ii) some of the participants in the internal armed conflict act on behalf of that other State.[85]

Internationalized armed conflicts have also been discussed in the following contexts: "(1) when a non-state actor manages to create a new state in the course of the conflict; (2) a case of a foreign state's intervention in support of a non-state actor against the state in which the conflict takes

---

[81] In addition to Common Article 3, non-international armed conflicts are subject to the 1977 Additional Protocol II to the Geneva Conventions. Syria is not, however, a signatory to Additional Protocol II.

[82] Arimatsu & Choudhury, *supra* note 9.

[83] Stewart, *supra note* 78 at 315.

[84] Janaby*, supra* note 77 at 397.

[85] Janaby*, supra* note 77 at 397 (quoting *Prosecutor v. Tadic*, Case No.IT-94-1-A, Judgment, P 84 (July 15, 1999), available at: http://bit.ly/1Tn7I3v).

place; and (3) a situation of a foreign state intervening against a non-state actor without consent of the territorial state."[86]  *See also* Stewart, *supra* note 78, p. 315 ("The factual circumstances that can achieve that internationalization are numerous and often complex: the term internationalized armed conflict includes war between two internal factions both of which are backed by different States; direct hostilities between two foreign States that militarily intervene in an internal armed conflict in support of opposing sides; and war involving a foreign intervention in support of an insurgent group fighting against an established government.").  The United States government's support of the *contras* in Nicaragua has been argued to be an internationalized armed conflict.[87]  Once internationalized, the conflict is subject to the standards applicable to international armed conflicts, including combatant immunity.[88]  Important policy considerations have been cited in support of "internationalized" armed conflicts, including for the protection of U.S. military personnel.[89]

If the appropriate type of conflict exists, then the next step in the analysis is to determine whether the individual can be treated to prisoner of war status, which would make him a lawful combatant.  A lawful combatants under GPW III include individuals that are "[m]embers of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming

---

[86] Aleksandar Marsavelski, *The Crime of Terrorism and the Right of Revolution in International Law*, 28 CONN. J. INT'L L. 243, 290-291 (2013).

[87] Stewart, *supra* note 78, p. 315 (citing *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America), Merits, Judgment,* ICJ Reports 1986, p. 14.  *See also id.* at pp. 323-24 for further discussion of the *Nicaragua* decision.

[88] Gill, *supra* note 39, p. 364 ("If an [organized armed group] is acting under the control of an outside State, or an outside State militarily intervenes on the side of an insurgent or rebel armed group against the armed forces of the State where the conflict is ongoing, the possibility arises that the conflict, which was hitherto non-international in character can become internationalized, triggering the applicability of the [international armed conflict] IHL regime."  IHL means the "law of armed conflict."  *Id.* at 362.

[89] Paust, *supra* note 72, p. 565 ("it is critically important from a policy-serving standpoint that whenever its military personnel engage in fighting during hostilities abroad, the United States recognize that such direct participation in hostilities has internationalized the armed conflict.  In doing so U.S. military personnel will have combatant status and combatant immunity for lawful acts of war, and therefore may not be prosecuted under relevant domestic law for murder or other domestic crimes.").

part of such armed forces" and "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power. GPW III, Art. 4(A)(1) and (3). Lawful combatants also include "[m]embers of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements," that fulfill the following four conditions:

> i. the organization must be commanded by a person responsible for his subordinates;
> ii. the organization's members must have a fixed distinctive emblem or uniform recognizable at a distance;
> iii. the organization's members must carry arms openly; and
> iv. the organization's members must conduct their operations in accordance with the laws and customs of war

Art. 4(A)(2). *United States v. Arnaout*, 236 F. Supp. 2d 916, 918 (N.D. Ill. 2003) (citing to *Lindh* and observing that "all armed forces or militias, regular and irregular, must meet the four criteria if their members are to receive combatant immunity."); *United States v. Hamidullin*, 114 F. Supp. 3d 365, 375 (E.D. Va. July 13, 2015) (no combatant immunity when defendant cannot show that the Taliban satisfy the four-part criteria from Art. 4(A)(2)).[90] Thus, a person who satisfies the requirements in either Article 4(A)(1), (2), or (3) is entitled to prisoner of war protections and is considered a lawful combatant.

Like the common law, under the GPW III lawful combatants "may not be sentenced by the military authority and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts." *Id.* Art. 87. *See also Id.* Art. 99 ("No prisoner of war may be tried or sentenced for an act

---

[90] The reasoning in *Hamidullin* has been criticized by an international law expert as "lacking in reality." *See* Paust *supra* note 72, at p. 571.

which is not forbidden by the law of the Detaining Power or by international law, in force at the time the said act was committed.").   Articles 87 and 99 "make clear that a [lawful] belligerent in a war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war." *Lindh*, 212 F. Supp. 2d at 553.

Customary international law also provides for combatant immunity.  Additional Protocol I "broaden[s] the scope of international humanitarian law by extending protection to a wider spectrum of individuals affected by violence in armed conflict."[91]  This was in part achieved by "including wars of national liberation within the definition of international armed conflicts," which one author observed produced the following effects:

> First, it expanded the scope of international legal regulation applicable to these conflicts. Second, it increased the perception of legitimacy for forces fighting for national liberation (as the ICRC Commentary indicates, the legitimacy of resort to arms to achieve national liberation had by 1977 been extensively addressed by the United Nations and other international organizations ). Third, it included within the scope of potential POW status and combatant immunity non-state belligerents fighting for national liberation.[92]

The United States regularly applies Additional Protocol I to the extent that it reflects customary international law.  In particular, the United States accepts Article 75 to Additional Protocol I as customary and legally binding.   Article 75, entitled "Fundamental Guarantees," provides in part that "persons who are in the power of a Party to the conflict and who do not benefit from more favourable treatment under the Conventions or under this Protocol shall be treated humanely in

---

[91] Melysa H. Sperber, *John Walker Lindh and Yaser Esam Hamdi: Closing the Loophole in International Humanitarian Law for American Nationals Captured Abroad While Fighting with Enemy Forces*, 40 AM. CRIM. L. REV. 159, 179-183 (2003); Geoffrey S. Corn, *Thinking the Unthinkable: Has the Time Come to Offer Combatant Immunity to Non-State Actors?*, 22 Stan. L. & Pol'y Rev 253, 269 (2011) (Additional Protocol I "was intended to both reaffirm and further develop international humanitarian law so that it could more effectively mitigate the human suffering associated with armed conflicts.")
[92] Corn, *supra* note 91, pp. 270-271.

all circumstances," and then continues to list a series of protections and prohibited acts.[93]  The United States has chosen "out of a sense of legal obligation to treat the principles set forth in Article 75 as applicable to any individual it detains in an international armed conflict."[94] Additional Protocol I also addresses combatant status and immunity.

Specifically, Additional Protocol I, Article 43 defines the term "armed forces" and provides that individuals of such armed forces have a right to engage in hostilities.  In relevant part, the Article provides as follows:

> The armed forces of a Party to a conflict consist of all organized armed forces, groups and units which are under a command responsible to that Party for the conduct of its subordinates, even if that Party is represented by a government or an authority not recognized by an adverse Party. Such armed forces shall be subject to an internal disciplinary system which, 'inter alia', shall enforce compliance with the rules of international law applicable in armed conflict.

> Members of the armed forces of a Party to a conflict (other than medical personnel and chaplains covered by Article 33 of the Third Convention) are combatants, that is to say, they have the right to participate directly in hostilities.[95]

Article 44 provides that any "combatant, as defined in Article 43, who falls into the power of an adverse Party shall be a prisoner of war."[96]   Article 44 also expands prisoner of war protections to combatants who do not always visibly distinguish themselves from the general population so long as they carry arms while visible to the enemy, and also during preparation for an attack and during an actual military engagement.  Additional Protocol I is thus seen as "the extension of combatant immunity to non-state belligerents fighting against lawful government authority."[97]

---

[93] Additional Protocol I, *supra* note 76, Art. 75.

[94] Department of Defense Law of War Manual, June 2015, p. 490.  *See also Hamdan*, 548 U.S. at 633 (Stevens, J., concurring) ("Although the United States declined to ratify Protocol I, its objections were not to Article 75 thereof. Indeed, it appears that the Government 'regard[s] the provisions of Article 75 as an articulation of safeguards to which all persons in the hands of an enemy are entitled.' Taft, *The Law of Armed Conflict After 9/11: Some Salient Features*, 28 Yale J. Int'l L. 319, 322 (2003)."

[95] Additional Protocol I, *supra* note 76, Article 43.

[96] *Id*., Article 44.

[97] Corn, *supra* note 91, p. 271.

IV.   **ARGUMENT**

  **A. Introduction.**

The combatant immunity doctrine applies to the unique facts of this case under either the common law theory or under the GPW.   Mr. Al-Jayab is charged, in violation of 18 U.S.C. § 2339A, with attempting to provide material support and resources, namely himself, knowing and intending that they would be used to carry out of violation of 18 U.S.C. § 956(a), which prohibits conspiring to commit "at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States."   "Murder" is defined as "the *unlawful* killing of a human being with malice aforethought."  18 U.S.C. § 1111 (emphasis added).[98]  If the alleged predicate of murder would not be "unlawful" because any acts would be privileged as part of legitimate warfare, then any material support and resources that Mr. Al-Jayab attempted to provide would also not be illegal.  Put simply, acts of legitimate opposition against Assad regime and acts in the defense of civilians cannot be considered murder abroad, and therefore those acts cannot serve as a basis for conspiracy or material support charges.

Accepting the allegations in the indictment as true for the purposes of this motion, Mr. Al-Jayab's conduct was privileged when he planned to travel and actually traveled to Syria to join a group that was determined to defend the civilian population and fight against Assad, which was at the very same time that the United States was supporting the fight Assad through arms, support, and training.  Specifically, because Mr. Al-Jayab was a belligerent force fighting against Assad's government, he qualifies for combatant immunity under common law.  And under the

---

[98] Kidnapping also requires an "unlawful" act, such as seizing or confining.  18 U.S.C. § 1201.   The definition of "maiming" does not expressly include the "unlawful" language (*see* 18 U.S.C. § 114), but it can of course be implied and, in any event, there is no indication that the government will proceed on a "maiming theory."

GPW, due to the extensive international involvement in the Syrian war in late 2013 and early 2014, the Syrian War can be said to have characteristics of an international armed conflict. Further, members of the Islamic Front would be lawful combatants due to its organization structure, including military and political operations, and other distinguishing factors.

### B. Legal Standards.

The Court may rule on the application of law and deem Mr. Al-Jayab immune from prosecution as charged in the indictment. Fed. R. Crim. P. 12(b)(1) (the defendant may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.") An indictment may be dismissed if it is subject to a defense that may be decided on issues of law. *United States v. Labs of Virginia, Inc.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003). The Advisory Committee notes to Rule 12(b) specifically provide that immunity is the type of defense that is "capable of determination without a trial of the general issue." *See also United States v. Brimberry*, 744 F.2d 580, 586 (7th Cir. 1984) ("Where a defendant contends that his or her prosecution is precluded by a grant of immunity, a motion to dismiss the indictment is the proper method of raising the issue"); *Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988) ("We therefore hold, as a general proposition, that a Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution."); *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (noting that pretrial motion to dismiss indictment may be appropriate when "immunity issues are implicated"). "When considering a motion to dismiss an indictment, a court assumes all facts in the indictment are true and must 'view all facts in the light most favorable to the government.'" *United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004) (quoting *United States v. Yashar,* 166 F.3d 873, 880 (7th Cir. 1999); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952) ("It

should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true.").

### C. Mr. Al-Jayab is Entitled to Combatant Immunity under the Common Law.

As detailed above, the common law doctrine of combatant immunity is deeply rooted in the history of this country. It predates GPW III and is not dependent on classifications and limitations that developed through international law, particularly the distinction between international and non-international armed conflicts. Under the common law, combatant immunity has been applied in the context of shielding members of Confederate forces from civil and criminal liability in the Civil War. It has also extended to protect American soldiers fighting overseas. And more recently, the OLC's July 16, 2010 Drone Memo expressly concludes that immunity is appropriate for C.I.A. personnel who committed targeted killings overseas, even though they could not claim immunity under international law.

In the Drone Memo, the OLC considered a request by the C.I.A. to "carry out the attack against an operational leader of an enemy force, as part of the United States's ongoing non-international armed conflict with al-Qaida." Drone Memo, p. 33. In a significant footnote, the OLC extended combatant immunity to C.I.A. personnel while expressly acknowledging that international law did not apply:

> If the killing by a member of the armed forces would comply with the law of war and otherwise be lawful, actions of CIA officials facilitating that killing should also not be unlawful. … Nor would the fact that CIA personnel would be involved in the operation itself cause the operation to violate the laws of war. It is true that CIA personnel, by virtue of their not being part of the armed forces, would not enjoy the immunity from prosecution under the domestic law of the countries in which they act for their conduct in targeting and killing enemy forces in compliance with the laws of war—an immunity that the armed forces enjoy by virtue of their status. … Nevertheless, lethal activities conducted in accord with the laws of war, and undertaken in the course of lawfully authorized hostilities, do not violate *the laws of war* by virtue of the fact that they are carried out in part by government actors who are not entitled to the combatant's privilege.

37

OLC Drone Memo, p. 33, footnote 44. (citations omitted, emphasis in original). The OLC Drone Memo also concluded that the planned C.I.A. action would not violate 18 U.S.C. § 956(a), which concerns "murder" abroad. The memorandum found that 18 U.S.C. § 956(a) incorporated the "traditional public authority justification that section 1111 recognizes." *Id*. at pp. 37-38.

Based on the public disclosures and reports described above, the C.I.A.'s involvement in Syria cannot be denied and further inquiry into the details of that involvement is warranted. This activity involved shipping stockpiles of heavy arms from Libya to ports in Syria by no later than the fall of 2012. It also involved providing billions of dollars to rebel groups for training, arms, and other material support. In addition to providing arms directly to rebels, the C.I.A. sold significant weaponry, including TOW rockets, to Saudi Arabia, undoubtedly knowing that those weapons were destined for Syrian rebels who were opposed to Assad.

It is also beyond dispute that the President of the United States expressly authorized the C.I.A.'s role in the Syria war under the code name "Timber Sycamore." President Obama also publicly called for direct military action and targeted strikes against Syria after Assad used chemical weapons killing over 1000 civilians, including hundreds of children, in August 2013. That Presidential declaration, in addition to the C.I.A.'s active role supporting Syrian rebels fighting Assad, all occurred *before* Mr. Al-Jayab travelled to Syria in November 2013. In Syria, Mr. Al-Jayab joined a rebel organization that was directly opposed to Assad, consistent with the position of the United States. Additionally, even if the public authority does not derive from the United States' own conduct in Syria, Mr. Al-Jayab could raise that defense as a member of the Islamic Front. As discussed in more detail above and also below, that organization had a defined hierarchy with political, military, and humanitarian sections. It was a recognizable force. It

controlled specific territory and defended it against the Syrian army and also ISIS. There is no suggestion that it violated the laws of war by not observing the "principles of civilized warfare." Indeed, it had express policies of distinguishing and defending civilians.

Under these unique circumstances, sufficient evidence has been proffered to proceed with a public authority defense that would require dismissal, particularly in light of the OLC's Drone Memo analysis which links the public authority defense to combatant immunity. *See also United States v. Achter*, 52 F.3d 753, 755 (8th Cir.1995) (the public authority defense allows the defendant to seek exoneration based on the fact that he reasonably relied on the authority of a government official to engage him in a covert activity).

Even if the Court deems dismissal premature at this stage, the defense has certainly proffered sufficient evidence to justify the production of further discovery that is material to this particular defense. Indeed, in light of the public record concerning the C.I.A.'s active role supporting Syrian rebels with funds, arms, and training, the government simply cannot withhold additional material concerning the C.I.A.'s role—particularly information regarding its support, directly or indirectly, to the Islamic Front and forces associated with it—based on a contention that those records are classified.

### D. Mr. Al-Jayab is Entitled to Combatant Immunity Under International Law.

Mr. Al-Jayab is immune from prosecution under international armed law because any "support" he attempted to or actually provided was done in an international armed conflict and in connection with the Islamic Front and Ansar al-Sham, organizations that qualify for combatant immunity under these unique circumstances. Moreover, even if the Syria war does not meet the technical definition of an "international armed conflict," it is still a "non-international armed conflict" and immunity should still apply under the common law.

1. **Combatant Immunity Applies Under GPW III.**

    a. **The Syrian War Is an International as Well as an Internationalized Armed Conflict.**

The Syrian War has been described as a "Hobbesian state of 'war of all against all'…a humanitarian catastrophe of epic proportions, unparalleled in complexity in modern history. Virtually all the world powers, almost all the countries in the Persian Gulf region, numerous rebel groups and militant Islamic extremist groups are fighting in alliance with or against each other."[99]  One international law expert has noted how the armed conflicts in Syrian "have grown from a popular uprising which started in February-March 2011 to become a complex set of conflicts involving myriad contending parties that include both State and non-State actors."[100] Indeed, while the origins of the Syrian War may have been as a pro-democracy civilian uprising during the Arab Spring, the reality is that it was an international proxy by late 2013 and early 2014 when Mr. Al-Jayab was in Syria.  Russia, Iran, and other forces, such as Hezbollah, supported the Syrian government, including by providing troops.  While on the other side, Saudi Arabia, Qatar, and the United States, which operated mainly through rebel groups that were transparently funded, supported, armed, and trained by their sponsors.

As it developed, the proxy war was primarily between Iran and Saudi Arabia, to whom the United States provided weapons.[101]  For example, Stephen Biddle from the Council on Foreign Relations believes "Saudi Arabia and Iran are fighting for influence in the county and are funding and arming militants who are clearly on opposite sides."[102]  More recently, the

---

[99] Shahir Shahidsaless, *It is Russia, not IS or al-Qaeda, that poses primary threat to US*, Middle East Eye, Aug. 16, 2016, available at: http://bit.ly/2Dj0FJg (last visited Jan. 10, 2018).

[100] Gill, *supra* note 39, p. 354.

[101] Eyder Peralta, *We Ask Experts: Has the Situation in Syria Become a Proxy War?*, NPR, Oct. 17, 2015, available at: http://n.pr/2B9z7jQ.

[102] *Id.*

United States' direct bombing of a Syrian airfield has clearly created an international armed conflict.[103]  Even before the 2017 bombing of the Syrian airfield, the United States enforced no-fly zones in Syria; militarily supported Turkey's ground invasion into Syria over the objection of Syria; and directly bombed Syrian military forces—incidents that can all give rise to an international armed conflict.[104]  Still, the United States' (and other international countries') direct and indirect support for rebel forces creates an international armed conflict.  The United States' support of the rebels is evidence that it believed the belligerency against Assad was legitimate warfare and that fighters against Assad were entitled to combatant immunity for their legitimate acts of warfare against the regime.

The intervention of the foreign states into internal conflicts can "internationalize" the conflict so that the rules applicable to international armed conflicts apply.  In *Tadic*, the ICTY held that a conflict is internationalized when another State intervenes through its troops or when "some of the participants in the internal armed conflict act on behalf of that other State."[105]  Additionally, the ICTY Trial Chamber held in 2000 that a conflict can be internationalized when the intervention of a third-party States "[has] an impact on the conduct of the conflict."[106]  The *Tadic* court held that when a third-party state exercises control over militias, the conflict can be deemed international.

The rule that rebel forces can become legitimate belligerents through the support of third-party states was reinforced in the *Tadic* appeal, where the Appeals Chamber for the ICTY

---

[103] Schmitt &. Ford, *supra* note 37, pp. 4-5  ("Clearly, the United States and Syria are involved in an international armed conflict because the former engaged in hostilities against the armed forces of the latter; it will continue until there is a prolonged cessation of hostilities.")

[104] Ryan Goodman, *Is the United States Already in an "International Armed Conflict" with Syria?*, Oct. 11, 2016, available at http://bit.ly/2DGjP8X (last visited Jan. 4, 2018).

[105] Katie Johnston, *Transformations of Conflict Status in Libya*, 17 J Conflict Security Law 81 (2012).

[106] *Prosecutor v. Blaskic*, Case No. IT-95-14 (Int'l Crim. Trib. For the Former Yugoslavia  March 3, 2000) at para. 94.

concluded that "the Bosnian Serb units were sufficiently directed by the Federal Republic of Yugoslavia to conclude that an IAC existed."[107]    On the critical point of when the involvement of a State constitutes "control," the Appeals Chamber observed as follows:

> In sum, the Appeals Chamber holds the view that international rules do not always require the same degree of control over armed groups or private individuals for the purpose of determining whether an individual not having the status of a State official under internal legislation can be regarded as a *de facto* organ of the State. The extent of the requisite State control varies. Where the question at issue is whether a *single* private individual or a *group that is not militarily organised* has acted as a *de facto* State organ when performing a specific act, it is necessary to ascertain whether specific instructions concerning the commission of that particular act had been issued by that State to the individual or group in question; alternatively, it must be established whether the unlawful act had been publicly endorsed or approved *ex post facto* by the State at issue.  By contrast, control by a State over subordinate *armed forces or militias or paramilitary units* may be of an overall character (and must comprise more than the mere provision of financial assistance or military equipment or training).  This requirement, however, does not go so far as to include the issuing of specific orders by the State, or its direction of each individual operation. Under international law it is by no means necessary that the controlling authorities should plan all the operations of the units dependent on them, choose their targets, or give specific instructions concerning the conduct of military operations and any alleged violations of international humanitarian law. The control required by international law may be deemed to exist when a State (or, in the context of an armed conflict, the Party to the conflict) *has a role in organising, coordinating or planning the military actions* of the military group, in addition to financing, training and equipping or providing operational support to that group. Acts performed by the group or members thereof may be regarded as acts of *de facto* State organs regardless of any specific instruction by the controlling State concerning the commission of each of those acts.[108]

Thus, under this "overall control" standard articulated in *Tadic*, State control over another group involved in an armed conflict does not require the State to issue specific orders for individual operations.  Rather, it is sufficient that the State has a role in organizing, coordinating, and planning, in addition to providing training and operational support.  Further, foreign military

---

[107] Arimatsu & Choudhury, *supra* note 9, p. 5.
[108] *Tadic*, at para. 137 (emphasis in original).  (available at http://bit.ly/1Tn7I3v).

intervention "that only indirectly affects an independent internal conflict is sufficient to render that conflict international."[109]

The United States' support of the Syrian rebel forces, discussed in detail above and not repeated here, clearly demonstrates that its support was far more substantial than mere recognition of the groups. Indeed, one author has recently questioned whether the United States' support to rebel groups created an international armed conflict with the Syrian government and raised the following issues that would create that reality:

> While no definitive conclusion can be reached (given the program's secrecy), the United States' program has likely been successfully crafted to remain just below the threshold of armed conflict. However, there are identifiable risk factors. The first risk factor is the training curriculum. While there is little clarity concerning what constitutes impermissible "lethal training," training tailored to operations in Syria or specific Syrian targets would potentially cross the threshold. The second risk factor is the logistical plan. The United States' cooperation in exfiltration of rebels from Syria for training, or infiltration back into Syria after training, would also likely cross the threshold. Finally, the countries providing the weapons likely have crossed the threshold into an armed conflict with the Syrian government, and close cooperation on the overall program could simply make the United States a co-belligerent.[110]

As discussed in detail above, more recent reports and disclosures about the C.I.A. program indicate that many of these "risk" factors were in fact met, specifically that the United States provided weapons to rebels directly, in addition through ally nations such as Saudi Arabia. This level of foreign intervention in support of other rebels is sufficient to create an internationalized armed conflict. *See Janaby*, supra note 77, at 407 ("An intervention by a foreign state in an internal armed conflict would lead to the internationalization of the conflict if such conflict

---

[109] Stewart, *supra* note 78, at p. 328.
[110] Major Jim Sleesman, Conducting Unconventional Warfare in Compliance with the Law of Armed Conflict, 224 Mil. L. Rev. 1101, 1120-1121 (2016).

supports the rebels."). Because the Syrian War is accurately described as an internationalized armed conflict, "[i]t is also possible to obtain a privileged combatant status."[111]

### b. The Islamic Front and Sub-Groups Qualify Under GPW III, Art. 4.

As there was an international armed conflict in Syria, prisoner of war status exists if the organization at issue meets the criteria under GPW III, Art. 4(A). Here, the Islamic Front, and thus by extension Ansar al-Sham, satisfies that test. As noted above, the Islamic Front was founded in late November 2013—just as Mr. Al-Jayab entered Syria. It was an umbrella organization for a number of rebel groups, specifically, Harakat Ahrar al-Sham al-Islamiyya, Jaysh al-Islam, Suqour al-Sham, Liwa al-Tawhid, Liwa al-Haqq, Ansar al-Sham and the Kurdish Islamic Front. It was announced as an "independent political, military and social formation" that was formed to "topple the Assad regime completely and build an Islamic state."[112] The Islamic Front had an organized hierarchy with leaders who held positions in different divisions, including political and military. Specifically, the leader of the Shura Council was Ahmed Issa al-Sheikh (Suqour al-Sham); the deputy leader of the Shura Council was Abu Omar Hureitan (Liwa al-Tawhid); the military head was Zahran Alloush (Jaysh al-Islam); the political head was Hassan Abboud (Ahrar al-Sham); and the head of the Sharia office was Abu al-Abbas al-Shami (Ahrar al-Sham).[113] After its formation, it included approximately 45,000 members, which is by far the largest group to oppose Assad.

Based on the hierarchy and leadership positions, the Islamic Front meets the first criteria of GPW III, Art. 4 of having members commanded by a person responsible for subordinates. With regard to the second factor, the Islamic Front had a distinct emblem that was recognizable from a distance. This flag is also clear and visible in the photos below, which were obtained in

---

[111] Marsavelski, *supra* note 86, pp. 290-291.

[112] BBC News, Guide to the Syrian Rebels, *supra* note 44.

[113] *Id.*

44

open-source searches. These images also portray that Islamic Front members would carry arms

openly, meeting the fourth prong of Article 4:





---

[114] Image from: http://bit.ly/2rgF92f.
[115] Image from: BBC News, *Leading Syrian rebel groups form new Islamic Front*, Nov. 22, 2013, available at: http://bbc.in/2FMR6QH (last visited Jan. 15, 2018).





---

[116] Image from https://twitter.com/IslamicFront_En (Apr. 8, 2014) (caption: The BMP that was seized by our fighters during the ongoing clashes in #Qalamoun in rural #Damascus). A "BMP" is a Russian-made tank.

[117] Image from: http://bit.ly/2Dm0Na9 (last visited Jan. 15, 2018).



Finally, there is no indication in any public source to contradict the fact that the Islamic Front conducted operations according to law and customs of war. These laws and customs are articulated in the Hague Convention Respecting the Laws and Customs of War on Land.[119] The purpose of this treaty was "to revise the general laws and customs of war, either with a view to defining them with greater precision or to confining them within such limits as would mitigate their severity as far as possible."[120] As evident from the caption in the last image above, the Islamic Front intentionally protected civilians from the Syrian Army. This message is consistent with many Islamic Front statements.

Importantly, the Islamic Front was never a designated foreign terrorist organization. Nor was Ansar al Sham so designated, the sub-group with which Mr. Al-Jayab was directly affiliated. The absence of such a designation is significant. In *United States v. Naj Ahmed, et al.*, one of the few cases to address the combatant immunity defense, the district court focused on ISIS's designation as a terrorist organization as a key reason in its failure to meet the Article 4(A)(2) standards. *United States v. Naj Ahmed, et al.*, Case No. 15 CR 49 (D. Minn, Feb. 11, 2016), Dkt.

---

[118] Image from: https://twitter.com/IslamicFront_En (July 28, 2014).
[119] Hague Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539.
[120] *Id.*

#371, p. 8 ("Even if that were true, that ISIL has become more than a terrorist organization, the fact remains that ISIL is a designated a foreign terrorist organization and defendants are charged in the Indictment with conspiring with ISIL to commit murder in the context of terrorist activities. Under these circumstances, combatant immunity does not apply."). Similarly, in *Lindh*, the district court denied the defendant's combatant immunity argument in large part because of an executive decision that declared the Taliban to be unlawful combatants. As unlawful combatants, Taliban members, including the defendant, could not claim prisoner of war status. *See Lindh*, 212 F. Supp. 2d at 554 ("The starting point in the analysis of Lindh's immunity claim is recognition that the President has unequivocally determined that Lindh, as a member of the Taliban, is an unlawful combatant and, as such, may not invoke lawful combatant immunity."). While the district court did not accept the government's position that the executive determination effectively precluded judicial review, it did give "substantial or great weight" to the executive's interpretation and application of the GPW to the defendant. *Id*. at 557. The district court ultimately found the President's "determination that Lindh is an unlawful combatant and thus ineligible for immunity is controlling." *Id*. at 558.[121]

Unlike the executive determination of the Taliban's status, neither the Islamic Front nor Ansar al-Sham are designated as foreign terrorist organizations; nor has there been any finding or declaration that those groups or Mr. Al-Jayab were unlawful combatants. Quite to the contrary, rather than declaring Syrian rebel opposition groups to be unlawful combatants, President Obama recognized them as legitimate representatives of the Syrian people in their fight against the Assad regime; secretly authorized the C.I.A. to provide arms and training; and then, both in words and actions, supported those opposition groups.

---

[121] The district court also considered the Article 4 factors and concluded that the Taliban could not satisfy those criteria. *Lindh*, 212 F. Supp. 2d at 557-58.

48

In sum, the Syria war in late 2013 and early 2014 was an international armed conflict, as defined by Article 2 of the GPW. Moreover, the Islamic Front, as well as Ansar al-Sham, meet the criteria set forth in Article 4. As a result, Mr. Al-Jayab, who was a member of those organizations during the brief period he was in Syria, is entitled to combatant immunity pursuant to Articles 87 and 99 of the GPW.

### 2. Mr. Al-Jayab is Entitled to Combatant Immunity Even if the Syrian War is Deemed to be a Non-International Armed Conflict.

As noted above, the entire distinction between international and non-international armed conflicts has come under intense scholarly debate as being irrelevant in modern warfare, including the Hobbesian "war of all against all" that is Syria.[122] Additionally, there is a trend of convergence of the *jus in bello* regulating non-international armed conflicts and international armed conflicts. Yet, and without conceding the fact that the Syrian War was an international armed conflict, combatant immunity would still apply even if the Court finds that it was a non-international armed conflict.

First, the Syrian War in late 2013 to early 2014 clearly met the standard of a non-international conflict.[123] A non-international conflict has two requirements: armed violence must be of sufficient intensity and the parties must be sufficiently organized. In 2012 the ICRC

---

[122] International courts have also questioned the distinction between international and non-international armed conflicts in the prosecution of war crimes, suggesting "that the prohibitions applicable in the former are now applicable by custom in the latter as well." *Prosecutor v. Tadic*, Case No. IT-94-1-A, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction PP 94-137 (Int'l Crim. Trib. For the Former Yugoslavia Oct. 2, 1995).

[123] *See* Gill, *supra* note 39, p. 374 ("there can be no doubt that at least since early 2012, given the degree of organization of the main opposition groups and the intensity of the fighting, the threshold of a non-international armed conflict, to which there were multiple parties, was crossed.").

concluded that Syria had not yet become an international armed conflict, but concluded that it could be classified as a non-international armed conflict.[124]

As a primary point, the GPW does not displace common law, which for reasons discussed above, still applies regardless if the conflict is non-international. Therefore, upon finding that the Syrian War was a non-international armed conflict, the Court should still apply combatant immunity under the common law for reasons discussed above. In other words, in establishing positive requirements for non-international armed conflicts, Common Article 3 did not expressly or implicitly negate pre-existing standards, specifically common law combatant immunity.[125]

Moreover, due to the unique and fluid aspects of the conflict, notwithstanding its internal aspects, it is still possible to classify the Syrian War as an international armed conflict through a doctrine known as transnational conflict. Under that doctrine, "a transnational conflict against a

---

[124] Counsel maintains that the Syrian War was an international conflict in late 2013 to early 2014. While the ICRC properly found that the level of hostilities rose to the level of an armed conflict, counsel submits that the level of international involvement, direct and by supporting and sponsoring proxy rebel groups, the armed conflict was one of international, not simply non-international dimension. The intensity requirement looks at the "the number, duration, and intensity of individual confrontations; the type of weapons and other military equipment used; the number and caliber of munitions fired; the number of persons and types of forces partaking in the fighting; the number of casualties; the extent of material destruction; and the number of civilians fleeing combat zones." For the organization requirement, the following factors are relevant: "the existence of a command structure and disciplinary rules and mechanisms within the group; the existence of a headquarters; the fact that the group controls a certain territory; the ability of the group to gain access to weapons, other military equipment, recruits, and military training; its ability to plan, coordinate, and carry out military operations, including troop movements and logistics; its ability to define a unified military strategy and use military tactics; and its ability to speak with one voice and negotiate and conclude agreements such as cease-fire or peace accords."

[125] *See* Jens David Ohlin, *The Combatant's Privilege in Asymmetric and Covert Conflicts*, 40 Yale J. Int'l L. 337, 347-8 (2015):

> This conclusion [by the ICRC] is an exaggeration. While it is clear that the delegates at Geneva rejected far more sweeping protections for non-state militias fighting in non-international armed conflicts, nothing in Common Article 3 explicitly rejects it. What Common Article 3 does include is a provision (paragraph 4) that otherwise preserves the status quo… But that just leaves open the question of the exact nature of the status quo at the time, a point that the existing commentaries often paper over. Whatever the existing framework was for the privilege of combatancy at the time the Geneva Conventions were adopted, the adoption of Common Article 3 did not change it.

non-state armed group that takes place without the consent of the territorial state in which the conflict occurs is an IAC."[126] The doctrine is inherent in the definition of a non-international armed conflict as laid out in Article 1(1) of Additional Protocol II: a non-international armed conflict must "take place in the territory of a High Contracting Party between its armed forces and dissident armed forces or other organized armed groups."[127] This means that a non-international armed conflict requires that the conflict take place within the borders of a Party to the GPW.  If the conflict spills over the borders and into other states, it no longer qualifies as a NIAC.

In 2013-2014, the Syrian War was arguably transnational through its relationships with both Turkey and Iraq. Turkey and Syria share a porous border, with FSA fighters and Syrian refugees moving freely between the two countries.[128] Additionally, Kurds in northeastern Syria are simultaneously battling the pro-government forces in Syria and the Turkish government. Further, both armed rebel groups in Syria and ISIS operate out of both Iraq and Syria, with ISIS controlling territory in both Syria and Iraq.[129]  Moreover, on October 3, 2012, Syria fired artillery into the Turkish town of Akcakale.  This incident killed five civilians.  Turkey responded with military force, but before doing so it contacted NATO, the Arab League, the Secretary-General of the United Nations, and the President of the U.N. Security Council.[130]

---

[126] Yahli Shereshevsky, *Politics by Other Means: The Battle over the Classification of Asymmetrical Conflicts*, 49 Vand. J. Transnat'l L. 455, 481 (2016).

[127] Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977. Syria is not a Party to Additional Protocol II.

[128] Arimatsu & Choudhury, *supra* note 9, p. 16.

[129] Greg Myre, *In One Map, The Dramatic Rise of the Islamic State Militants*, NPR, June 13, 2014, available at: http://n.pr/2FKCnWg.

[130] Paust, *supra* note 72, pp. 433-434 ("the continued exchange between the Syrian and Turkish militaries has resulted in a limited international armed conflict to which the laws of war apply").

Lastly, it is essential to recognize that the dichotomy between international and non-international armed conflicts has come under intense scrutiny, especially insofar as modern wars involving international and internal components such as Syria are examined. International law experts have called for the recognition of combatant immunity privilege even in non-international armed conflicts under certain conditions.[131] Those in favor of that expansion argue that withholding combatant immunity provides no incentive for groups involved in non-international armed conflicts to honor laws of armed conflict and respect international human rights. Moreover, failing to recognize combatant immunity when foreign countries undeniably participate in the conflict encourages the self-interested political manipulation of international human rights law.[132]

Maintaining the rigid dichotomy promotes covert proxy wars, such as the one that has fueled the endless bloodshed in Syria, where foreign State sponsors that actively provide training, funds, and lethal weaponry can claim that they have no "legal" participation in the

---

[131] *See* Ruys, *supra* note 71, p. 276 ("the preferred option is to recognized that, when the conditions are met, members of [non-State armed groups] should not be prosecuted and punished for mere participation in hostilities but should instead be endowed with the combatant privilege. Apart from this, members of [non-State armed groups] should not be treated as ordinary 'criminals' and should accordingly be kept separate from such criminals.") The conditions discussed by Ruys include that the non-State armed group comply with the laws of armed conflict and properly distinguish itself from the civilian discussion. *Id. See also* Gagro, *supra* note 79, p. 76; Odermatt, *supra* note 80, p. 29 ("The law of armed conflict is still premised on the distinction between international and non-international armed conflicts. However, a close examination of the types of conflicts that have taken place since the end of the Cold War demonstrates that such a sharp distinction no longer exists in practice (if it ever did).").

[132] *See* M. Cherif Bassiouni, *The New Wars and the Crisis of Compliance with the Law of Armed Conflict by Non-State Actors*, 98 J. of Crim. L. and Criminology, 711, 731 (2008) ("It is anachronistic that these different legal regimes and sub-regimes apply to the same socially protected interests and reflect the same human and social values, but differ in their applications depending on the legal characterization of the type of conflict. Governments maintain these distinctions for purely political reasons, namely, to avoid giving insurgents any claim or appearance of legal legitimacy. This political rationale is the source for the legal disparities in IHL mentioned above."); Stewart, *supra* note __, p. 344 ("while a single definition of armed conflict within the confines of a uniform body of humanitarian law would not prevent disagreements of fact, hostile covert takeovers or internationalized armed conflicts, it would prevent political agendas from so negatively affecting humanitarian principles applicable in those contexts.").

armed conflict. That untenable position not only ignores reality, but it may also lead to unintended and precarious consequences for the intervening countries' own personnel, and also encourages non-compliance with the laws of war.[133] Policy reasons aside, the reality is that regardless of the technical classification of the Syrian War, the participation of foreign countries in that conflict is undeniable, and the impact of that involvement cannot be ignored.

## V.    CONCLUSION

For the all of the foregoing reasons, Defendant Aws Mohammed Younis Al-Jayab respectfully requests that his motion to dismiss based on combatant immunity should be granted.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Robin V. Waters
**ROBIN V. WATERS,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**,
Attorneys for Defendant
Aws Mohammed Younis Al-Jayab.

</div>

**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
tdurkin@durkinroberts.com

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

---

[133] *See* Paust *supra* note 72, at 575 ("counterfactual classification of an armed conflict as one that is not of an international character can pose threats of civil and criminal responsibility for soldiers even when identical conduct would be permissible during an armed conflict of an international character."); Corn, *supra* note 91, p. 287 ("Combatant immunity is not merely a humanitarian principle; it is an incentive to comply with the law during the conduct of military operations.").

<u>**CERTIFICATE OF SERVICE**</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant Aws Mohammed Younis Al-Jayab's Memorandum of Law in Support of Motion to Dismiss the Indictment Based on Combatant Immunity was served on January 16, 2018, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.1, and LCrR 49.2, pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman

53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

54