# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 16 CR 181 |
| | ) | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS | ) | |
| AL-JAYAB, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT AWS MOHAMMED YOUNIS AL-JAYAB'S
SUBMISSION OF SUPPLEMENTAL AUTHORITIES IN SUPPORT OF
HIS MOTIONS TO SUPPRESS EVIDENCE OBTAINED OR DERIVED
FROM WARRANTLESS SURVEILLANCE UNDER SECTION 702 OF THE
FISA AMENDMENTS ACT (DKT. #47, 48), AND FOR NOTICE OF SURVEILLANCE
TECHNIQUES USED DURING THE COURSE OF THE INVESTIGATION (DKT. #52)**

Defendant, **AWS MOHAMMED YOUNIS AL-JAYAB,** by and through his attorneys,

**THOMAS ANTHONY DURKIN**, **ROBIN V. WATERS**, and **JOSHUA G. HERMAN**,

pursuant to Rule 12 of the Federal Rules of Criminal Procedure, as well as the Due Process and

Effective Assistance of Counsel Clauses of the Fifth and Sixth Amendments to the Constitution of

the United States, respectfully submits the attached Supplemental Authorities in Support of his

Motions to Suppress Evidence Obtained or Derived from Warrantless Surveillance Under Section

702 of the FISA Amendments Act (Dkt. #47, 48), and For Notice of Surveillance Techniques Used

During the Course of the Investigation (Dkt. #52), both of which seek the disclosure to cleared

counsel the underlying FISA certifications, applications, orders and directives related to the FISA

surveillance in this case.[1]

In support of this submission, Defendant, through counsel, shows to the Court the following:

1.    Throughout this litigation, and in virtually every other case in the country involving FISA materials since FISA's enactment in 1978, the prosecution has maintained that disclosure of the underlying FISA application would cause grave damage to national security.  *See* Declaration and Claim of Privilege of the Attorney General of the United States, Dkt. #63-1 ("I hereby claim that it would harm the national security of the United States to disclosure or hold an adversary hearing with respect to the FISA materials… [U]nauthorized disclosure of the FISA materials that are classified at the "TOP SECRET" level reasonably could be expected to cause exceptionally grave damage to the national security of the United States.").  In the forty years since the enactment of FISA, every district court had accepted this government assertion—with the relatively recent exception of Judge Sharon Johnson Coleman's FISA disclosure order that was reversed after the government sought an interlocutory appeal.  *United States v. Daoud*, 755 F.3d 479, supplemented, 761 F.3d 679 (7th Cir. 2014), cert. denied, 135 S. Ct. 1456 (2015).  The underpinning rationale for non-disclosure serving as the norm—which counsel respectfully submits is inconsistent with the legislative history of FISA—has been severely called into question by recent events playing out at the highest levels of government.

2.    On February 2, 2018, President Donald J. Trump—head of the same Executive Branch that is prosecuting Defendant—declassified and approved release of a House Permanent

---

[1] *See* Defendant Aws Mohammad Younis al-Jayab's Memorandum of Law in Support of Motion to Suppress Evidence Obtained or Derived from Warrantless Surveillance Under Section 702 of the FISA Amendments Act (Dkt. 48), p.48; and Defendant Aws Mohammad Younis al-Jayab's Motion For Notice of Surveillance Techniques Used During the Course of the Investigation (Dkt. #52), p.3.

Select Committee on Intelligence ("HPSCI") majority memorandum that summarizes portions of a FISA application targeting an American Citizen (the "HPSCI Majority Memorandum"). A copy of the HPSCI Majority Memorandum is attached hereto as Exhibit A. The cover letter accompanying the HPSCI Majority Memorandum, authored by current Counsel to the President Donald F. McGahn II, explains that "standards permit declassification when the public interest in disclosure outweighs any need to protect the information," and that the President determined the declassification appropriate in light of the "significant public interest in the memorandum." (Exhibit A, p.2). The HPSCI Majority Memorandum asserts that its findings "raise concerns with the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence Surveillance Court (FISC)," and "represent a troubling breakdown of legal processes established to protected the American people from abuses related to the FISA process." (Exhibit A, p.3). The Speaker of the U.S. House of Representatives observed that release of the HPSCI Memorandum "provide[s] greater transparency" concerning FISA and helps "ensure the FISA system works as intended and Americans' rights are properly safeguarded." Al Weaver, *Paul Ryan: Nunes memo lays out a 'specific, legitimate' worry about surveillance,* Washington Examiner, Feb. 2, 2018 (https://www.washingtonexaminer.com/paul-ryan-nunes-memo-lays-out-a-specific-legitimate-worry-about-surveillance/article/2647957).

3.      Not to be outdone, on February 24, 2018, HPSCI released a second redacted, declassified version of a minority memorandum (the "HPSCI Minority Memorandum"), which challenges certain assertions made in the HPSCI Majority Memorandum. A copy of the HPSCI Minority Memorandum is attached hereto as Exhibit B. The HPSCI Minority Memorandum, like the HPSCI Majority Memorandum, summarizes portions of the underlying FISA application.

4.     Setting aside the political motives behind the dueling memos—which are beyond the scope of this submission—the mere declassification of the HPSCI Majority Memorandum and the HPSCI Minority Memorandum (collectively the "HPSCI Memoranda") patently demonstrates that it is possible to discuss publicly the merits of a FISA application without damaging national security.  Moreover, it is notable that the DOJ and the FBI voiced strong objections to the release of the HPSCI Memoranda. *See* Kelly Cohen, *DOJ warns Devin Nunes against 'extraordinarily reckless' release of memo on alleged FISA abuses*, Washington Examiner, January 24, 2018 (https://www.washingtonexaminer.com/doj-warns-devin-nunes-against-extraordinarily-reckless-release-of-memo-on-alleged-fisa-abuses/article/2646995); FBI National Press Office, *FBI Statement on HPSCI Memo*, January 31, 2018 (https://www.fbi.gov/news/pressrel/press-releases/fbi-statement-on-hpsci-memo).[2]  The declassification of the HPSCI Memoranda certainly highlights the often hyperbolic and disingenuous tenor of the prosecution's repeated assertions—in this and other cases involving motions to suppress FISA surveillance—that *any* disclosure of a FISA application, even to cleared defense counsel under the protection of CIPA, would irreparably harm national security.  If the HPSCI Memoranda can be disclosed without harming national security, as the Executive Branch has determined, at least comparable disclosure of the FISA materials for Defendant can be made to cleared defense counsel under CIPA without causing such harm. In short, what is good for the goose ought well to be good for the gander.

---

[2] Despite these protestations, in a recent Joint Status Report filed in *James Madison Project v. DOJ*, 17-cv-0597 (D.D.C.)—a FOIA suit seeking disclosure of FISA-materials related to surveillance of President Trump and the Trump presidential campaign—the DOJ acknowledged it is reviewing the Carter Page FISA application for potential disclosure to the public. (Dkt. #34, p.2)("…[O]ngoing review of these documents [for potential disclosure] is novel, complex, and time consuming. The Government has never, in any litigation civil or criminal, processed FISA applications for release to the public.").

5.     Accordingly, counsel respectfully submit the attached HPSCI Memoranda (Exhibits A & B) as supplemental authorities in support of disclosure of the requested FISA materials.

Respectfully Submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Robin V. Waters
**ROBIN V. WATERS,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN,**
Attorneys for Defendant
Aws Mohammed Younis Al-Jayab.

**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, IL 60614
Tel: (312) 981-0123
Fax: (312) 913-9235
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

**LAW OFFICES OF JOSHUA G. HERMAN**
53 West Jackson Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

Thomas Anthony Durkin, Attorney at Law, hereby certifies that Defendant Aws Mohammad Younis Al-Jayab's Submission of Supplemental Authorities in Support of His Motions to Suppress Evidence Obtained or Derived from Warrantless Surveillance Under Section 702 of the FISA Amendments Act (Dkt. #47, 48) and For Notice of Surveillance Techniques Used During the Course of the Investigation (Dkt. #52), was served on April 4, 2018, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN**
2446 N. Clark Street
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com

# EXHIBIT A

## THE WHITE HOUSE

WASHINGTON

February 2, 2018

The Honorable Devin Nunes
Chairman, House Permanent Select Committee on Intelligence
United States Capitol
Washington, DC 20515

Dear Mr. Chairman:

On January 29, 2018, the House Permanent Select Committee on Intelligence (hereinafter "the Committee") voted to disclose publicly a memorandum containing classified information provided to the Committee in connection with its oversight activities (the "Memorandum," which is attached to this letter). As provided by clause 11(g) of Rule X of the House of Representatives, the Committee has forwarded this Memorandum to the President based on its determination that the release of the Memorandum would serve the public interest.

The Constitution vests the President with the authority to protect national security secrets from disclosure. As the Supreme Court has recognized, it is the President's responsibility to classify, declassify, and control access to information bearing on our intelligence sources and methods and national defense. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). In order to facilitate appropriate congressional oversight, the Executive Branch may entrust classified information to the appropriate committees of Congress, as it has done in connection with the Committee's oversight activities here. The Executive Branch does so on the assumption that the Committee will responsibly protect such classified information, consistent with the laws of the United States.

The Committee has now determined that the release of the Memorandum would be appropriate. The Executive Branch, across Administrations of both parties, has worked to accommodate congressional requests to declassify specific materials in the public interest.[1] However, public release of classified information by unilateral action of the Legislative Branch is extremely rare and raises significant separation of powers concerns. Accordingly, the Committee's request to release the Memorandum is interpreted as a request for declassification pursuant to the President's authority.

The President understands that the protection of our national security represents his highest obligation. Accordingly, he has directed lawyers and national security staff to assess the

---

[1] *See, e.g.*, S. Rept. 114-8 at 12 (Administration of Barack Obama) ("On April 3, 2014 . . . the Committee agreed to send the revised Findings and Conclusions, and the updated Executive Summary of the Committee Study, to the President for declassification and public release."); H. Rept. 107-792 (Administration of George W. Bush) (similar); E.O. 12812 (Administration of George H.W. Bush) (noting Senate resolution requesting that President provide for declassification of certain information via Executive Order).

declassification request, consistent with established standards governing the handling of classified information, including those under Section 3.1(d) of Executive Order 13526. Those standards permit declassification when the public interest in disclosure outweighs any need to protect the information. The White House review process also included input from the Office of the Director of National Intelligence and the Department of Justice. Consistent with this review and these standards, the President has determined that declassification of the Memorandum is appropriate.

Based on this assessment and in light of the significant public interest in the memorandum, the President has authorized the declassification of the Memorandum. To be clear, the Memorandum reflects the judgments of its congressional authors. The President understands that oversight concerning matters related to the Memorandum may be continuing. Though the circumstances leading to the declassification through this process are extraordinary, the Executive Branch stands ready to work with Congress to accommodate oversight requests consistent with applicable standards and processes, including the need to protect intelligence sources and methods.

Sincerely,

Donald F. McGahn II
Counsel to the President

cc: The Honorable Paul Ryan
Speaker of the House of Representatives

The Honorable Adam Schiff
Ranking Member, House Permanent Select Committee on Intelligence

UNCLASSIFIED ~~TOP SECRET//NOFORN~~

January 18, 2018

Declassified by order of the President
February 2, 2018

To:       HPSCI Majority Members

From:     HPSCI Majority Staff

Subject:  Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the
          Federal Bureau of Investigation

## Purpose

This memorandum provides Members an update on significant facts relating to the
Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the
2016 presidential election cycle. Our findings, which are detailed below, 1) raise concerns with
the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence
Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established
to protect the American people from abuses related to the FISA process.

## Investigation Update

On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order
(not under Title VII) authorizing electronic surveillance on Carter Page from the FISC. Page is a
U.S. citizen who served as a volunteer advisor to the Trump presidential campaign. Consistent
with requirements under FISA, the application had to be first certified by the Director or Deputy
Director of the FBI. It then required the approval of the Attorney General, Deputy Attorney
General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security
Division.

The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA
renewals from the FISC. As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an
American citizen must be renewed by the FISC every 90 days and each renewal requires a
separate finding of probable cause. Then-Director James Comey signed three FISA applications
in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one. Then-DAG
Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more
FISA applications on behalf of DOJ.

Due to the sensitive nature of foreign intelligence activity, FISA submissions (including
renewals) before the FISC are classified. As such, the public's confidence in the integrity of the
FISA process depends on the court's ability to hold the government to the highest standard—
particularly as it relates to surveillance of American citizens. However, the FISC's rigor in
protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance
orders, is necessarily dependent on the government's production to the court of all material and
relevant facts. This should include information potentially favorable to the target of the FISA

~~TOP SECRET//NOFORN~~

application that is known by the government. In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts. However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application. Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier). The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow. This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News*. The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*. Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS. Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn. Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

**UNCLASSIFIED**

TOP SECRET//NOFORN

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

b)  Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3)  Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing Ohr, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he "**was desperate that Donald Trump not get elected and was passionate about him not being president.**" This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

a)  During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4)  According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

# UNCLASSIFIED

TOP SECRET//NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

TOP SECRET//NOFORN

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

# UNCLASSIFIED

TOP SECRET//NOFORN

PROPERTY OF THE U.S. HOUSE OF REPRESENTATIVES

# EXHIBIT B

UNCLASSIFIED

TOP SECRET//NOFORN

**TO:** All Members of the House of Representatives
**FROM:** HPSCI Minority
**DATE:** January 29, 2018
**RE: Correcting the Record – The Russia Investigations**

The HPSCI Majority's move to release to the House of Representatives its allegations against the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) is a transparent effort to undermine those agencies, the Special Counsel, and Congress' investigations. It also risks public exposure of sensitive sources and methods for no legitimate purpose.

FBI and DOJ officials did <u>not</u> "abuse" the Foreign Intelligence Surveillance Act (FISA) process, omit material information, or subvert this vital tool to spy on the Trump campaign.

In fact, DOJ and the FBI would have been remiss in their duty to protect the country had they not sought a FISA warrant and repeated renewals to conduct temporary surveillance of Carter Page, someone the FBI assessed to be an agent of the Russian government. DOJ met the <u>rigor, transparency, and evidentiary basis</u> needed to meet FISA's probable cause requirement, by demonstrating:

- o contemporaneous evidence of Russia's election interference;
- o concerning Russian links and outreach to Trump campaign officials;
- o Page's history with Russian intelligence; and
- o ███████████████ Page's suspicious activities in 2016, including in Moscow.

The Committee's Minority has therefore prepared this memorandum to correct the record:

- **Christopher Steele's raw intelligence reporting did <u>not</u> inform the FBI's decision to initiate its counterintelligence investigation in late July 2016.** In fact, the FBI's closely-held investigative team only received Steele's reporting in mid-September — more than seven weeks later. The FBI – and, subsequently, the Special Counsel's – investigation into links between the Russian government and Trump campaign associates has been based on troubling law enforcement and intelligence information <u>unrelated</u> to the "dossier."

- **DOJ's October 21, 2016 FISA application and three subsequent renewals carefully outlined for the Court a multi-pronged rationale for surveilling Page,** who, at the time of the first application, was no longer with the Trump campaign. DOJ detailed Page's past relationships with Russian spies and interaction with Russian officials during the 2016 campaign, ██████████████. DOJ cited multiple sources to support the case for surveilling Page — but made only narrow use of information from Steele's sources about Page's specific activities in 2016, chiefly his suspected July 2016 meetings in Moscow with Russian officials. ██████████████████. In fact, the FBI interviewed Page in March 2016 about his contact with Russian intelligence, the very month candidate Donald Trump named him a foreign policy advisor.

As DOJ informed the Court in subsequent renewals, ████████████████████
**Steele's reporting about Page's Moscow meetings** ██████████████. DOJ's
applications did <u>not</u> otherwise rely on Steele's reporting, including any "salacious" allegations

1

TOP SECRET//NOFORN



UNCLASSIFIED

TOP SECRET//NOFORN

about Trump, and the FBI never paid Steele for this reporting. While explaining why the FBI viewed Steele's reporting and sources as reliable and credible, DOJ also disclosed:

- o Steele's prior relationship with the FBI;
- o the fact of and reason for his termination as a source; and
- o the assessed political motivation of those who hired him.

- **The Committee Majority's memorandum, which draws selectively on highly sensitive classified information, includes other distortions and misrepresentations** that are contradicted by the underlying classified documents, which the vast majority of Members of the Committee and the House have not had the opportunity to review – and which Chairman Nunes chose not to read himself.[1]

### Background

On January 18, 2018, the Committee Majority, during an unrelated business meeting, forced a surprise vote to release to the full House a profoundly misleading memorandum alleging serious abuses by the FBI and DOJ. Majority staff drafted the document in secret on behalf of Chairman Devin Nunes (and reportedly with guidance and input from Rep. Trey Gowdy), and then rushed a party-line vote without prior notice.

This was by design. The overwhelming majority of Committee Members never received DOJ authorization to access the underlying classified information, and therefore could not judge the veracity of Chairman Nunes' claims. Due to sensitive sources and methods, DOJ provided access only to the Committee's Chair and Ranking Member (or respective designees), and limited staff, to facilitate the Committee's investigation into Russia's covert campaign to influence the 2016 U.S. elections.[2] As DOJ has confirmed publicly, it did not authorize the broader release of this information within Congress or to the public, and Chairman Nunes refused to allow DOJ and the FBI to review his document until he permitted the FBI Director to see it for the first time in HPSCI's secure spaces late on Sunday, January 28 – 10 days after disclosure to the House.[3]

### FBI's Counterintelligence Investigation

In its October 2016 FISA application and subsequent renewals, DOJ accurately informed the Court that the FBI initiated its counterintelligence investigation on July 31, 2016, after receiving information ▮▮▮▮▮▮▮▮▮▮▮. George Papadopoulos revealed ▮▮▮▮▮ that individuals linked to Russia, who took interest in Papadopoulos as a Trump campaign foreign policy adviser, informed him in late April 2016 that Russia ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[4] Papadopoulos's disclosure, moreover, occurred against **the backdrop of Russia's aggressive covert campaign to influence our elections, which the FBI was already monitoring.** We would later learn in Papadopoulos's plea that that the information the Russians could assist by anonymously releasing were thousands of Hillary Clinton's emails.[5]

DOJ told the Court the truth. Its representation was consistent with the FBI's underlying investigative record, which current and former senior officials later corroborated in extensive

TOP SECRET//NOFORN



UNCLASSIFIED

UNCLASSIFIED

~~TOP SECRET//NOFORN~~

Committee testimony. Christopher Steele's reporting, which he began to share with an FBI agent ▬▬▬▬▬▬▬▬▬ through the end of October 2016, **played no role** in launching the FBI's counterintelligence investigation into Russian interference and links to the Trump campaign. In fact, Steele's reporting did not reach the counterintelligence team investigating Russia at FBI headquarters until mid-September 2016, more than seven weeks after the FBI opened its investigation, because the probe's existence was so closely held within the FBI.[6] By then, the FBI had already opened sub-inquiries into ▬▬ individuals linked to the Trump campaign: ▬▬▬▬▬▬▬▬▬ and former campaign foreign policy advisor **Carter Page**.

As Committee testimony bears out, the FBI would have continued its investigation, including against ▬▬▬ individuals, even if it had never received information from Steele, never applied for a FISA warrant against Page, or if the FISC had rejected the application.[7]

**DOJ's FISA Application and Renewals**

The initial warrant application and subsequent renewals received independent scrutiny and approval by four different federal judges, ~~three~~ two of whom were appointed by President George W. *one by George H.W. Bush* Bush and one by President Ronald Reagan. DOJ first applied to the FISC on October 21, 2016 for a warrant to permit the FBI to initiate electronic surveillance and physical search of Page for 90 days, consistent with FISA requirements. The Court approved three renewals – in early January 2017, early April 2017, and late June 2017 – which authorized the FBI to maintain surveillance on Page until late September 2017. Senior DOJ and FBI officials appointed by the Obama and Trump Administrations, including acting Attorney General Dana Boente and Deputy Attorney General Rod Rosenstein, certified the applications with the Court.

**FISA was not used to spy on Trump or his campaign.** As the Trump campaign and Page have acknowledged, Page ended his formal affiliation with the campaign months **before** DOJ applied for a warrant. DOJ, moreover, submitted the initial application **less than three weeks** before the election, even though the FBI's investigation had been ongoing since the end of July 2016.

DOJ's warrant request was based on compelling evidence and probable cause to believe Page was knowingly assisting clandestine Russian intelligence activities in the U.S.:

- **Page's Connections to Russian Government and Intelligence Officials:** <u>The FBI had an independent basis for investigating Page's motivations and actions during the campaign, transition, and following the inauguration.</u> As DOJ described in detail to the Court, Page had an extensive record as ▬▬▬▬▬▬▬▬▬▬[8] prior to joining the Trump campaign. He resided in Moscow from 2004-2007 and pursued business deals with Russia's state-owned energy company Gazprom—▬▬▬▬▬▬▬▬[9] As early as ▬▬▬, a Russian intelligence officer ▬▬▬▬▬▬ targeted Page for recruitment. Page showed ▬▬▬▬▬▬▬▬.

~~TOP SECRET//NOFORN~~



UNCLASSIFIED

~~TOP SECRET//NOFORN~~

**Page remained on the radar of Russian intelligence and the FBI.** In 2013, prosecutors indicted three other Russian spies, two of whom targeted Page for recruitment. The FBI also interviewed Page multiple times about his Russian intelligence contacts, including in March 2016.[10] The FBI's concern about and knowledge of Page's activities therefore <u>long predate</u> the FBI's receipt of Steele's information.

- **Page's Suspicious Activity During the 2016 Campaign:** The FISA applications also detail Page's suspicious activity after joining the Trump campaign in March 2016. ████████ ████████████████████████████ Page traveled to Moscow in July 2016, during which he gave a university commencement address – an honor usually reserved for well-known luminaries.

  - It is in this specific sub-section of the applications that DOJ refers to Steele's reporting on Page and his alleged coordination with Russian officials. Steele's information about Page was consistent with the FBI's assessment of Russian intelligence efforts to recruit him and his connections to Russian persons of interest.

  - In particular, Steele's sources reported that Page met separately while in Russia with Igor Sechin, a close associate of Vladimir Putin and executive chairman of Rosneft, Russia's state-owned oil company, and Igor Divyekin, a senior Kremlin official. Sechin allegedly discussed the prospect of future U.S.-Russia energy cooperation and "an associated move to lift Ukraine-related western sanctions against Russia." Divyekin allegedly disclosed to Page that the Kremlin possessed compromising information on Clinton ("kompromat") and noted "the possibility of its being released to Candidate #1's campaign."[11] [*Note*: "Candidate #1" refers to candidate Trump.] This closely tracks what other Russian contacts were informing another Trump foreign policy advisor, George Papadopoulos.

- In subsequent FISA renewals, **DOJ provided additional information obtained through multiple independent sources that corroborated Steele's reporting.**

  - ████████████████████████████████████████████ ████████████████████████████████[12]

  - ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

  - Page's ████████████████████████ in Moscow with senior Russian officials ████████████████████ as well as meetings with Russian officials ████[13]

This information contradicts Page's November 2, 2017 testimony to the Committee, in which he initially denied any such meetings and then was forced to admit speaking with

~~TOP SECRET//NOFORN~~



**UNCLASSIFIED**

TOP SECRET//NOFORN

Dvorkovich and meeting with Rosneft's Sechin-tied investor relations chief, Andrey Baranov.

- **The Court-approved surveillance of Page allowed FBI to collect valuable intelligence.** The FISA renewals demonstrate that the FBI collected important investigative information and leads by conducting Court-approved surveillance. For instance, ████████████

 ██████████████████████████████████████████████

 DOJ also documented evidence that Page ███████████████████████████████, anticipated ███████████████ and repeatedly contacted ███████████████ in an effort to present himself as █████████████ [15] ████████

 [16]

 Page's efforts to ████████████████████████████████████ also contradict his sworn testimony to our Committee.

### DOJ's Transparency about Christopher Steele

**Far from "omitting" material facts about Steele, as the Majority claims,[17] DOJ repeatedly informed the Court about Steele's background, credibility, and potential bias.** DOJ explained in detail Steele's prior relationship with and compensation from the FBI; his credibility, reporting history, and source network; the fact of and reason for his termination as a source in late October 2016; and the likely political motivations of those who hired Steele.

- **DOJ was transparent with Court about Steele's sourcing:** The Committee Majority, which had earlier accused Obama Administration officials of improper "unmasking," faults DOJ for not revealing the names of specific U.S. persons and entities in the FISA application and subsequent renewals. In fact, DOJ appropriately upheld its longstanding practice of protecting U.S. citizen information by purposefully not "unmasking" U.S. person and entity names, unless they were themselves the subject of a counterintelligence investigation. DOJ instead used generic identifiers that provided the Court with more than sufficient information to understand the political context of Steele's research. In an extensive explanation to the Court, DOJ discloses that Steele

 *"was approached by an identified U.S. Person,[18] who indicated to Source #1 [Steele][19] that a U.S.-based law firm[20] had hired the identified U.S. Person to conduct research regarding Candidate #1's[21] ties to Russia. (The identified U.S. Person and Source #1 have a long-standing business relationship.) The identified U.S. person hired Source #1 to conduct this research. The identified U.S. Person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. Person was likely looking for information that could be used to discredit Candidate #1's campaign."[22]*

Contrary to the Majority's assertion that DOJ fails to mention that Steele's research was commissioned by "political actors" to "obtain derogatory information on Donald Trump's ties to Russia,"[23] **DOJ in fact informed the Court accurately that Steele was hired by**

TOP SECRET//NOFORN



**UNCLASSIFIED**

UNCLASSIFIED

TOP SECRET//NOFORN

politically-motivated U.S. persons and entities and that his research appeared intended for use "to discredit" Trump's campaign.

- **DOJ explained the FBI's reasonable basis for finding Steele credible:** The applications correctly described Steele as ███████████████████████████████. The applications also reviewed Steele's multi-year history of credible reporting on Russia and other matters, including information DOJ used in criminal proceedings.[24] Senior FBI and DOJ officials have repeatedly affirmed to the Committee the reliability and credibility of Steele's reporting, an assessment also reflected in the FBI's underlying source documents.[25] The FBI has undertaken a rigorous process to vet allegations from Steele's reporting, including with regard to Page.[26]

- **The FBI properly notified the FISC after it terminated Steele as a source for making unauthorized disclosures to the media.** The Majority cites no evidence that the FBI, prior to filing its initial October 21, 2016 application, actually knew or should have known of any allegedly inappropriate media contacts by Steele. Nor do they cite evidence that Steele disclosed to *Yahoo!* details included in the FISA warrant, since the British Court filings to which they refer do not address what Steele may have said to *Yahoo!*.

  DOJ informed the Court in its renewals that the FBI acted promptly to terminate Steele after learning from him (after DOJ filed the first warrant application) that he had discussed his work with a media outlet in late October. The January 2018 renewal further explained to the Court that Steele told the FBI that he made his unauthorized media disclosure because of his frustration at Director Comey's public announcement shortly before the election that the FBI reopened its investigation into candidate Clinton's email use.

- **DOJ never paid Steele for the "dossier":** The Majority asserts that the FBI had "separately authorized payment" to Steele for his research on Trump but neglects to mention that payment was cancelled and never made. As the FBI's records and Committee testimony confirms, although the FBI initially considered compensation ████████████████████ ████████████████████, **Steele ultimately never received payment from the FBI for any "dossier"-related information.**[27] DOJ accurately informed the Court that Steele had been an FBI confidential human source since ████, for which he was "compensated ████████████████ by the FBI" -- payment for previously-shared information of value unrelated to the FBI's Russia investigation.[28]

**Additional Omissions, Errors, and Distortions in the Majority's Memorandum**

- **DOJ appropriately provided the Court with a comprehensive explanation of Russia's election interference, including evidence that Russia courted another Trump campaign advisor, Papadopoulos, and that Russian agents previewed their hack and dissemination of stolen emails.** In claiming that there is "no evidence of any cooperation or conspiracy between Page and Papadopoulos,"[29] the Majority misstates the reason why DOJ specifically explained Russia's courting of Papadopoulos. Papadopoulos's interaction with Russian agents, coupled with real-time evidence of Russian election interference, provided the Court with a broader context in which to evaluate Russia's clandestine activities and Page's history and alleged contact with Russian officials. Moreover, since only Page ████

TOP SECRET//NOFORN




UNCLASSIFIED

TOP SECRET//NOFORN

██████████, no evidence of a separate conspiracy between him and Papadopoulos was required. **DOJ would have been negligent in omitting vital information about Papadopoulos and Russia's concerted efforts.**

- **In its Court filings, DOJ made proper use of news coverage.** The Majority falsely claims that the FISA materials "relied heavily" on a September 23, 2016 *Yahoo!* News article by Michael Isikoff and that this article "does not corroborate the Steele Dossier because it is derived from information leaked by Steele himself."[30] In fact, DOJ referenced Isikoff's article, alongside another article the Majority fails to mention, not to provide separate corroboration for Steele's reporting, but instead to inform the Court of Page's public denial of his suspected meetings in Moscow, which Page also echoed in a September 25, 2016 letter to FBI Director Comey. ████████████
  ████████████[31]

- **The Majority's reference to Bruce Ohr is misleading.** The Majority mischaracterizes Bruce Ohr's role, overstates the significance of his interactions with Steele, and misleads about the timeframe of Ohr's communication with the FBI. In late November 2016, Ohr informed the FBI of his prior professional relationship with Steele and information that Steele shared with him (including Steele's concern about Trump being compromised by Russia). He also described his wife's contract work with Fusion GPS, the firm that hired Steele separately. This occurred weeks <u>after</u> the election and more than a month <u>after</u> the Court approved the initial FISA application. The Majority describes Bruce Ohr as a senior DOJ official who "worked closely with the Deputy Attorney General, Yates and later Rosenstein," in order to imply that Ohr was somehow involved in the FISA process, but there is no indication this is the case.

  Bruce Ohr is a well-respected career professional whose portfolio is drugs and organized crime, not counterintelligence. There is no evidence that he would have known about the Page FISA applications and their contents. The Majority's assertions, moreover, are irrelevant in determining the veracity of Steele's reporting. By the time Ohr debriefs with the FBI, it had already terminated Steele as a source and was independently corroborating Steele's reporting about Page's activities. Bruce Ohr took the initiative to inform the FBI of what he knew, and the Majority does him a grave disservice by suggesting he is part of some malign conspiracy.

- **Finally, Peter Strzok and Lisa Page's text messages are irrelevant to the FISA application.** The Majority gratuitously includes reference to Strzok and Page at the end of their memorandum, in an effort to imply that political bias infected the FBI's investigation and DOJ's FISA applications. In fact, neither Strzok nor Page served as affiants on the applications, which were the product of extensive and senior DOJ and FBI review.[32] In demonizing both career professionals, the Majority accuses them of "orchestrating leaks to the media" – a serious charge; omits inconvenient text messages, in which they critiqued a wide range of other officials and candidates from both parties; does not disclose that FBI Deputy Director McCabe testified to the Committee that he had no idea what Page and Strzok were referring to in their "insurance policy" texts;[33] and ignores Strzok's acknowledged role in preparing a public declaration, by then Director Comey, about former Secretary Clinton's "extreme carelessness" in handling classified information—which greatly damaged Clinton's public reputation in the days just prior to the presidential election.

TOP SECRET//NOFORN




UNCLASSIFIED

UNCLASSIFIED

TOP SECRET//NOFORN

---

[1] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[2] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018. DOJ also confirmed in writing to Minority Staff DOJ and FBI's terms of review:

> the Department has accommodated HPSCI's oversight request by allowing repeated in camera reviews of the material in an appropriate secure facility under the general stipulations that (1) **the Chair (or his delegate) and the Ranking Member (or his delegate) and two staff each, with appropriate security clearances, be allowed to review on behalf of the Committee,** (2) that the review take place in a reading room set up at the Department, and (3) that the documents not leave the physical control of the Department, and (5) that the review opportunities be bipartisan in nature. Though we originally requested that no notes be taken, in acknowledgment of a request by the Committee and recognizing that the volume of documents had increased with time, the Department eventually allowed notes to be taken to facilitate HPSCI's review. Also, initial reviews of the material include [sic] short briefings by Department officials to put the material in context and to provide some additional information.

Email from Stephen Boyd to HPSCI Minority Staff, January 18, 2018 (emphasis supplied).

[3] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[4] 

[5] Papadopoulos's October 5, 2017 guilty plea adds further texture to this initial tip, by clarifying that a Russian agent told Papadopoulos that "They [the Russians] have dirt on her"; "the Russians had emails of Clinton"; "they have thousands of emails." *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia), p. 7.

[6] 

[7] Under the Special Counsel's direction, Flynn and Papadopoulos have both pleaded guilty to lying to federal investigators and are cooperating with the Special Counsel's investigation, while Manafort and his long-time aide, former Trump deputy campaign manager Rick Gates, have been indicted on multiple counts and are awaiting trial. See *U.S. v. Michael T. Flynn* (1:17-cr-232, District of Columbia); *U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III* (1:17-cr-201, District of Columbia); *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia).

[8] 

[9]

[10] See also, *U.S. v. Evgeny Buryakov, a/k/a "Zhenya," Igor Sporyshev, and Victor Podobnyy*, U.S. Southern District of New York, January 23, 2015.

[11] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p.18. Repeated in subsequent renewal applications

[12] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

TOP SECRET//NOFORN

UNCLASSIFIED

UNCLASSIFIED

TOP SECRET//NOFORN

[13] ███████████████████████████████████████

[14] ███████████████████████████████ the FBI and broader Intelligence Community's high confidence assessment that the Russian government was engaged in a covert interference campaign to influence the 2016 election, including that Russian intelligence actors "compromised the DNC" and WikiLeaks subsequently leaked in July 2016 "a trove" of DNC emails. Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 6-7. Repeated and updated with new information in subsequent renewal applications. Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

[15] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 36, 46, 48.

[16] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, p. 56.

[17] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, pp. 2-3 (enumerating "omissions" of fact, regarding Steele and his activities, from the Page FISA applications).

[18] Glenn Simpson.

[19] Christopher Steele.

[20] Perkins Coie LLP.

[21] Donald Trump.

[22] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

[23] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, p. 2.

[24] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 15, footnote 8. Repeated in subsequent renewal applications.

[25] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 46, 100; Interview of Sally Yates (former Deputy Attorney General), House Permanent Select Committee on Intelligence, November 3, 2017, p. 16; Interview with John Carlin (former Assistant Attorney General for National Security), House Permanent Select Committee on Intelligence, July, 2017, p. 35.
[26] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 100-101, 115.

[27] Interview of FBI Agent, House Permanent Select Committee on Intelligence, December 20, 2017, p. 112.

[28] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

[29] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, p. 4 ("The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos.")

[30] HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, p. 2. Neither Isikoff nor *Yahoo!* are specifically identified in the FISA Materials, in keeping with the FBI's general practice of not identifying U.S. persons.

[31] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 25; Department of Justice, Foreign Intelligence Surveillance Court Application, January 12, 2017, p. 31; Carter Page, Letter to FBI Director James Comey, September 25, 2016.

9

TOP SECRET//NOFORN

UNCLASSIFIED

UNCLASSIFIED

~~TOP SECRET//NOFORN~~

[33] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 157.

~~TOP SECRET//NOFORN~~

