# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

    v.

AWS MOHAMMED YOUNIS AL-JAYAB

No. 16 CR 181

Judge Sara L. Ellis

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO DISMISS THE INDICTMENT BASED ON
## COMBATANT IMMUNITY AND SUPPORTING MEMORANDUM OF LAW

## **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND............................................ 1

     A.     Defendant's Plans to Travel to Syria..................................................... 1

     B.     Defendant's Travel to Turkey and Syria ................................................. 5

     C.     Defendant's Return to Turkey and the United States ........................... 7

     D.     Defendant's Lies to the USCIS and FBI ................................................. 8

     E.     Charges and Procedural History ............................................................ 8

II.    MEMORANDUM OF LAW AND ARGUMENT ................................................. 9

     A.     Legal Standard ...................................................................................... 10

     B.     Defendant Is Not Entitled to a Public Authority Defense.................... 12

     C.     Defendant is Not Entitled to Combatant Immunity............................. 16

           1.     The Third Geneva Convention (GPW) ......................................... 16

           2.     Elements of the Defense of Combatant Immunity..................... 19

                 a.     Combatant immunity under the GPW is only available to members of the armed forces of a state engaged in international armed conflict............................................. 20

                 b.     Even in an international armed conflict, combatant immunity is available only to defendants who would qualify as prisoners of war under the GPW. ................... 23

                 c.     A fighter for a State in an international armed conflict who qualifies for POW status enjoys the Combatant's Privilege. ..................................................................... 25

           3.     Defendant is Not Entitled to Combatant Immunity.................. 25

D.    Combatant Immunity Does Not Apply to Non-International Armed Conflicts ................................................................................................ 31

III.    CONCLUSION .................................................................................................... 33

## TABLE OF AUTHORITIES

Cases

*United States v. Al-Jayab*, No. 16 CR 08 (E.D. Cal.)......................................8, n.2, 14

*United States v. Al-Hardan*, No. 16 CR 03 (S.D. Tex.)............................................n.5

*United States v. Ahmed et al.,* No. 15 CR 49 (D. Minn. Feb. 10, 2016) ........ 11, 24, 31

*United States v. Arnaout,* 236 F. Supp. 2d 916 (N.D. Ill. 2003)..........................18, 31

*United States v. Bailey,* 444 U.S. 394 (1980) ........................................................11, 28

*United States v. Brimberry*, 744 F.2d 580 (7th Cir. 1984) ........................................10

*United States v. Douglas,* 81 F.2d 1317 (7th Cir. 1987)............................................11

*Gherebi v. Obama,* 609 F. Supp. 2d 43 (D.D.C. 2009) ...............................................21

*Hamdan v. Rumsfeld,* 548 U.S. 557 (2006)...........................................................*passim*

*Hamdan v. Rumsfeld,* 415 F.3d 33 (D.C. Cir. 2005)................................................n.21

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004)...............................................................n.26

*Hamdi v. Rumsfeld*, 316 F.3d 450 (4th Cir. 2003) .................................................n.16

*United States v. Hamidullin,* No. 15-4788, -- F.3d --, 2018 WL 1833604 (4th Cir. Apr. 18, 2018) ......................................................................................................*passim*

*United States v. Hamidullin,* 114 F. Supp. 3d 365 (E.D. Va. 2015) ...................29, 31

*Hamlily v. Obama,* 616 F. Supp. 2d 63 (D.D.C. 2009) ........................................21, 31

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ....................................n.12

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) .......................................................n.16

*United States v. Khadr,* 717 F. Supp. 2d 1215 (USCMCR 2007)..............................19

*United States v. Lindh,* 212 F. Supp. 2d 541 (E.D. Va. 2002)...........................*passim*

iii

*Medellin v. Texas*, 552 U.S. 491 (2008) ................................................................. n.16

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) ........................................ n.12

*Mullaney v. Wilbur,* 421 U.S. 684 (1975) .................................................................. 11

*New York Times Co. v. U.S. Department of Justice,* 756 F.3d 100 (2d Cir. 2014)........

.................................................................................................................... 14, 15

*Noriega v. Pastrana*, 564 F.3d 1290 (11th Cir. 2009)............................................. n.16

*United States v. Pineda,* No. 04-CR-232, 2006 WL 785287 (D.D.C. Mar. 28, 2006) .....

.................................................................................................................... 18, 32

*The Prize Cases*, 67 U.S. 635 (1862) ........................................................................ 28

*Ex Parte Quirin,* 317 U.S. 1 (1942) .......................................................................... 16

*Reid v. Covert,* 354 U.S. 1, 19 n. 38 (1957)............................................................. n.17

*United States v. Stallworth,* 656 3d 721 (7th Cir. 2011) ..................................... 13, 15

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ............................................. n.12

*United States v. Strahan,* 565 F.3d 1047 (7th Cir. 2009)..................................... 13, 15

*Tel-Oren v. Libyan Arab Rep.*, 726 F. 2d 774 (D.C. Cir. 1984)............................... n.16

*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999)............................................. 11

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) ................................ 28

<u>Federal Statutes</u>

18 U.S.C § 1001............................................................................................... 9, n.5

18 U.S.C. § 1425(a) ............................................................................................ n.5

18 U.S.C. § 2332(b)(2) ......................................................................................... 30

18 U.S.C. § 2339A ............................................................................ 9, 18, 31, n.12

18 U.S.C. § 2339B ............................................................................................ n.5

18 U.S.C. § 2441(e) ......................................................................................... n.16

Federal Rules of Criminal Procedure

Rule 12(b)(1) ...................................................................................................... 10

Rule 12.3 ............................................................................................................ 12

Seventh Circuit Pattern Federal Jury Instructions – Criminal (2012)

Instruction 6.06 .................................................................................................. 13

Instruction 6.07 .................................................................................................. 13

Treaties, Treatises, and Other Authorities

Expert Paper submitted by L. Arimatsu & M. Choudhury, *The Legal Classification of the Armed Conflicts in Syria, Yemen and Libya* (2014) Chatham House International Law PP 2014/01 at 16 (2014) ........................................................................ 25

Brussels Declaration of 1874, Article IX, July 26, 1874, *reprinted in The Laws of Armed Conflicts* 25 (3d ed. 1988) .............................................................. n.17

Department of Defense Law of War Manual (Dec. 2016) ................................. *passim*

*Geneva Convention (III) Relative to the Treatment of Prisoners of War,* Aug. 12 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, 1956 WL 54809 (U.S. Treaty 1956) ................ *passim*

*Hague Convention (IV) Respecting the Laws and Customs of War on Land, Regulations Annexed art. 1,* Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 (Hague Convention) ........................................................................................................ n.17

Int'l Civilian Persons in time of War art. 3, 34 (Jean S. Pictet ed., 1958) ............ n.22

Int'l Comm. of the Red Cross, *Commentary to Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 4* (Jean de Preux ed., 1960) ........................... n.17

Francis Lieber, *Instructions for the Government of the Armies of the United States in the Field,* Headquarters, United States Army, Gen. Order No. 100 (Apr. 24, 1863), *reprinted in The Laws of Armed Conflicts* (3d ed. 1988) (Lieber Code) ................. n.17

*Manual of Military Law* 240 (British War Office 1914) ............................................ 27

v

Michael N. Schmitt and Christopher M. Ford, *Assessing U.S. Justifications for Using Force in Response to Syria's Chemical Attacks: An International Law Perspective* 9 J. Nat'l Security L. & Pol'y 283 (2017)............................................................................ 27

Dan E. Stigall & Christopher L. Blakesley, *Non-State Armed Groups and the Role of Transnational Criminal Law During Armed Conflicts,* 48 Geo. Wash. Int'l L. Rev. 1 (2015)................................................................................................................... 26, n.22

Sten Verhoeven, *International and Non-International Armed Conflicts,* 3 (Instit. For Int'l Law K. U. Leuven, Working Paper No. 107, March 2007).............................. n.22

The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (2016) ......... ............................................................................................................................ 26, 27

Col. William Winthrop, *Military Law and Precedents,* at 782-83 (2d ed. 1920) .... n.17

## I.  INTRODUCTION

The United States of America, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby files this response to defendant's Motion to Dismiss the Indictment Based on Combatant Immunity and the Supporting Memorandum of Law. Dkt. No. 91, 92.[1] For the following reasons, defendant's motion to dismiss should be denied.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant Aws Mohammed Younis Al-Jayab, who is a native Iraqi of Palestinian heritage, came to the U.S. as a United Nations refugee in October 2012 through an application filed by defendant's father on behalf of his family.[2] At the time, defendant was living with his family in a refugee camp in Syria.

### A.  Defendant's Plans to Travel to Syria

From the moment he arrived in the U.S., defendant began to plot his return to Syria to fight on behalf of terrorist groups there. Beginning as early as mid-October 2012, via his Facebook accounts, defendant told multiple family members and associates that he intended to travel to Syria to support violent jihad, identified Turkey as a probable transit point, and sought to arrange the finances and logistics for his travel.

---

[1]    Citations to the docket are to "Dkt.," followed by the document number. Citations to defendant's brief (Dkt. 92) are to "D.Br." Each is followed by a page number.

[2]    The facts and quoted material set forth in this section are based upon the Complaint filed in *United States v. Aws Mohammed Younis Al-Jayab*, Case No. 16 CR 08 (E.D. Cal.), Dkt. No. 1.

For example, on October 13, 2012, defendant told Individual A, an associate located in Iraq, "I want to go back . . . I'll go to Turkey and enter smuggled to Syria . . . When I come, I'll call. Don't go with anyone except the Front. [. . .] Go with Ansar or with the Front[3] only."[4] Defendant continued to engage in Facebook message discussions with individuals located in Iraq, Turkey, and Syria in order to arrange for finances and travel. Indeed, in February 2013, two individuals sent a total of $681 to defendant to finance defendant's travel.

In March 2013, another of defendant's associates instructed defendant on how to get into Syria from Turkey. Defendant then wrote multiple Facebook messages about his travel plans and how best to enter Syria via Turkey, and commented on his plans to work only with Jabhat Al-Nusra. Because he was traveling with a U.S. travel document and needed to maintain his ability to travel legally, defendant proposed, "I'll go to the American Embassy in Turkey. I will tell them that due to circumstances,

---

[3]     Based upon the training and experience of the investigating agents and the communications themselves, the government believes "Ansar" refers to Ansar Al-Islam, also known as Ansar Al-Sunna among other aliases, which is a Sunni terrorist group that has vowed to establish an independent Islamic state in Iraq; and "Front" refers to Al Nusra Front, also known as Jabhat Al Nusra. Ansar Al-Islam originated in Iraqi Kurdistan and was founded by Mullah Krekar. Pursuant to Section 219 of the Immigration and Nationality Act, the U.S. Secretary of State designated Ansar Al Islam and Al Nusra Front (which had previously been designated in 2012 as an alias of al Qaeda in Iraq, *see United States v. Al-Jayab*, No. 16 CR 08, Dkt. No. 1 at 5, n.4) as foreign terrorist organizations in 2004 and 2014, respectively. *See* https://2009-2017.state.gov/j/ct/rls/other/des/123085.htm (last visited April 19, 2018). To the extent defendant disagrees about the identity of the relevant groups, the Court need not resolve this factual dispute in order to rule on this motion as combatant immunity would be unavailable for members of any of these non-State groups.

[4]     The translations of the communications detailed in this pleading were based upon preliminary, and not final, translations of the Arabic-language communications.

I can't return now. . . I'll say tourism, or I'll tell him my grandmother is sick in Turkey and I wanted to be with her."

In April 2013, defendant and Omar Al-Hardan, who resided in Texas,[5] discussed via Facebook their plans to travel to Syria to fight with the mujahidin,[6] and defendant's prior experience fighting in Syria. Defendant explained that he had joined the mujahidin in Syria when he was 16 years old; and he fought for a group now known as Ansar Al-Islam. During one conversation, defendant said he had previously fought in Syria during a battle against Syrian President Bashar al-Assad, adding, "God willing, you will have your chance to shoot . . . the most shots I made with it in my life was in the biggest battle I participated in. Seven magazines in one breath . . . Just shooting, spraying, spraying."

Defendant and Al-Hardan continued their discussions of firearms, referencing specific models like the PKC, Glock, M16, and Kalashnikov. In fact, Al-Hardan expressed his desire to learn from defendant's expertise with weapons, explaining that he had never "sprayed fire with a Kalashnikov." Defendant responded:

> Brother, God willing, you will be bored of shooting with guns. I have not seen anything better than the Glock. All my work was with the Glock and a nine

---

[5]     On January 6, 2016, Omar Al-Hardan was charged in the Southern District of Texas with one count each of providing material support to the Islamic State of Iraq and Al-Sham ("ISIS"), in violation of Title 18, United States Code, Section 2339B, procurement of citizenship or naturalization unlawfully, in violation of Title 18, United States Code, Section 1425(a), and making false statements, in violation of Title 18, United States Code, Section 1001. *See United States v. Omar Al-Hardan,* 16 CR 03 (S.D. Tex.), Dkt. No. 1. On October 17, 2016, Al-Hardan pled guilty to the Section 2339B count. *Id.*, Dkt. No. 91. He was sentenced on December 18, 2017 to 192 months imprisonment, to be followed by a lifetime term of supervised release. *Id.*, Dkt. No. 115.

[6]     A *mujahidin* is defined in the Merriam-Webster dictionary as an Islamic guerrilla fighter, especially in the Middle East.

Tariq and also its silencer [. . .] Once it hits someone, you would think the person fainted right before your eyes. It does not look like you killed him.

During another discussion about defendant's time fight in in Syria, Al-Hardan asked what do "Assad's soldiers scream when you raid?" Defendant replied:

They fall silent. They stiffen. I remember once I went down together with a brother. We executed [. . .] three. As for the brother who was with me, he shot two. The third one aimed the Russian at the brother [. . .] and would not unlock the safety. He was so scared, he could not do it.

Defendant continued:

Do you remember the national security headquarters building in Syria? The mujahidin, Al-Nusra Front struck it. [. . .] Those suicide bombers they want to break in. There is a control checkpoint that would stop them. Their car is full of ammunition and suicide vests, its booby traps were visible, so they would stop them and arrest them. We got down and overran the control checkpoint and opened the way for them to raid, and we retreated.

Defendant promised to train Al-Hardan when they arrived in Syria, and expressed his commitment to jihad, writing, "O God, grant us martyrdom for your sake while engaged in fighting and not retreating; a martyrdom that would make you satisfied with us."

In April 2013, defendant engaged in a Facebook conversation with another individual, who was a mujahidin in Syria and who told defendant that "we just killed ten of the Syrian militia, the Shabihah. Hahaha, with an IED [improved explosive device]." Defendant expressed his excitement at working with the mujahidin, stating "let us do the killing together" and that he was "eager to see blood."

From June through August 2013, defendant continued to write to different associates about his travel preparations. On June 30, 2013, defendant said he was at a shooting club to learn long-range shooting, and shared photos of himself at a gun

4

range in Wisconsin as well as photos of himself holding various weapons. Notably, during this time period defendant communicated with an individual based in Syria who used his Facebook account to distribute propaganda for the Islamic State of Iraq and al-Sham ("ISIS").[7]

### B. Defendant's Travel to Turkey and Syria

In early November 2013, when defendant was residing in the Milwaukee, Wisconsin area, he received approximately $4,500 in an insurance settlement. The next day, defendant purchased an airline ticket, and on November 9, 2013, flew directly from Chicago to Istanbul, Turkey.

From Turkey, defendant traveled to Syria, as evidenced by satellite geolocation information and defendant's own Facebook messages and location information. For example, on November 28, 2013, defendant's brother told defendant to avoid using his phone because it showed "that [defendant was] writing from Aleppo." Additional messages revealed that defendant was armed while in Syria. For example, on December 23, 2013, defendant wrote, "I have m16," meaning an M16 assault rifle.

---

[7]     On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias ISIL as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham, The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State and ISIS. To date, ISIS remains a designated FTO.

On December 28, 2013, defendant told an associate that he was in Aleppo and had joined Ansar al-Sham, which he explained was "the same as Ansar al-Islam, just with another name."[8] Defendant continued, "It is the one that leads the new Islamic Front formed after merging with Jabhat al-Nusra," but he noted that this alliance had not been publicly declared. Defendant further explained, "The Army of Islam and Ahrar al-Sham and Al-Tawhid Brigade became the al-Jabhah al-Islamiyyah.[9] When they engage in battles [they are] led by Jabhat al-Nusra and Ansar al-Sham." Defendant detailed the cooperation and "joint action" that existed between certain Sunni extremist groups engaged in the conflict against the Syrian regime.

Defendant also expressed his concern over conflict that was occurring among some of the Islamic groups in the area. He wrote that ISIS, which he referred to as "the State," "have killed many from Jabhat al-Nusra and hundreds of mujahidin [are detained] by the State . . . Brother this is the blood of Muslims shed at the hands of the State." He continued:

> If it weren't for the State's bloodletting, I would have been the first one to join it. [That's] why I joined the al-Ansar even though there's little action; the al-Ansar, at least they don't kill Muslims . . . Brother, I'll join al-Nusra shortly [. . .] and if any sedition arises, I'll leave my weapon and go to Turkey.

---

[8]     Ansar al-Sham has not been designated by the United States Government as a foreign terrorist organization.

[9]     According to open-source information, Al-Jabhah al-Islamiyyah is an Arabic phrase that translates to "the Islamic Front." The Islamic Front was an umbrella organization of Sunni Salafist groups fighting to depose the Syrian regime. In late 2013, founding members of the Islamic Front included Ansar al-Sham, Ahrar al-Sham, the Tawhid Brigade, and the Army of Islam.

Despite these concerns, defendant still expressed an interest in joining ISIS. In January 2014, he wrote, "I have been thinking of joining the State and abandon[ing] the al-Ansar." Defendant explained that he was in "Haritan, Aleppo, a fighting zone [between] the State and the Free Army.[10] When asked if he was with "the Free now," meaning the Free Army, defendant replied, "No. Ansar al-Islam."[11] The next day, defendant wrote:

> Brother, we do not sit and watch. [. . .] Our headquarters is next to the State exactly, and we are against the Free Army. We have prevented the Free Army from entering the area and attacking the State's headquarters. And if the Free Army advances, we will fight it. [. . .] We installed the Doshkas [a Russian machine gun widely used in the Syrian conflict] in the street and spread among all of our headquarters because we are at the entrance of Aleppo. The Free Army is under the control of our forces.

Ultimately, as a result of these internal conflicts between the terrorist organizations, defendant began to express his intention to return home. For example, on January 7, 2014, he wrote:

> I swear that the State is killing [members of] al-Ansar and al-Nusra. They are our bothers, but they are making a mistake. And we are going to stand with the State against the [Free Army]. . . I might withdraw. . . When the seditious acts are over, I will return. . . I did not come to fight for the sake of sedition.

## C. Defendant's Return to Turkey and the United States

On January 17, 2014, defendant traveled from Syria to Turkey. Soon thereafter, on January 23, 2014, defendant flew to Sacramento, California (where his

---

[10] According to open source information, the Free Syrian Army was established in 2011 by Syrian military defectors, and it has since become an umbrella organization for various armed opposition groups fighting to depose the regime of President al-Assad.

[11] Defendant's statements in January 2014 appear to be at odds with the representations in his motion to dismiss that the Free Syrian Army and the Islamic Front cooperated with each other in opposing ISIS. D.Br. at 16-17.

family had recently moved) via London and Los Angeles. Upon his return to the U.S., defendant made no mention of his travel to Turkey and Syria on his Customs Declaration Form; he listed only "Jordan" and "U.K" in the form's "countries visited" field.

### D.     Defendant's Lies to the USCIS and FBI

On July 29, 2014, defendant was interviewed by employees of the U.S. Citizenship and Immigration Services ("USCIS") as part of his application for adjustment of his immigration status. During that interview, defendant said he had traveled to Turkey about six months earlier, which was January 2014. On October 6, 2014, defendant was interviewed by USCIS employees a second time, during which interview defendant denied any terrorist affiliations and falsely represented that he traveled to Turkey to visit his grandmother. Defendant does not have a grandmother living in Turkey.

On June 18, 2015, defendant was interviewed by FBI agents, during which interview defendant stated that he had traveled to Turkey for a vacation in 2014. He denied traveling to Syria in 2013 or 2014.

### E.     Charges and Procedural History

On January 7, 2016, defendant was arrested in the Eastern District of California pursuant to a federal criminal complaint. *See United States v. Al-Jayab*, Case No. 16 CR 08 (E.D. Cal.), Dkt. No. 1. The complaint charged defendant with knowingly providing a materially false statement to federal agents in a matter involving international terrorism, based on the false statement defendant made to the USCIS employees on October 6, 2014, in violation of Title 18, United States Code,

Section 1001. *Id.* On January 14, 2016, a grand jury sitting in the Eastern District of California returned a one-count indictment charging the Section 1001 offense. *Id.,* Dkt. No. 13.

On March 17, 2016, a one-count indictment was filed in this Court, charging defendant with attempting to provide material support to terrorists, in violation of Title 18, United States Code, Section 2339A. Dkt. No. 1.[12]

On January 16, 2018, defendant filed a motion to dismiss the indictment based on combatant immunity and supporting memorandum of law. Dkt. No. 91, 92.

## III.    MEMORANDUM OF LAW AND ARGUMENT

Defendant has moved to dismiss the indictment arguing that (1) he is entitled to combatant immunity under common law (D.Br. at 37-39); (2) he is entitled to combatant immunity as a prisoner of war (POW) under the Third Geneva Convention Relative to the Treatment of Prisoners of War (GPW) (*id.* at 39-49); and (3) he ought to be entitled to combatant immunity even if the Syrian war was not an international armed conflict during the times relevant to the indictment (*id.* at 49-53).

Defendant's first submission—that he is entitled to combatant immunity under the common law—is actually an assertion that he is entitled to an affirmative

---

[12]    To establish a violation of Section 2339A, the government must prove "that the defendant had the specific intent to provide material support, knowing or intending that it would be used in a conspiracy to kill persons abroad." *United States v. Mehanna,* 735 F.3d 32, 43 (1st Cir. 2013) (citing *United States v. Stewart,* 590 F.3d 93, 113 (2d Cir. 2009) ("Section 2339A requires . . . that the defendant provide support or resources with the knowledge or intent that such resources be used to commit specific violent crimes."). Courts have found that providing one's self as a fighter or offering services to a terrorist or terrorist organization constitutes "material support" under Section 2339A. *See, e.g., United States v. Jayyousi,* 657 F.3d 1085, 1105 (11th Cir. 2011) (affirming conviction under § 2339A where defendant provided himself to mujahidin in the form of a recruit for jihad training overseas).

public authority defense. Defendant is not entitled to that defense because he cannot establish that he was engaged in otherwise-illegal conduct in Syria at the express direction of a U.S. government official.

With respect to his second claim of combatant immunity, defendant cannot establish as required by law that (1) at all times relevant to the indictment, the Syrian conflict was an international armed conflict; and (2) members of Ansar al-Islam or the Islamic Front, for which he claims to have fought from November 2013 to January 2014, are entitled to prisoner of war status under Article 4(A)(2) of the GPW. These deficiencies are fatal to defendant's second argument for dismissal.

Finally, defendant claims that the court should grant him combatant immunity in the absence of an international armed conflict because the situation in Syria is so complex. This is an aspirational argument without legal foundation. All federal courts to address the issue of combatant immunity have done so under the rubric of the GPW, to which the U.S. is a signatory.

Defendant's motion to dismiss fails on all three claims of combatant immunity and should thus be denied.

### A. Legal Standard

The Federal Rules of Criminal Procedure provide that a criminal defendant may, prior to trial, raise any defense, objection, or request that the court can determine without a trial on the merits. Fed. R. Crim. P. 12(b)(1). A motion to dismiss an indictment based on a claim of immunity is properly brought under Rule 12(b)(1). *United States v. Brimberry*, 744 F.2d 580, 586 (7th Cir. 1984). When considering a motion to dismiss, a court assumes all facts in the indictment are true and "must view

all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999).

Defendant's first claim for relief is a public authority defense. To raise the affirmative defense of public authority, defendant must first make a *prima facie* showing that he can produce evidence on each element of the claimed affirmative defense. *See United States v. Bailey,* 444 U.S. 394, 412 & n.9 (1980) (defendant must present evidence supporting his affirmative defense of duress or necessity before he is entitled to a jury instruction on the defense); *United States v. Douglas,* 81 F.2d 1317, 1320-21 (7th Cir. 1987) ("[A] defendant is entitled to an instruction on his or her theory of defense if: the defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include the instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial.").

In arguing for dismissal based upon combatant immunity in his second and third claims for relief, defendant contends that the criminal conduct charged in the indictment is immunized from domestic criminal sanction because he was a lawful combatant. Defendant bears the burden to establish that he was a lawful combatant. *United States v. Lindh,* 212 F. Supp. 2d 541, 557 (E.D. Va. 2002) (holding that it is the defendant who bears the burden of establishing that he is entitled to lawful combatant immunity) (citing *Mullaney v. Wilbur,* 421 U.S. 684, 697-99 (1975)); *see also* Mem. Op. and Order at 6, *United States v. Ahmed et al.,* No. 15 CR 49 (D. Minn.

Feb. 10, 2016), Dkt. No. 368 ("it is the defendants' burden to establish that they are entitled to lawful combatant immunity").

### B.    Defendant Is Not Entitled to a Public Authority Defense

After a lengthy discussion of the Syrian conflict and the Geneva Convention, defendant's argument actually begins on page 37 of his supporting brief in a section styled, "Mr. Al-Jayab is Entitled to Combatant Immunity under the Common Law." D.Br. at 37. What follows is actually a claim that "sufficient evidence has been proffered to proceed with a public authority defense that would require dismissal." *Id.* at 39. In other words, defendant is seeking dismissal of the indictment based upon combatant immunity under the auspices of a public authority defense.[13]

Fed. R. Crim Pr. Rule 12.3 states that "if a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency," the defendant must provide notice to the government. The notice must identify the law enforcement or intelligence agency involved, the particular agency member the defendant claims to have acted on behalf of, and the time during which the defendant acted with public authority. To date, no such notice has been provided nor does the motion to dismiss set forth the required information.

---

[13]    To the extent defendant is seeking the common law combatant immunity applied to the Confederate forces during the Civil War (D.Br. 37), the Third Geneva Convention has since superseded those common law principles. *United States v. Hamidullin,* No. 15-4788, -- F.3d --, 2018 WL 1833604, at *10 (4th Cir. Apr. 18, 2018) ("The principles reflected in the common law decisions cited by Hamidullin were refined and collected in 20th century efforts to codify the international law of war that resulted in the Third Geneva Convention.").

The defendant bears the burden of establishing that he is entitled to the affirmative defense of public authority. *See, e.g., United States v. Strahan,* 565 F.3d 1047, 1050-51 (7th Cir. 2009) (affirming district court's refusal to give a public authority jury instruction where such instruction was unsupported by evidence adduced at trial). Beyond the notice requirement, in order to prevail on the public authority affirmative defense, the defendant must establish that each of the following things are more likely true than not true:

> 1. An [agent; representative; official] of the United States government [requested; directed; authorized] the defendant to engage in the conduct charged against the defendant; and

> 2. This [agent; representative; official] had the actual authority to grant authorization for the defendant to engage in this conduct; and

> 3. In engaging in this conduct, the defendant reasonably relied on the [agent's; representative's; official's] authorization.

Seventh Circuit Pattern Federal Jury Instructions – Criminal 6.06 (2012).

"In other words, the public-authority defense requires reasonable reliance by a defendant on a public official's *directive* to engage in behavior that the defendant knows to be illegal." *Strahan,* 565 F.3d at 1051 (emphasis added). More succinctly, a defendant must establish that someone in the government *affirmatively communicated* to the defendant authorizing his otherwise-illegal actions. *See United States v. Stallworth,* 656 3d 721, 727 (7th Cir. 2011) (emphasis added) (affirming district court's refusal to give jury instruction on affirmative defense, and examining the differences between public authority defense and entrapment by estoppel (*cf.* Seventh Circuit Pattern Federal Jury Instructions – Criminal 6.06 and 6.07).

13

In support of a public authority defense, defendant offers media reports, which allege that President Obama authorized covert U.S. government support of Syrian rebel groups in mid-2012, and a 2010 Justice Department Office of Legal Counsel memorandum examining the applicability of criminal laws and the Constitution to "contemplated lethal operations against Shaykh Anwar al-Aulaqi." D.Br. 37-39; *see also* Appendix A to *New York Times Co. v. U.S. Department of Justice,* 756 F.3d 100, 124 (2d Cir. 2014).

The government does not concede the veracity of the media reports concerning presidential directives to the U.S. Intelligence Community. But even if the media reports are true, defendant's argument is tantamount to saying, "President Obama told me to do it." That is a non-starter. The first prong for a public authority defense requires the defendant to show that a government official requested, directed, or authorized *the defendant* to engage in otherwise illegal activity. A covert intelligence directive signed by the President of the United States, even if true, is far too attenuated to support defendant's public authority claim.[14] Defendant does not allege that any specific intelligence official communicated such instructions to him. Such a showing lacks the direct communication that the Seventh Circuit requires between

---

[14]     The affirmative defense of public authority is also contrary to the facts of this case. Defendant knew his conduct was illegal: In early December 2013 while in Syria, defendant wrote to an associate in Cyprus that he was "afraid of being imprisoned in America [because] the government is alert for everything, [and] my trip here constitutes a charge." *Al-Jayab,* No. 16 CR 08 (E.D. Cal.), Dkt. No. 1 at 13. Defendant's subsequent false statements further undermine any contention that he relied on U.S. government authorization when he conspired to travel to Syria to fight.

14

the official authorizing the behavior and the defendant. *See Strahan* and *Stallworth, supra.*

Furthermore, the so-called "OLC Drone Memo" actually undercuts defendant's position. Defendant mischaracterizes the memorandum when he argues that it "demonstrates how the common law understanding of combatant immunity is broader than the immunity set forth in international law." D.Br. at 26. To the contrary, the OLC memorandum concluded that the public authority defense—not combatant immunity—would apply to lethal actions contemplated by the Defense Department and the C.I.A. against a U.S. citizen, the terrorist leader Anwar al-Aulaqi. *See* Appendix A to *New York Times Co.,* 756 F.3d at 124.

Defendant in the present case is about as far removed as possible from the persons addressed in the OLC memorandum. The government personnel contemplated in the memorandum were poised to engage in lethal actions at the direction of U.S. government superiors against a terrorist leader abroad who happened to be a U.S. citizen. Conversely, defendant conspired to travel to Syria on his *own* initiative to associate with terrorists and engage in killing.

Defendant has failed to establish the first element of a public authority defense – that is, a U.S. Government representative requested, authorized, or directed the defendant to commit the conduct for which he has been charged, an element he cannot satisfy because, in fact, there was no U.S. government sanction for his conduct

whatsoever.[15] Accordingly, defendant's motion to dismiss based on his stated theory of common law combatant immunity should be denied, and defendant should be precluded from asserting a public authority defense at trial.

### C. Defendant is Not Entitled to Combatant Immunity

Defendant is not entitled to dismissal based on combatant immunity under the GPW because the Syrian civil war was not an international armed conflict, and because defendant did not qualify for POW protections under the GPW.

### 1. The Third Geneva Convention (GPW)

Lawful combatant immunity is a doctrine reflected in international law, including the law of war (or law of armed conflict). In an international armed conflict, POWs may not be prosecuted for lawful acts of war. *United States v. Hamidullin*, No. 15-4788, -- F.3d --, 2018 WL 1833604, at *2 (4th Cir. Apr. 18, 2018); *Lindh*, 212 F. Supp. 2d at 553. However, the mere existence of a common law combatant immunity in federal court does not mean that a defendant is immunized for criminal acts simply because he subjectively believed he had justly taken up arms in a conflict. *Lindh*, 212 F. Supp. 2d at 554.

Only lawful combatants are entitled to protections as POWs and therefore are immune for lawful acts committed in an armed conflict. *Ex Parte Quirin*, 317 U.S. 1, 30-31 (1942) (lawful combatants are subject to capture and detention as POWs;

---

[15]     In *United States v. Hamidullin*, the district court rejected a similar reliance on the same Office of Legal Counsel memorandum by the defendant who claimed that he was entitled to a public authority affirmative defense as a civilian who fought with the Taliban in Afghanistan. *Hamidullin*, 114 F .Supp. 3d 365, at 382-83 (E.D. Va. 2015); *see also Hamidullin*, 2018 WL 1833604, at *10 (affirming district court's conclusion that Hamadullin "does not qualify for the common law defense of public authority.").

unlawful combatants are likewise subject to capture and detention, *but also to trial and punishment)*. Belligerent acts committed by lawful combatants in an international armed conflict generally "may be punished as crimes under a belligerent's municipal law only to the extent that they violate international humanitarian law or are unrelated to the conflict." *Hamidullin*, 2018 WL 1833604, at *2 (quoting *Lindh,* 212 F. Supp. 2d at 553).

Combatant immunity is a common law defense that incorporates the standards of the *Geneva Convention (III) Relative to the Treatment of Prisoners of War,* Aug. 12 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, 1956 WL 54809 (U.S. Treaty 1956) (GPW or Third Geneva Convention), to which the U.S. is a party.[16] Combatant immunity doctrine has a long history preceding the GPW and is grounded in common law principles, early international conventions, statutes, and treaties. *See Lindh,* 212 F. Supp. 2d at 553.[17] However, the contemporary doctrine of combatant immunity is

---

[16]    The GPW itself does not afford individual defendants judicially enforceable rights or legal defenses. *See Johnson v. Eisentrager*, 339 U.S. 763, 789 n. 14 (1950) (concluding that the predecessor to the current GPW – the Third Geneva Convention of 1929 – conferred rights on alien enemies that could be vindicated "only through protests and intervention of protecting powers," not through the courts); *see also Medellin v. Texas*, 552 U.S. 491, 506 n. 3 (2008) ("background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts"); *Hamdi v. Rumsfeld*, 316 F. 3d 450, 468 (4th Cir. 2003) ("the Geneva Conventions evince no [] intent [to provide a private right of action]"), *vacated and remanded on unrelated grounds*, 542 U.S. 507 (2004); *Tel-Oren v. Libyan Arab Rep.*, 726 F. 2d 774, 809 (D.C. Cir. 1984) (same); *cf. Noriega v. Pastrana*, 564 F.3d 1290, 1296-97 (11th Cir. 2009) (in non-criminal context, holding that the Military Commissions Act of 2006, 18 U.S.C. § 2441(e), bars the invocation of the Geneva Conventions in habeas corpus or other civil action in U.S. court).

[17]    *See* Francis Lieber, *Instructions for the Government of the Armies of the United States in the Field,* Headquarters, United States Army, Gen. Order No. 100 (Apr. 24, 1863), *reprinted in The Laws of Armed Conflicts,* 3 (3d ed. 1988) (Lieber Code) ("So soon as a man is

reflected in the provisions of the GPW, which refined and codified the international law of armed conflict. *Hamidullin*, 2018 WL 1833604, at *9-10 (recognizing that the GPW "is the governing articulation of lawful combatant status" and rejecting Hamidullin's combatant immunity claim under the GPW framework); *United States v. Arnaout,* 236 F. Supp. 2d 916, 917-18 (N.D. Ill. 2003) (denying defendant's motion to dismiss § 2339A material support indictment on the ground that intended recipients of support were lawful combatants because defendant failed to demonstrate that recipients satisfied the GPW criteria); *United States v. Pineda,* No. 04-CR-232, 2006 WL 785287, at *2 (D.D.C. Mar. 28, 2006) (noting that while the doctrine of combatant immunity is derived from multiple sources of international law, "most notable for this Court's purposes is the Geneva Convention Relative to the

---

armed by a sovereign government and takes the soldier's oath of fidelity, he is a belligerent; his killing, wounding, or other warlike acts are not individual crimes or offenses."); Col. William Winthrop, *Military Law and Precedents,* at 782-83 (2d ed. 1920) (observing that "[i]t is the general rule that the operations of war on land can legally be carried on only through the recognized armies or soldiery of the State as duly enlisted or employed in its service," but in contrast, "[i]rregular armed bodies or persons not forming part of the organized forces of a belligerent, or operating under the orders of its established commanders, are not in general recognized as legitimate troops or entitled, when taken, to be treated as prisoners of war, but may upon capture be summarily punished . . ."); *Reid v. Covert,* 354 U.S. 1, 19 n. 38 (1957) (referring to Col. Winthrop as the "Blackstone of Military Law"); *Hamdan v. Rumsfeld,* 548 U.S. 557, 597 (2006) (same); *Hague Convention (IV) Respecting the Laws and Customs of War on Land, Regulations Annexed art. 1,* Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 (Hague Convention) (U.S. is a party to Hague Convention); Int'l Comm. of the Red Cross, *Commentary to Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 4, 44* (Jean de Preux ed., 1960) (notion that POWs are entitled to protection was codified in multilateral treaties, including Article 1 of the GPW; Brussels Declaration of 1874, Article IX, July 26, 1874, *reprinted in The Laws of Armed Conflicts* 25 (3d ed. 1988); *Manual of Military Law* 240 (British War Office 1914). Because the GPW incorporated a description of who qualifies as a POW that is very similar to, but builds in some upon, the description used in the Hague IV Annexed Regulations to identify who is vested with the rights and duties of war, this became a common reference for assessing who qualifies for lawful combatant status, including the privilege of combatant immunity.

18

Treatment of Prisoners of War"). Indeed, as far as the government is aware, in every case in which a defendant has asserted combatant immunity, the court has analyzed the question according to the standards set forth in the GPW.

<h3>2.    **Elements of the Defense of Combatant Immunity**</h3>

The GPW reflects two overarching requirements for a valid assertion of combatant immunity. "To be entitled to combatant immunity, the Third Geneva Convention requires that a combatant (1) be captured during an international armed conflict, and (2) be a lawful combatant—in other words, the combatant must belong to one of the Article 4 categories defining POW's." *Hamidullin*, 2018 WL 1833604, at *8.

To fall within one of the relevant Article 4 categories, the group must act under the authority of a State that is a party to the conflict, and its members must (1) be commanded by a person responsible for his or her subordinates; (2) display a fixed distinctive sign; (3) carry arms openly; and (4) conduct operations in accordance with the laws and customs of war. Unless the conflict is international *and* the group satisfies the Article 4 criteria, a person may not validly assert the combatant's privilege from domestic criminal sanction. *See Lindh,* 212 F. Supp. 2d at 554 ("this immunity can be invoked only by members of regular or irregular armed forces who fight on behalf of a state and comply with the requirements for lawful combatants"); *see also United States v. Khadr,* 717 F. Supp. 2d 1215, 1222 (USCMCR 2007); *See, e.g.,* Department of Defense Law of War Manual (Dec. 2016) § 1.11.1.1 ("[A]rmed groups must belong to a State to receive the privilege of combatant status."); *Id.* § 17.4.1.1 ("persons belonging to non-State armed groups lack any legal privilege or

immunity from prosecution by a State that is engaged in hostilities against that group.").[18]

### a. Combatant immunity under the GPW is only available to members of the armed forces of a state engaged in international armed conflict.

First, under the doctrine reflected in the GPW, for the defense to apply, the defendant must be engaged in an international armed conflict, as a member of armed forces of a State, or an organized belligerent group fighting on behalf of, and under the authority of, a State, in armed conflict with another State (*i.e.,* an international armed conflict).[19] GPW, art. 2, par. 1:

> Article 2: In addition to the provisions which shall be implemented in peace time, the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.

GPW. Art. 2, ¶ 1.

An international armed conflict is a conflict between States, not merely a conflict that takes place on a global stage or straddling a border. The Supreme Court has affirmed the key distinction between international armed conflicts under Article 2 and non-international armed conflicts under Article 3. *See Hamdan v. Rumsfeld,* 548 U.S. 557, 630-31 (2006) (an international armed conflict is a conflict between

---

[18]    The updated DoD Law of War Manual is publicly available at the "News" tab on www.Defense.gov under "Publications", including in sections titled *Belonging to a Party to the Conflict* (§ 4.6.2); and *Combatants—Legal Immunity and Sovereignty* (§ 4.4.3.2) (last visited April 19, 2018).

[19]    Even in a non-international armed conflict, there may be circumstances in which members of the armed forces of a State may benefit from immunity with respect to actions authorized by that State. *See* DoD Law of War Manual § 17.4.1.1 & n. 77. Any such exception plainly does not apply here, where the defendant does not allege that he is a member of a State's armed forces.

20

States, and Common Article 3 affords some minimal protection in non-international armed conflicts, falling short of full protection under the Conventions that is provided for international armed conflicts under Common Article 2); *see also Gherebi v. Obama,* 609 F. Supp. 2d 43, 57-58 (D.D.C. 2009) ("The distinction drawn between 'international' and 'non-international' conflicts has its roots in the Geneva Conventions, four treaties that comprise a part of 'the rules and precepts of the law of nations.'").

Under the GPW analysis applicable here, the defense of combatant immunity is categorically unavailable unless defendant is a member of the armed forces of a State engaged in armed conflict with another State (an international armed conflict). States have exclusive sovereign authority to engage in hostilities, and only those individuals acting under the authority of States may claim international legal privilege to do so.[20]

When a fighter is engaged in an international armed conflict (Article 2), this *triggers* the POW provision (Article 4, discussed below) and combatant immunity provisions (Articles 87 and 99, discussed below) of the GPW. However, absent an international armed conflict, there is no such thing as a POW, and combatant immunity is categorically unavailable. *See Hamlily v. Obama,* 616 F. Supp. 2d 63, 72-

---

[20]    *See, e.g.,* DoD Law of War Manual (Dec. 2016) (The updated manual is publicly available at the "News" tab on www.Defense.gov under "Publications", including in sections titled *Belonging to a Party to the Conflict* (§ 4.6.2); and *Combatants—Legal Immunity and Sovereignty* (§ 4.4.3.2)) (last visited April 19, 2018).

73 (D.D.C. 2009) (noting that Article 4 POW provisions do not apply to the armed conflict with Al-Qa'ida because that is a non-international armed conflict).[21]

Importantly, if the person is not a member of a State army or fighting on behalf of a State party, it is simply irrelevant how "regular" the armed group may appear, or how consistent with the law of war his or her organization's operations may be. Common Article 2. If the conflict in question is non-international, a court need not consider any other element of the combatant immunity analysis.[22]

---

[21]    If the combatant's privilege were not reserved for members of forces acting under the authority of States, then the United States and other States would have to treat lawless groups as if they were regular forces responsible to and controlled by a recognized States. *Hamdan v. Rumsfeld,* 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., concurring) (reasoning that non-State actors cannot be parties to international armed conflicts because they "cannot sign an international treaty" or "secure protection by complying with the [GPW's] requirements").

[22]    Even though combatant immunity is unavailable to fighters in a non-international armed conflict, this does not mean that non-international armed conflicts are not subject to the law of armed conflict. To the contrary, GPW Article 3 provides baseline protections for individuals in armed conflicts between a State and a non-State armed group, or between two non-State armed groups, but it expressly provides that parties to such an armed conflict may prosecute captured fighters before a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See Hamdan,* 548 U.S. at 631-32. Thus, *combatant immunity is not one of the protections provided under Article 3 for non-State actors in non-international armed conflicts.* The POW provision (Article 4) and combatant immunity provisions of the GPW (Articles 87 and 99) are only triggered in the event of an international armed conflict as provided in Article 2. *See also* Sten Verhoeven, *International and Non-International Armed Conflicts,* 3 (Instit. For Int'l Law K. U. Leuven, Working Paper No. 107, March 2007) (with the exception of Article 3 common to the four Geneva Conventions, they apply only in relation to *international* armed conflicts, which means conflicts between two high contracting parties (States or Nations)). "Article 3 is like a 'Convention in miniature'. It applies to non-international conflicts only, and will be the only Article applicable to them . . ." Int'l Civilian Persons in time of War art. 3, 34 (Jean S. Pictet ed., 1958). Article 3, (unlike Article 2) does not trigger any other articles or recognize any other privileges present elsewhere in the four Geneva Conventions, such as combatant immunity. Moreover, non-international armed conflicts may involve State actions including military force, criminal prosecution, and the operation of transnational criminal law such as mutual legal assistance and extradition. *See generally* Dan E. Stigall & Christopher L. Blakesley, *Non-State Armed Groups and the Role of Transnational Criminal Law During Armed Conflicts*, 48 Geo. Wash. Int'l L. Rev. 1 (2015).

The Fourth Circuit recently applied these principles in *Hamidullin*. In that case, the court rejected Hamidullin's combatant immunity claim on the ground that, at the time of Hamidullin's conduct, the Taliban was no longer a State and the conflict between the Taliban and the U.S. was a non-international armed conflict. *See Hamidullin*, 2018 WL 1833604, at \*5-6, 9. As the court explained, although the conflict began in 2001 as a war between the U.S. and the Taliban-controlled Afghan government, by 2009 the Taliban had been replaced by a new government, and the war had become a non-international armed conflict between the new Afghan government and its allies (including the U.S.) on one side and unlawful Taliban insurgents on the other. The court concluded that Hamidullin, as a fighter for a non-State insurgency in a non-international armed conflict, was not entitled to combatant immunity under the GPW. *Id.* This Court should reach the same conclusion here.

> **b.  Even in an international armed conflict, combatant immunity is available only to defendants who would qualify as prisoners of war under the GPW.**

Even assuming *arguendo* that the Syrian civil war was an international armed conflict, for a defendant to validly assert combatant immunity, he would also have to establish that he was fighting as part of a force that would qualify for POW protections under the GPW. GPW Article 4(A) reflects, in pertinent part, the forces entitled to POW protections:

> (1) Members of the armed forces of a Party to the conflicts as well as members of militias or volunteer corps forming part of such armed forces.

> (2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory

is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfill the following conditions:

a. That of being commanded by a person responsible for his subordinates;
b. That of having a fixed distinctive sign recognizable at a distance;
c. That of carrying arms openly;
d. That of conducting their operations in accordance with the laws and customs of war.

GPW, art. 4(A). Belligerents who fall within the scope of these categories are, as a result, considered *lawful* combatants who receive the privilege to participate in hostilities and qualify for POW status if captured.

Federal courts that have addressed combatant immunity claims have focused on whether the overall military organization, not the individual defendant or his particular unit, satisfy the four criteria. *See* Memorandum Opinion and Order at 6, *Ahmed, et al.,* No. 15 CR 49 (D. Minn.), Dkt. No. 368; *Lindh,* 212 F. Supp. 2d at 558 n.39 ("[w]hat matters for determination of lawful combatant status is not whether Lindh personally violated the laws and customs of war, but whether the Taliban did so").

As explained in the following section, a captive who qualifies for POW status pursuant to these provisions of the GPW may enjoy lawful combatant immunity.[23] However, unless both of these requirements—international armed conflict and POW status—are satisfied, no fighter may validly assert the defense.

---

[23] This understanding that only individuals who qualify for POW status may claim the combatant's privilege is central to U.S. military practice, and is reflected in the DoD Law of War Manual, notable in sections titled *"Combatant—Notes on Terminology—"Lawful," "Privileged," and "Qualified"* (§ 4.3.2.2); *Types of Lawful Combatants* (§ 4.3.3); *Combatants— Legal Immunity From a Foreign State's Domestic Law* (§ 4.4.3); and *Combatants—Legal Immunity and Sovereignty* (§ 4.4.3.2.).

3. **A fighter for a State in an international armed conflict who qualifies for POW status enjoys the Combatant's Privilege.**

When a fighter (a) acts on behalf of a State in an international armed conflict and (b) he or she would qualify for POW protection if captured, then and only then the GPW combatant immunity provisions, Article 87 and 99, apply:

> Article 87: Prisoners of war may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts.

And:

> Article 99: No prisoner of war may be tried or sentenced for an act which is not forbidden by the laws of the Detaining Power or by international law, in force at the time the said act was committed.

In sum, the combatant's privilege under GPW Articles 87 and 99 is triggered only if the two elements of the combatant immunity defense are first met. First, the conflict must be recognized as an international armed conflict under Article 2. Second, the criminal defendant must also be part of a fighting force that qualifies for POW status pursuant to GPW Article 4(a). In this case, defendant fails to satisfy his burden as to either prong of the analysis.

4. **Defendant is Not Entitled to Combatant Immunity**

The first element for combatant immunity is dispositive against the defendant. At all times relevant to the charges in the indictment, the conflict in Syria was judged to be a non-international armed conflict. Expert Paper submitted by L. Arimatsu & M. Choudhury, *The Legal Classification of the Armed Conflicts in Syria, Yemen and*

25

*Libya* (2014) Chatham House International Law PP 2014/01 at 16 (2014),[24] D. Stigall and C. Blakesly, *Non-State Armed Groups and the Role of Transnational Criminal Law During Armed Conflict,* 48 Geo.Wash.Int'l L.Rev. 1 (2015) at 30 n.152 (collecting authorities). United States military operations against ISIS and Al-Qaida in Syria did not change this fact. *See* The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations*, at 17 (2016) (characterizing current [December 2016] military operations as "hostilities against only non-State actors," and noting that the applicable legal regime governing such military operations was "the law of armed conflict covering non-international armed conflicts.").

Some scholars have suggested that one or more international armed conflicts may have now arisen in Syria, particularly after direct U.S. military intervention against the Assad regime in Syria in April 2017. That military strike occurred some 15 months after defendant's arrest and some 13 months after defendant was indicted in this Court. Defendant has cited scholarly articles which identify the Syrian conflict as a non-international armed conflict, deplore the violence in Syria, and question whether the complex situation ought to be deemed an international armed conflict or given the same status under the GPW. D.Br., *passim*. But in fact, the only cited article

---

[24]    "Despite the level of political and material support that both the opposition groups in Syria and the [Free Syrian Army] have been able to secure from other states, the legal experts were of the opinion that the armed conflict – at least until March 2013 – remained non-international in character since there was inadequate evidence to suggest that any of the anti-Assad armed groups were under the overall control of another state. The level and nature of external involvement in the conflict may constitute violations of international law but neither would alter the character of the armed conflict."

to call the fighting in Syria an international armed conflict was published in 2017, and it examines April 2017 U.S. military action against the Assad regime. *See* Michael N. Schmitt and Christopher M. Ford, *Assessing U.S. Justifications for Using Force in Response to Syria's Chemical Attacks: An International Law Perspective* 9 J. Nat'l Security L. & Pol'y 283 (2017) ("Clearly, the United States and Syria are involved in an international armed conflict because the former engaged in hostilities against the armed forces of the latter; it will continue until there is a prolonged cessation of hostilities."), quoted in D.Br. at 40-41.[25]

Relying on *Tadic*, defendant speculates that the U.S. government has supported and directed Syrian rebel groups fighting against the Assad government to such an extent that those groups have become State actors, thereby transforming the conflict into an international one. D.Br. 49 (citing *Prosecutor v. Tadic*, Case No. IT-94-1-A, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction PP 94-137 (Int'l Crim. Trib. For the Former Yugoslavia Oct. 2, 1995)). Defendant provides no factual support for that claim, and his argument is flatly contradicted by the public statement of the U.S. government in 2016 that it was engaged only in non-international armed conflicts in Syria. The White House, *Report on the Legal and*

---

[25] Other articles, for example, examine the humanitarian utility of deeming the Syrian fighting an international armed conflict without calling it such. *See, e.g.,* Ryan Goodman, *Is the United States Already in an "International Armed Conflict" with Syria?,* Oct. 11, 2016, available at https://www.justsecurity.org/33477/united-states-international-armed-conflict-syria/ and cited in D.Br. at 41 n. 104. It should be noted that months after the Goodman article was published, the Obama Administration continued to characterize United States operations in Syria as against non-State actors (ISIS and Al-Qaida).

*Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (2016).

In any event, to the extent there is doubt as to the proper classification of the relevant conflict, this Court should defer to the determination of the Executive Branch regarding the appropriate legal framework governing an armed conflict and whether to recognize foreign groups as lawful belligerents. *See The Prize Cases*, 67 U.S. 635, 670 (1862) (whether to recognize enemy belligerents is "a question to be decided by [the President], and this Court must be governed by [his] decisions"); *Baker v. Carr*, 369 U.S. 186, 212 (1962) ("recognition of belligerency abroad is an executive responsibility" that "defies judicial treatment"); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2087 (2015) ("The Executive has exclusive and unreviewable authority to recognize foreign sovereigns.").

Defendant's failure to meet his burden on the "international armed conflict" element is fatal to his claim, and the motion to dismiss should be denied on this basis. *See Hamidullin,* 2018 WL 1833604, at *9 (rejecting combatant immunity defense on this ground). Evidence of a claimed defense may be excluded if the defendant's offer of proof on even one essential element is insufficient as a matter of law to support the claimed defense. *Bailey,* 444 U.S. at 416.

But even if the Court were to conclude that defendant had established an international armed conflict in Syria at the time of his offense conduct, defendant has not established that Ansar al-Sham or the "umbrella group" under which he fought, the Islamic Front, would qualify for prisoner of war status. Combatant immunity "can

only be invoked by members of regular or irregular armed forces who fight on behalf of a state and comply with the requirements for lawful combatants." *Lindh,* 212 F. Supp. 2d at 554. The analysis is governed by Article 4(A)(2) of the GPW. To qualify defendant must establish that

> (1) The organization must be commanded by a person responsible for his subordinates;
> (2) The organization's members must have a fixed distinctive sign recognizable at a distance;
> (3) The organization's members must carry arms openly; and
> (4) The organizations members must conduct their operations in accordance with the laws and customs of war.

*Lindh,* 212 F. Supp. 2d at 554.

The district court in *Hamidullin* applied the GPW Article 4 categories in rejecting Hamidullin's combatant immunity claim. *See Hamidullin,* 114 F. Supp. 3d 365. Relying on an extensive record from an evidentiary hearing, the district court ultimately denied the motion to dismiss on the second prong of the inquiry. Looking past whether the conflict in Afghanistan was an international armed conflict, the court concluded that Hamidullin was not entitled to combatant immunity or lawful combatant status because Hamidullin had failed to establish that the Taliban met the criteria for prisoner of war status articulated in Article 4(A)(2) of the GPW. *Id.* at 387. The Court also rejected Hamidullin's claim that he was entitled to a public authority defense. *Id.* at 382-83, 388.

In reaching its conclusions that the defendant was not entitled to combatant immunity, the district court in *Hamidullin* relied on the district court's treatment of the same issue in *Lindh,* 212 F. Supp. 2d 541. Lindh, an American citizen who fought

29

for the Taliban and al Qaeda in Afghanistan in 2002, was charged in the Eastern District of Virginia with, *inter alia,* conspiracy to murder U.S. nationals serving in Afghanistan, in violation of 18 U.S.C. § 2332(b)(2). After an extensive treatment of the relevant law, the district court deferred to the president's determination that Lindh was an unlawful combatant, found that Lindh had not met his burden of establishing facts to the contrary, and found that the Taliban did not meet the criteria of GPW Article 4(A)(2). *Lindh,* 212 F. Supp. 2d at 552-58.

While the district court in *Hamidullin* held a hearing in order to develop a record on the Article 4(A)(2) issue, a hearing is not necessary in this case. First, defendant cannot establish that he was engaged in an international armed conflict, and thus this Court need not reach the question of whether he qualifies for protection as a POW under Article 4(A). Second, defendant has not alleged facts sufficient to warrant a hearing on Article 4(A)(2). At most, defendant in his supporting brief has offered several open-source photographs in which an Islamic Front Insignia has been imposed on digital photographs. D.Br. 45-47. He provided no information to establish the first, third, and fourth prongs of Article 4(A)(2). That is, there are no images of defendant with a commander to whom he answered; there are no images of defendant and others carrying arms openly; defendant has not established that the Islamic Front conducts operations in accordance with the laws and customs of war or that it was fighting on behalf of a State. Instead, defendant asks the court to draw a positive conclusion from a lack of evidence. *Id.* at 47 ("[T]here is no indication in any public source to contradict the fact that the Islamic Front conducted operations according to

30

law and customs of war."). Contrary to defendant's argument, the Article 4(A)(2) inquiry does not presume; it requires. It is defendant's burden to establish that the four criteria are satisfied, and he has not done so. *Accord, Arnaout,* 236 F. Supp. 2d at 917 (concluding in § 2339A prosecution that defendant "failed to establish as a matter of law that the lawful combatant privilege" applied).

### D. Combatant Immunity Does Not Apply to Non-International Armed Conflicts

The final basis for relief is quickly addressed. Defendant argues that combatant immunity under the GPW *ought* to apply to non-international armed conflicts, and that the distinctions between international armed conflicts and non-international armed conflicts are outmoded, particularly in Syria. D.Br. 49-53. Whatever merits there may be to this argument as a policy matter, it is contrary to precedent. *See Hamidullin*, 2018 WL 1833604, at *9-10 (holding that the GPW's "definition of lawful and unlawful combatants is conclusive" and that combatant immunity protections under the GPW did not apply to Taliban fighters detained in a non-international armed conflict). The High Contracting Parties that adopted the GPW, including the U.S., intended for combatant immunity to apply only in international armed conflicts to groups that act on behalf of States and fall within the other Article 4 criteria for prisoner of war status. All federal courts to examine the question have employed this analysis consistent with the GPW. *See, e.g.*, *Hamdan,* 548 U.S. at 630-31; *Ahmed et al.*, No. 15-CR-049 (D. Minn.), Dkt. No. 368; *Hamidullin,* 114 F. Supp. 3d at 380-81; *Hamlily*, 616 F. Supp. 2d at 72-73 (noting that Article POW provisions do not apply to the armed conflict with al Qaeda because

31

that is a non-international armed conflict); *Pineda,* 2006 WL 785287, at *2; *Lindh,* 212 F. Supp. 2d at 553.

This does not mean that non-State actors in non-international armed conflicts are stripped of all protections. Rather, Common Article 3 of the Geneva Conventions provides baseline protections to such persons. *See Hamdan,* 548 U.S. at 630-31 (an international armed conflict is a conflict between States, and Common Article 3 affords some minimal protection in non-international armed conflicts, falling short of full protection under the Conventions that is provided for international armed conflicts under Common Article 2); *see also* footnote 21, *supra.* Well-established precedent from the Supreme Court, the Fourth Circuit, and other district courts foreclose defendant's attempt to expand the scope of combatant immunity. Moreover, defendant's expansion of combatant immunity beyond the recognized Geneva Convention framework would "threaten to elevate every band of terrorists around the world to near nation-state status and, in so doing, to extend the protections of the [GPW] to those who both regularly and flagrantly violate its dictates." *Hamidullin*, 2018 WL 1833604, at *12 (Wilkinson, J., concurring).[26] Accordingly, defendant's final basis for relief should be summarily denied as contrary to law. Until there are internationally-ratified amendments to the GPW, combatant immunity remains a

---

[26] Defendant's motion does not come to terms with the logical implication of his assertion of POW status, which is that he could be subject to detention without trial under the law of war for the duration of hostilities. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). Defendant has not requested such "relief," presumably because, as Judge Wilkinson recognized, his argument amounts to "a shell game designed to play one part of American governance against another." *Hamidullin*, 2018 WL 1833604 at *12 (Wilkinson, J., concurring).

protection that is only afforded to certain participants in international armed conflicts.

## IV. CONCLUSION

In summary, defendant is not entitled to a public authority affirmative defense because has not made a *prima facie* showing that he was engaged in otherwise-illegal conduct in Syria at the express direction of a U.S. government official; he has not met his burden to establish he is entitled to combatant immunity because he was fighting in a non-international armed conflict for militant groups that did not meet the prisoner of war criteria of GPW Article 4(A)(2); and there is no basis to extend the protections of combatant immunity beyond the established and internationally recognized framework of GPW Article 2.

For these reasons, defendant's motion should be denied in its entirety.

Dated: April 20, 2018                       Respectfully submitted,

                                            JOHN R. LAUSCH, JR.
                                            United States Attorney

                              By:     */s/ Shoba Pillay*
                                            BARRY JONAS
                                            SHOBA PILLAY
                                            Assistant United States Attorneys
                                            219 South Dearborn Street, 5th Floor
                                            Chicago, Illinois 60604
                                            (312) 353-5300

                                            DAVID ANDREW SIGLER
                                            Trial Attorney, Counterterrorism Section
                                            National Security Division
                                            United States Department of Justice
                                            950 Pennsylvania Avenue, NW
                                            Washington, DC 20530