**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CR 181 |
| | ) | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS | ) | |
| AL-JAYAB, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION
TO DISMISS THE INDICTMENT BASED ON COMBATANT IMMUNITY**

Defendant, **AWS MOHAMMED YOUNIS AL-JAYAB**, by and through his attorneys,

**THOMAS ANTHONY DURKIN, ROBIN V. WATERS,** and **JOSHUA G. HERMAN**,

respectfully replies to the Government's Response to Defendant's Motion to Dismiss Based on

Combatant Immunity and Supporting Memorandum of Law.  (Dkt. #102, "Response").

## I.     INTRODUCTION.

The ongoing horrors of the Syrian War, instigated by President Bashar al-Assad and his

allies, are undeniable. Nor can we deny the involvement of the United States in the conflict.  Our

government has called for the ouster of Assad; it has recognized opposition forces as the

legitimate representatives of the Syrian people; our military and intelligence agencies have

armed, trained, and equipped rebel forces, including with lethal assistance; and, as recently as

one month ago, our military launched missiles into Syria that were televised to our nation.

Mr. Al-Jayab's Memorandum painstakingly detailed many of these facts with references

to public sources and the words of our own government officials.  (*See* Memorandum, pp. 6-21).

In its Response, the government nevertheless manages to dodge these indisputable facts by

claiming that "even if true," they would not be relevant to the issue before the Court.  (Response,

p. 14). Quite to the contrary, the realities of the Syrian War are fundamentally important to these unique legal questions before the Court. Specifically, the United States' role in Syria not only shows that our government has lethally supported Syrian opposition groups in their struggle against the Assad regime both before, during, and after Mr. Al-Jayab's time in Syria;[1] but it also shows that the United States' involvement along with a number of other nations on both sides of the Syrian War has created an international armed conflict.

Rather than acknowledge the import of that background, the prosecution attempts to recast this as a "terrorism" case involving "violent jihad" (Response, pp. 1, 15), proving once more the old adage that "one man's terrorist is another's freedom fighter." It does so, of course, to delegitimize Mr. Al-Jayab's decision to stand up to the Assad regime and defend others. But the prosecution knows full well that this is not a "terrorism" case in any real sense of the word.

---

[1] Indeed, during a September 3, 2013 hearing before the Senate Committee on Foreign Relations, Secretary of Defense Chuck Hagel confirmed President Obama's "decision to support lethal assistance to the opposition" and also referenced an ongoing "covert action." The transcript of this hearing is available at: https://bit.ly/2FapvIa (last visited May 20, 2018). The relevant portion of the exchange, which occurs on p. 18 of the hearing transcript is as follows:

> Senator CORKER. I am very aware of all those things. What I am unaware of is why it is so slow in actually helping them with lethal support? Why has that been so slow?
>
> Secretary KERRY. I think, Senator, we need to have that discussion tomorrow in classified session. We can talk about some components of that. Suffice it to say that it is increasing significantly. I want General Dempsey to speak to this, maybe Secretary Hagel as well. It has increased in its competency. I think it has made leaps and bounds over the course of the last few months. Secretary Hagel, do you, or General, do you want to?
>
> Secretary HAGEL. I would only add that it was June of this year that the President made the decision to support lethal assistance to the opposition. As you all know, we have been very supportive with hundreds of millions of dollars of nonlethal assistance. The vetting process, as Secretary Kerry noted, has been significant, but I will ask General Dempsey if he wants to add anything. But we, the Department of Defense, have not been directly involved in this. This is, as you know, a covert action and as Secretary Kerry noted, to go into much more detail would require a closed or classified hearing

General Martin Dempsey then replied to Senator Corker's question by stating: "To your question about the opposition, moderate opposition, the path to the resolution of the Syrian conflict is through a developed, capable, moderate opposition, and we know how to do that."

Muting that rhetoric is essential to understand how Mr. Al-Jayab's conduct was legally privileged, and, in any event, done in good faith.

Finally, counsel would be remiss in failing to address the prosecutors' flippant footnote comment at the end of its pleading suggesting that our arguments are but a "shell game designed to play one part of American governance against another."  (Response, p. 32, note 26 (quoting *United States v. Hamidullin*, 2018 WL 1833604 (4th Cir. April 18, 2018) (Wilkinson, J., concurring).  The only shell game being played here is the government's selective use of the federal criminal justice system to prosecute whomever it selectively deems to be a terrorist. Unlike Irek Hamidullin or Yaser Hamdi, Aws al-Jayab is not being charged with conspiring to kill Americans, only the supposed enemy of America, the Syrian regime of Bashar al-Assad. Mr. Al-Jayab is not an unlawful enemy combatant or an American POW to be shipped to Guantanamo.  Nor is he a criminal.

## II.    ARGUMENT.

### A.    The Government's Response Ignores Background That is Relevant to the Combatant Immunity Defense and Injects the Rhetoric of "Terrorism."

Mr. Al-Jayab's Memorandum extensively detailed the history of the Syrian War. (Memorandum, pp. 6-20).  It also discussed the role of the United States in Syria, which dates back at least to 2012 prior to Mr. Al-Jayab's return in late 2013.  (*Id.*, pp. 8-14; 17-20; 38-39). This background was drawn from multiple credible sources.  Given that the government does not specifically deny the relevant factual and historical background, it will not be repeated here.

Contrary to the prosecution's suggestion, however, there is nothing "speculative" whatsoever about the fact that our government was involved in Syria.  (Response, p. 27).  The only thing speculative is the extent of that involvement and assistance, which the prosecution refuses to disclose.  As noted above, rather than address the background facts, the prosecutors

take a qualified "even if true" approach. (*See* Response, p. 14). This response may very well have come straight from an intelligence agency, as it mirrors the "Glomar" response that neither confirms nor denies. The problem with such a response here is that the factual record is clear that the United States supported, trained, and armed rebels directly and through regional allies. The Court can and should draw its own reasonable inferences from the prosecution's conspicuous "even if true" response.

While not addressing the realities of the Syrian War as detailed in Mr. Al-Jayab's pleading, the prosecution repeatedly references "terrorism" and even suggests that Mr. Al-Jayab was motivated by what it calls "violent jihad." It apparently does so to squeeze these facts into its traditional national security/terrorism prosecutorial narrative.[2] These allegations are deeply ironic in light of the fact that Mr. Al-Jayab was motivated to oppose the Assad regime, just as *our* government has done—from demanding that Assad to step down, to firing missiles into Syria, which according to the International Committee of the Red Cross created "an international armed conflict…expanding both sides' humanitarian obligations to cover any prisoners of war."[3]

Moreover, the prosecution accusations are not well taken given how the Indictment does not allege that Mr. Al-Jayab provided material support to a Designated Foreign Terrorist Organization (FTO) or specific terrorists, as is typically the case in prosecutions brought under 18 U.S.C. § 2339A or § 2339B. Nor does the prosecution argue that Mr. Al-Jayab is an unlawful

---

[2] For instance, the prosecution writes: "From the moment he arrived in the U.S., defendant began to plot his return to Syria to fight on behalf of terrorist groups there," (Response, p. 1) and "Beginning as early as mid-October 2012, via his Facebook accounts, defendant told multiple family members and associates that he intended to travel to Syria to support violent jihad…" (*id.*). In the end, the prosecution's misplaced rhetoric only confirms counsel's previous comment that this case, involving a young man who suffered personal loss at the hands of Assad "has now wound its way absurdly into a U.S. criminal court as part of our endless War on Terror."

[3] Stephanie Nebehay, *Exclusive: Situation in Syria constitutes international armed conflict - Red Cross*, REUTERS, Apr. 7, 2017, available at: https://bit.ly/2IBMHRE (last visited May 20, 2018).

combatant or categorically precluded from raising the immunity defense simply due to his association with a particular group, as seen in the cases upon which it principally relies.[4]  To the contrary, the proscution acknowledges that Ansar al-Sham was not an FTO.  (Response, p. 6, note 6).  Indeed, Mr. Al-Jayab is no more a terrorist than others who travelled to Syria to fight against al-Assad's regime, and have returned, only to be interviewed on network television, not prosecuted as "terrorists."  (*See* Memorandum, p. 6, note 6).  No matter how many times the prosecution says so, the fact remains that this case simply does not fit within its prosecutorial narrative, notwithstanding its monotonous references to "terrorism" and "violent jihad."[5]

**B.** **Mr. Al-Jayab is Entitled to Receive Lawful Combatant Immunity.**

The complexities of the doctrine of combatant immunity have been described in great detail in the parties' initial pleadings, and they need not be reiterated.  The Response, however, does raise several points that must be addressed.

**1. Mr. Al-Jayab is Entitled to Combatant Immunity Under Common Law.**

According to the prosecution, common law combatant immunity no longer exists, and has been replaced by international treaty law, specifically the Geneva Convention ("GPW III"). (Response, pp. 11-18).  The prosecution then argues that Mr. Al-Jayab raises a public authority defense, for which there has been no notice and he is not entitled to receive.  This is wrong.

The defense advanced by Mr. Al-Jayab under the common law does not turn on the public authority defense that is made under Rule 12.3.  Nor is the defense raised simply that

---

[4] *See, e.g.*, *United States v. Hamidullin*, 114 F. Supp. 3d 365 (E.D. Va. 2015) *aff'd* No. 15-4788, -- F.3d -, 2018 WL 1833604 (4th Cir. April 18, 2018) (Taliban not entitled to raise combatant immunity); *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002) (same).

[5] The Response references snippets of online conversations with several other individuals from 2012 and 2013, prior to his departure to Syria.  Mr. Al-Jayab does not admit the veracity of the substance of those conversations.  Moreover, the prosecution's references to electronic communications from 2012 and 2013 only confirm counsel's ongoing concerns that Mr. Al-Jayab's communications were subject to collection and surveillance even before he travelled to Syria in November 2013.

"President Obama told [him] to do it," as the prosecution glibly suggests (Response, p. 14). Rather, the claim is that Mr. Al-Jayab was privileged under the common law because he associated with an organized party that acted lawfully during a time of war. *The Three Friends*, 166 U.S. 1, 63-64 (1897). The U.S. government publicly announced that similar groups were the legitimate representatives of the Syrian people before Mr. Al-Jayab returned to Syria. (*See supra* note 1). Moreover, during the time Mr. Al-Jayab was in Syria, the United States and other ally countries supported the rebel forces that opposed Assad. Importantly, the common law defense raised here also takes into account the very salient fact that Mr. Al-Jayab himself *lived in Syria and personally experienced the Assad regime's atrocities against its own people*.

This common law defense is deeply rooted and does not depend on the status of the individual or the characterization of the conflict. (*See* Memorandum, p. 25). Nor was this historical doctrine abrogated or replaced by GPW Art. 3. *See Johnson v. Eisentrager*, 339 U.S. 763, 793 (1950) (Black, J., dissenting) ("It must be remembered that legitimate 'acts of warfare,' however murderous, do not justify criminal conviction. In *Ex parte Quirin*, 317 U.S. 1, 30-31, we cautioned that military tribunals can punish only 'unlawful' combatants; it is no 'crime' to be a soldier."); Wayne R. LaFave, Substantive Criminal Law § 10.2 (2d ed. 2003) ("if a soldier intentionally kills an enemy combatant in time of war and within the rules of warfare, he is not guilty of murder."). Thus, the common law variant of the public authority defense applies to, and protects, combatants who act "within the rules of warfare."

Next, and contrary to the prosecution's argument, the OLC "Drone Memo" does support combatant immunity outside of international law; *i.e.*, it provides immunity to those who may not qualify for Geneva prisoner of war status. (*See* Memorandum, pp. 37-38; Response, p. 14). In discussing whether the public authority/duty defense would "render lethal action carried out

by a governmental official lawful in some circumstances," the OLC relied on a Model Penal Code provision that considers deadly force to be lawful when it "occurs in the lawful conduct of war." *See* OLC Drone Memo, p. 16, available at Appendix A to *New York Times Co. v. United States DOJ*, 756 F.3d 100, 129 (2d Cir. 2014) (citing Model Penal Code § 3.03(2)(b)); *see also* Memorandum, pp. 37-38, quoting OLC Drone Memo, p. 33, footnote 44. These references to the "laws of war" and "lawful conduct of war" draw on the common law understanding that legitimate acts taken during war are not subject to criminal prosecution. *See* OLC Drone Memo, p. 20 ("In light of the combination of circumstances that we understand would be present, and which we describe below, we conclude that the justification would be available because the operation would constitute the "lawful conduct of war"—a well-established variant of the public authority justification."). This "well-established variant of the public authority justification" defense need not be interpreted as a public authority defense under Rule 12.3. Thus, common law combatant immunity should be considered on its merits. (Memorandum, pp. 23-26, 37-38).

Further, while counsel disagree that a claim under common law combatant immunity is automatically transformed into a public authority defense that depends on authorization from U.S. officials, they reserve the right to raise such a defense pending further investigation and discovery. Counsel are well aware of the notice requirements under Rule 12.3, and have attempted to develop the factual predicate for that notice and the defense itself. For instance, on October 11, 2017, counsel sent a discovery request to the prosecution requesting, among other things, records regarding President Obama's "intelligence finding" as well as records related to the U.S. support for Syrian rebel groups. A copy of that discovery request is attached hereto as Exhibit A. The prosecution responded on December 11, 2017, and declined to provide any additional discovery because Rule 12.3 notice had not been provided and the specific public

officials had not been identified. A copy of the prosecution's letter is also attached hereto as Exhibit B. Needless to say, the prosecution's response has stymied counsel's ongoing inquiry into this potentially viable defense.[6]

### 2. Mr. Al-Jayab is Entitled to Combatant Immunity Under International Law.

In addition to the common law immunity, Mr. Al-Jayab is also entitled to combatant immunity under international law. This determination must be made on an individual basis. *See United States v. Khadr*, 717 F. Supp. 2d 1215, 1229 n.21 (Ct. Mil. Comm'n Rev. 2007). As noted above, the general provisions of the treaty have been detailed in the parties' pleadings, and this Reply will focus on the points of disagreement.

### a. The Syrian War Was an International Armed Conflict in Late 2013 to Early 2014 and Thus Qualifies Under GPW Art. 2.

The prosecution argues that combatant immunity is categorically unavailable because the Syrian War, particularly in late 2013 and early 2014, does not qualify as an international armed conflict. It makes this argument even though it acknowledges how "one or more international armed conflicts may have now arisen in Syria, particularly after direct U.S. military intervention against the Assad regime in April 2017." (Response, p. 26). This very statement exposes the underlying flaws in the prosecution's position on the Syrian War.

Put simply, if the U.S. military intervention in Syria in 2017 against the Assad regime creates an international armed conflict, then U.S. military intervention in prior years that directly supported rebels fighting against the Assad regime would also create an international armed conflict. The same logic would hold true with multiple other countries—not just the United

---

[6] Notably, the government has refused to disclose an Office of Legal Counsel (OLC) memorandum that purportedly served as the basis for the missile attacks into Syria that President Trump ordered in April 2017, and also in April 2018. This OLC memorandum is the subject of ongoing FOIA litigation brought by the Protect Democracy Project. (Case No. 1:17-cv-00842, D.D.C.).

States—which have had a physical presence in Syria in addition to providing support for rebel groups on the one side, and the Syrian regime on the other. The presence of these countries, particularly Iran and Russia, which have an actual military presence in Syria, also contribute to the existence of an international armed conflict. (Memorandum, pp. 8-14), Moreover, Assad himself recognized in 2012 that the war was a "regional and global war," not just an isolated, internal conflict.[7] Further, the indirect involvement of foreign countries vis-à-vis rebel groups can also lead to an "internationalized" armed conflict. (*See* Memorandum, pp. 41-43).

The prosecution's recognition that U.S. military intervention in 2017 contributed to "one or more international armed conflicts" in Syria underscores the importance of disclosure of U.S. involvement in Syria, at the very least, in a classified setting. It was of course al-Assad's use of chemical weapons that lead to the "redline" drawn by President Obama in 2012, and also to the U.S. airstrikes in 2017 and 2018 ordered by President Trump. The prosecution should not be able to refuse to provide information regarding the U.S. involvement in Syria when it acknowledges at the same time that such conduct could create an international armed conflict.

Put another way, the Court cannot conclude that the Syrian War is not an international armed conflict based on the self-serving classifications of the government, especially when it does not provide the bases for its military intervention, including the 2012 "intelligence finding." Indeed, the prosecution's reliance on the 2016 White House *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security*

---

[7] Associated Press, *Syria needs time to win 'regional, global' battle, Assad says: Turkey wants UN to set up safe havens in Syria for refugees*, CBC News, Aug. 29, 2012, available at: https://bit.ly/2ENHIuM (last visited May 20, 2018).

*Operations* ("2016 White House Report"[8]) surely does not provide the final word on whether the Syrian War was an international armed conflict. (Response, p. 26-27).

The prosecution claims that Mr. Al-Jayab only "speculates" about U.S. involvement in Syria and refers to the 2016 White House report. But the record itself dispels any notion of speculation. Indeed, the 2016 White House Report only raises more questions concerning the presence of the U.S. military in Syria than it answers. Specifically, while the 2016 White House Report frames the United States' involvement "as part of the campaign against ISIL," it still confirms prior U.S. military operations in Syria when it states as follows: "small teams of U.S. special operations forces have also deployed to Syria to help coordinate U.S. operations with some of these indigenous ground forces." (2016 White House Report, p. 16). This type of coordination directly resembles the "overall control" standard discussed by the international criminal court in *Tadic* that may render a conflict international. (*See* Memorandum, pp. 42-43).

Several other points must be made that call into question the prosecution's conclusions that the 2016 White House Report proves that Syria is a non-international armed conflict. First, it is an academic exercise to argue that direct U.S. military support for "indigenous forces" in Syria was limited only to anti-ISIL (*i.e.*, non-state) actors, and did not conflict with state actors, namely Syria. Indeed, in early February 2018, the United States and "the Coalition" conducted airstrikes against "Syrian pro-regime forces" that attacked "Syrian Democratic Forces."[9]

Second, the 2015 National Defense Authorization Act (NDAA), which is cited in the 2016 White House Report, is not just limited to anti-ISIL campaigns. Specifically, Section 1209

---

[8] A copy of this Report is available at: https://bit.ly/2IwRjfT.

[9] *Unprovoked attack by Syrian pro-regime forces prompts Coalition defensive strikes*, CENTCOM, Feb. 7, 2018, available at: https://bit.ly/2IvBm9A (last visited May 20, 2018); Anne Barnard and Richard Pérez-Peña, *U.S.-Backed Coalition in Syria Strikes Pro-Assad Forces*, N.Y. TIMES, Feb. 8, 2018, available at: https://nyti.ms/2rWdqln (last visited May 20, 2018).

of the 2015 NDAA, entitled, "Authority to Provide Assistance to The Vetted Syrian Opposition," provides, in relevant part that the Secretary of State is authorized to "provide assistance, including training, equipment … to appropriately vetted elements of the Syrian opposition" for purposes that include "Promoting the conditions for a negotiated settlement to end the conflict in Syria."[10] The 2015 NDAA thus authorizes broad support for "vetted elements of the Syrian opposition," not just for anti-ISIL campaigns, and also for promoting an end to the "conflict in Syria" itself, which clearly contemplates the Assad regime.[11]

Also, the legal framework cited in the 2016 White House Report may very well be incomplete.[12] For one thing, it makes no reference to President Obama's 2012 "intelligence finding" and the authority that provided for U.S. assistance and intervention. Nor does it reference Article II of the Constitution when it explains the grounds for the United States' role in Syria. Interestingly, Article II was later cited to justify the 2017 airstrikes in Syria.[13]

The bottom line is that the 2016 White House Report not only confirms the presence of the U.S. military in Syria, but also raises questions as to the purported authority for that presence

---

[10] The 2015 NDAA is available at: https://bit.ly/2IAHvxp (last visited May 20, 2018). Section 1209, cited above, begins on page 623.

[11] Further, the 2016 White House Report makes clear that this supported for "vetted" groups includes military arms: "The United States has also made monitoring the use of the U.S. military equipment, ammunition, and other assistance provided to these groups part of the mission of U.S. forces in Syria to help ensure that any assistance is used appropriately by recipients." (2016 White House Report, p. 13).

[12] To justify U.S. military involvement in Syria, the 2016 White House Report cites only the 2001 and 2002 Authorizations for Use of Military Force Against Terrorists (AUMF) and principals of individual and collective self defense. (2016 White House Report, pp. 16-17).

[13] A copy of this report, entitled, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations*, is available at: https://bit.ly/2IvGria (last visited May 20, 2016). Importantly, the report states as follows: "Article II of the Constitution provides authority for the use of military force in certain circumstances even without specific prior authorization of Congress. For example, on April 6, 2017, the President directed a military strike against the Shayrat military airfield in Syria pursuant to his authority under Article II of the Constitution to conduct foreign relations and as Commander in Chief and Chief Executive." (*Id.*, pp. 3-4).

and the nature of the support for "vetted" Syrian opposition groups. Contrary to the prosecution's argument, the report certainly does not foreclose the existence of an international or internationalized armed conflict in Syria. If anything, it infers the opposite.

### b. Mr. Al-Jayab's Proffered Association with Ansar al-Sham Qualifies him to Combatant Immunity Under GPW Art. 4.

After properly classifying the Syrian War as an international armed conflict under GPW Art. 3, the next inquiry is whether the individual's group qualifies under GPW Art. 4. If so, then the individual is immune from criminal prosecution. Mr. Al-Jayab's Memorandum proffered his association with Ansar al-Sham, which was part of a coalition of forces under the Islamic Front. (Memorandum, pp. 14-17, 20-21). As previously discussed, the Islamic Front was estimated to have 40,000 to 50,000 members, a hierarchy and structure including military and political organization, distinct banners, and a united opposition to topple the Assad regime and establish a new government for the Syrian people.[14] In response, the prosecution acknowledges that Mr. Al-Jayab stated, in December 28, 2013, that he had joined Ansar al-Sham and was in Aleppo. (Response, p. 6). The prosecution also recognizes that Ansar al-Sham was, and is not an FTO. (Response, p. 6, note 6). It nevertheless argues that Mr. Al-Jayab cannot satisfy the criteria of GPW Art. 4. There are a number of problems with this analysis.

First, the prosecution primarily relies on two cases: *Hamidullin* and *Lindh*. (See Response, pp. 16, 23, 29-30). In each of those cases the defendants who sought combatant immunity were members of the *Taliban and were accused of direct hostilities against United*

---

[14] Due to its size and political and military structure, the Islamic Front could even be said to qualify under Article 4(A)(3), which covers "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining power." To obtain prisoner of war status under Article 4(A)(3), an individual need not meet the four criteria set forth in Article 4(A)(2)(a)-(d).

*States forces*.  Neither defendant could claim combatant immunity due to a 2002 finding by President Bush that members of the Taliban were unlawful combatants.  In stark contrast, here the prosecution does not claim that Mr. Al-Jayab is an unlawful combatant, a member of an FTO, or participated in hostilities against U.S. forces.  For those reason alone, *Hamidullin* and *Lindh* are of little utility for the GPW Art. 4 inquiry in this case.

Turning to the GPW Art. 4 analysis, the prosecution appears to concede that the second factor of the four-part Article 4(A)(2) standard is met, in that the Islamic Front and Ansar al-Sham had fixed and distinctive signs.  But it criticizes Mr. Al-Jayab for not attaching any images of himself either with a commander, or carrying arms openly.  These arguments are not persuasive.  Article 4(A)(2) does not require photographic proof of an individual with a commander.  Nor would one require an infantryman in a U.S. Army squadron to show a photograph of himself next to his company's captain to prove he is in the U.S. Army.  This demand for photographic evidence is all the more comical given that Mr. Al-Jayab was in Syria for a short period of time before he left due to the increasing violence, as reflected by some of the messages included in the Response.  Further, Mr. Al-Jayab's Memorandum describes how the Islamic Front and its sub-groups had hierarchies, specific leaders, and distinct emblems (as the prosecution concedes), which evidence the existence of a command structure.

The prosecution also faults Mr. Al-Jayab for not including photographs of himself carrying arms openly.  (Response, p. 30).  However, Mr. Al-Jayab's Memorandum included numerous images of Islamic Front members carrying arms openly.  That should be enough, unless the world has reached the point that "selfies" are now required to prove any statement made by a litigant.  Moreover, the prosecution's argument on this point is questionable to begin with as it is contrary to the very allegations against Mr. Al-Jayab and the prosecution's

13

anticipated evidence, which not only include photographs but also statements that it may seek to introduce at trial, some of which are reflected in the Response, such as "I have m16"—which is, of course, a standard rifle used by the U.S. military. (Response, p. 5).

Lastly, the prosecution argues that Mr. Al-Jayab is not entitled to combatant immunity because he cannot show that the Islamic Front and Ansar al-Sham complied with the laws of war. (Response, p. 30 - 31). Essentially, the prosecution contends that Mr. Al-Jayab cannot prove a positive with a negative. However, here the best evidence of compliance with the laws of war is the lack of proof, even anecdotal, of violations of the laws of war. Indeed, Justice Black suggested this very approach: "[t]here is not the slightest intimation that the accused were spies, or engaged in cruelty, torture, or any conduct other than that which soldiers or civilians might properly perform when entangled in their country's war." *Johnson*, 339 U.S. at 793 (Black, J., dissenting). Surely, if the prosecution had evidence that there were violations of the laws of war, then it would be quick to cite them. The absence of such evidence should be seen as proof of compliance—or at least the absence of non-compliance.

### c. Even if the Syrian War is Seen as a Non-International Armed Conflict, Mr. Al-Jayab Is Still Entitled to Combatant Immunity.

Mr. Al-Jayab's Memorandum provides additional reasons why he should be immune from prosecution even if the Syrian War is classified as a non-international armed conflict during late 2013 and early 2014. (Memorandum, pp. 49-54). In response, the prosecution cites precedent that primarily focuses on the nature of the group involved (*i.e.*, unlawful combatants or FTOs), not the nature of the conflict itself. *See* Response, pp. 31-32 (citing *Hamidullin*, *supra* (Taliban member charged with attack U.S. forces).[15] Moreover, not one of these cases analyzes

---

[15] The prosecution also cites the following cases: *Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006) (associate of al Qaeda captured in Afghanistan, enemy combatant); *United States v. Ahmed, et al.*, Case

the complex dynamics of the Syrian War itself.[16]  If that conflict is deemed to be a non-international armed conflict, then, importantly, combatant immunity extends to belligerent acts of legitimate warfare.  *See Ford v. Surget*, 97 U.S. 594, 602 (1878).  Mr. Al-Jayab has proffered sufficient evidence showing that the Islamic Front was an organized entity that held territory and commenced hostilities against the Syrian government.  These and other factors show that Mr. Al-Jayab is entitled to lawful combatant immunity even if Syria is seen to be a non-international armed conflict in late 2013 and early 2014.

The prosecution concludes with a policy argument that extending combatant immunity to non-international armed conflicts would extend protections to terrorists that violate the law.  (Response, p. 32).  The Court should not fear this unlikely outcome.  For one thing, those who fail to comply with the laws of war would not be beyond punishment.  Further, extending combatant immunity to non-international armed conflicts could just incentivize compliance with international norms.  Finally, extending combatant immunity to Mr. Al-Jayab's participation in the Syrian War—even if deemed non-international in 2013 or 2014—simply reflects an honest appraisal of the ambiguousness of the Syrian War, in which numerous foreign nation states, including the United States, have a real direct and indirect presence that has continued to fuel the war and its tragic loss of life and devastating relocation of millions of refugees.

---

No. 15 CR 49 (D. Minn) (Dkt. No. 371, p. 6, ruling that, "Based on the record before it, the Court finds that defendants have not met this burden as they have not demonstrated that ISIL meets any of the criteria set forth in Article 4 that would extend them lawful combatant status"); *Hamlily v. Obama*, 616 F. Supp. 2d 72-73 (D.D.C. 2009) (U.S. conflict with al Qaeda is non-international); *United States v. Pineda*, 2006 WL 785287, *2 (D.D.C. Mar. 28, 2006) (noting that Fuerzas Armadas Revolucion Arias De Colombia (FARC) member could not claim combatant immunity, in part because United States was not involved in Columbian conflict); *Lindh*, 212 F. Supp. 3d at 553 (Taliban member, declared unlawful combatant).

[16] In *United States v. Ahmed*, the government argued that combatant immunity was not available because Syria was a non-international armed conflict.  The district court did not reach this issue, as it found that the defendants, associated with ISIS, could not meet the Article 4(A)(2) criteria.  (Case No. 15 CR 49 (D. Minn.) (Dkt. No. 371, p. 6)).

## III.   CONCLUSION.

For the foregoing reasons, as well as those set forth in Mr. Al-Jayab's Motion to Dismiss and supporting Memorandum of Law, counsel respectfully request that the Court grant Mr. Al-Jayab's motion and dismiss the indictment.   And, in any event, due to the complexities of this case, even if the matters submitted do not require dismissal of the indictment at this stage, counsel submit they have been more than adequate to preserve the affirmative defense for trial.[17]

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Robin V. Waters
**ROBIN V. WATERS,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**.

**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

---

[17] This was, in fact, the recent conclusion reached by a magistrate judge in *United States v. Hodzic, et al.*, 4:15 CR 49 (E.D. Mo.).  (Dkt. #429).  In *Hodzic*, the defendants raised a combatant immunity defense in response to charges brought under 18 U.S.C. § 2339A and 18 U.S.C. § 956.  The charges primarily related to money and other property provided to another individual who was in Syria and fought for various rebel groups before he was killed.  The government brought federal criminal charges against others who allegedly provided supported the individual prior to his death.  Unlike Mr. Al-Jayab's case, the government alleged that individual fought for FTOs.  (*See* 4:15 CR 49, Dkt. #2, Count I).  While the magistrate declined to dismiss the indictment based on combatant immunity, he did conclude that the defendants "be permitted to submit the lawful combatant immunity affirmative defense at trial."  (Case No. 4:15 CR 49, Dkt. #429, p. 21).

**<u>CERTIFICATE OF SERVICE</u>**

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant Aws Mohammed Younis Al-Jayab's Reply in Support of Motion to Dismiss the Indictment Based on Combatant Immunity was served on May 21, 2018, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.1, and LCrR 49.2, pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com