**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CR 181; 18 CR 721 |
| | ) | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS | ) | |
| AL-JAYAB, | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT AWS MOHAMMED YOUNIS AL-JAYAB'S CLARIFICATIONS TO THE
PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

**THOMAS ANTHONY DURKIN**
**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: 312-909-0434

## TABLE OF CONTENTS

### Cases

*Adham Amin Hassoun v. Searls*, 19-cv-6196 (W.D.N.Y.) ....................................................... 49

*Koon v. United States*, 518 U.S. 14. 81 (1996) ..................................................................... 10

*Nelson v. United States*, 555 U.S. 350 (2009) ......................................................................... 9

*Pepper v. United States*, 131 S. Ct. 1229 (2011) .............................................................. 8, 10

*United States v. Booker*, 543 U.S. 220 (2005) ......................................................................... 8

*United States v. Burke*, 425 F.3d 400 (7th Cir. 2005) ........................................................... 11

*United States v. Chen*, 933 F.2d 793 (9th Cir. 1991) ............................................................. 11

*United States v. Ferreria*, 239 F. Supp. 2d 849 (E.D. Wis. 2002) ......................................... 50

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) ................................................................. 8

*United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916 (D. Colo., July 18, 2018) ................... 7

*United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011) ............................................................. 9

*United States v. Muhtorov*, 12 CR 33, Dkt. 1955-1 (D. Colo.) .............................................. 48

*United States v. Muhtorov*, 329 F. Supp. 3d 1289 (D. Colo. 2018) ........................................ 50

*United States v. Musgraves*, 883 F.3d 709 (7th Cir. 2018) ..................................................... 9

*United States v. Pankow*, 884 F.3d 785 (7th Cir. 2018) .......................................................... 9

*United States v. Perez*, 571 F. App'x 495 (7th Cir. 2014) ....................................................... 9

*United States v. Santoya*, 493 F. Supp. 2d 1075 (E.D. Wis. 2007) ....................................... 10

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .............................................................. 8

*United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007) ..................................................... 9

*Wheel v. Robinson*, 34 F.3d 60 (2d Cir. 1994) ...................................................................... 11

### Statutes

18 U.S.C. § 2339A ...................................................................................................................... 5

18 U.S.C. § 2339B ........................................................................................................... 5, 11, 14

18 U.S.C. § 3553(a)(1) ........................................................................................................ 10, 16

18 U.S.C. §1001 ..................................................................................................................... 4, 10

18 U.S.C. §3553(a)(2) ............................................................................................................... 45

18 U.S.C. §3553(a)(6) ............................................................................................................... 15

18 U.S.C. § 956(a)(1) ............................................................................................................ 5, 13

28 U.S.C. § 994(j) ..................................................................................................................... 41

## Federal Sentencing Guidelines

Appendix C—Volume III, November 1, 2010 (amendment 739) ............................................. 41

U.S.S.G. § 3A1.4(a) ...................................................................................................... 4, 7

U.S.S.G. § 5H1.1 ....................................................................................................... 41, 44

U.S.S.G. § 5K2.0 .............................................................................................................. 50

## Rules

Rule 32(c) of the Federal Rules of Criminal Procedure ................................................................ 1

## Articles and Other Sources

2 Guys From Brooklyn Went To Syria To Fight ISIS.
    Now They're Back (HBO), Vice News ...................................................................... 15

Attorney General Loretta E. Lynch Delivers Opening
    Remarks at an Office of Justice Programs Panel Discussion
    on Justice-Involved Young Adults (Sept. 8, 2015) ................................................... 43

Brief for the American Medical Association and the American Academy of
    Child and Adolescent Psychiatry as *Amici Curiae* in support of Neither Party"
    to the United States Supreme Court in Graham v. Florida (July 23, 2009)........................ 40, 41

Dave Phillipps, *American Volunteers Fighting ISIS in Syria Worry*
    *About a U.S. Pullout*, N.Y. Times, Feb. 16, 2019 ...................................................... 15

Elaine Scarry, *The Body in Pain* 13 (Oxford University Press, 1985) ........................................ 1

Ernest Hemingway, *For Whom The Bell Tolls* 467 (Scribner, 1995)............................................ 2

Nicholas Schmidle, College Grads Fight ISIS with the Kurds;
    Two twenty-one-year-olds chat about what it takes to go to Syria,
    *The New Yorker*, July 31, 2017 ........................................................................... 15

Rosemary Sobol and Patrick M. O'Connell, *A mission 'you're willing to die for':*
    *Michigan man shows up in Chicago ER after getting shot in Syria,*
    Chicago Trib., Mar. 5, 2018 .................................................................................. 15

Shane Bauer, *Behind the Lines*, Mother Jones, May/June 2019 Issue................................... 14, 34

Shirin Jaafari, *For some Americans, the conflict in Syria*
    *is 'the Spanish Civil War of our time*, PRI, Sept. 13, 2017................................................. 2, 14

Tam Hussein, *The Ansar al-Sham Battalions*
    (Mar. 24, 2014, Carnegie Middle East Center) ...................................................... 13

United States Sentencing Commission, *Youthful Offenders*
    *in the Federal System* (May 2017) ........................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**I.  Introduction** ................................................................................................................. 1

**II.  Procedural Background** .............................................................................................. 4

**III. Clarifications to the PSR and Posititon on the Advisory Guideline Level** ...................... 6

  A.  Clarifications to the PSR ............................................................................................. 6

    1.  Identifying Data; Citizenship, p. 3 ......................................................................... 6

    2.  Part A. The Offense; Charge(s) and Conviction(s), p. 6, ¶ 16 ............................... 6

    3.  Part C.  Offender Characteristics; Employment Record, p. 18, ¶ 92 ..................... 7

  B.  Position on the Advisory Guideline Level ................................................................... 7

**IV. Argument** .................................................................................................................... 8

  A.  Legal Standards .......................................................................................................... 8

  B.  Nature and Circumstances of the Offense—§ 3553(a)(1) ........................................... 10

    1.  False Statement, 18 U.S.C. §1001(a)(2) ............................................................... 10

    2.  Material Support, 18 U.S.C. § 2339B ................................................................... 11

  C.  History and Characteristics of Defendant—§3553(a)(1) ............................................ 16

    1. Aws's Childhood in Iraq was Marred by Numerous
       Tragedies Ranging From the Loss of His Mother to
       War and Sectarian Violence ............................................................................... 16

      a.  Aws's Early Childhood Was Marred by Abuse and
         Neglect After His Mother Died and His Father Remarried ............................. 17

      b.  The 2003 American-led Invasion of Iraq Upends
         Aws's Already Difficult Existence ................................................................. 21

      c.  Aws Survived Sectarian Violence Following the Fall of
         Saddam Hussein, and Witnessing Destruction and Civilian Deaths,
         Including of Close Family Members and Friends ........................................... 22

      d.  Aws is Kidnapped and Tortured For Weeks
         Based on a Case of Mistaken Identity ........................................................... 26

      e.  After Aws's Kidnapping and Torture, the Al-Jayab
         Family Leaves Iraq for Syria, Forcing Aws to Leave
         His Young Wife Behind in Iraq ..................................................................... 27

  D.  Aws and His Family Flee to Syria Only to
     Find More Death, Destruction, and War ..................................................................... 28

  E.  The Al-Jayabs Flee to America as Refugees to Find a New Home,
     But Aws Remains Consumed By the Suffering of the Syrian People .............................. 31

  F.  Aws Returns to Syria for Approximately
     Two Months And Then Returns to the United States ..................................................... 33

G.   Aws Begins to Live a Normal Life After Returning to the United States
     and During the Nearly Two Years Prior to His Arrest in January 2016. ........................... 35

H.   Aws's Physical and Mental Health Condition .................................................. 37

     1.   Physical Health ........................................................................ 37

     2.   Mental Health ......................................................................... 37

I.   Aws's Family Connections Remain Strong Notwithstanding the Charges. ........................ 39

J.   Aws's Youth at the Time of the Offenses
     is a Compelling Mitigating Factor. ............................................................ 40

K.   A Sentence Well Below the Advisory Guidelines
     Addresses the Factors Set Forth in § 3553(a)(2). ............................................. 45

     1.   Seriousness of the Offenses. ............................................................ 45

     2.   General Deterrence ..................................................................... 46

     3.   Specific Deterrence .................................................................... 46

L.   Aws Faces Further Incarceration and Severe Immigration
     Consequences Following the Completion of The Sentence Imposed by the Court. .......... 48

**V.   Conclusion** ................................................................................ 51

Defendant, **AWS MOHAMMED YOUNIS AL-JAYAB**, by and through his attorneys,

**THOMAS ANTHONY DURKIN** and **JOSHUA G. HERMAN** pursuant to the Due Process,

Effective Assistance of Counsel, and Cruel and Unusual Punishment clauses of the Constitution

of the United States, Rule 32(c) of the Federal Rules of Criminal Procedure, and 18 U.S.C. §

3553(a), respectfully submits the following: Clarifications to the Presentence Investigation

Report ("PSR") and Sentencing Memorandum.

## I.    INTRODUCTION

Simply reducing to words the many horrific experiences that have befallen Aws in the 23

years of his life before his arrest necessarily diminishes their significance and reality.[1]  Since his

birth, war, death, and destruction have shadowed him, leaving lasting physical and psychic scars.

Aws's life, as his younger brother Samer writes, has been "like an overbearing continuous

nightmare."  (S. Al-Jayab Letter, p. 1).[2]  Indeed, properly contextualizing those experiences

requires considering the impact of multiple wars, international conflicts, humanitarian crises, the

foreign policies of different nations, and the political motives that undergird this and every

federal "national security" prosecution.   In the end, counsel can add little to what Aws has

written in his lengthy and compelling autobiographic piece entitled, "A Forever Foreigner

(Experiencing the Substance of Life)," which was submitted as an exhibit to the Defense Version

---

[1] In her work, *The Body in Pain*, Professor Elaine Scarry writes:

> As physical pain is monolithically consistent in its assault on language, so the verbal
> strategies for overcoming that assault are very small in number and reappear consistently
> as one looks at the words of patient, physician, Amnesty worker, lawyer, artist:   these
> verbal strategies revolve around the verbal sign of the weapon or what will eventually be
> called here the language of "agency."

Elaine Scarry, *The Body in Pain* 13 (Oxford University Press, 1985).

[2] Character letters will be submitted under separate cover to the Court, with copies provided to the
government and Probation Officer.

of the Offense, and is attached hereto and filed under seal as Exhibit A for the Court's convenience.

Yet, and notwithstanding these challenges, for the purposes of sentencing it is essential to consider Aws as the person in the context of his tragic upbringing. This Memorandum is thus offered to assist the Court as it fashions an individualized sentence in his truly unique and tragic case. When seen as an individual, it is immediately clear how Aws's life experiences—in particular his survival through wars, torture, injustice, and statelessness—compelled him to return to Syria to defend others for what he believed to be just political and humanitarian reasons. (*See* PSR, p. 7, ¶ 22 "The defendant contends in his version of the offense that his motivation for the instant offense was 'purely political and honorably motivated' in that he wanted to help those who were suffering in Syria because of Al Assad's regime."). Just barely older than a teenager, it can readily be seen that Aws acted impulsively on the idealistic belief that the world was "worth the fighting for."[3] He is a classic product of survival through war and conflict, and his actions and words (many of which were naïve and misguided teenage braggadocio) must be seen in that context.

Time and maturity have given Aws perspective. He recognizes that while he perceived his motivations to be just, his conduct was wrong. He acknowledged as much to Probation when

---

[3] Ernest Hemingway, *For Whom The Bell Tolls* 467 (Scribner, 1995). The quoted excerpt is from Robert Jordan's famous internal monologue, delivered when he was immobilized by a crushed leg and exposed to the approaching Spanish Nationalist soldiers. The complete quote and context is as follows: "I have fought for what I believed in for a year now. If we win here we will win everywhere. The world is a fine place and worth the fighting for and I hate very much to leave it." Fictional analogies aside, there are strong non-fictional links in the fights waged by rebel groups fighting against Assad's Syrian regime and the anti-fascist forces who fought against Francisco Franco's Nationalist forces in Spain during the 1936-1939 Spanish Civil War. Those anti-fascist forces included close to 3,000 Americans who fought in groups such as the Abraham Lincoln Brigade. Not surprisingly, others have observed the links between the Syrian War and the Spanish Civil War. *See* Shirin Jaafari, *For some Americans, the conflict in Syria is 'the Spanish Civil War of our time*, PRI, Sept. 13, 2017, available at: https://bit.ly/2y2Oqtd (last visited July 9, 2019).

he said that "he was trying to do the right thing for the Syrian people; however, he went about it in the wrong way." (PSR, p. 5, ¶14). It should be equally clear from this background that Aws was and is in no way a "radical jihadi," as the government will no doubt mischaracterize him in its continued one-size-fits-all national security prosecution narrative. Notably, Aws could have very well stayed in Syria in 2014. He could have joined other groups that were there. But he chose not to do so. Instead, he returned to the United States to be with his family, where he enrolled in a community college, worked at a hotel, had girlfriends, and hung out and travelled with a diverse group of friends. In other words, he started to become an American after experiencing peace for the first time in his life.

Moreover, during the nearly two years that Aws lived in Sacramento between his return from Syria and his arrest in January 2016, he found work, friends, and finally a sense of home despite struggling with the "overbearing continuous nightmare" of his past. Significantly, during this time Aws was under near constant government surveillance, both through surreptitious physical and electronic surveillance as well as through multiple undercover operatives who befriended him under false pretenses. This fact alone should not escape the Court's attention when considering the government's argument that future dangerousness is a serious factor to consider.

Likewise, now, more than five years after the offense conduct, Aws faces not only the potential of further imprisonment, but also the terrifying reality that any sentence imposed by the Court will be the beginning of what could be even more severe and permanent punishment. After completing the sentence imposed by this Court, Aws expects to be thrown into the limbo of immigration proceedings that will most certainly result in his ongoing detention. He will then face the prospect of being removed from the country in which he finally found some semblance

3

of peace and hope. Removal from this country would likely put him at risk of being sent to a country where he has no connections and faces the renewed threat of persecution not only because of his status as a Sunni Palestinian, but also because of this case. He will also be separated from the family whose strength and bonds have kept him alive through the years of war and conflict. In short, Aws will once again have to endure the "overbearing continuous nightmare" that he thought he had finally escaped as he started to live a normal life in the United States.

For these and other compelling reasons discussed herein, counsel respectfully request a sentence within the range of 57-71 months, which represents the otherwise applicable guideline range, but for the misguided and misplaced "terrorism enhancement" from U.S.S.G. § 3A1.4(a). And, in light of the severe immigration consequences that Aws will face—which will not only prevent him from receiving benefits in the BOP such as placement in a halfway house, but will also lead to his direct transfer from the BOP into immigration custody followed by further incarceration and potential removal from the United States—the circumstances justify a sentence toward the low-end of the 57-71 month range.

## II.     PROCEDURAL BACKGROUND

The PSR summarizes the key points of the procedural background points. (PSR, pp. 4-5, ¶¶ 1-13). In short, Aws was first charged on January 6, 2016, by Criminal Complaint in the Eastern District of California. (Case No. 16 MJ 1 (E.D. Cal.). That complaint charged Aws with making false statements in a matter involving international terrorism in violation of 18 U.S.C. § 1001. (PSR, p. 4, ¶1). Those false statements were made on October 6, 2014, long before his arrest in January 2016. An indictment was returned on January 14, 2016. (16 CR 8); (PSR, p. 4, ¶4). The indictment charged one count of making a false statement to the United States

4

Citizenship and Immigration Services (USCIS), and listed ten false statements made in violation of 18 U.S.C. § 1001(a)(2).  (PSR, p. 4, ¶4).

Two months after being charged in the Eastern District of California, the DOJ brought another indictment against Aws, this time in the Northern District of Illinois.   Specifically, on March 17, 2016, an indictment was filed that charged Aws with having "attempted to provide material support and resources, namely, personnel (including himself), knowing and intending that they were to be used in the preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons outside of the United States), in violation of 18 U.S.C. § 2339A.   (Dkt. #1).   The indictment alleges that the charged offense occurred from October 2012 to January 23, 2014.    (PSR, p. 4, ¶8).

On October 29, 2018, shortly before trial was to commence on the material support charge, a one-count superseding information was filed that charged Aws with knowingly providing material support and resources, namely personnel, to Ansar al-Islam, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B.  (Dkt. #125).

On October 31, 2018, Aws pled guilty pursuant to a written plea agreement with the government pursuant to Fed. R. Crim. P. 11(c)(1)(C).  (Dkt. #129). Specifically, Aws pled guilty to a new material support charge in the superseding information, as well as the false statement charge, which had been transferred from the Eastern District of California pursuant to Fed. R. Crim. P. 20.  (PSR, p. 4, ¶ 6).[4]  The parties agreed that the maximum sentence that could be imposed was 15 years, the statutory maximum for the material support charge.  (PSR, p. 5, ¶ 12).

---

[4] When the California false statement case was transferred to this district it was given Case No. 18 CR 721 and was initially assigned to Judge Ronald A. Guzman.  On November 1, 2018, the case was transferred to this court pursuant to Order of the Executive Committee.  (Case No. 18 CR 721, Dkt. #6).

Subject to that maximum sentence, the plea agreement permits the parties to recommend any sentence deemed appropriate, and the Court may impose any sentence up to fifteen years. (*Id.*). As a final point of procedural background, on November 5, 2018, a revised superseding information was filed concerning the material support charge. (Dkt. #131). This document was filed in order to conform the charge to amendments that were made in the plea agreement regarding Ansar al-Islam simply being identified as a designated terrorist organization, and not one that had "engaged in and was engaging in terrorist activity and terrorism." (*Compare* Dkt. #125 (superseding information) *with* Dkt. #131 (revised superseding information)).

### III.  CLARIFICATIONS TO THE PSR AND POSITION ON THE ADVISORY GUIDELINE LEVEL

#### A.  Clarifications to the PSR

1.  IDENTIFYING DATA
    Citizenship, p. 3

On the page listing Aws's "Identifying Data," the PSR describes his "Citizenship" as follows:  "Citizen of Another Country."  Counsel would clarify that Aws is not a citizen of any other country.  The more accurate description would be "Palestinian" or "Palestinian refugee."

2.  PART A.  THE OFFENSE
    Charge(s) and Conviction(s), p. 6, ¶ 16

The PSR summarizes points from the government's version, including that Aws returned to Syria to fight on behalf of terrorist groups "supporting violent jihad."  (PSR, p. 6, ¶16).  While counsel understand that these are the government's arguments, it cannot go without mention that Aws's conduct should most certainly not be mistaken for what the government portrays as "violent jihad," particularly insofar as the term may be employed to imply some sort of risk of future dangerousness.

Any version of "jihad" that Aws supported as what he perceived to be an obligation, and not necessarily one solely prescribed by his religion, should not be mistaken to be one that condones, supports, or perpetrates violence against innocent civilians. Nor should the facts raised in the Motion to Dismiss based on Combatant Immunity be forgotten. There is no evidence that points to Aws doing anything other than fighting in the Syrian War. *See also infra* pp. 11-15.

### 3.  PART C.  OFFENDER CHARACTERISTICS
<u>Employment Record, p. 18, ¶ 92</u>

The PSR lists Aws's employer as "Whitney Bose" in Milwaukee, Wisconsin from June 2013 through December 2013. (PSR, p. 18, ¶92). As a minor point of correction Aws's employer was "Pitney Bowes." The same correction should be made in the following paragraph. (PSR, p. 18, ¶93).

### B.  <u>Position on the Advisory Guideline Level</u>

Counsel agree, consistent with the PSR, which in turn reflects the terms of the plea agreement, that the adjusted guideline range is 180 months. (PSR, p. 5, ¶ 12); (Plea Agreement, Dkt. #129, ¶11). While counsel lodges no formal objection to this adjusted guidelines range, for the record, and for what it is worth, counsel object to the application of the draconian "terrorism enhancement" from U.S.S.G. § 3A1.4(a). (PSR, p. 9, ¶ 36); *United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916, *13, 2018 WL 3490886 (D. Colo., July 18, 2018) (noting that the terrorism enhancement takes a "wrecking ball" to the guideline range and is "draconian"). Pursuant to that extreme enhancement, 12 offense level points are added as a "victim related adjustment."[5]

---

[5] This "victim related adjustment" is particularly questionable given the circumstances here: war, where Aws was ultimately aligned against Assad's Syrian regime, aligning him with both Presidents Obama and Trump—the former who covertly support rebel forces fighting Assad and the latter who attacked Assad directly.

7

Additionally, Aws, who has no criminal history, is vaulted to the highest possible level of Criminal History VI when his criminal history would otherwise be zero, resulting in a criminal history category of I. (PSR, p. 10, ¶ 48).

For perspective, absent the terrorism enhancement, Aws's adjusted offense level would be 25 and his criminal history level I. Together, that would result in an advisory guideline range of 57-71 months. Thus, while Aws has agreed to the maximum advisory guideline range of 180 months pursuant to the plea agreement, counsel submits that these concerns are worthy factors considering, vis-à-vis 18 U.S.C. § 3553(a), both in terms of the artificially overstated offense level but also the overstated criminal history, which should not handcuff the Court's broad discretion. *See*, *e.g.*, *United States v. Stewart*, 590 F.3d 93, 154 (2d Cir. 2009) (Calabresi, J.) (considering the terrorism enhancement and observing, "When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*, 543 U.S. 220, 244 (2005).").

## IV.   ARGUMENT

### A.  Legal Standards

The Federal Sentencing Guidelines serve as a "starting point" and "initial benchmark" in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). *Gall* directs sentencing judges to "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

Thus, under *Gall*, district courts must "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). A district court cannot simply presume the guideline range to be reasonable. *United States v. Perez*, 571 F. App'x 495, 497 (7th Cir. 2014) (citing *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("A district court cannot presume that a sentence within the guidelines range would be reasonable."). As the Seventh Circuit has emphasized, "the Guidelines are, after all, guidelines [that] must be considered seriously and applied carefully.... In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)." *United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (internal citations omitted); *United States v. Musgraves*, 883 F.3d 709, 715 (7th Cir. 2018) (the "Guidelines are an advisory starting point for a judge, but after correctly calculating a guideline range, the judge has discretion to select an appropriate sentence for the individual defendant and the surrounding circumstances.").

Adequate consideration of the § 3553(a) sentencing factors helps ensure that the sentencing decision is individualized, as it must be. Indeed, "[w]hen determining a sentence, the court 'must make an individualized assessment based on the facts presented.'" *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018) (quoting *Gall*, 552 U.S. at 50)); *see United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007) (internal citations omitted) ("the § 3553(a) factors are broad, vague, and open-ended ... and review for reasonableness is deferential … so the sentencing judge has considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a)."). The Supreme Court has emphasized that the punishment imposed "should fit the offender and not merely the crime."

9

*Pepper*, 131 S.Ct. at 1240 (citations omitted) (emphasis added). *See also Gall*, 522 U.S. at 52, *quoting Koon v. United States*, 518 U.S. 14. 81, 113 (1996).

The "sufficient but not greater than necessary" standard—also known as the "parsimony" clause—is the "overarching provision" of § 3553(a). *Kimbrough*, 552 U.S. at 101. By its terms, that provision instructs the Court to consider a sentence that is the least severe, *i.e.*, not greater than necessary. *See United States v. Santoya*, 493 F. Supp. 2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant.").

### B.  Nature and Circumstances of the Offense—§ 3553(a)(1)

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).

#### 1.  False Statement, 18 U.S.C. §1001(a)(2)

On January 6, 2016, Aws was arrested based on a criminal complaint filed in the Eastern District of California and charged with making false statements to an agency of the United States in an offense involving terrorism in violation of 18 U.S.C. §1001(a)(2). The charge related to statements that Aws made on October 6, 2014, during an interview with the United States Citizenship and Immigration Services (USCIS). At the time, Aws was present in the United States as a refugee. According to the DHS report generated from this meeting, the purported purpose of the interview was for Aws to "follow-up on the status of his pending I-485/Application to Register Permanent Residence or Adjust Status as well as his I-765/Application for Employment Authorization." AL-JAYAB_000084. During the interview, government agents asked Aws pointed questions about his travel, activity, and prior associations.

As set forth in the plea agreement, Aws did not provide accurate answers about his international travel and conduct in 2013-14. (Plea Agreement, Dkt. #129, pp. 4-6).

Significantly, at the time of the interview in October 2014, the government knew full well that the answers were not accurate. As reported in the PSR, the FBI agent told Probation that "at the time USCIS agents interviewed the defendant on October 6, 2014, the agents were aware that the defendant had traveled to Syria." (PSR, p. 7, ¶ 25). Indeed, Aws had been under near-constant government surveillance since at least March 2014, which was less than two months after his return to the United States. This surveillance included, among other things, electronic searches, foreign intelligence warrants, multiple search warrants on social media accounts, physical searches, and the use of in-person confidential informants who pretended to be Aws's friends while they collected information on him and reported to the FBI.

Given that the FBI already knew of Aws's travels prior to the October 2014 interview, counsel have always advanced the proposition that the case bore many similarities to a perjury trap.[6] The interview was in many ways a pretense, and any answer Aws gave would have led to serious immigration consequences and criminal charges.

## 2. Material Support, 18 U.S.C. § 2339B

The revised superseding information charges Aws with knowingly providing material support to Ansar al-Islam, a designated foreign terrorist organization. While this conduct allegedly occurred between October 2012 and January 23, 2014, in the Northern District of

---

[6] A "perjury trap" occurs when the government calls a witness in order to obtain testimony in order to prosecute him later for perjury. *United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005) (quoting *United States v. Chen*, 933 F.2d 793, 796 (9th Cir. 1991)); *Wheel v. Robinson*, 34 F.3d 60, 67 (2d Cir. 1994). The Seventh Circuit has yet to accept this as a complete and substantive defense. *Burke*, 425 F.3d at 408.

Illinois and elsewhere, the critical time frame is actually between mid-November 2013 and January 23, 2014, which was when Aws was in Syria and then returned to the United States. It was then that, in his own mind, Aws attempted to defend the Syrian people and others against the dictatorial regime of al-Assad and the brutality of his army and associated forces.

Understanding the nature and cirucmstnaces of the offense thus requires evaluating the complex geopolitical and policy issues that were discussed in detail in Aws's memorandum in support of his motion to dismiss based on combatant immunity ("Combatant Immunity Memo") (Combatant Immunity Memo Dkt). Aws was in Syria between late November 2013 through January 2014, a particularly chaotic period when numerous rebel and opposition groups often worked cooperatively or at least shoulder-to-shoulder in their opposition against al-Assad and in defense of terroity, cities, and civilian populations. Many of these groups were armed, supported, and funded by other countries, including the United States. (Combatant Immunity Memo, pp. 17-20). The fluidity amongst most groups at the time spoke of the common objective: defeating al-Assad. This cooperation amongst groups often led to association with different groups.

In a December 28, 2013, online chat Aws told a friend that he had been in Aleppo for a month and that he was with "Ansar al-Sham." (AL-JAYAB_283068). He then added that it is "the same as Ansar al-Islam" with another name and was part of the Islamic Front. (*Id*.). Aws would later comment during this chat, "Ansar al-Islam and Ansar al-Sham have one and the same faith and approach." (AL-JAYAB_283072). And in another online chat with another individual on January 4, 2016, Aws said was with Ansar al-Islam and added that they are the same as Ansar in Syria, and "They will declare themselves as Ansar al-Sham." (AL-JAYAB_283082).

In addition to the sources described in the Comabtant Immunity Memo, additional information regarding rebel groups in Syria, and particularly Ansar al-Sham, is set forth in the memorandum by Tam Hussein, attached hereto as Exhibit B. Mr. Hussein is an investigaive journalist who defense counsel contacted pre-trial as a potential witness in support of Aws's combatant immunity defense. Mr. Hussein had extensive knowledge of the Ansar al-Sham group, as he had previously interacted with its members and written about it generally. *See* Tam Hussein, *The Ansar al-Sham Battalions* (Mar. 24, 2014, Carnegie Middle East Center) available at https://carnegie-mec.org/diwan/55066. In the attached memorandum, Mr. Hussein describes in plain terms how foreign influence, including that of America and the C.I.A., was obviously present in Syria in 2013. Mr. Hussein describes how Ansar al-Sham operated in areas of Aleppo and Hraytan, and had good relationships with other groups, including Ahrar al-Sham.

The language used in the revised superseding information reflects the unique nature and circumstances of this case. As initially charged, Aws was accused of proivding material support (to no group in particular) knowing that it would be used to carry out a violation of 18 U.S.C. §956(a)(1) (conspiracy to kill, kidnap, maim, or injure persons outside the United States). (Dkt. #1). Aws rightly would not accept those allegations. In contrast, the revised superseding informaiton more accuraetely reflects how Aws provided material support to Ansar al-Islam, knowing that it was a designated foreign terrorist organization. (Dkt. #131).

Thus, the charge to which Aws ultimately pled guilty does not involve any allegatoins of engaging in a conspiracy to kill, kidnap, maim, or injure. Moreover, and as Aws insisted at the change of plea hearing, language was stricken from the plea agreement (and subsequently from the information) that would have required Aws to admit that he knew Ansar al-Islam was

13

engaging in terrorist activity and terrorism.[7]  Thus, the charge to which Aws has pled guilty is that he provided material support to a group that he knew was designated to be a foreign terrorist organization.

Second, there is nothing in the nature and circumstances of the offense to even remotely indicate that Aws had any intention to participate in any conduct directed toward the United States.  The government may offer at sentencing, as it did in its version of the offense, pictures of Aws on family trips in Wisconsin or stray social media comments and imply that he was plotting some kind of activity in America or posed a threat in any way for domestic conduct.  *See* Defense Version, p. 6.  This case involved no plot to do damage in the United States.  There were no plans to harm Americans.  Any suggestion to the contrary should be rejected out-of-hand.

Third, it must also be noted that Aws was not unlike many young idealistic men who travelled to Syria to fight what they perceived to be injustice.   In the Combatant Immunity pleading, counsel cited a number of instances involving young Americans who had travelled to Syria to fight with rebel groups against Assad or ISIS, or against dictatorial regimes elsewhere in the region.  (Combatant Immunity Memo, p. 6, footnote 6).[8]   The media often praised these

---

[7] The mental state requirement in 18 U.S.C. § 2339B is worded in the disjunctive:

> To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

[8] In addition to the articles cited in the Combatant Immunity Memo, *see also* Shirin Jaafar, *supra* note 2 (stating, "It was Oct. 1. The dead of night. Lucas Chapman was as close as he'd ever been to realizing his dream. He was finally getting smuggled into Syria"; and including pictures of Americans posing in fatigues with AK-47 guns); Shane Bauer, *Behind the Lines*, Mother Jones, May/June 2019 Issue, available at: https://bit.ly/2XGOsnS (last visited July 9, 2019); (discussing interview with "Barry, an American who fought with the YPG in Syria and worked in coordination with traditional American forces and noting: "A few American YPG fighters have been open about their stints in Syria, and so far, none has been prosecuted.  Other American comrades were also approached by federal agents, Barry says. The agents didn't warn them against fighting ISIS in Syria, but if they took up arms against Turkey, a NATO

individuals for their bravery upon their return. Many were self-described "radicals" who joined the PKK; some had military background; and others had no political ideology or other qualifying background. Yet, unlike each and every one of these individuals, Aws returned to a country that he had recently left where he experienced first-hand the atrocities of war and conflict. He returned to a country where he had friends and family. Moreover, his stated purpose was to defend civilians against the violence of the Assad regime that, before his departure, President Obama and numerous world leaders condemned in the strongest terms, including by calling for military action against the regime. Yet, instead of being praised, he was prosecuted.[9]

Of course, these points are not made to minimize the seriousness of the offense. Rather, they are made to contextualize it. The offense must be seen as part of the Syrian War because, but for that conflict, Aws would have never left the United States. Moreover, the offense must

---

ally, they could be charged with terrorism."); Dave Phillipps, *American Volunteers Fighting ISIS in Syria Worry About a U.S. Pullout*, N.Y. Times, Feb. 16, 2019, available at: https://nyti.ms/2XzyvUB (last visited July 9, 2019); ("Mr. Pugh, like many before him, said he left home because he felt trapped in a dead-end job and wanted to live a life of meaning. He got the idea of volunteering with the Kurds from an article in Rolling Stone, and contacted the Y.P.G. through the group's recruiting website. He said he was sent encrypted email instructions to fly to Iraq, where he would be met."); 2 Guys From Brooklyn Went To Syria To Fight ISIS. Now They're Back (HBO), Vice News, available at https://bit.ly/2LeV36o (last visited July 9, 2019) (profiling two Brooklynites, Christopher, a "former bike racer and photographer who is now a metalworker" and Chris a "former theater director," who "took a break from their jobs" to go to Syria to fight the Islamic State with the YPG, and showing video of them holding rifles and hand grenades, and stating how "most of the time it was super boring" between occasional fire fights when they admit they did not know how many people they may have killed); Rosemary Sobol and Patrick M. O'Connell, *A mission 'you're willing to die for': Michigan man shows up in Chicago ER after getting shot in Syria*, Chicago Trib., Mar. 5, 2018, available at https://bit.ly/2G4WDUm (last visited July 9, 2019); Nicholas Schmidle, College Grads Fight ISIS with the Kurds; Two twenty-one-year-olds chat about what it takes to go to Syria, *The New Yorker*, July 31, 2017, available at: https://bit.ly/2y4GFXO, last visited July 9, 2019.

[9] In some respects, this point could be considered under a broad understanding of 18 U.S.C. §3553(a)(6)'s directive to avoid unwarranted disparities. However, because the comparison is between Aws's case and other similarly situated individuals who were not charged (and who were often celebrated upon their return), the analysis may not technically fit under 18 U.S.C. §3553(a)(6). Still, counsel submit, these facts may and should be considered when analyzing the nature and circumstances of the offense.

also be seen as a product of Aws's unique and tragic personal history. This history is discussed in more detail below.

### C. History and Characteristics of Defendant—§3553(a)(1)

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The PSR provides a thorough overview of Aws's history and characteristics. Letters submitted by family and loved ones supply additional detail into Aws as an individual, as well as the experiences that he endured. And most important, Aws's autobiography, A Forever Foreigner, provides further details and memories of his life. To supplement this extensive material that is already before the Court, counsel highlight below the significant aspects of Aws's unique history and characteristics.

1. Aws's Childhood in Iraq was Marred by Numerous Tragedies Ranging From the Loss of His Mother to War and Sectarian Violence.

Aws's history in Iraq is in many ways the product of generations of conflicts and international foreign policy decisions that continue to wreak havoc in the region resulting in the deaths and displacement of millions. As a Palestinian refugee, he and his family members were stateless and faced constant prejudice, as his father discusses in his letter. (M. Al-Jayab Letter, p. 1) ("we were always treated by the people of Iraq as outsiders who were not fortunate to be welcomed even as fellow human beings let alone fellow Arabs. His childhood involved seeking shelter from bombs; witnessing the death of friends and relatives; and being jailed and tortured. But his loss began at a more profoundly personal level with the death of his mother that destabilized his life just as it began.

a. Aws's Early Childhood Was Marred by Abuse and
Neglect After His Mother Died and His Father Remarried.

Aws was born in Baghdad, Iraq on November 15, 1992.  (PSR, p. 10, ¶53).  This was almost two years after the First Gulf War concluded in February 1991 that ultimately left Saddam Hussein in power. At a very young age Aws had physical challenges.  He recalls needing braces on his legs because he was born with what his older brother describes as "bent legs."  (PSR, p. 14, ¶ 72).  It is more likely that he suffered from Ricketts Disease as an infant.  (*Id.*); (M. Al-Jayab Letter, p. 2) ("Aws was born with a disability called 'rachitis' and this became an extreme financial setback because it needed a lot of expenses to cure it.").

In 1996, Aws's mother died when she was just 25 years old during complications form the birth of Aws's younger brother, Samer.  (PSR, p. 10, ¶ 53); (M. Al-Jayab Letter, p. 2) (describing how his wife died due to medical mistreatment, "During the surgery so many problems occurred that were instigated by the doctor's inadequacy that only a day after Samer was born she died.").  At the time of her death, Aws was just four years old.  (PSR, p. 10, ¶ 53).  While he did not have a chance to know her, the loss of his mother has had a profound impact on Aws as he poignantly describes in his autobiography, *A Forever Foreigner*.  (Ex. A, *A Forever Foreigner*, pp. 2-3).  She was buried in an unmarked grave, and Aws recalls making a gravestone for her when he visited her gravesite in Iraq in 2010.  (PSR, p. 10, ¶ 53).

Aws's brother Samer shares these feelings when he describes how the three brothers became aware that they "were completely alone in this world" after the loss of their mother.  (S. Al-Jayab Letter, p. 1 "The lack of a mother leaves a child without the most basic need which is a mother's care.  Without this, life would have treated us much differently and maybe many things would be different than how they are now.").  Samer also writes about how the loss of their

mother resulted in his brother Aws having to live with other relatives. (*Id*.). In Samer's words, Aws immediately "became lost in this world." (*Id*.).

Aws's father soon remarried after his wife died. In his letter, Aws's father describes the stress he was under at the time as he was unemployed, under immense financial pressure, and alone with three young boys. (M. Al-Jayab Letter, p. 3) ("My newborn Samer had needs such as diapers and milk because there was no one there to breastfeed him. Without work each hardship became harder for me to bear until I finally decided to get married in order to have someone to help with the kids so that I could focus on work."). Unfortunately, Aws's stepmother refused to accept Aws and his brothers and instead abused them in many ways.

Aws bluntly told Probation that his stepmother "hates him and his biological brothers." (PSR, p. 11, ¶ 54). Aws's brothers confirm that assessment in the PSR and in their letters. (PSR, p. 11, ¶ 54) ("Younis described their stepmother as a 'harsh' person who did not love the children."); (Y. Al-Jayab Letter, p. 1) ("we so unexpected treat she didn't care about us at all she use to treat us like nobody. She didn't try at all to get close to us or to treat us how she supposed to and my dad always at work comes home late.")). Other family members likewise confirm how Aws's step mother would not even feed him and his two brothers, preferring her own biological children over them. (Hisham Adnan Younis Mahmoud Letter, p. 1) ("She did not love her husband's children, treating them as strangers, and forbidding them to eat and drink. If she gave them food, it would be the last of her remains. She preferred her children to her husband's children."); (Nada Mahmoud Shayban Letter, p. 1) ("Their stepmother was very harsh in every way and rationed everything from their food to their clothing and did not want them to even be there. They ended up always in the streets on a daily basis and a lot of times they would walk for up to an hour away from the home until they reached my mother's house.").

When they were home, Aws's stepmother would often hit and kick him and his brothers. (PSR, p. 12, ¶ 59).[10] *See also* (S. Al-Jayab Letter, p. 1 "Not only was there mental abuse factors but also at times there were instances that we would get beat slightly for doing absolutely nothing than just merely existing within this 'home.'").  Other family members note that Aws's father also engaged in physical abuse during this time.  (Yusra Al-Jayab Letter, p 1 "She was really good in front of us but the opposite was actually happening to the kids. She started to restrict the kids from everything big and small. As all children make mistakes, Aws was no different but she was the harshest with him. The complaints never ended to their father and my brother also punished them in the same harshness by way of beating."); (S. Al-Jayab Letter, p. 1 ("as I grew older I began to understand that my father was an extremely strict man and at times to the point of cruelty.").

For his part, Aws's father now recognizes the abuse that he could not see at the time.  In his letter, he notes that remarrying was "another page of despair" "because [he] could not see that [his] new wife was not getting along with the kids and it took a toll on them."  (M. Al-Jayab Letter, p. 3).  Aws's father worked long hours and was barely home.  He now sees that the tension between his new wife and children caused his kids to have "a depressing childhood." (M. Al-Jayab Letter, p. 3).

It should be no surprise that the brothers depict this as an extremely painful and isolating time. (Y. Al-Jayab Letter, p. 1) ("We never felt loved inside the house."); (S. Al-Jayab Letter, p. 1 "Basically she destroyed our sense of childhood and of any feelings of protection in a happy home.").  As a consequence of this hostile and abusive environment, Aws and his brothers were

---

[10] The PSR also notes how Aws suffered nightmares about his young cousin's death in an attack and urinated in his bed as a result.  In response, his stepmother would poor cold water on him while he was sleeping.  The PSR notes that this occurred on one occasion, but the sad reality is that it was a somewhat regular occurrence for Aws when he was around 13 years old and lasted for nearly a year.

forced to live in different households, and Aws himself was kicked out of his own house by his stepmother, forcing him to live with different family and friends. (PSR, p. 11, ¶ 58).

In addition to these difficulties at home, Aws and his brothers experienced poverty and shortages of food growing up. (PSR, p. 11, ¶ 58). Much of this was due to growing up during and after war, as well as the fact that they were Palestinian refugees who had very restricted rights and limited options for work. Aws's brothers poignantly recall these hardships in their letters. (Y. Al-Jayab Letter, p. 1) ("I remember one day we couldn't even go to the school for a week because my dad couldn't buy us shoes for the school that's how hard the life was."); (S. Al-Jayab Letter, p. 1) ("from the smallest most basic needs such as food, clothing, care, we were slowly stripped of and mistreated at every turn."). The brothers started working at an early age and gave their father the money they earned to help with the family expenses. (Y. Al-Jayab Letter, p. 1). Having to work caused them to miss out on much of their childhood. (Y. Al-Jayab Letter, p. 2 )("Aws and I worked a lot. We sold ice in the streets we sold gas and clothes, and we sold sweets, we worked in street cleaning. We even worked with my dad as well. In all this working we did we were too young. We didn't had time to play or to enjoy our time like the people in our age we were always busy working."). Aws was even pulled out of school to work. (Sana Al-Jayab Letter, pp. 1-2) ("[Aws] was a smart student but they took him out of school to help his father working in order to please his stepmother's wishes.").

Needless to say, these awful formative experiences deprived Aws of any sense of normalcy. (Sana Al-Jayab Letter, pp. 1-2) ("The child grew into a man without living a normal life without a family that is understanding."). (Yusra Al-Jayab Letter, p. 1) ("Aws was living a life that differed from almost all children and his teenage years were harder not like those who grew through their young adulthood with a normal mother and father atmosphere. He lost all

childhood feelings and I cannot write about this anymore because I am writing about a stolen childhood, lost dreams and a harsh teenage years other than any other young man's."). Aws's already difficult living conditions became even more unbearable when war came in 2003.

### b. The 2003 American-led Invasion of Iraq Upends Aws's Already Difficult Existence.

Aws's arduous living conditions worsened, at times beyond comprehension after the infamous U.S.-led invasion in 2003. That invasion can be seen as a foolish and misguided overstep of military power, sold to the American people using fear and fabrications. Aws is a stark reminder that the decisions in Washington had devastating real-world consequences for innumerable individuals that reverberate to this day.

Aws was just 10 years old when the United States invaded Iraq. He would live the next 7 years of his life in Iraq in war and military conflict. He describes the horrors of the war in great detail in A Forever Foreigner. He vividly remembers fleeing from rocket attacks; seeking shelter with others in crowded rooms as bombs rained down; seeing corpses in the street; and fearing death on a daily basis. His father writes how "the war started in [I]raq in 2003 and the first night of the war the sky started to fall in every angle of he country. we had to run in the streets like crazy to the safest place that i knew i could protect my family." (M. Al-Jayab Letter, p. 4).

While Aws's detailed autobiography is perhaps the best source of information regarding his grueling story of survival and hardship during this deadly period of war in Iraq, the PSR does summarize some of the more tragic events. (PSR, pp. 12-13, ¶¶ 63-64). His brothers also recall the war in chilling detail. His brother Samer writes in his letter:

> But the nightmares started when the Iraqi war began to create a sense of eternal horror that has not been lifted from our lives, minds and consciousness till this day. The war brought death, kidnappings, tortures, rape, street body mortuaries for our people and this was seen by us through the eyes of young adults. I was only 6 years old when the war began and was never sheltered from the sights of bloodshed and human remains broken and apart all over. It became a daily

routine; bombs, gunfire, explosions and death as if hell was on earth and the apocalypse hade begun without sight of an end.

S. Al-Jayab Letter, p. 2. His brother Younis notes how their Palestinian camp were bombed during the war. For three years, the family survived, which meant "accepting what [is] usually not accepted," as his father states. (M. Al-Jayab Letter, p. 4).

The immediate aftermath of the forceful military removal of Saddam Hussein and his Ba'athist regime was the creation of a power vacuum that led to years of bloody sectarian violence that needlessly took numerous lives. These consequences were worse than the invasion itself. This was especially hard for Sunni Palestinian refugees such as Aws and his family, who were targeted because of their minority status and religion by other groups, particularly Shia militia forces.

<blockquote>
c. Aws Survived Sectarian Violence Following the Fall of Saddam Hussein, and Witnessing Destruction and Civilian Deaths, Including of Close Family Members and Friends.
</blockquote>

Even prior to the war, Aws and his family faced daily discrimination because of their status as Palestinian refugees. (PSR, p. 11, ¶62). For instance, neither he nor his family could own property, including a car, and were not considered Iraqi citizens. (S. Al-Jayab Letter, pp. 1-2) ("Along with the sadness and unbearable feelings of not being loved by what should have been our family, we also had to deal with the racism and discrimination of the Iraqi people. Being a Palestinian refugee in Iraq was hard but being a child living in an atmosphere filled with hatred at every turn was the worst."). (Sana Al-Jayab Letter, p. 1, "Since we were born in Iraq and until this day the Palestinian people have suffered from the Iraqi people terms of safety and lack of mercy. Because of this we are now again refugees."). (Y. Al-Jayab letter, p. 2, "We as Palestinians we were hated by everyone including our neighbors. A lot of Palestinian people in Baghdad were killed because of their identity. Racism grow between Iraqi people and

Palestinian more and more by each day a lot of people were kidnapped for the money and we the Palestinian people pay the receive their hostages by garbage bags."). They were also forced to live in buildings and restricted to particular areas. (M. Al-Jayab Letter, p. 1) (describing how UN Refugee Organization built 16 buildings with 48 apartments to contain 35,000 Palestinian refugees).

Prior to the war and its chaotic aftermath, Aws and other refugees endured restraints on their freedom of movement, but after the invasion and the destabilization that followed, leaving his neighborhood risked being kidnapped, tortured and killed by police and militia forces that patrolled the area. Aws told Probation how between 2004 and 2007 15 members of his extended family were tortured and killed and killed by Iraqi militia, and 36 of his neighbors were also killed. (PSR, p. 12, ¶ 63). Aws's father describes how they, like other Palestinian refugees, "were literally prisoners because we were afraid to leave the compound because we were a target of official and renegade forces. At that time people were arrested and killed because of their identity." (M. Al-Jayab Letter, pp. 4-5).

As Sunni Palestinian refugees, Aws, his family, and his community were particularly at risk by both Iraqi police and Shia militias, including the notorious Mahdi Army that was formed by Muqtada al-Sadr in 2003 as a response to the U.S. invasion. Aws and other Palestinian refugees in the Baladiyat neighborhood of Baghdad were often caught in the cross fire or outright targeted by American and Shia forces. Aws's brother Samer explains why the war period was especially hard on Palestinian refugees:

> I will tell you that after Saddam Hussein's death the Iraqis racism went to a whole other level. The main idea behind it all was that Iraqis believed in their core that we had stolen their land and shouldn't be in their country even though we had been there since our exile from Palestine in 1948. We did not just have to fear death by bombings, we were mainly afraid of the raids and hatred portrayed by

the Iraqi militia in forms of kidnappings, constant raping of our women, and
massacres on a daily basis.

(S. Al-Jayab Letter, p. 2). Life for Aws and other Palestinians in Iraq became "hell on earth" as
his brother describes. (S. Al-Jayab Letter, p. 6, "Living in Iraq became hell on earth for
Palestinians because we always felt like death was following us from the words that were
repeated to us by the Iraqis."). *See also* Sana Al-Jayab Letter, p. 2, ("The wars came and the
Iraqi people started to raid the homes resided by the Palestinians in order to assault the women
and kidnapping the men randomly and killing them. This is what made the majority of
Palestinians to flee.").

As described in often chilling and gruesome detail in his autobiography, Aws
experienced war as an innocent civilian at its most brutal level. He witnessed friends and family
being torn apart by bullets and mortars. He witnessed people being crushed by tanks. He
regularly saw dismembered limbs and corpses in the street. But the incident that perhaps haunts
him the most occurred in December 2006 when he was 14 years old. He was near a pool hall
when mortars or rockets hit the area close enough so that he was in the blast radius. A close
cousin named Mohammed was "ripped apart" by the explosions. Aws was close enough to see
his cousin's intestines in the aftermath. Amazingly, it appears that this attack was reported in
Western media, which documented the attack as part of ongoing and escalating violence against
Palestinians. *See* Hannah Allam, *Palestinians have become targets in Iraq's chaos*, McLatchy
DC, Dec. 21, 2006, available at https://bit.ly/2XCoy3R (last visited July 9, 2019) ("At the end of
the attack, the Palestinians counted their losses: six dead and 29 injured, including a repairman
next to the compound's generator, two neighborhood boys with their heads and stomachs split
open in the billiards hall, and the bean-seller beside his pushcart who screamed "Save me!"
before he died.").

24

Younis was also present for this attack, and he recalls: "I was selling gas at the corner of the street and Aws was at he pool hall and the bomb feel [sic] between us my aunt's son died during the occurrence, and my other aunt's daughter was injured in her head by a bullet fragment that is in her head until today." (Y. Al-Jayab Letter, p. 2). Sana Al-Jayab Letter, p. 2, ("My sister lost her son from a rocket strike that came down on a Palestinian home and Aws saw his cousin slip away from life who had been struck and split physically in half. And when he turned to look the other way his female cousin was struck with bomb shards on her head and back and there was nothing with him that could ease or help the situation.").

Mohammed's death is also seared in Samer's mind, as he writes:

> The one instance that neither I nor my brothers will ever forget before we left Iraq and is imprinted in our minds but mostly Aws's mind. Aws at the time was only 13, before we left Iraq seeking refuge Aws was with his cousin Mohammad at the Billiards Hall that was owned by Mohammad's father. The Iraqis started a random attack as was usual without warning and 2 of the bombs hit the hall in which they were in. At the time Mohammad was standing outside of the building while Aws was inside the hall. The first bomb shard brazed Mohammads leg which dropped him to the ground while the second consecutive bomb left Mohammad in half. As devastating as this was what came next was another surprise a few feet away on the same path was their other cousin Rania who was on her way to her grandmother's house which was right next to the pool hall. She also was hit with the same second bomb that had tore Mohammad. A bomb shard had hit the back of her head and back. Mohammad was still speaking while his insides had come out and intestines were falling from his body while Rania was bleeding out and crying. Aws ran to his cousin Mohammad but did not know how he could help.

(S. Al-Jayab Letter, pp. 2-3). Aws was very close to Mohammed, whose death had a serious and lasting impact on his psyche. (S. Al-Jayab Letter, p. 3) ("this event was not only devastating to the family member and best friend. Raised as brothrs [sic] Mohammad's death changed Aws forever. He became distant, depressed and lonlier [sic] than he had ever been.").

25

d. Aws is Kidnapped and Tortured For Weeks
Based on a Case of Mistaken Identity.

In addition to witnessing the death, destruction, and sectarian violence Aws was himself the victim of torture when he was just 17 years old. In *A Forever Foreigner*, he describes in painful detail how he was kidnapped in March of 2012 by Iraqi police forces and detained for 22 days, on suspicion of being involved in a car bombing four years prior. (Ex. A, *A Forever Foreigner*, pp. 19-32). He describes being pulled out of his grandmother's home at gunpoint by a number of armed men. He also describes what he felt to be the most painful part of the experience: watching as the men pull guns on his younger brother Samer.

Samer recalls this incident from his vantage point in his letter. (S. Al-Jayab Letter, pp. 4-5). Samer also describes how he and his father desperately went around the neighborhood and asked for any word on where Aws had been taken. (S. Al-Jayab Letter, p. 5 "We all began to feel dread and a feeling of hopelessness and we eventually went home without succeeding in finding any news or information of my brother's whereabouts."). *See also* Yusra Al-Jayab Letter, p. 2 ("After a short time two Palestinian children were kidnapped and one of them was Aws and my brother did not have any substantial money to trade for his son's life. We and the rest of my family gathered all the money possible and by doing this we were able to save him from his captors."). Aws's kidnapping was also reported on a website dedicated to Palestinian Iraqis.[11] A rough English translation of he article prepared by Younis is attached hereto as Exhibit C.

During his confinement Aws was subjected to excruciating torture that often left him wishing for death. (PSR, p. 13, ¶ 64). This torture included force positions, sleep deprivation, temperature control, being hung by his limbs, electrocution, physical beatings with objects such

---

[11] The story in Arabic is available at: http://www.paliraq.com/news.aspx?id=5445.

as hoses and sticks, and mock executions. (PSR, p 13, ¶ 64). It involved intense interrogation during which his tormentors demanded Aws confess to crimes that he did not commit. *A Forever Foreigner*, which is the first time that Aws has relived these darkest moments of his life, details the torture outlined above, and also describes other abuse that he endured which Aws has at this time asked not be made public. (Ex. A, *A Forever Foreigner*, pp. 27-30).

The cruel irony of this confinement and torture is that it was apparently based on a case of mistaken identity after Aws appeared before a judge. (PSR, p 13, ¶ 64). Still, his family had to pay a ransom for his release. (S. Al-Jayab Letter, p. 5 "After three weeks had passed we had eventually found out that my brother was held captive for ransom as were many. My family gathered the money and gave the ransom seekers what they had asked for but to our dismay and horror the money was taken but Aws was not returned."); (S. Al-Jayab Letter, p. 5, "Aws was released and I could see that my brother could barely walk and was staggering from the torture they had put him through."); (M. Al-Jayab Letter, p. 5) ("We continued to struggle until 2011 when another nightmare arrived at our doorstep and this time Aws was detained for no reason other than mistaking him for another Aws. They released him only after they tortured him extremely still thinking he was someone else and the judge found him innocent of all charges."). Aws was still in a cast weeks after his release, as evidenced in Exhibit D, a photo that was provided by the family.

> e. After Aws's Kidnapping and Torture, the Al-Jayab
> Family Leaves Iraq for Syria, Forcing Aws to Leave
> His Young Wife Behind in Iraq.

After he was release, Aws's father decided that the family was going to leave Iraq. Aws's father describes how his son's torture "added on to my ever growing fears that my sons lives were going to be far from fatality. So i had no choice but to take my family any where else

27

but this country." (M. Al-Jayab Letter, p. 5). Aws describes the harrowing experience of leaving Iraq and going to Syria. (Ex. A, *A Forever Foreigner*, pp. 38-40). Soon, his family began to leave Iraq seeking asylum. His uncles fled to the United States while his older brother escaped to Cyprus.

Despite the horrendous conditions, the decision to leave was not easy for Aws. As he details in *A Forever Foreigner*, Aws was in a relationship with a young woman whom he eventually married. While they did not live together, this marriage offered Aws some hope of being able to live a normal life. Aws initially resisted leaving Iraq because it meant separation from his wife, who could not leave her own family. But when his father told him that the entire family would stay if Aws did not leave, and that he would also personally be at fault if anything happened to his brothers or sister, Aws placed his own family over his own relationship. (PSR, p. 12, ¶ 62). He agreed to leave Iraq. The marriage was annulled and Aws left Iraq with his family on a harrowing journey to Syria where things, in many respects, only became worse. He would never see his wife again.

### D. Aws and His Family Flee to Syria Only to Find More Death, Destruction, and War.

Reaching Syria in early 2012 initially provided some hope for a different life. But it soon became apparent that things would not be better. The Al-Jayabs found that Palestinian refugees were treated much the same as in Iraq—with disdain, disrespect, and prejudice. And not long after they arrived, war erupted after the Assad regime violently responded to civilian protests. (S. Al-Jayab Letter, p. 7) ("Reaching Syria we were full of hope that we could start a new life without racism and hatred that had filled our lives before. The feeling of safety and peace only lasted for a couple of months and then the war began in Syria."). Indeed, from March to October

of 2012, when Aws was in Syria with his family, Assad and his forces unleashed a brutal campaign of violence against the civilian population that sought his ouster.

Aws and his family lived in would live in different refugee camps in Syria.[12]  They had to move as the fighting kept coming closer, as civilians and their neighborhoods were deemed legitimate targets by the Syrian Army.  (PSR, p. 13, ¶65 "The defendant witnessed the Syrian military attack civilians as it traveled through the neighborhoods and he saw, and lived through, acts of violence, including deaths by bombings").  His brother Samer describes the experience as "déjà vu" as they again experienced bombings and "began to relive new seens [sic] of new bodies with more death and destruction all over again but now the only difference was the country."  (S. Al-Jayab Letter, p. 7); (M. Al Jayab Letter, p. 5) ("during this time the area we lived in was bombed too many times and we sow [sic] dead people on a daily basis.").

As in Iraq, Aws suffered a great personal loss when his cousin and best friend Mohammad Nasr Jayab was shot in the head and killed by a Syrian sniper on July 19, 2012.  In *A Forever Foreigner*, Aws painfully describes how the family looked for Mohammad's body after he did not come home, and then buried him after his corpse was located.  (Ex. A, *A Forever Foreigner*, pp. 42-46).  Video still available online shows Aws and others carrying Mohammad's body.[13]  Aws's social media posts also contain many images of Mohammad, both alive and, in another photo showing Aws paying respects to his cousin.  (*See* Exhibit E).

Younis describes how Mohammed's death deeply affected Aws.  (Y. Al-Jayab Letter, p. 3).  ("When the [sic] moved to Syria after a little while another civil war started in Syria and

---

[12] The PSR reflects that, while in Syria, Aws lived in one Palestinian refugee camp in Yarmouk, which is a suburb of Damascus.  (PSR, p. 13, ¶65).  In addition to the Yarmouk camp, Aws lived in other refugee camps as well.  (Ex. A, *A Forever Foreigner*, pp. 40-41).

[13] Video of Aws carrying the corpse of his cousin is available at https://bit.ly/2Cqh4JN (last visited July 9, 2019). In this video, Aws is seen in the black t-shirt helping to carry his cousin's corpse along with other friends and family members.

another a best friend and cousin to Aws passed away in a different place and different war all this things everything that happened to us and Aws put until this point would break anyone spirit and would kill any hope."). Samer, who was in Syria with Aws at the time, also recalls how Mohammed's death devastated his brother. (S. Al-Jayab Letter, p. 7) ("This brought death once again to the eyes of my family and give us the feeling of no hope for safety ever again. Aws fell into depression once again. No one in my family was normal and all of us changed in our own way some of us became distant and some no longer even smiled but Aws was hard broken and sadness filled my brother's eyes."). Aws's father also described the sudden and severe impact that Mohammed's death had on his son: "the next day we found out that he was killed and Aws was shocked hes [sic] state of mind was already deep in depression and with the recurrence of losing another close friend and cousin he fill [sic] into a deeper state of lack of hope. At the funeral Aws and I puts his cosen [sic] in the grave and this imprinted in his heart as a major wound." (M. Al-Jayab Letter, p. 5). Yet, Aws's own words best describes the impact of his cousin's death on his own mental health. (Ex. A, *A Forever Foreigner*, p. 46).

Life in Syria again became "hell on earth" for the Al-Jayab family. (S. Al-Jayab Letter, p. 7). ("As time went by the events of the war became worse and worse. Life as we know it had reached a pint that brought the sight of death at every corner to which there was no end we knew we had to leave but there was no escaping and we became imprisoned in another hell on earth."). The family again sought to leave, this time to the United States on refugee status. Aws's younger brother also needed medical attention for a cranial injury that he suffered from after an attack in Iraq. (PSR, p. 15, ¶ 75 "According to the defendant's social history report, Ali was hit in the head with shrapnel while standing on a balcony when gunfire erupted in his community in Baghdad."); (M. Al-Jayab Letter) (describing injury to Ali).

30

While conditions in Syria were hellish, Aws identified with the Syrian civilians who were oppressed by the Assad regime. He felt an affinity with their struggle and in many ways wanted to remain in Syria. He also had other family and friends there who were united in the struggle against Al-Assad. Leaving Syria meant abandoning his friends and family. However, as in Iraq, his father told him that if he did not go, then no one from the family would go and Aws would be responsible for the hardship that fell on anyone, including his younger brother who needed medical treatment. Again Aws acquiesced and joined his family to America, even though his heart told him to stay in Syria. (PSR, p. 15, ¶ 75) ("[Aws] indicated that he wanted to defend the Syrian people, but in order to do that, he would have to be taken off a refugee list with his family, which would delay medical treatment for his brother, Ali, who had a brain/skull injury.").

### E. The Al-Jayabs Flee to America as Refugees to Find a New Home, But Aws Remains Consumed By the Suffering of the Syrian People.

In October 2012, the Al-Jayabs emigrated from Syria to the United States as refugees. Samer recalls how in 2012, their "memories of hell were all that we could take with us." (S. Al-Jayab Letter, p. 8). Those memories consumed Aws, who felt adrift in the United States. While some family members were in America, he knew little of the culture and did not even speak the language. He travelled to different states and lived with different family members. It was nearly impossible to live with his father because his abusive stepmother still refused to accept him and his brothers.

Aws lived with his father for a few weeks, briefly lived in Arizona with another uncle, and then moved to Milwaukee to live with an uncle for six to eight months. The itinerant life added to his sense of displacement. His brother describes the feeling:

Life as a refugee is easy to say but not at all to live no matter where. You need to imagine that you are pulled from everything you know and placed somewhere that is completely unfamiliar. Not only do you lack the language but you don't know

> anyone and don't know the laws or places or even the atmosphere.  It's as if you are lost and don't know where to even start understanding your surroundings and along with that you live amongst people who look at you as if you were there to hurt them.   The unwantedness of refugees follows you wherever you go even by the people who have accepted you into their country but they still don't really want you.  No words can explain how lost and unwanted one feels.

S. Al-Jayab Letter, p. 8.  While he lived with family, they also overworked him in Wisconsin, which he describes in *A Forever Foreigner*.  (Ex. A, *A Forever Foreigner*, pp. 50-52).

The PSR correctly notes how, after coming to the United States in 2012 when he was just 19 years old, Aws had no friends, "he did not speak the native language, know the culture, or have many friends or family other than his immediately family members."    (PSR, p. 6, ¶18).  Moreover, in the United States he "felt as if he abandoned his friends and family who were trapped in a violent environment." (*Id*.).   He felt guilt for feeling that he had left others behind.  (PSR, p. 15, ¶75) ("The defendant felt guilty about not helping those who were injured and leaving others behind.").  To alleviate the sense of alienation and displacement, Aws continued to communicate with family members and friends in Iraq and Syria.  And as news of atrocities continued to spread, Aws's social media posts began to express a desire to go back to Syria.

The government will no doubt rely on Aws's social media posts, particularly those set forth in the Criminal Complaint filed in the Eastern District of California.  But in considering those posts, it is essential to see Aws's social media posts and comments in the context of his life experiences.  Unlike many people who talk about war and violence, Aws actually experienced it at a very personal level.  He saw and experienced things no one should endure.  Additionally, it is important to understand Aws's youth and immaturity at the time.  He was, of course, 19 years old when he came to the United States and in his early 20s when he returned to Syria.  As discussed below, even if not for the years of psychological trauma resulting in PTSD, Aws's executive functioning was still developing at a basic organic level.  Further, in addition to being

young, naïve, and immature, at this time Aws had very little education and his world view was shaped by news of current events such as the American invasion of Iraq and scenes from Abu Ghraib prison. Lastly, the significance of Aws's isolation in America cannot be understated. He used social media allowed him to connect with other people. Doing so often involved embellishing, exaggerated, and made-up comments as he sought acceptance and camaraderie.

Further, in addition to having a lasting psychological impact, living through two wars also shaped Aws's political views. More to the point, experiencing and surviving war as a civilian—and seeing many other innocent civilians be not so fortunate—instilled in Aws a strong sense of opposition to injustice, as naïve as it may have been. This is especially true with respect to the Assad regime and the widespread violence and death it has perpetrated. While Aws's sympathy with groups aligned against Assad varied—his own opposition to Assad was constant, if for no other reason that he was a first-hand witness to its murdering of innocent civilians, including his own cousin. This much is clear in Aws's social media posts in 2013 and 2014 that react powerfully to images of human suffering. In these images, examples of which are attached hereto as Exhibit F, it is possible to see the root of what made him reluctant to leave Syria in the first place and what also spurred his desire to return.

### F. Aws Returns to Syria for Approximately Two Months And Then Returns to the United States.

In August 2013, the Syrian Army launched a devastating chemical weapon attack that killed over 1,400 civilians, including 426 children in Ghouta, a city located near Damascus. This brutal attack occurred one year after President Obama declared a chemical weapons "redline" and authorized the C.I.A. to arm Syrian rebels. (Combatant Immunity Memo, pp. 11-12). Images of the chemical attack spread online and in the media. In his recent article on the Syrian War, Shane Bauer describes these grisly images as follows:

33

> The images that poured out of eastern Ghouta in the early hours of August 21, 2013, were hellish. Men with water hoses were spraying down the victims of a chemical attack. People writhed on the floors of hospitals, mosques, and schools. Others were running around senselessly, screaming and pleading to God. There was no blood anywhere, but hundreds of people were clearly dying.
>
> A girl with sunken eyes lay on a hospital floor, unmoving except for periodic, slow gulps of air. A boy's arm wandered jerkily above him, gesturing in circles as his legs, chest, and the muscles around his vacant eyes twitched violently. A man shrieked and flopped around like a fish fighting for life, and a naked girl clutched her head, her face full of terror, saying "I'm alive," over and over. On a hospital bed, a man pumped the chest of a small, lifeless boy until foam leaked from the child's mouth. He clutched the boy's limp body to his chest. Then he screamed.

Bauer, *supra* footnote 8. President Obama condemned the attack, calling it a "crime against humanity, and a violation of the laws of war." (Combatant Immunity Memo, p. 12). In response, President Obama called for a "targeted military strike" to "deter Assad from using chemical weapons, to degrade his regime's ability to use them and to make clear to the world that we will not tolerate their use." (*Id*.). But while the call for military action was forceful and determined, the response was ultimately tepid because President Obama called on Congress to authorize the airstrike only to have political inertia take over.

Aws saw the images of human beings dying miserably from the Ghouta chemical weapons attack. Those gruesome images had a profound impact on him. While Aws had discussed returning to Syria not long after he arrived to America, it was the escalation of the humanitarian crises and civilian deaths, of which Ghouta was emblematic, that truly steeled his desire to return, which he ultimately accomplished in November 2013.

As noted above and in the Combatant Immunity Memo, by the time Aws had returned to Syria, many Western powers, including the United States, were covertly and overtly funding, arming, and training many rebel groups. On the other side, both Russian and Iran were

34

providing direct military support to the Assad.  While not exculpating his conduct, it is necessary to consider this larger context of the conflict that Aws entered.

It is also important to recognize how many different rebel groups were united in opposition against Assad.  There were often shifts in alliances between different groups and leadership structure within each group.  The Combatant Immunity pleading, as well as Mr. Hussein's memo attached hereto as Exhibit B, provide an overview of how, particularly in late 2013 and early 2014, many groups joined forces to cooperate with each other under the same banner.  For instance, Aws was associated with Ansar al-Sham, which was part of a coalition under the Islamic Front.  (Combatant Immunity Memo, pp. 15-17).  He has acknowledged through his plea that he also associated with Ansar al-Islam through Ansar al-Sham.  Illustrating the fluidity of the groups, while in Syria Aws noted in electronic communications that the two groups "have one and the same faith and approach"  (AL-JAYAB_283072) and that he understood Ansar al-Islam to declare itself as Ansar al-Sham.  (AL-JAYAB_283082).

While Aws initially believed, in his youthful and naïve idealism, that the trip to Syria was necessary, it was not long he realized that the reality was different.  This was due in large part to the fact that ISIS started attacking other rebel groups, which Aws found to be antithetical to his reasons for returning to Syria in the first place.  Before the end of January 2014, Aws was back in the United States after spending approximately two months altogether in Syria.

### G.  Aws Begins to Live a Normal Life After Returning to the United States and During the Nearly Two Years Prior to His Arrest in January 2016.

After returning to the United States, Aws tried to establish a normal life for perhaps the first time.  He started by moving in with his father in Sacramento.  He would eventually enroll at the American River College.  He worked several jobs, including as a security officer at a Ramada Inn.  (PSR, p. 13, ¶ 66).  He worked there from February 1, 2015 through December 31, 2015,

35

just before he was arrested. (PSR, pp. 17-18, ¶ 90). According to the PSR, the hotel "would consider re-employing" Aws. (PSR, p. 17, ¶ 90). He also enrolled at American River College, a community college located in Sacramento where he participated in ESL, reading, writing, and computer science classes from August through December 2015. (PSR, p. 17, ¶85). *See* M. Al-Jayab Letter, p. 5 ("Aws lived with me for short time then he went to live with his friend. At this time Aws started to look forward to his life he started to work and study and started to plan to make family of his own.").

After returning from Syria, getting a job, enrolling in school, and assimilating to America culture, Aws finally began to feel like he had a home. For the first time in his life, Aws lived in a country not embroiled in deadly conflict and war. He finally felt the shadow of war lift. As he told Probation, "2014 through 2016" were the "'best years' of his life in that he was in a relationship with his girlfriend, was employed, and wanted to become an engineer." (PSR, p. 13, ¶ 67). He was also "motivated to obtain United States citizenship at that time." (PSR, p. 13, ¶ 67).

Samer describes how Aws was "making progress" during this time period. (S. Al-Jayab Letter, p. 8). Samer goes on to state as follows:

> He had started to work at a local hotel as a security guard and at the same time had applied to classes in American River College. His dull and depressed demeanor slowly started to fade and he began to set goals for success in his life. Aws became much more social and made friends at every turn whether at work or in school Aws was the life of the gathering. We all saw how serious my brother Aws became towards building a better future for himself and in turn for us as well. He had also started to fall in love with a girl and was planning to marry her and start a family.

(*Id*.). A letter from a friend, V. Ponce, helps illustrate how others saw him during those years in California after he came back from California. Ms. Ponce describes how she saw Aws on a daily basis because he lived in one of her mother's apartments. She goes on to provide specific

36

examples of his altruism in helping her and others. (V. Ponce Letters). This stability allowed Aws to think of his future, which included starting a family. (Y. Al-Jayab Letter, "He wants to build a family of his own and to love and care for then [sic] the way that he never got the chance to be loved and cared for."). Those plans were stopped by his arrest in January 2016.

### H. Aws's Physical and Mental Health Condition

#### 1. Physical Health

In additional to the psychological scars discussed in more detail below, Aws bears physical scars "allover his body, including his hands, head, upper right arm, mouth, legs, and back from being tortured in Iraq." (PSR, p. 14, ¶71). He was tabbed in the left shoulder blade in 2012 in Syria. (*Id.*). He also has additional physical injuries caused by his torture that are referenced in the PSR. (*Id.*).

#### 2. Mental Health

Aws's life experiences have taken a tremendous psychological toll on him. This trauma started at a very young age with the loss of his mother and then the abuse and alienation that he suffered in the household after his father remarried. Living through war and sectarian violence and witnessing death and destruction on a massive and gruesome scale severely impacted Aws's mental health. As a child, Aws believed that he could be killed at any time. (PSR, p. 12, ¶ 62) ("The defendant reported that as a young child, he believed he would die at any moment because of the violence he witnessed in Iraq."). In many ways, the war never left Aws except for when he finally found relative peace in California in 2014-2015. (S. Al-Jayab Letter, p. 2) ("... we left the war behind us but the war did not leave us."). But, when he came to the United States in late 2012, the war followed him. (PSR, p. 15, ¶75) ("The defendant advised that when he arrived in the United States in 2012, he had persistent thoughts about the violence he witnessed in Syria.")

Aws experienced nightmares as a child and into his adolescence. (PSR, p. 15, ¶76). While the nightmares have not gone away as he has grown up, they have subsided. (*Id.*). He still experiences depression and mood swings. (PSR, p. 15, ¶ 76) ("The defendant stated that he frequently feels sad or depressed and he has difficulty controlling his emotions in that he is strongly affected by feelings of happiness and sadness."). He also experienced having suicidal thoughts, but never acted on them. (PSR, p. 15, ¶ 75) ("The defendant admitted that he had suicidal thoughts when he lived in Iraq because he could no longer endure being tortured, which reportedly 'took over' his mind at the time and he simply wanted the torture to stop."). His religion likely saved him from taking his own life. (PSR, p. 15, ¶75 "The defendant believed suicide would lead to hell, so he did not follow through on his suicidal thoughts.").

Early in this case, Dr. Stephen Xenakis evaluated Aws and reviewed other case material. On March 13, 2019, he authored a report regarding his findings. A copy of that report was attached to the Defense Version, and, for the Court's convenience, is attached hereto as Exhibit G, which is filed under seal. Dr. Xenakis concluded that Aws suffers from Major Depressive Disorder, with Anxious Distress and Posttraumatic Stress Disorder. (Xenakis Report, p. 6). Dr. Xenakis also opined that Aws suffered from "survivor's guilt" and that he was "susceptible to bonding to victims of oppression and hardship." (*Id.*, p. 5); (PSR, p. 15, ¶ 78). *See also* PSR, p. 15, ¶75 ("The defendant felt guilty about not helping those who were injured and leaving others behind.). Several passages from Dr. Xenakis' report require emphasis, as they speak to the mental health issues that contributed to Aws's poor decisions, his need for ongoing treatment, and also his growth. In his report, Dr. Xenakis writes as follows:

> Al-Jayab had a limited capacity to conceptualize the elements of a complex situation, acted impulsively, and lacked the capacity to scope out the consequences of his actions when he planned his trip to Syria. He was predisposed to feeling sympathy towards victims of abuse and brutality and acted

out of emotional sentimentality and guilt without grasping the totality of the situation he was confronting. The disposition to impulsive reactions to situations is recognized as a common phenomenon in adolescence and findings in neuropsychological development.

Al-Jayab requires a comprehensive and intense therapy program for chronic grief and depression, anxiety, and posttraumatic stress from torture, brutality, and consequences of war. He has no history of drug or alcohol abuse or misconduct that mark him for criminal activity. Effective programs for young adults with his problems provide multiple modalities including individual and group therapy, education, and religious services and teaching.

Al-Jayab has felt confused for many years, confounded by the misfortune that has burdened him, and seeks relief from the relentless grief and hardship that has marked his life. His writing and communications with attorneys reveal growing maturity and understanding and support a good prognosis with a course in treatment. He has rejected the options of returning to Syria to help the victims suffering from the horrors and atrocities of the fighting. He seeks to pursue education and training and establish a life as a constructive citizen.

(Xenakis Report, p. 6). To this date, Aws has yet to receive meaningful mental health treatment, much less the "comprehensive and intense therapy program" recommended by Dr. Xenakis.

## I. **Aws's Family Connections Remain Strong Notwithstanding the Charges.**

Despite these numerous hardships, Aws remains close with his family, particularly his brothers Samer and Younis. While his relationship with his father was often strained by the tension caused by his stepmother, it started to improve while they were in California and has since become stronger while Aws has been in prison. His father's powerful letter to the Court evidences the care that he has for his son. Aws has an especially close relationship with his younger brother Samer. In 2009 or 2010 when the eldest brother Younis left Iraq to try and forge a new life for the rest of the family, Aws was left to watch over Samer. As Samer writes in his letter, Aws "became the role of my father, mother, brother, and friend. He was everything to me and I was everything to him. HE watched over me and protected me from everyone and everything." (S. Al-Jayab Letter, p. 3). His brothers and sister have all visited him at the MCC

and he has remained in frequent contact with other family members.  (PSR, p. 14, ¶ 68).  Thus, despite the strain of the case and uncertainty of what the future may hold, Aws will benefit from this family support, particularly when it comes to ensuring that he receives any mental health treatment that is available to him.[14]

### J.  Aws's Youth at the Time of the Offense is a Compelling Mitigating Factor.

Another important mitigating factor to consider Aws's youth at the time of the offenses. A short timeline illustrates just how young Aws was during the key events in this case.  In October 2012 he was just 19 years old.  And in November 2013 when he left for Syria he was 20 years old.  He returned to the United States in January 2014 as a 21-year old.  He was still 21 years old during the USCIS interview held in October 2014.  And he was only 23 when he was arrested in California and ultimately charged in the Northern District of Illinois.  Scientific studies adopted by courts throughout the country, including the U.S. Supreme Court, discuss how an adolescent's developing mind renders them less culpable for their conduct.  For instance, in a 2009 amicus brief submitted by the American Medical Association and the American Academy of Child and Adolescent Psychiatry filed in *Graham v. Florida*,[15] the following was noted:

> The adolescent's mind works differently from ours….  The differences in behavior have been documented by scientists along several dimensions. Scientists have found that adolescents as a group, even at later stages of adolescence, are more likely than adults to engage in risky, impulsive, and sensation-seeking behavior.  This is, in part, because they overvalue short-term benefits and rewards, are less capable of controlling their impulses, and are more

---

[14] For this reason, counsel anticipate requesting that the Court recommend that Aws serve any additional prison time in a facility located close to Sacramento, CA.

[15] "Brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as *Amici Curiae* in support of Neither Party" to the United States Supreme Court in Graham v. Florida (July 23, 2009).  A copy of this brief is available at:  https://bit.ly/2xIg68J (last visited July 10, 2019).

easily distracted from their goals. Adolescents are also more emotionally volatiles and susceptible to stress from peer influences. In short, the average adolescent cannot be expected o act with the same control or foresight as a mature adult.

*Graham v. Florida*, Amicus Brief, p. 2.

Congress and the Sentencing Commission have identified youth as a mitigating factor that often warrants a reduced sentence. Ongoing research and scholarship concerning brain development in young adults provides further reasons to temper the punishment imposed on young offenders. All of these issues are highly relevant for the Court's consideration, and together they provide strong support for a sentence well below the guidelines, particularly given Aws's lack of criminal history prior to his arrest.

Federal statute and the sentencing guidelines express concern for the fair treatment of youthful offenders. First, in outlining the duties of the Sentencing Commission, Congress specifically instructed as follows:

> The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j) (emphasis added). Second, in 2010, the Sentencing Commission amended its policy statement on age to expressly state that departures may be based on age and youth. Specifically, U.S.S.G. § 5H1.1, titled "Age (Policy Statement)," provides as follows: "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." That language replaced the prior policy statement language: "Age (including

41

youth) is not ordinarily relevant in determining whether a departure is warranted." (Appendix C—Volume III, November 1, 2010 (amendment 739)). Thus, the commission has updated its view of youth as being "not ordinarily relevant" to finding that it "may be relevant." Pursuant to § 3553(a)(5), the Court should consider this Sentencing policy statement, and particularly the shift in the policy, from considering youth "not ordinarily relevant" to noting that it "may be relevant" for a departure.[16]

The policy shift appears to reflect the research and scholarship that has focused on brain development and cognitive matters that often lead "youthful offenders" to commit crimes, and the corollary issue of how to punish those individuals. Indeed, in a 2017 report, the United States Sentencing Commission presented information regarding "youthful offenders" (defined as persons under age 25). *See* United States Sentencing Commission, *Youthful Offenders in the Federal System* (May 2017) (https://bit.ly/2JxKCch). At the outset of its report, the Sentencing Commission observed as follows:

> Recent studies on brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished. This report reviews those studies and provides an overview of youthful federal offenders, including their demographic characteristics, what type of offenses they were sentenced for, how they were sentenced, and the extent of their criminal histories.1 The report also discusses the intersection of neuroscience and law, and how this intersection has influenced the treatment of youthful offenders in the criminal justice system.

*Id.*, p. 1. The report discusses how the studies on age and brain development, specifically regarding the frontal lobe that is essential for executive decision-making, found that "maturation is completed in the mid-20s." *Id.*, p. 7. Another study compared frontal lobe contributions to

---

[16] The Commission explained that it "adopted this departure standard after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." (Appendix C—Volume III, November 1, 2010 (amendment 739), "Reason for Amendment," p. 1193 of 2016 Edition).

cognitive control in children and adults and found "clear differences in the ways and extent to which the frontal lobe was used in decision making." *Id*. And yet another cited study noted the "the confounding effect of marijuana and alcohol use on the adolescent brain and its development, with results indicating further delays in brain development among youth and young adults with substance use histories." *Id*. The Commission noted that there was general agreement on the following four points:

> First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place, but note there will be significant variation from person to person. Finally, researchers caution against the over-generalization of brain science.

*Id.* (footnotes omitted).

Relatively recent statements from the Department of Justice echo the Commission's concerns regarding young offenders, and also point to growing trend of considering alternatives to incarceration. In 2015, then Attorney General Lynch offered opening remarks at a "Panel Discussion on Justice-Involved Young Adults," during which she acknowledged the neurobiological and developmental research confirms brain development continues well into a person's twenties:

> Research indicates that as young adults age through their late teens and early 20s, they experience a period of rapid and profound brain development. In addition to providing insight into why young adults act the way they do, brain science also indicates that we may have a significant opportunity, even after the teenage years, to exert a positive influence and reduce future criminality through appropriate interventions. It raises the possibility that considering these unique stages of development within the criminal justice setting, we could reduce the likelihood of recidivism and create important benefits for public safety. And it offers a chance to consider new and innovative ways to augment our criminal justice approach.

Attorney General Loretta E. Lynch Delivers Opening Remarks at an Office of Justice Programs Panel Discussion on Justice-Involved Young Adults (Sept. 8, 2015), available at

https://bit.ly/30wAJRO (last accessed July 12, 2017). Lynch linked prevailing brain science to the Justice Department's commitment to developing effective means for reducing recidivism in youthful offenders. The science behind Lynch's remarks is particularly important in Daoud's case, because it indicates a very real hope that he has a "significant opportunity" to move beyond his conviction in this case, and the poor decision-making that led to his involvement in this offense, so that he may live a productive, law-abiding life.

No doubt, the Court could have always considered Aws's youth under § 3553(a). *See Gall*, 552 U.S. at 58 (holding that "it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor…. Indeed, his consideration of that factor finds support in our cases."). However, recent scientific studies, reflected in the amendment to § 5H1.1, as well as in the Sentencing Commission's reports, the statements of former Attorney General Lynch, and other sources show, on balance, that there are numerous reasons to see youth as a powerful mitigating factor.

While counsel has not found case law that substantively discusses when youth is present "to an unusual degree and distinguish the case from the typical cases covered by the guidelines" (U.S.S.G. § 5H1.1), counsel respectfully submits that the totality of factors in this case distinguish it from typical cases, and warrant a sentence that reflects what would have been a "departure" under the Guidelines.

On a positive note, Aws has matured while he has been in prison and has shown a tremendous amount of self-reflection, as evidenced by *A Forever Foreigner*. He has also gained insight into his own impulsive and rash decisions and has acknowledged the wrongfulness of his conduct to Probation. This recognition not only demonstrates his acceptance of responsibility,

44

but also how he has matured, both emotionally and cognitively, from the person he was six years ago. In plain point of fact, Aws is not the same person today who naively left for Syria in 2013.

### K. A Sentence Well Below the Advisory Guidelines Addresses the Factors Set Forth in § 3553(a)(2).

In fashioning its sentence, the Court also takes into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

#### 1. Seriousness of the Offenses.

Counsel do not quarrel with the offenses being labeled as "serious," as any national security prosecution must be considered. Nonetheless, one size cannot fit all as the terrorism enhancement is concerned. Yet, the context provided above hopefully shows why it is both dangerous and inaccurate to label this case as yet another example of "violent jihad" in a way that disregards Aws's unique personal history and motivations that led to the offense conduct. Moreover, it must be recognized that had Aws never come with his family in October 2012, similar conduct would not be subject to U.S. prosecution. Further, had Ansar al-Sham not been associated with Ansar al-Islam at the time that Aws was in Syria; had he been associated with another group; or had he been treated like the Brooklynites or other young men who fought with the YPG after reading a *Rolling Stone* article, perhaps he would not be prosecuted. Additionally, with respect to the false statement case, counsel again note that the government knew full well that Aws had gone to Syria when he came into the USCIS accompanied by an undercover informant who convinced Aws that he was his friend.

45

2. General Deterrence

With regard to deterrence, counsel recognize the government's interest in general deterrence. But quantifying how much general deterrence results from a particular prosecution and sentence is, counsel submit, an exercise in abstraction that is even more diffuse based on the particularly unique facts of this case.

In an ideal world, a sentence could be designed to discourage individuals from travelling overseas to associate with designated foreign terrorist organizations and to truthfully tell immigration officers that they had done so when asked. However, it is questionable whether any sentence would have that desired deterrent affect. For one thing, the facts and circumstances of Aws's case are so unique that it is difficult to imagine another individual, much less the public in general would be similarly situated and be deterred because of the sentence imposed in this case.

Further, the potential deterrent value of a sentence is diminished by the length of time that passed between the commission of the offenses and the arrest. The material support charge covers a time span from October 2012 through January 2014, with the key time period occurring between November 2013 and January 2014. The false statement charge is based on conduct occurring on October 2014. Aws was not arrested until January 2016. Due to the years-long delay between the offenses and the arrest a lengthy sentence would very likely not serve to deter other individuals.

3. Specific Deterrence

With regard to specific deterrence, counsel submit that the need to impose a strict sentence to deter Aws is extraordinarily low. Aws is not a risk for recidivism. The need to protect the public from Aws should likewise not be concern. His honest comments to Probation and acknowledgment of the wrongfulness of his conduct prove as much. Again, he told Probation "he was trying to do the right thing for the Syrian people; however, he went about it in

46

the wrong way." But the Court need not look just to what he told Probation. It should also look at his conduct after he returned to the United States in January 2014, as well as his conduct in custody since January 2016.

During the two years that Aws was in Sacramento prior to his arrest, he focused on working, going to school, and forming relationships with a diverse group of friends. Unfortunately for him, some of those relationships happened to be with confidential informants who, at a minimum, closely monitored Aws for any indication of trouble. Yet, the fact that, despite this near constant surveillance, the government's charges remained the short trip to Syria and the false statements to USCIS is a strong indicator of Aws conduct during the 2014-2016 period. This is a strong indicator that future dangerousness is not a concern that should drive the sentence.

Aws has also taken positive steps toward self-improvement since he has been incarcerated. Following his arrest, Aws had to make the hard adjustment to being incarcerated. However, Aws soon adjusted and also found ways to improve himself and further his education. While at the MCC, Aws has taken ESL classes to improve his English. Copies of certificates from the MCC show that he has participated and completed various educational courses in 2017 and 2018, including ESL, sleep hygiene, anger management, and mind over mood. (PSR, p. 17, ¶ 86). (Exhibit H). And should he have the opportunity to work in the United States, he is interested in vocational training programs to learn about auto mechanics and small business operations. (PSR, p. 17, ¶ 87). Taken together, Aws's statements to Probation, his conduct prior to his arrest, and his positive conduct after his arrest strongly indicate that he does not pose a risk for recidivism, and the need for specific deterrence is low.

### L. Aws Faces Further Incarceration and Severe
### Immigration Consequences Following the Completion
### The Sentence Imposed by the Court.

Aws's immediate future plans may unfortunately be aspirational due to the immigration consequences that he will almost certainly face following his sentence of imprisonment. Because of his refugee status, he "may be amenable to arrest for violations of the Immigration and Nationality Act." (PSR, p. 14, ¶ 69). An immediate consequence in the BOP is that Aws would not be entitled to the benefits of 18 U.S.C. § 3624(c), such as placement in the halfway house for the final percentage of his sentence. But the long-term consequences are far more disconcerting.

Based on the ICE detainer presently logged against him, Aws will go straight to immigration custody after being released from the BOP.[17] He will then face legal proceedings that could last for years. Those proceedings could very well result in his removal from this country. Based on information provided by an experienced immigration attorney, counsel understand that the Immigration Judge will have no ability to order or consider bond, which all but guarantees that Aws will remain in custody for the remainder of his immigration proceedings.[18] Aws will likely remain in custody even if he can show that he is entitled to relief

---

[17] Special conditions of supervised release also require Aws to surrender to government agents to determine if he is deportable. *See* Special Conditions No. 21.

[18] Specifically, undersigned counsel have asked an immigration attorney review the exhibit to the Muhtorov pleading for a variant sentence. (*United States v. Muhtorov*, 12 CR 33, Dkt. 1955-1 (D. Colo.)). The informal opinion is that it is an accurate overview of potential outcomes given the facts reported in the letter itself. Moreover, those potential outcomes would apply to Aws and be likely, given that he is a refugee while Muhtorov was a legal permanent resident. Specifically, like Muhtorov, in light of the nature of Aws's conviction as well as the practice of ICE, it is likely that Aws "will remain in ICE custody for a significant period of time, which may amount to years or until he is removed from the United States." (Dkt. #1955-1, p. 3). Further, like Mr. Muhtorov, Aws will be charged as deportable from the United States under the "security and related" and "terrorist activities" grounds for deportability under the Immigration and Nationality Act (INA). INA § 237(a)(4)(A) and INA§ 237(a)(4)(B). He may also be deportable under the crime of moral turpitude grounds. INA §237(a)(2)(A)(i). As a result of his conviction and the clear grounds for deportability, Aws's refugee status will be terminated and an

under Convention Against Torture.[19]    That custodial period could easily reach into the years until ICE has exhausted every effort to secure Aws deportation.  If he were ever to be able to be released from Immigration custody, then he would be under a permanent order of supervision with electronic monitoring.  But there is now reason to question whether even that conditional release would be available.

Aws's material support conviction and his status as a stateless Palestinian even raise the specter of indefinite administrative detention following the completion of his criminal sentence. Precedent for such a controversial outcome is seen in the case of Adham Amin Hassoun.  Mr. Hassoun was convicted of providing material support to terrorists in the Southern District of Florida (Case No. 04-600001, S.D. Fl.).   After completing his sentence, he was placed in immigration proceedings, and was then ordered removed from the United States.  However, as a stateless Palestinian, the United States did not identify any country to which he could be sent. And rather than release him on supervised release pending his removal, the government placed Mr. Hassoun in what is alleged to be an indefinite administrative detention based on the conclusion that he poses a national security threat.  Mr. Hassoun, through counsel, has filed a petition for habeas corpus relief in the Western District of New York.  *See Adham Amin Hassoun*

---

Immigration Judge will find him deportable.   That conviction will also render him statutorily ineligible to preserve his refugee status or gain that status again in immigration court.   He will also be ineligible for asylum and withholding of removal due to the statutory bar under INA § 208(b)(2)(A)(ii) (for asylum) and § 241(b)(3)(B)(ii) (for withholding).

[19] Aws's only hope at remaining in this country may be under the Convention Against Torture (CAT). Someone is eligible for relief under CAT if they can show that it is more likely than not that they would be tortured in the country to which they would return after removal from the United States.  Relief under CAT can result in the withholding of removal or the deferral of removal.  However, because of the nature of the crime that Aws has been convicted, the Immigration Judge would summarily deny and withholding of removal argument.  He will therefore only be able to pursue deferral under CAT.  And even if Aws can show he is entitled to relief under CAT, the Immigration Judge still enters the order of removal, but simply orders that it be deferred.   Also, even showing that he is entitled to relief under CAT does not mean that Aws will be released from ICE custody.  Instead, ICE could continue to detain Aws.

*v. Searls*, 19-cv-6196 (W.D.N.Y.).[20]  The potential risk of such indefinite detention for Aws, who like Mr. Hassoun is a stateless Palestinian, is one that cannot go unnoticed given how immigration laws and policies appear to have been warped under the current administration.

Lastly, further separation from his family, including potential removal from this country, imposes additional punishment on Aws that the Court may consider.  *United States v. Ferreria*, 239 F. Supp. 2d 849, 856 (E.D. Wis. 2002)  (in pre-*Booker* decision, imposing a one-level departure from the guidelines based in part on the fact that the "defendant's immigration status will result in his deportation and the separation from his family following completion of his prison sentence.").  Aws's family, particularly his two brothers, has been the one constant in his life.  Removal from this country could mean that he may never see them again in person.

The Court may certainly consider the fact that Aws will most certainly face harsher conditions in the BOP, as well as further deprivation of liberty in addition to any sentence imposed by this Court (and essentially due to the same underlying conduct) under 18 U.S.C. § 3553(a) when fashioning its sentence.  *See United States v. Muhtorov*, 329 F. Supp. 3d 1289, 1301 (D. Colo. 2018) (noting that argument of "indefinite immigration detention" or deportation could be considered under § 3553(a), but not U.S.S.G. § 5K2.0).  Moreover, the Court should also factor that Aws could very likely face the worst of two options:  either lengthy, indeterminate incarceration due to his statelessness, or removal to a potentially hostile country. In either event, Aws will be separated from the family with whom he has survived multiple wars and conflicts.

---

[20] Copies of the petition for habeas relief and other case background are available on the ACLU's website at:  https://bit.ly/2YPqI1B.  (Last visited July 12, 2019).

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, and also those to be presented at the sentencing hearing,

counsel respectfully request a sentence toward the low-end of the 57-71 month range.

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
Attorneys for Defendant
Aws Mohammed Younis Al-Jayab.

**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, Illinois 60614
Tel: 312-981-0123
tdurkin@durkinroberts.com

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 457
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

51

## <u>CERTIFICATE OF SERVICE</u>

     Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant Aws Mohammed Younis Al-Jayab's Clarifications to the Presentence Investigation Report and Sentencing Memorandum was served on July 26, 2019, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.1, and LCrR 49.2, pursuant to the district court's system as to ECF filers.

                                     /s/ Joshua G. Herman
                                     53 W. Jackson, Blvd., Suite 457
                                     Chicago, IL 60604
                                     Tel: (312) 909-0434
                                     jherman@joshhermanlaw.com