UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 16 CR 181 |
| v. | No. 18 CR 721 |
| | Judge Sara L. Ellis |
| AWS MOHAMMED YOUNIS AL-JAYAB | |

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, United States Attorney for the Northern District of Illinois, submits the following position paper as to sentencing factors. For the reasons set forth below, the government respectfully requests that this Court sentence defendant AWS MOHAMMED YOUNIS AL-JAYAB to a term of imprisonment of 180 months, a sentence well-supported by the factors to be considered under Title 18, United States Code, Section 3553(a).

## I. INTRODUCTION

Defendant AWS MOHAMMED YOUNIS AL-JAYAB pled guilty to providing material support to a foreign terrorist organization, namely Ansar Al-Islam, and to making a material false statement to immigration authorities. Throughout his sentencing submission, defendant seeks to minimize his offense conduct by painting himself as a victim and hero, claiming he traveled to Syria to fight with his brothers against the brutal Syrian regime. The facts belie defendant's manufactured narrative and his attempts to mask the truth of the violent and dangerous nature of his conduct should not be credited. Defendant was not a hero. Defendant was a knowing and

willing member of a designated foreign terrorist organization, intent on creating an Islamic State in the Syrian land and defeating the infidel, the United States.

The goals of the foreign terrorist organizations with which defendant fought are revealing of defendant's offense conduct. As an initial matter, an organization is designated as a foreign terrorist organization by the United States Department of State if (A) the organization is a foreign organization; (B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title or terrorism (as defined in section 2656f(d)(2) of title 22), or retains the capability and intent to engage in terrorist activity or terrorism); and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States. *See* 8 U.S.C. § 1189(a).

*Ansar Al-Islam*: According to the United States Department of State Country Reports on Terrorism 2014, Ansar al-Islam, also known as Ansar al-Sunna among other aliases, is a Sunni terrorist group that has vowed to establish an independent Islamic state in Iraq. Ansar al-Islam originated in Iraqi Kurdistan and was founded by Mullah Krekar. On or about March 22, 2004, Department of State designated Ansar al-Islam a foreign terrorist organization pursuant to 18 U.S.C. § 1189(a).[1] According to a report by the Council on Foreign Relations, Ansar Al-Islam was founded in December 2001 with funding and logistical support from al-Qaeda and Osama bin Laden. *See* Exhibit A (*Ansar al-Islam (Iraq, Islamists/Kurdish Separatists), Ansar al-Sunnah, A profile of a militant Islamist Kurdish separatist*

---

[1] *See* https://2001-2009.state.gov/r/pa/prs/ps/2004/30649.htm.

*movement seeking to transform Iraq into an Islamic state*, Backgrounder by Kathryn Gregory, November 5, 2008). Ansar al-Islam claims the second largest number of Sunni jihadist attacks in Iraq, after al-Qaeda in Iraq. *Id.* at 4.[2] "Ansar al-Islam adheres to a rigid Salafi ideology. Its founding declaration states 'jihad in Iraq has become an individual duty of every Muslim after the infidel enemy attacked the land of Islam.'" *Id.* at 3.

*Jabhat al-Nusrah*: On December 11, 2012, the Department of State amended the foreign terrorist organization designation of al-Qaeda in Iraq (AQI) to include al-Nusrah Front, Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.[3] According to the Department of State and the Bureau of Counterterrorism and Countering Violent Extremism, from November 2011 through December 2012, al-Nusrah claimed nearly 600 attacks – ranging from more than 40 suicide attacks to small arms and improvised explosive device operations – in major city centers including Damascus, Aleppo, Hamah, Dara, Homs, Idlib, and Dayr al-Zawr. *Id.* During these attacks numerous innocent Syrians were killed. Through these attacks, al-Nusrah sought to portray itself as part of the legitimate Syrian opposition while it was, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes. *Id.*; *see also* Exhibit B (Countering Extremism Project, Nusra Front (Jabhat Fateh al-Sham) ("In Syria, the

---

[2]  *Jihad* is defined in the Merriam-Webster dictionary as a holy war waged on behalf of Islam as a religious duty.

[3] *See* https://web.archive.org/web/20170204084405/https://www.state.gov/j/ct/rls/other/des/266590.htm

group continues to profess its goal of toppling the Assad regime and establishing an Islamic state in its place."). According to the Countering Extremism Project, "the Nusra Front adheres to a Salafist, jihadist ideology with the professed aim of establishing Islamic governance in all areas under its control." *See* Exhibit B at 1.

Ansar al-Islam and Jabhat al-Nusrah sought to dismantle the Syrian government because they wanted the Syrian land for the Islamic caliphate. Defendant seeks to confuse this Court by conflating the violent jihad of Ansar al-Islam and Jabhat al-Nusrah with efforts by the Free Syrian Army ("FSA") to oppose the brutal regime of Syria's President Bashar al-Assad in order to create a secular government. According to open source information, the FSA was established in 2011 by Syrian military defectors, and it has since become an umbrella organization for various armed opposition groups fighting to depose the Syrian regime of Assad. Elements of the FSA have historically stated support for secular governance in Syria.

Defendant has never claimed any allegiance to the FSA or any interest in fighting against Assad in order to establish a secular government in Syria. In fact, he made clear his disgust and disdain for the FSA in his communications. *See infra* pp. 17-18. Instead, from at least approximately 2012 through 2014, defendant exchanged thousands of communications with his friends and family located in the United States and abroad about his jihadi ideals, his membership in and time fighting with Ansar Al-Islam, his support of Jabhat Al-Nusrah, his desire to see the establishment of an Islamic State, and his loathing of the United States.

Defendant admitted to traveling to Syria to provide material support to a foreign terrorist organization, Ansar Al-Islam, and lying to immigration authorities about his travels to Syria. Defendant's efforts to now minimize his offense conduct by rebranding himself as a hero rather than a terrorist are not consistent with the facts of this case, defendant's admissions in his plea agreement, his communications, or his actions.

## II.   OFFENSE CONDUCT

Defendant's offense conduct is discussed in detail in the Complaint (Dkt. 1), the Presentence Investigation Report (the "PSR"), the Plea Agreement (Dkt. 129), the Government's Version of the Offense (the "GVO"), and is summarized below.[4]

### A.   Defendant's Ties to a Foreign Terrorist Organization Before Arriving in the United States

Defendant was born in Iraq, fled to in Syria in approximately 2011, and immigrated to the United States with his family in October 2012. During defendant's time in Iraq and Syria, defendant was a knowing and active member of Ansar al-Islam. For example, on March 8, 2012, defendant told his cousin over Facebook messaging that defendant's "platoon" while he was in Iraq was "Ansar al-Islam."[5] He quoted his Ansar al-Islam leader to his cousin as follows, "He used to say, 'We fight

---

[4]  Citations to the docket in *United States v. Al-Jayab*, 16 CR 181 (N.D. Ill.) are to "Dkt.," followed by the document number. Citations to defendant's sentencing memorandum (Dkt. 143) are to "D.S.M." Each is followed by a page number.

[5]  The communications detailed in this memorandum are translations from Arabic to English performed by linguists employed by the FBI. The quoted communications are verbatim translations and the remaining references are summarizing the verbatim translation.

to rule the entire earth with what God has revealed and there is no fighting for the homeland,'" echoing the Ansar al-Islam goal of establishing a global Islamic State.

On May 5, 2012, the same cousin asked for videos of defendant's "work," meaning violent jihad on behalf of Ansar al-Islam. Defendant sent his cousin links to a series of videos on YouTube of other members of Ansar al-Islam engaging in terrorist acts in Baghdad, Iraq. One of the videos was an Ansar al-Islam production depicting masked mujahedin holding guns and knives training in the desert, along with violent images of men who had been executed, and which video defendant described as "marvelous." Defendant's cousin specifically asked for videos of defendant involved in jihad, and defendant responded that his leader, the leader of Ansar al-Islam in Iraq, did not like to tape them performing "work."

Defendant's communications also made clear that defendant continued to fight with Ansar al-Islam after he relocated to Syria. For example, in February 2013, defendant told Individual L about his time fighting in Syria before he moved to the United States: "Our headquarters is outside of Damascus in another province. It is away from Damascus less than an hour. At night we go and in the morning we go to Damascus to work. We stir a lot of trouble in the world and then return."

In April 2013, defendant expounded upon his prior experience fighting in Syria to his friend and disciple, Omar Al-Hardan, who resided in Texas.[6] Defendant

---

[6] On January 6, 2016, Omar Al-Hardan was charged in the Southern District of Texas with one count each of providing material support to the Islamic State of Iraq and Al-Sham ("ISIS"), in violation of Title 18, United States Code, Section 2339B, procurement of citizenship or naturalization unlawfully, in violation of Title 18, United States Code, Section 1425(a), and making false statements, in violation of Title 18, United States Code, Section 1001. *See United States v. Omar Al-Hardan,* 16 CR 03 (S.D. Tex.), Dkt. No. 1. On October 17,

explained that he had joined the mujahidin in Syria when he was 16 years old; and he fought for a group now known as Ansar Al-Islam.[7] During one conversation with Al-Hardan, defendant said he had previously fought in Syria during a battle against the Syrian government forces, adding, "God willing, you will have your chance to shoot . . . the most shots I made with it in my life was in the biggest battle I participated in. Seven magazines in one breathe . . . Just shooting, spraying, spraying." Later during the same conversation, Al-Hardan asked what do "Assad's soldiers scream when you raid?" Defendant replied "They fall silent. They stiffen. I remember once I went down together with a brother. We executed [. . .] three. As for the brother who was with me, he shot two. The third one aimed the Russian at the brother [. . .] He continued aiming and would not unlock the safety. He was so scared, he could not do it." Al-Hardan wrote "and you silenced him?" Defendant responded, "Yes…In the chest, in the head. And when he falls, we shoot again." Defendant continued,

> Do you remember the national security headquarters building in Syria? The mujahidin, Al-Nusrah Front struck it. [. . .] Those suicide bombers they want to break in. There is a control checkpoint that would stop them. Their car is full of ammunition and suicide vests, its booby traps were visible, so they would stop them and arrest them. We got down and overran the control checkpoint and opened the way for them to raid, and we retreated.

---

2016, Al-Hardan pled guilty to the Section 2339B count. *Id.*, Dkt. No. 91. He was sentenced on December 18, 2017 to 192 months imprisonment, to be followed by a lifetime term of supervised release. *Id.*, Dkt. No. 115.

[7] A *mujahidin* is defined in the Merriam-Webster dictionary as an Islamic guerrilla fighter, especially in the Middle East.

Defendant's affinity for violence before he arrived in the United States was also clear. For example, on March 19, 2012, defendant told his cousin about a fight he had in Syria the day before, during which fight defendant broke a man's nose and "poured his anger at him." During the same conversation, defendant boasted about another fight he had in Syria in which he found a man who defendant believed had previously hit him with a pipe, and defendant hit the man hard, crippled him, and destroyed the man's vehicle, ripping his tires and shattering the windows.

## B.  Defendant's Plans to Travel to Syria

From the moment he arrived in the United States in October 2012, defendant began to plot his return to Syria to fight on behalf of terrorist groups there. Beginning as early as mid-October 2012, via his Facebook accounts, defendant told multiple family members and associates that he intended to travel to Syria to support violent jihad, identified Turkey as a probable transit point, and sought to arrange the finances and logistics for his travel. For example, on October 13, 2012, defendant told Individual A, an associate located in Iraq, "I want to go back . . . I'll go to Turkey and enter smuggled to Syria . . . When I come, I'll call. Don't go with anyone except the Front. [. . .] Go with Ansar [Ansar Al-Islam] or with the Front [Jabhat Al Nusrah Front] only."

Defendant was desperate to leave the United States and return to Syria. On November 7, 2012, he told his friend Individual Q, who was likely located in Syria, that his "soul is in Syria with the brothers…I swear to God, I am more determined here…Pray for me, to be steadfast in the face of these rotten seditions here, and most importantly the return." On December 7, 2012, he told a friend that he would even

return by "bribing, as much as it costs I will pay." Defendant's intention was to return to Syria to fight, as indicated by what he told his father on November 17, 2012:

> I will roam all over the world. I, the jihad is in my blood. . . I will attack the whole world including America and all that is in it. When I was in Syria, I told you, no one can stop me from my path.

In January 2013, during another discussion about returning to Syria, defendant discussed weapons with Individual Q, including, "when I come, I will give you a Walther [semi-automatic pistol], God willing…By God, once I joined in a battle, I used up seven magazines with a Russian [Russian-made AK-47 Assault Rifle]."

Defendant engaged in Facebook message discussions with individuals located in Iraq, Turkey, and Syria in order to arrange for finances and travel. Indeed, in February 2013, one of these individuals sent two money orders totaling $681 to defendant to finance defendant's travel. On February 5, 2013, defendant told a friend that he wanted to go to Syria, and not Iraq, because there was more "work," in Syria, referencing violent jihad. He separately told two friends that "I want to rush there. I want to die. How nice it would be if I could jump into Syria!" and "I do not want to get married. I want to die."

In these messages and others, defendant also demonstrated his allegiance to Jabhat Al-Nusrah. For example, on February 9, 2013, he told a friend that he wanted the friend to create a Facebook page dedicated to the young men of Al-Nusrah and call it "A soldier of al-Jabhah…Soldiers of the Front." He went on to expound upon his own work with Jabhat Al-Nusrah, "my group participates in every operation. By God we are strong and we get our strength from God. May God protect them all and

protect the Army, the Front, and all the mujahidin." Defendant's friend lauded defendant's group as being clever with booby-trapping ability, and asked defendant when his group would enter Damascus, Syria. Defendant indicated they would hear "good news soon," and that Jabhat Al-Nusrah announced that some martyrs-to-be had entered Damascus.

Later that month, on February 25, he continued his conversation with Individual Q regarding his desire to open a Facebook page honoring members of Al-Nusrah, "I told the youth that I would like to open a page and let the brothers in it, post the news . . . But not an official one for the Front. It includes news about the Front, and anything pertaining to the Front." Individual Q asked what name he wanted the page to have, and defendant responded "Al-Nusrah Front Soldiers. Followers of Al-Nusrah Front." The same day, defendant discussed his plans to fight in Syria with Individual Q. When Individual Q lamented his injured leg, defendant said that was no excuse, that he had a friend who fought with only one leg, and "By God, I would go to paradise limping." Defendant praised that "the Front are formidable," that "they are all about cars laden with explosives, vests, and suicide bombers," that "they are terrifying and all their lives they have seen nothing but blood and destruction," and that his friend "should be proud of the Front," again referring to Jabhat al-Nusrah Front.

In addition to talking about violence, defendant watched and shared violent videos. For example, on February 15, 2013, defendant sent his friend Individual L, who the government believes was located in Iraq a graphic violent video which

showed deceased individuals and body parts. Defendant told the friend "Watch the video, it is important. If you catch a Shi'ite, kill him; revenge for this brother, may God welcome him in paradise."

In February 2013 defendant was living with his uncle in Tucson, Arizona, near an Air Force military base. Defendant told Individual L about the base:

> There is a military airport by us; it holds thousands of F-16 airplanes. I go and look at it daily, and I get torn apart, and then I go back home…Thousands of airplanes, I swear to God. They train many people tirelessly. May God humiliate them. They train a group daily…And the Umma [Islamic nation] is sleeping, and those are training daily to destroy it. . . .

> Every Thursday a container goes in. I am following it; and sometimes on Saturday a container goes inside a small unit and it will be placed inside, and when it gets in we give them its cost. I am telling you it is a top job, really.

In March 2013, another of defendant's associates instructed defendant on how to get into Syria from Turkey. Defendant then wrote multiple Facebook messages about his travel plans and how best to enter Syria via Turkey, and commented on his plans to work only with Jabhat Al-Nusrah. On March 23, defendant communicated with Individual H, an acquaintance from Iraq who was living in Gaziantep, Turkey near the border with Syria at the time and who defendant was asking for help to get from Turkey into Syria. Individual H asked defendant if he wanted Al-Nusrah Front, defendant stated, "I worked with them for a while before I traveled, and they arranged everything for me." On the same day defendant told Individual G "only the Jabhat al-Nusrah group. It is impossible that we go with others."

Because he was traveling with a U.S. travel document and needed to maintain his ability to travel legally, defendant proposed to Individual H, "I'll go to the

American Embassy in Turkey. I will tell them that due to circumstances, I can't return now. . . I'll say tourism, or I'll tell him my grandmother is sick in Turkey and I wanted to be with her." Dfendant did not have a grandmother in Turkey. However, this was not defendant's first choice of an alibi. Several months earlier, on December 19, 2012, defendant had told a different friend that he would tell immigration that he wanted to return because he got engaged and his "fiancée's parents gave him an ultimatum 'if you do not come and get her, we will marry her off.'"

In April 2013, defendant and Al-Hardan discussed their plans to travel to Syria to fight with the mujahidin. Defendant and Al-Hardan discussed firearms, referencing specific models like the PKC, Glock, M16, and Kalashnikov. In fact, Al-Hardan expressed his desire to learn from defendant's expertise with weapons, explaining that he had never "sprayed fire with a Kalashnikov." Defendant stated later in the conversation, "Brother, God willing, you will be bored of shooting with guns. I have not seen anything better than the Glock. All my work was with the Glock and a nine Tariq and also its silencer [. . .] Once it hits someone, you would think the person fainted right before your eyes. It does not look like you killed him." Defendant promised to train Al-Hardan when they arrived in Syria, and expressed his commitment to jihad, writing, "O God, grant us martyrdom for your sake while engaged in fighting and not retreating; a martyrdom that would make you satisfied with us." In order to further prepare Al-Hardan for jihad, defendant sent Al-Hardan links to multiple, violent videos on Youtube depicting, among others, Usama bin Laden, Ansar al-Islam, and content praising the Khost bomber.

12

In April 2013, defendant also engaged in a Facebook conversation with a mujahidin in Syria, who told defendant that "Do you know that we just killed ten of the Syrian militia, the Shabihah. Hahaha, with an IED [improvised explosive device]." Defendant expressed his excitement at working with the mujahidin, stating "I was told that you and I will work together." The mujahidin individual wrote "I wish, come, let us do the killing together." Defendant later wrote "I do not want anything in the world, just to get to Syria safely, and find you there,…I am eager to see blood."

On April 8, 2013, defendant told his friend Individual F that "America will not isolate me from my Islamic duty. Only death will do us part. My only wish is to see you and start action." Defendant also expressed his weapons preference, telling another friend, who is believed to have been located in Syria on April 20, 2013, that "When I come, I will take a silencer and a Glock…I like Glock."

On July 5, 2013, defendant sent the below picture of himself holding a weapon to Individual L:



From June through August 2013, defendant continued to write to different associates about his travel preparations. On June 30, 2013, defendant said he was at a shooting club to learn long-range shooting, and shared photos of himself at a gun range in Wisconsin holding a bow and arrow, as well as photos of rifles on display.

### C. Defendant's Travel to Turkey and Syria

In early November 2013, when defendant was residing in the Milwaukee, Wisconsin area, he received approximately $4,500 in an insurance settlement. Two days later, defendant purchased an airline ticket, and on November 9, 2013, flew directly from Chicago to Istanbul, Turkey. While in Turkey, he told his brother that he planned to enter Syria and that he would be "going with the Mujahidin soon." On November 19 he told his brother that he arrived in Aleppo, Syria. He told his brother not to tell anyone where he was and that if anything happened to him, his friends will inform his brother at once. He also told his brother that he was using the name "Anas."

From Turkey, defendant traveled to Syria, but wanted that fact to remain confidential because he knew he was committing a crime. On November 19, 2013, defendant told his brother, "I have safely arrived […in] Syria. Don't ever tell anyone, okay?" Defendant also told multiple other associates he was in Sham or Syria, including Aleppo, Syria, specifically. On November 28, 2013, defendant's brother told defendant to avoid using his phone because it showed "that [defendant was] writing from Aleppo." His brother went on to write, "Aws, I need to you get out of Syria as soon as possible," and noted defendant's phone "will reveal that you are in Syria […]

14

and this is dangerous to your situation over there." Defendant responded, "Sorry, I have work," meaning he was in Syria to engage in jihad.

Additional messages revealed that defendant was armed while in Syria and preparing to enter into armed conflict. For example, on December 10, 2013, he told his brother to "forgive me. I might become a martyr." On December 23, 2013, defendant wrote, "I have m16," meaning an M16 assault rifle. On December 25, defendant's brother told defendant to remove a picture that shows he was wearing a military uniform. In addition, the photo below is a photo of defendant, in military garb, holding a weapon.



On December 28, 2013, defendant told a family member, who was then located in Indonesia, according to his communication with defendant, "I am in Aleppo" and that he had joined Ansar al-Sham, which he explained was "the same as Ansar al-

Islam, just with another name."[8] Defendant continued, "It is the one that leads the new Islamic Front formed after merging with Jabhat al-Nusrah," but he noted that this alliance had not been publicly declared. Defendant further explained, "The Army of Islam and Ahrar al-Sham and Al-Tawhid Brigade became the al-Jabhah al-Islamiyyah. When they engage in battles [they are] led by Jabhat al-Nusrah and Ansar al-Sham."[9] Defendant detailed the cooperation and "joint action" that existed between certain Sunni extremist groups engaged in the conflict against the Syrian regime.

Defendant also expressed his concern over conflict that was occurring among some of the Islamic groups in the area. He wrote that ISIS, which he referred to as "the State," "have killed many from Jabhat al-Nusrah and hundreds of mujahidin [are detained] by the State[...] Brother this is the blood of Muslims shed at the hands of the State." He continued, "If it weren't for the State's bloodletting, I would have been the first one to join it. [That's] why I joined the al-Ansar even though there's little action; the al-Ansar, at least they don't kill Muslims[...] Brother, I'll join al-Nusrah shortly [...] and if any sedition arises, I'll leave my weapon and go to Turkey."

---

[8]     Ansar al-Sham has not been designated by the United States Government as a foreign terrorist organization.

[9]     According to open-source information, Al-Jabhah al-Islamiyyah is an Arabic phrase that translates to "the Islamic Front." The Islamic Front was an umbrella organization of Sunni Salafist groups fighting to depose the Syrian regime. In late 2013, founding members of the Islamic Front included Ansar al-Sham, Ahrar al-Sham, the Tawhid Brigade, and the Army of Islam.

On December 28, 2013, defendant sent the following Ansar al-Sham related images to the same family member:





Despite his concerns about ISIS, defendant still expressed an interest in joining ISIS. In January 2014, he wrote, "I have been thinking of joining the State and abandon[ing] the al-Ansar." Defendant explained that he was in "Haritan, Aleppo, a fighting zone [between] the State and the Free Army. When asked if he was with "the Free now," meaning the Free Syrian Army, defendant replied, "No. Ansar al-Islam."

While in Syria defendant expressed his disdain for the U.S. supported Free Syrian Army. For example, on January 7, 2014, he wrote to Individual P,

> The Free Army are SOBs. They are killing the brethren from the Islamic State. They killed many…Look, we will neither fight Nusrah nor State…We will fight the Free Army because they detained women.

> Our headquarters is next to the State [ISIS] exactly and we are against the Free Army. We have prevented the Free Army from entering the area and attacking the State's headquarters. And if the Free Army advances, we will fight it. […] We installed the Doshkas [a Russian machine gun widely used in the Syrian conflict] in the street and spread among all of our headquarters because we are at the entrance of Aleppo. The Free Army is under the control of our forces.

Ultimately, as a result of these internal conflicts between the terrorist organizations, defendant began to communicate his intention to return home.

> I swear that the State is killing [members of] al-Ansar and al-Nusrah. They are our brothers, but they are making a mistake. And we are going to stand with the State against the [Free Syrian Army]. . . I might withdraw. . . When the seditious acts are over, I will return. . . I did not come to fight for the sake of sedition.

When Omar Alhefawy suggested he join the Free Syrian Army, defendant responded "No, I do not want the SOBs of [the] Free Army.

Defendant recognized that his conduct was a crime in the United States. He told his brother "I am afraid of being imprisoned in America. The government is alert for everything […] my trip here constitutes a charge."

### D. Defendant's Return to Turkey and the United States

On January 17, 2014, defendant traveled from Syria to Turkey. Soon thereafter, on January 23, 2014, defendant flew to Sacramento, California (where his family had moved while he was in Syria) via London and Los Angeles. Upon his return to the U.S., defendant made no mention of his travel to Turkey and Syria on

18

his Customs Declaration Form; "Jordan" and "U.K" were the only entries listed in the form's "countries visited" field. At the time he returned, he indicated to Individual N his intention to return to Syria. "I am not in Turkey, neither in Syria. I will return in one month and a half." He told Individual N that he will "renew my residency, extend the passport and then return in forty days…Every six months I return for 40 days."

### E.    Defendant's Lies to the USCIS and FBI

On July 29, 2014, defendant was interviewed by employees of USCIS as part of his application for adjustment of his immigration status. During that interview, defendant said that he had traveled to Turkey and returned to the United States about six months earlier, which was January 2014.

On October 6, 2014, defendant was interviewed by USCIS employees a second time, during which interview defendant falsely represented that he traveled to Turkey to visit his grandmother. Defendant does not have a grandmother living in Turkey. Defendant also falsely claimed (1) he had only visited Turkey and the United Kingdom; (2) he had never been a member of or assisted any rebel group, militia, or insurgent organization; (3) he never solicited membership or funds for any terrorist group or organization; (4) he had never provided any type of material support to any person or group engaged in terrorist activity; (5) he had never called for, helped with or committed the killing of any person or the intentional and sever injury of any person; (6) he had never been a member of a group in which he used or threatened to use any type of weapon against any person; and (7) he had never assisted a group where other people use a weapon against any person. Based upon the facts detailed above, each of these statements, made under oath, was a lie.

On June 18, 2015, defendant was interviewed by FBI agents, during which interview defendant stated that he had traveled to Turkey for a vacation to visit his grandmother in 2013. He denied traveling to Syria since his arrival in the United States in 2012.

## III. THE GUIDELINES CALCULATIONS

### F. The Guidelines Enhancements

#### 1. Providing Material Support to a Foreign Terrorist Organization (18 U.S.C. § 2339B)

The base offense level is 26, pursuant to Guideline § 2M5.3(a). PSR. 9.

The offense level is increased by 2 levels because the offense involved the provision of material support with the intent, knowledge, or reason to believe that the support was to be used to commit or assist in the commission of a violent act, pursuant to Guideline § 2M5.3(b)(1)(E). *Id.*

The offense level is increased by 12 levels, pursuant to Guideline § 3A1.4(a), because the offense is a felony that involved a federal crime of terrorism as defined in Title 18, United States Code, Section 2332b(g)(5), namely, the offense: (1) was calculated to influence or affect the conduct of government by intimidation and coercion, and to retaliate against government conduct; and (2) was a violation of Title 18, United States Code, Section 2339B. *Id.*

The total offense level for the violation of 18 U.S.C. § 2339B is 40. *Id.*

### 2. Material False Statement (18 U.S.C. § 1001(a)(2))

The base offense level is 14, pursuant to Guideline § 2J1.2(a), because the offense involved obstruction of justice of a matter related to international terrorism. PSR. 8.

Pursuant to Guideline § 2J1.2(b)(1)(C), the offense level is increased by 12 levels because defendant was convicted under 18 U.S.C. § 1001, and the statutory maximum term of 8 years of imprisonment applies because the matter relates to international terrorism. *Id.*

The total offense level for the violation of 18 U.S.C. § 1001(a)(2) is 26. *Id.*

### 3. Grouping

Pursuant to Guideline § 3D1.2(c), the offenses are grouped because the § 2339B charge embodies conduct that is treated as a specific offense characteristic in the guideline applicable to the § 1001(a)(2) conduct, namely because the offense involved a matter related to international terrorism. *Id.*

Pursuant to Guideline § 3D1.3(a), the offense level applicable to the Group is 40, because it is the offense level for the most serious of the charges comprising the Group. PSR. 8-9.

### 4. Acceptance of Responsibility

Pursuant to Guideline § 3E1.1, the total offense level is reduced by three levels because defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. PSR. 9.

### 5. Total Adjusted Offense Level

The total adjusted offense level is thus 37. *Id.*

### G. Criminal History

Pursuant to Guideline § 3A1.4(b), defendant's criminal history category is VI because the offense is a felony that involved a federal crime of terrorism. PSR. 10.

### H. The Guidelines Range

An offense level of 37, when combined with the anticipated criminal history category of VI, results in an anticipated advisory guidelines range of 360 months to life imprisonment. PSR. 19. Because the statutory maximum term of imprisonment is 23 years, pursuant to Guideline § 5G1.1(a), the advisory guidelines sentence is 276 months. *Id*. However, pursuant to the Plea Agreement, the parties agreed under Rule 11(c)(1)(C) that the maximum term of imprisonment will not exceed 180 months. Dkt. No. 129 at 12.

## IV. THE SECTION 3553(A) FACTORS SUPPORT A SENTENCE OF 180 MONTHS OF IMPRISONMENT

A sentence of 180 months of imprisonment is warranted under the Section 3553(a) factors. Further, such a sentence is sufficient, but not greater than necessary, to comply with the Section 3553(a) factors.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offense are detailed above, and are significant. Notably, in his sentencing submission, defendant wholly fails to address any of his actual offense conduct. Instead, he paints himself as a victim of his circumstances, ill-equipped for his life due to his youth, naiveté, and poor development of executive function. Defendant's own words and actions paint a very different picture.

22

### 1.   Providing Material Support to a Foreign Terrorist Organization (18 U.S.C. § 2339B)

Defendant pled guilty and admitted to providing material support to a foreign terrorist organization, namely Ansar Al-Islam, knowing that organization was a designated foreign terrorist organization. Defendant now seeks to minimize that offense conduct by making a series of arguments that are belied by the facts.

Defendant now claims that his travel to Syria was for the sole purpose of fighting with his brothers against the brutal and dictatorial regime of Bashar Al-Assad. D.S.M. 12-15. 33-35. Defendant goes so far as to claim that but for the Syrian war, he would never have left the United States (D.S.M. 15), and that he discussed returning to Syria soon after his arrival in the United States because of the "escalation of the humanitarian crises and civilian deaths," which drove his desire to return (D.S.M. 34). However, defendant did not (and cannot) cite to one of his own thousands of communications to support this conclusion.

In fact, as detailed above, from the moment he arrived in the United States, defendant began to plan his return to Syria to fight with terrorist organizations. *See*, *e.g.*, (October 13, 2012: "I want to go back . . . I'll go to Turkey and enter smuggled to Syria . . . When I come, I'll call. Don't go with anyone except the Front . . . Go with Ansar [al-Islam] or with the Front [Jabhat al-Nusrah Front]"; March 23, 2013, defendant explained that he wanted to travel to Turkey to enter Syria and asked Individual H to pick him up at the airport, and Individual H asked if defendant "want[ed] Al-Nusra Front," and defendant responded, "that's for sure.").

Defendant further claims that it was the escalation of the humanitarian crises after Assad's chemical weapons attack in August 2013 that "steeled his desire to return" in November 2013. As his communications in 2012-13 make clear, defendant was ready to return Syria upon his arrival in the United States in 2012, well before the August 2013 chemical attacks, further undermining his current efforts to mitigate his conduct. Nevertheless, defendant fails to cite to any messages or other evidence in which defendant articulates a desire to return to Syria due to the Syrian war or the attendant humanitarian crisis.

Instead, his communications are replete with his longing to return to Syria to get away from the United States and return to violent jihad. *See, e.g.*, (October 24, 2012: when defendant expressed a desire to return to Syria, a friend told him to "Sit still!!! Syria is ablaze! Why do you want to go back?" and defendant responded, "I know. I want to return. . . . I want a solution . . . I want them to deport me. I am getting extremely fed up."; October 28, 2012: when asked about America, defendant responded "Garbage to the truest sense of the word . . . it is an animal's life here," and further stated that he wanted Allah to return him to Syria and that the Muslims in America were "worthless," because they married outside the religion; November 17, 2012: defendant stated to his father: "The hell with money, and the hell with women, and the hell with America, and the hell with Obama. May God burn America! . . . the jihad is in my blood. And the greatest tyrant, America, and I do not care about anything whatever it may be. The commandment of God is greater! . . . I swear, I will bring out all of my anger on America."; April 8, 2013: defendant stated

24

"When I arrive, I'll arrange with [Individual C]. […] America will not isolate me from my Islamic duty. Only death will do us part.").

Moreover, defendant's travel schedule was more clearly driven by his finances and not his purported desire to address the humanitarian crises. Indeed, after months of seeking funds sufficient to travel, and without any regard or reference to Assad, defendant used an insurance settlement he received in November 2013 to travel to Syria. Even while in Syria, defendant's messages did not reference humanitarian concerns or his efforts to fight against Assad, and instead are focused on his efforts to make jihad with Ansar al-Islam, Ansar al-Sham, and Jabhat al-Nusrah.

Defendant's efforts to ground his travel to Syria in a purported humanitarian crusade is further undermined by his own history of fighting with foreign terrorist organizations. As detailed above, defendant told Al-Hardan that he joined Ansar Al-Islam as a teenager, fought in a number of battles, and even participated in a high profile bombing of the national security headquarters in Syria.

Finally, defendant attempts to wipe away the entirety of his thousands of messages expressing his support of terrorist organizations and violent jihad by characterizing those statements as nothing more than "naïve and misguided teenage braggadocio." D.S.M. 2. This Court should reject any notion that defendant was a misguided youth bragging about his history of violence. The breadth and extent of defendant's messages, the details contained in those messages, and his conviction in describing his history of fighting as a member of Ansar al-Islam, as well as his

consistent and argent support for violent jihad, Jabhat al-Nsurah, and Ansar al-Islam, among other terrorist organizations, cannot be ignored.

Ironically, defendant wants this Court to take as fact his "auto-biography" written primarily while defendant was in custody on this case (D.S.M. Exhibit A), rather than the *thousands* of messages he wrote to his friends and family when he did not know or expect those messages would be intercepted by the government and presented to this Court. As is always the case, the words spoken or written when a criminal believes no one else is listening are the most likely to be true.

The nature and circumstances of defendant's offense of providing material support to a foreign terrorist organization are significant and defendant's efforts to minimize that conduct should be rejected.

## 2. Material False Statement (18 U.S.C. § 1001(a)(2))

Defendant lied to immigration officials about the nature and circumstances of his travel abroad in November 2013 through January 2014, claiming he travelled to the United Kingdom and Turkey in order to visit his grandmother. These statements were knowing and intentional lies to which defendant admitted when he pled guilty. But he now also seeks to minimize his false statement offense conduct by characterizing it as akin to a "perjury trap."[10] D.S.M. 11. Again, his efforts to minimize and mitigate should be rejected.

---

[10] A perjury trap is most commonly defined as a form of prosecutorial misconduct in which a prosecutor calls a witness to testify, typically before a grand jury, with the intent of coercing the witness into perjury. *See* Gershman, Bennett L. (1981), "The 'Perjury Trap.'" University of Pennsylvania Law Review. 129 (624).

In arguing that the government created a "perjury trap," defendant asserts that because the government knew of his travels to Syria during the October 2014 interview, the government knew that defendant would lie. In other words, according to defendant, the government set defendant up to commit a crime. This argument is belied by the facts.

First, defendant premeditated these lies. On March 23, 2013, approximately eighteen months *before* defendant lied to the United States immigration authorities (October 2014), and one year *before* the government began its investigation of defendant (February 2014), defendant clearly stated that in order to maintain his ability to travel legally, defendant planned to "go to the American Embassy in Turkey. I will tell them that due to circumstances, I can't return now. […] I'll say tourism, or I'll tell him my grandmother is sick in Turkey and I wanted to be with her." Defendant had a different lie in mind several months earlier, when on December 19, 2012, he planned to tell immigration that he wanted to return to Turkey because his "fiancée's parents gave him an ultimatum 'if you do not come and get her, we will marry her off." Defendant's calculated plans to lie to immigration authorities were planned well before the government's investigation and interviews.

Second, it was defendant who lied *over and over again*. Upon his return from Syria on January 23, 2014, defendant indicated that he visited Jordan and the United Kingdom on his Customs Declaration Form, falsely omitting both Syria and Turkey. On July 29, 2014, when interviewed by immigration authorities, he revealed he had travelled to Turkey, but falsely omitted his travel to Syria. On October 6, 2014, when

27

again interviewed by immigration authorities, defendant continued in his lies. During this interview, defendant clearly and affirmatively *chose* to omit his travel to Syria, to falsely state that he traveled to Turkey to visit his grandmother, and to falsely deny having ever been a member of and having ever provided any type of material support to any person or group that engaged in terrorist activity. Finally, on June 18, 2015, during an interview with the FBI, he claimed he had vacationed in Turkey, continuing his denial of having been in Syria.

Third, defendant knew full well that his travel to Syria was a crime, because he knew he had been fighting with a foreign terrorist organization. While in Syria in late 2013, when Individual O warned defendant multiple times that defendant's communications revealed that he was in Syria, defendant acknowledged that he knew his travel to Syria was a crime and that he feared imprisonment. *See, e.g.*, (December 17, 2013: defendant told Individual O that he was "afraid of being imprisoned in America [because] the government is alert for everything, [and] my trip here constitutes a charge."). As traveling to Syria was not, in and of itself, a crime, defendant knew that his participation in violent jihad with foreign terrorist organizations in Syria was a crime. It was that knowledge that drove his fear of being caught and imprisoned, and culminated in defendant's affirmative decisions to lie over and over to the United States immigration authorities.

Defendant's offense of making materially false statements to immigration authorities was not the product of a purported "perjury trap," or any conduct by the government, and was instead defendant's knowing and intentional efforts to conceal

28

his travel to engage in violent jihad in support of a foreign terrorist organization. This is the offense conduct to which he admitted and pled guilty and his efforts to now minimize that offense conduct should be rejected.

Taking into account the nature and circumstances of the entirety of defendant's offense conduct, the requested sentence of 180 months is appropriate.

### B.     History and Characteristics of the Defendant

Defendant is 27 years old, was born in Iraq, and came to the United States with his family as a refugee from Syria as a result of the Iraq war. There is no dispute that the majority of defendant's life has been filled with tragic and devastating circumstances, including the loss of his mother and experiencing his teenage years amidst the devastation of the Iraq war.

While this history is extraordinary and provides some measure of mitigation to defendant's conduct, it does not exculpate his serious offense. Indeed, his two biological brothers suffered much of the same childhood as defendant, and did not travel to Syria in order to fight with a foreign terrorist organization. Moreover, it was his own family who sought to prevent him from traveling back to Syria. *See, e.g.*, (October 14, 2012: Defendant's uncle said "My dear Aws, let me give you advice, for God's sake. You may be able to do good work in America. The West needs you more than our countries," to which defendant replied, "I cannot live here.").

Moreover, contrary to his position in his sentencing submission, defendant is a jihadist, as evidenced by his membership and time fighting with foreign terrorist

29

organizations, his own words decrying the infidels in the United States, and his published support of jihad. *See, e.g.*

> May 5, 2012: Defendant sent a link to a YouTube video to a friend entitled "Shaddo Al-Withaq #5, Presented by Al-Ansar Media," which describes the death of jihadis in 2006 at the hands of the U.S. Army and threaten retaliation.

> May 9, 2012: Defendant sent a link to a YouTube video to a friend entitled "Lions Anthem," which describes a collage of Jiahdi pictures from Somalia, Iraq, Syria, North Africa, Chechnya, with music in the background.

> September 23, 2012: Defendant publically posted the following photo on his Facebook Account with a title stating that this is the photo of the martyr Shamil LNU who is now in heaven. The title states that the earth is for cowards.



> March 23, 2013: Defendant publically posted the following photo on his Facebook Account, which is a photo of Emir Khattab, a Chechen fighter in the first and second Chechen wars who died in 2002 following exposure to a poison letter, who had no connection to Syria or the Syrian conflict.



May 7, 2013: Defendant reposted the following on his Facebook status, "People live and die, but martyrs live and go on living! People live to die, but martyrs die to live. There is a shortcut for everything: the shortcut to heaven is jihad."

June 30, 2013: Defendant publically reposted the following on his Facebook status, "The sons of Iraq don't need advice: they are the lions of jihad in all the lands. They took an oath that only death will end their battle with you, O'Persian Magi [Iranians]. Watch your necks."

September 2, 2013: Defendant publically posted the following on his Facebook status: "Every drop of blood that quenches the earth in Sham [Syria] is a source of life for it. The nation will rise to establish an Islamic Caliphate. The evil plans of the infidel nations will be thwarted by the promise of the Prophet. Aws"

September 28, 2013: Defendant publically shared a YouTube link on his Facebook Page to a video of Sheikh Muhammad Al-Arifi inciting listeners to conduct jihad in Syria.

Defendant also preached his jihadi idealism to others, further indicating his identification of himself as a jihadist. *See, e.g.*, (February 4, 2013: defendant told a friend already in Syria that "all infidels are the same," that "in religion, there is no your country or my country, it is all one land," that his friend should not abandon jihad, and that his friend should "not blow himself up, but blow up his enemies instead."; April 2013: the messages between defendant and Al-Hardan (*supra* 6-7, 12) indicate Al-Hardan was a disciple of defendant's, including defendant's promise to train Al-Hardan on how to fight when they arrived in Syria).

While the circumstances of defendant's life warrant mitigation, the government has taken that mitigation into account in agreeing to a cap of 180 months in this case rather than seeking a sentence at the full statutory maximum of 23 years. Defendant's history and characteristics warrant a sentence of 180 months.

**C.**   **Seriousness of the Offense and the Need to Promote Respect for the Law, Provide Just Punishment, To Afford Adequate Deterrence, and Avoid Unwarranted Disparities.**

Material support of a foreign terrorist organization is an extraordinarily serious offense. This is not a case in which defendant sent money or weapons as the support. Instead, he provided himself. He traveled to Syria in order to engage in violent activities as a knowing member of a foreign terrorist organization, Ansar Al-Islam. He expressed his excitement in April 2013 to Al-Hardan in anticipation of his travel of doing "the killing together," and that he was "eager to see blood" after delighting over the IED used to kill Syrian militia. He did this after having previously associated himself with Ansar Al-Islam, with which he participated in a range of violent encounters involving using a variety of weapons to kill enemy soldiers. He also hailed Jabhat Al-Nusra's suicide bomber attack on the Syrian national security headquarters, for which he and his fellow Ansar al-Islam members provided support both prior to and during the attack. Further, defendant further established himself as a jihadist with his efforts to train others on how to engage in violent jihad, such as Al-Hardan, who he promised to train on the use of weapons when they fought together in Syria.

There is no doubt that the Syrian conflict is a complicated war with a range of parties engaged in violence. However, the complex contours of the Syrian conflict are essentially irrelevant to defendant's offense conduct. The crux of the analysis is instead grounded in defendant's own stated desires to join a foreign terrorist organization in order to engage in violent jihad, and his own admissions to this Court

32

that he successfully acted upon these desires by traveling to Syria to fight with Ansar al-Islam.

Moreover, the need for both specific and general deterrence is significant. In light of defendant's own stated desires to be a martyr and his historical commitment to jihad, a significant sentence will send the appropriate message to defendant that supporting a foreign terrorist organization should no longer be part of his life plan. Likewise, a significant sentence is critical to send the same message to other would-be martyrs and jihadists bent on traveling to fight with a designated foreign terrorist organization.

In order avoid unwarranted sentencing disparities, this Court can take into account the sentences issued in similar cases involving foreign nationals who immigrated to the United States and returned to their native region in order to fight with foreign terrorist organizations, as follows:

- *United States v. Abdiraham Sheikh Mohamud*, 15 CR 95 (S.D. Ohio): Mohamud was a Somali native and naturalized United States citizen, who traveled to Syria to fight for Jahbat Al-Nusrah. Mohamud was sentenced to 22 years of imprisonment.
- *United States v. Omar Al-Hardan*, 16 CR 03 (S.D. Tex.): Al-Hardan was an Iraqi-born Palestinian and legal permanent resident of the United States, who attempted to travel to Syria in an effort to join ISIS. Al-Hardan was sentenced to 192 months of imprisonment.
- *United States v. Mohamed Rafik Naji*, 16 CR 653 (E.D.N.Y.): Naji was a Yemeni native and legal permanent resident of the United States, who traveled to Turkey and Yemen in an effort to join ISIS. Naji was sentenced to 20 years of imprisonment.
- *United States v. Laith Waleed Alebbini*, 17 CR 71 (S.D. Ohio): Alebbini was a Jordanian native and legal permanent resident of the United States, who attempted to travel to Syria in an effort to join ISIS, but was turned away at the Turkey border. Alebbini was sentenced to 15 years of imprisonment.

Notably, the 180 month sentence sought in this case is at the low end of these similarly situated cases.

For all of these reasons, a sentence of 180 months of imprisonment is an appropriate sentence in this case.

## V.   SUPERVISED RELEASE

The government agrees with the Probation Office's recommendations for the conditions of supervised release to be imposed in this matter as the facts underlying the offense and detailed in the PSR support the imposition of those conditions. *See* PSR at 20-27.

### A.   Mandatory Conditions

The government respectfully requests that defendant be required to comply with the following mandatory conditions set forth in 18 U.S.C. § 3583(d) and Guideline § 5D1.3(a):

1.     Defendant shall not commit another federal, state or local offense.

2.     Defendant shall not unlawfully possess a controlled substance.

3.     Defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office pursuant to 42 U.S.C. § 14135a(a).

4.     Defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests, and up to a maximum of 104 tests thereafter, for use of a controlled substance.

**B.     Discretionary Conditions**

In addition, the government respectfully requests that defendant be required to comply with the following discretionary conditions permitted by 18 U.S.C. § 3583(d) and Guideline § 5D1.3(c), which serve to facilitate supervision by the probation officer, support defendant's rehabilitation and reintegration into society, and serve to promote deterrence and protect the public, and are appropriate in this case:

1.     Defendant shall seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip defendant for employment, unless excused by the probation officer.

2.     Defendant shall refrain from knowingly meeting, communicating, or otherwise interacting with any person whom he knows to be engaged, or planning to be engaged, in criminal activity.

3.     Defendant shall refrain from excessive use of alcohol (defined as having a blood alcohol concentration greater than 0.08%), or any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner.

4.     Defendant shall refrain from possession a firearm, destructive device, or other dangerous weapon.

5.     Defendant shall participate, at the direction of a probation officer, in a mental health treatment program, which may include the use of prescription medications.

35

6. Defendant shall remain within the jurisdiction where defendant is being supervised, unless granted permission to leave by the court or a probation officer.

7. Defendant shall report to the probation officer as directed by the court or the probation officer.

8. Defendant shall permit the probation officer to visit the defendant at home, work, school, community service location, or other reasonable location specified by a probation officer at any reasonable time, and permit confiscation of any contraband in plain view of the officer.

9. Defendant shall notify the probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer.

10. Defendant shall notify the probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

11. Defendant shall be surrendered to a duly authorized official of the Homeland Security department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementation regulations. If ordered deported, the defendant shall not reenter the United States without obtaining, in advance, the express written consent of the Attorney General or the Secretary of the Department of Homeland Security.

12. Defendant shall submit his person, property, house, residence, vehicle papers [computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic

communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. Defendant shall warn any other occupants that the premises may be subject to searches pursuant to this conduction. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must conducted at a reasonable time and in a reasonable manner.

### C.    Special Conditions

Finally, the government respectfully requests that defendant be required to comply with the following special conditions permitted by 18 U.S.C. § 3583(d), which further support defendant's reintegration into society:

1.    If defendant has not obtained a high school diploma or equivalent, participate in a GED preparation course and seek to obtain a GED within the first year of supervision.

2.    Defendant shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

3.    Defendant shall provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release.

4.    Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

5.      Defendant shall attend violent extremism counseling from providers as directed by the Probation Office, and agreed to by the Probation Office, the United States Attorney's Office for the Northern District of Illinois, and the defendant. Defendant shall also authorize the release of any mental health and/or violent extremism counseling records to the probation officer.

6.      Defendant shall not possess or use at any location (including his place of employment), any external storage device without the prior approval of a probation officer.

7.      Defendant shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. Defendant shall consent to the installation of computer monitoring software on all identified computers to which defendant has access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of monitoring software. Defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

a.      The cost of monitoring shall be paid by defendant at the monthly contractual rate, if defendant is financially able, subject to satisfaction of other financial obligations imposed by this judgment.

b.      Defendant shall not possess or use any device with access to any online computer service at any location (including place of employment) without the

prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

8.    Defendant shall be required to submit to periodic polygraph testing at the direction of the probation office as a means to ensure that defendant is in compliance with the requirements of his supervision or treatment program.

## VI.    CONCLUSION

For all of the foregoing reasons, the government respectfully requests this Court sentence defendant to a term of imprisonment of 180 months to be followed by a period of supervised release of life. Such a sentence will reflect the seriousness of the offense, promote respect for the law, and provide a just punishment for the offense as set forth in Section 3553(a)(2)(A).

Dated: August 19, 2019                    Respectfully submitted,

                                          JOHN R. LAUSCH, JR.
                                          United States Attorney

                          By:    */s/ Shoba Pillay*
                                          BARRY JONAS
                                          SHOBA PILLAY
                                          Assistant United States Attorneys
                                          219 South Dearborn Street, 5th Floor
                                          Chicago, Illinois 60604
                                          (312) 353-5300

                                          HEIKO COPPOLA
                                          Assistant United States Attorney
                                          501 I Street, Suite 10-100
                                          Sacramento, CA 95814

                                          DAVID ANDREW SIGLER
                                          Trial Attorney, Counterterrorism Section
                                          NSD, United States Department of Justice
                                          950 Pennsylvania Avenue, NW
                                          Washington, DC  20530